UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| C.D.A., minor child, and Mr. A., his father; and E.A.Q.A., minor child, and Mr. Q., his father, | Case No. _____ |
| *Plaintiffs*, | **ELECTRONICALLY FILED** |
| v. | |
| United States of America, | **JURY TRIAL DEMANDED AS TO THOSE CLAIMS SO TRIABLE** |
| *Defendant*. | |

## <u>COMPLAINT</u>

### INTRODUCTION

1.     This matter concerns a cruel and inhumane policy crafted, issued, and carried out by the Trump Administration's Department of Homeland Security ("DHS"), Department of Health and Human Services ("HHS"), and subsidiary agencies/offices to forcibly separate asylum-seeking parents from their children as part of the Administration's efforts to systemically terrorize and punish those vulnerable migrants exercising their right under the asylum statute to seek the protection of the United States. Defendant's improper purpose was to thereby deter future migration to the United States. The implementation of the family separation policy and the corresponding long-term separation and isolation of children from their parents had the intended effect of causing extraordinary and profound trauma

to thousands of families, including Plaintiffs, Mr. A. and Mr. Q. (together,

"Plaintiff Fathers") and their respective sons, then-9-year-old C.D.A. and then-10-

year-old E.A.Q.A. (together, "Plaintiff Sons"), in a manner that meets the U.S.

statutory and international law definitions of torture, *i.e.*, the intentional infliction

of severe physical or mental pain or suffering.[1] The trauma suffered by Plaintiffs

and other parents and children was no incidental byproduct of the policy. It was the

point.

2.     Moreover, consistent with the Trump Administration's well-

documented animus directed toward non-white migrants, the policy was geared at

punishing asylum seekers from Central America, as approximately 90% of the

children separated arrived from just three countries: Guatemala, El Salvador and

Honduras (the originating country of Plaintiffs Mr. Q. and E.A.Q.A.).[2] Moreover,

the majority of migrants targeted by this policy are Indigenous peoples, Afro-

descendants, or belong to ethnic and racial groups that are often categorized as

non-white in the United States, including all Plaintiffs. As such, the policy was

---

[1] *See, e.g.*, OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-09- 18-00431, CARE PROVIDER FACILITIES DESCRIBED CHALLENGES ADDRESSING MENTAL HEALTH NEEDS OF CHILDREN IN HHS CUSTODY (Sept. 2019), https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf.
[2] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-20-245, SOUTHWEST BORDER: ACTIONS NEEDED TO IMPROVE DHS PROCESSING OF FAMILIES AND COORDINATION BETWEEN DHS AND HHS (Feb. 2020) at 20, 92-93, https://www.gao.gov/assets/710/704683.pdf; *see also* ACLU, *Family Separation by the Numbers*, https://www.aclu.org/issues/immigrants- rights/immigrants-rights-and-detention/family-separation.

intended to deny and did deny Plaintiffs' fundamental constitutional rights and rights under international law, including the right to family integrity, on a discriminatory basis on such a widespread and systematic scale as to constitute the crime against humanity of persecution.

3.     The Administration made clear that they intended to exploit the trauma resulting from family separations, and media reporting about that trauma, to deter future asylum seekers, particularly parents and children, at the United States' southern border with Mexico, and thus fundamentally undermine this country's 70-year-old asylum system, which implements the U.S.' international and domestic legal obligations to asylum-seekers. Federal officials at the highest levels made repeated public statements acknowledging the policy's purpose.

4.     Despite widespread condemnation and a federal court injunction in *Ms. L. v. U.S. Immigration and Customs Enforcement*, 310 F. Supp. 3d 1133, 1137 (S.D. Cal. 2018), which required Immigration and Customs Enforcement ("ICE") to reunite separated families and stop further separations, as well as an abundance of scientific and medical evidence documenting the trauma associated with forced family separation, the Trump Administration continuously contended that separating parents from children at the U.S.-Mexico border was somehow necessary to protect national security. The Administration thus deliberately subjected thousands of vulnerable people, including thousands of children, to a

brutal and traumatizing campaign of physical and psychological harm to achieve

narrow—and unlawful—policy goals.

5.      Officially, the federal government has admitted to separating at least

4,368 children from their parents or guardians after they crossed the U.S. southern

border.[3] However, the number of families separated is likely thousands higher, in

part due to lax, if not intentionally deceptive, record-keeping failures of several

government agencies.[4]

---

[3] Kristina Davis, *U.S. officials say they are highly confident to have reached tally on separated children: 4,368*, L.A. TIMES (Jan. 18, 2020), https://www.latimes.com/world-nation/story/2020-01-18/u-s-officials-say-they-are-highly-confident-to-have-reached-tally-on-separated-children-4-368. *See also* Joint Status Report at *1, *10, *Ms. L. v. U.S. Immigration and Customs Enf't*, No. 18cv00428 DMS (MDD) (S.D. Cal. Sept. 9, 2019), ECF No. 465 (the government acknowledged that, for the original class, as many as 2,814 children were separated from their parents, and has so far acknowledged an additional 986 children as part of the expanded class); *see also* OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-Bl-18-00511, SEPARATED CHILDREN PLACED IN OFFICE OF REFUGEE RESETTLEMENT CARE (Jan. 17, 2019) at 11, https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf [hereinafter HHS OIG REPORT I]; S. Poverty L. Ctr., *Family separation under the Trump administration – a timeline* (June 17, 2020), https://www.splcenter.org/news/2020/06/17/family-separation-under-trump-administration-timeline#2020.

[4] *See* OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC. OIG-20-35, CBP SEPARATED MORE ASYLUM-SEEKING FAMILIES AT PORTS OF ENTRY THAN REPORTS AND FOR REASONS OTHER THAN THOSE OUTLINED IN PUBLIC STATEMENTS (May 29, 2020) at 11, *available at* https://www.oig.dhs.gov/sites/default/files/assets/2020-06/OIG-20-35-May20.pdf ("[W]e encountered data reliability issues calling into question DHS' ability to accurately identify and address all family separations prior to June 2018. Before then, OFO's system for tracking [noncitizens] at the ports of entry included a data field that could be used to indicate a child was held separately from his or her parent. However, OFO officials said staff did not use the data field consistently, and as a result, OFO could not provide a reliable number of families separated before June 2018."). *See also* HHS OIG REPORT I, *supra* note 3, at 1, 6, 13 (reporting that "thousands of children may have been separated . . . before the accounting required by the Court [in *Ms. L.*]").

6.      After tearing children away from their parents, DHS agents inflicted further terror and trauma on families by delaying and failing to provide information regarding each other's whereabouts and well-being to distraught parents, their children and family members. Defying the consensus of expert opinion[5] and Defendant's legal obligations pursuant to the *Flores* Settlement Agreement, not to mention basic human decency, DHS also systemically refused to facilitate adequate communication between the parents and children during their separation.

7.      DHS along with the Department of Health and Human Services' Office of Refugee Resettlement (ORR), the agency charged with taking custody of the separated children, likewise failed to implement any system for tracking the children to ensure that the families could be reunited. All this was done without even the merest pretense that the parent posed a danger to the child, one of the only lawful bases for separation.

8.      In an action filed in the U.S. District Court for the Northern District of Illinois, C.D.A. alleged that the continued separation from his father violated their inherent right to family integrity as well as the basic rights provided to him as a

---

[5] *See* report by Physicians for Human Rights, *"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation* (Feb 2020), https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf; APA's May 30, 2018 statement, Am. Psychiatric Assoc., *APA Statement Opposing Separation of Children from Parents at the Border* (May 30, 2018), https://www.psychiatry.org/newsroom/news-releases/apa-statement-opposing-separation-of-children-from-parents-at-the-border.

child pursuant to the *Flores* settlement agreement, a consent decree between the United States and children in immigration custody. *Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017). United States District Court Judge Edmond E. Chang agreed that Mr. A. and C.D.A.'s continued separation was unconstitutional and recognized that enforced separation violated the families' due process right to family integrity. Judge Chang ordered the immediate reunification of father and son on July 12, 2018. At the hearing in which he issued his decision, Judge Chang stated that the irreparable harm inflicted on C.D.A. **"reinforces why the separation shocks the conscience."** *W.S.R. and C.D.A. v. Sessions et al.*, 318 F.Supp.3d 1116, 1126 (N.D. Ill. 2018).

9.      The intentional infliction of such severe mental and physical trauma on asylum-seeking parents and children is at the crux, and was the intent, of the government's family separation policy. As the Special Rapporteur on Torture has explained, its implementation constitutes torture because the harm was inflicted, in this case and in others, "for the purpose of deterring, intimidating or punishing migrants or their families [or] coercing them into withdrawing their requests for asylum."[6] Seeking asylum is a lawful process that all persons are entitled to seek,

---

[6] U.N. HUMAN RIGHTS COUNCIL, *Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment* ¶ 20, U.N. Doc. A/HRC/37/50, (Feb. 26, 2018), https://www.ohchr.org/Documents/Issues/Torture/A_HRC_37_50_EN.pdf. *See also* NYU amicus brief, arguing family separation, is torture in habeas proceeding https://chrgj.org/wp- content/uploads/2019/02/Redacted-GJC-et-al-Brief-Amici-Curiae-Feb-2019.pdf.

upon reaching the United States. Family separation was intended to coerce frightened parents and vulnerable children to give up their statutory right to seek protection, and to be safe from physical harm, persecution and torture.

10.    Plaintiff Fathers and Sons fell victim to the Administration's family separation policy. U.S. government officials forcibly seized then-9-year-old C.D.A. and then-10-year-old E.A.Q.A. from their fathers' custody and separated them for seven weeks and five weeks, respectively, until their court-ordered reunifications. ICE officials threatened to deport Plaintiff Fathers without their sons, and coercively conditioned their reunification with Plaintiff Sons on the agreement to waive their bona fide asylum claims. Throughout this forced separation, the government provided Plaintiff Fathers only limited information about their children's whereabouts and well-being, and afforded the fathers limited opportunities to directly communicate with their sons.

11.    The separation caused Plaintiff Fathers unbearable anguish and grief as well as fear for their children's mental, emotional, and physical well-being. An enduring trauma which continues today. As a result of ICE's actions, Plaintiff Fathers and Sons suffered and continue to suffer substantial and ongoing mental, emotional, and physical trauma.

12.    ICE and ORR's forcible and continued separation and isolation of a young child from his parent, as well as ICE's conditioning of Plaintiff Fathers'

reunification with their sons on a waiver of his asylum rights was cruel and unusual. It was also unlawful.

13.     The United States is liable in damages for the conduct which harmed Plaintiffs under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, *et seq.* ("FTCA"). The conduct against these noncitizens also violated the law of nations, conferring jurisdiction on the court under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, as individual agents acting for the United States: (1) inflicted severe physical or mental pain or suffering and did so in order to coerce Plaintiff Fathers to forfeit their right to seek asylum and in a coordinated effort to limit or forestall migration and asylum from Latin America, which meets the customary international law definition of torture; and (2) did so motivated by a discriminatory animus against individuals of Central American origin and other BIPOC, targeting parents and children for separation on national, ethnic or racial grounds, thereby constituting the crime against humanity of persecution as defined under customary international law.

14.     Plaintiffs bring this action under the FTCA and ATS seeking compensation for the extraordinary harms they suffered at the hands of ICE and ORR officials.

**JURISDICTION AND VENUE**

15.    This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331, 1346(b), and 1350.

16.    On July 9, 2020, Plaintiffs Mr. A. and C.D.A. submitted an administrative claim to DHS, HHS, U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS). On July 14, 2020, Plaintiffs Mr. Q. and E.A.Q.A. submitted their administrative claim to the same agencies. Neither agency has made a final disposition on any Plaintiffs' administrative claims and, as six months have passed since Plaintiffs' submission of the claims, they are deemed constructively denied. 28 U.S.C. § 2675(a). Accordingly, Plaintiffs have exhausted all potential administrative remedies.

17.    Venue is proper in this District under 28 U.S.C. §§ 1391 and 1402(b) as Plaintiffs are residents of this District.

**PARTIES**

18.    Plaintiff Mr. A.[7] is an adult asylum-seeker from Brazil and is the father of C.D.A. Together with C.D.A., Mr. A. fled Brazil seeking protection from

---

[7] Plaintiff Fathers use their initials in order to protect the identity of their minor sons, C.D.A. and E.A.Q.A., who proceed under initials pursuant to Fed. R. Civ. P. 5.2. In addition, Plaintiff Fathers further wish to protect their identity because their immigration proceedings are pending and because they fear consequences from those who threatened them in their home countries. Plaintiff Fathers intend to file a motion to proceed under initials pursuant to *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011).

persecution, including threats to his life and that of his son. Now 34 years old, Mr. A. was 31 years old at the time DHS and ORR officials forcibly took and kept his son away from him.

19.     Plaintiff C.D.A. is 11 years old. He was only nine years old when DHS and ORR officials forcibly separated him from his father. C.D.A. entered the United States with his father on or about May 23, 2018 to seek protection from persecution. This action is brought on his behalf, under the authority of his father, Plaintiff Mr. A.

20.     Plaintiff Mr. Q. is an adult man from Honduras and the father of E.A.Q.A. Together with E.A.Q.A., Mr. Q. fled Honduras seeking protection from persecution, including threats to his life and that of his son. Now 39 years old, Mr. Q. was 36 years old at the time DHS and ORR officials forcibly took and kept his son away from him.

21.     Plaintiff E.A.Q.A. is 13 years old. He was only ten years old when DHS and ORR officials forcibly separated him from his father. E.A.Q.A. entered the United States with his father on or about June 7, 2018. This action is brought on his behalf, under the authority of his father, Plaintiff Mr. Q.

22.     Defendant United States of America is the appropriate defendant under the FTCA, 28 U.S.C. §§ 1346(b), 2671, *et seq*., and under the Alien Tort Statute, 28 U.S.C. § 1350, as the United States has no sovereign immunity for

violations of *jus cogens* violations such as torture and the crime against humanity of persecution.

23.     All federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, DHS, its subsidiaries, ICE and CBP, and HHS and its subsidiary, ORR.[8]

24.     DHS agents were responsible for separating Plaintiff Fathers from Plaintiff Sons. DHS employees also are responsible for supervising and managing detained individuals at CBP and ICE facilities and were the ones responsible for attempting to coercively condition Plaintiff Fathers' reunification with their sons on a waiver of their right to asylum.

25.     HHS agents are responsible for supervising and managing the detention of children the government classifies as unaccompanied.

26.     At all relevant times, all DHS employees referenced in this Complaint who interacted with Plaintiffs were acting as investigative or law enforcement officers.[9]

---

8 The unlawful appointment of various Acting Secretaries of the Department of Homeland Security is not relevant to this Complaint, as the family separation policy was instituted by the last Senate-confirmed Secretary of Homeland Security, Kirstjen Nielsen.
[9] 28 U.S.C. § 2680(h).

11

## STATEMENT OF FACTS

### A. The Trump Administration's Family Separation Policy

#### 1. The Development of the Separation Policy and Its Intent to Deter Future Central American and BIPOC Asylum Seekers

27.     Trump Administration officials pursued a range of immigration policies that collectively aimed to dramatically decrease the number of individuals—primarily Central Americans, Africans, and other Black, indigenous, and people of color (BIPOC) immigrants — from seeking asylum in the United States.[10] One of the many tools used by the DHS to deter, bar or coerce parents from seeking asylum was the creation of a family separation policy.

---

[10] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-19-163, UNACCOMPANIED CHILDREN: AGENCY EFFORTS TO REUNIFY CHILDREN SEPARATED FROM PARENTS AT THE BORDER (Oct. 2018), *available at* https://www.gao.gov/assets/700/694963.pdf [hereinafter GAO REPORT]. *See also, e.g.*, Kevin Lemarque, *U.S. Judge Bars Trump Administration From Enforcing Asylum Ban*, CNBC (Nov. 20, 2018), https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars- us-from-enforcing-trump-asylum-ban.html; Shaw Drake & Edgar Saldivar, *Trump Administration Is Illegally Turning Away Asylum Seekers*, ACLU (Oct. 30, 2018), https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-asylum-seekers; Nick Miroff & Josh Dawsey, *The Advisor Who Scripts Trump's Immigration Policy*, WASH. POST (Aug. 17, 2019), https://www.washingtonpost.com/graphics/2019/politics/stephen-miller-trump-immigration/; Emma Platoff, et al., *While Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum*, TEXAS TRIBUNE (July 10, 2018), https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-seekers-donald-trump/; Maria Sacchetti, et al., *Trump Tightens Asylum Rules, Will Make Immigrants Pay Fees to Seek Humanitarian Refuge*, WASH. Post (Apr. 30, 2019), https://www.washingtonpost.com/politics/trump-issues-memo-calling-for-changes-to-handling-of-asylum-cases/2019/04/29/df41b5f2- 6adb-11e9-be3a-33217240a539_story.html?noredirect=on&utm_term=.5e3bcec9eead; Glenn Thrush, *U.S. to Begin Blocking Asylum Seekers From Entering Over Mexican Border*, N.Y. TIMES (Jan. 24, 2019), https://www.nytimes.com/2019/01/24/us/politics/migrants-blocked-asylum-trump.html; Yeganeh Torbati & Kristina Cooke, *Trump Administration Moves to Curb Migrants' Asylum*

28.     In an effort to deter and limit the number of individuals seeking asylum, in July of 2017, the Trump Administration established a family separation pilot program in CBP's El Paso sector, which covers regions in Western Texas and New Mexico.[11] This pilot program targeted parents who crossed the border with children for criminal prosecution.[12]

29.     Through this program, DHS and subsidiary agency officials detained parents and children, forcibly took children away from their parents' custody, and referred the parents to the Department of Justice (DOJ) for criminal prosecution.[13] Children, some as young as four months old,[14] were separated from their parents, designated as unaccompanied minors, and placed in the custody of ORR.[15] The vast majority of separated families, including Plaintiffs, were not informed by immigration officials when or how they would be reunited; nor were they assured that they would not be deported without their children in the event their asylum claim failed.[16]

---

*Claims*, REUTERS, Nov. 8, 2018, https://www.reuters.com/article/us-usa-immigration-asylum/trump-administration-moves-to-curb-migrants-asylum-claims-idUSKCN1ND35K.
[11] GAO REPORT, *supra* note 10, at 15-16. *See also* HHS OIG REPORT I, *supra* note 3, at 3.
[12] *Id.*
[13] HHS OIG REPORT I, *supra* note 3, at 4.
[14] Todd Heisler & Caitlin Dickerson, *The Youngest Child Separated From His Family at the Border Was 4 Months Old*, N.Y. TIMES (Jun. 18, 2019)**,** https://www.nytimes.com/2019/06/16/us/baby-constantine-romania-migrants.html.
[15] HHS OIG REPORT I, *supra* note 3, at 4.
[16] *See* Miriam Jordan, '*I Can't Go Without My Son,' A Mother Pleaded as She Was Deported to Guatemala*, N.Y. TIMES (June 17, 2018), https://www.nytimes.com/2018/06/17/us/immigration-deported-parents.html; Christianna Silva, *What we know about the immigrant kids separated from their* families, VICE NEWS (June 22,

30.     During the span of only five months, from July to November 2017, the government separated at least 281 individuals in families through this pilot initiative.[17]

31.     In December 2017, one month after the end of the pilot program, the Trump Administration circulated a memorandum entitled "Policy Options to Respond to Border Surge of Illegal Immigration."[18] Two of the policies outlined in the memorandum were titled: "Increased Prosecution of Family Unit Parents" and "Separate Family Units."[19] This memorandum evinced the Administration's deterrent intent and was reviewed by senior officials at the Department of Justice and DHS.

32.     Under the "Prosecution" policy, the memorandum states that "parents would be prosecuted for illegal entry . . . and the minors present with them would be placed in HHS custody as [unaccompanied noncitizen children]." Similarly, under the "Separate Family Units" policy, the memorandum called for an announcement that adults would be placed in adult immigration detention

---

2018), https://www.vice.com/en_us/article/evkwq4/what-we-know-about-the-immigrant-kids-separated-from-their-families.

[17] HHS OIG REPORT I, *supra* note 3, at 3.

[18] *Policy Options to Respond to Border Surge of Illegal Immigration*, (Dec. 16, 2017), *available at* https://www.documentcloud.org/documents/5688664-Merkleydocs2.html [hereinafter *Policy Options*]. *See also* Julia Ainsley, *Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation of Children*, NBC NEWS (Jan. 17, 2019), https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targeting-migrant-families-speeding-deportation-children-n958811 (explaining that the December 2017 policy options draft plan was made public by the office of Senator Jeff Merkley).

[19] *Policy Options*, *supra* note 18.

(primarily county jails and privately contracted detention centers), while children would be placed in ORR custody. The memorandum specifically asserted that the "increase in prosecutions would be reported by media and it would have substantial deterrent effect." Indeed, the Administration intended that publicity concerning the trauma suffered by asylum seekers would deter other would-be asylum seekers from seeking refuge in the United States for fear of suffering the same fate.

33. Ultimately, this December 2017 memorandum, outlining the prosecution and separation policies. is consistent with directives announced, approximately five months later, on April 6, 2018, by then-Attorney General Jeff Sessions.

34. On April 6, 2018, then-Attorney General Jeff Sessions announced the government's new "Zero Tolerance" policy, directed specifically and exclusively at the Southwest Border, which mandated the prosecution of all persons who crossed the United States border between ports of entry.[20] This policy effectively endorsed the practices of criminal prosecution and family separation previously tested in the El Paso pilot program.

---

[20] Memorandum from The Attorney General to Federal Prosecutors Along the Southwest Border (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

35.    The Trump Administration knew and intended that the zero-tolerance policy would result in family separation.[21]

36.    The Trump Administration enacted these policies to deter individuals from seeking asylum or otherwise coming to the United States by forcibly separating parents from their children.[22] A statement released by the White House entitled "What You Need To Know About President Donald J. Trump's Efforts To End Catch And Release"[23] shows that ending "catch and release" was intended to "empower Federal authorities . . . with the legal authority and resources [needed]," to address the issue of "more than 107,000 [unaccompanied children being] released into the United States since fiscal year 2016."[24]

---

[21] Nila Bala & Arthur Rizer, *Trump's family separation policy never really ended. This is why.*, NBC NEWS (Jul. 1, 2019), https://www.nbcnews.com/think/opinion/trump-s-family-separation-policy-never-really-ended-why-ncna1025376 ("[T]he zero tolerance and family separation policies are distinct from each other. Family separation refers to the policy of automatically breaking up family units because children cannot be detained in adult detention centers, while 'zero tolerance' is an approach to border crossings in which all undocumented immigrants who enter our country through the border with Mexico are automatically referred for criminal prosecution and sent to pretrial jail. Child separation, though, is a direct result of zero tolerance, and cannot be ended without truly ending zero tolerance.").

[22] *See 60 Minutes*, *Chaos on the Border, Robots to the Rescue, To Kill a Mockingbird*, CBS TELEVISION BROADCAST, Nov. 25, 2018 (revealing an un-redacted copy of the memo implementing the "Zero Tolerance" policy that stated that the policy's purpose was deterrence); *see also Policy Options*, *supra* note 18.

[23] "Catch and Release" is a simplified, misleading term referring to a federal practice implemented by various administrations allowing asylum-seekers, among other groups of immigrants, to live in the community, rather than be held in government custody, while awaiting their immigration hearings. This practice is fully in accord with U.S. immigration law.

[24] *What You Need To Know About President Donald J. Trump's Efforts To End Catch And Release*, The White House, Statements & Releases, April 9, 2018, https://www.whitehouse.gov/briefings-statements/need-know-president-donald-j-trumps-efforts-end-catch-release/.

37.    Former Attorney General Sessions attacked asylum as "an easy ticket to illegal entry into the United States," swamped with "vague, insubstantial, and subjective claims."[25] Secretary Nielsen signed off on the policy after receiving a memo observing that such a policy would "have the greatest impact on current flows."[26] The National Security Council and Stephen Miller laid out their strategy to turn away and deny asylum seekers even when processed: In July 2019, a National Security Council official told CBP officials, "My mantra has persistently been presenting aliens with *multiple unsolvable dilemmas* to impact their calculus for choosing to make the arduous journey to begin with."[27]

---

[25] Jeffrey B. Sessions III, *Remarks to the Executive Office for Immigration Review* (Oct. 12, 2017) (transcript available at https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review).

[26] Cora Currier, *Prosecuting Parents–and Separating Families–Was Meant to Deter Migration, Signed Memo Confirms*, THE INTERCEPT (Sept. 25, 2018), https://theintercept.com/2018/09/25/family-separation-border-crossings-zero-tolerance/ (containing excerpts of the DHS memo). *See also* Memorandum to the Secretary of Dep't of Homeland Security, Kirstjen Nielson, from Kevin K. McAleen, *Increasing Prosecutions of Immigration Violations* (Apr. 23, 2018), https://www.documentcloud.org/documents/4936850-Part3-From-CBP-2018-070727-Redacted.html#document/p14/a456180.

[27] Julia Ainsley, *Stephen Miller Wants Border Patrol, Not Asylum Officers, to Determine Migrant Asylum Claims*, NBC NEWS (July 29, 2019), https://www.nbcnews.com/politics/immigration/stephen-miller-wants-use-border-agents-screen-migrants-cut-number-n1035831 (emphasis added). Jud Murdock, CBP's Acting Assistant Commissioner stated in December 2018 that actually considering asylum seekers' applications would only encourage more asylum seekers to come, emphasizing what the administration wished to avoid: "[t]he more we process, the more will come." Hamed Aleaziz, *The Trump Administration is Slowing the Asylum Process to Discourage Applicants, An Official Told Congress*, BUZZFEED (Dec. 17, 2018), https://www.buzzfeednews.com/article/hamedaleaziz/the-trump-administration-is-slowing-the-asylum-process-to.

38.     With full knowledge that the policy of forcibly separating children from their families would cause severe harm to those affected—and specifically intending to cause such harm—Administration officials at the highest levels created a legally sanctioned procedure to incite fear, and inflict trauma, and pain on lawfully asylum-seeking families.[28]

39.     Administration officials did this despite, and indeed in part because of, repeated warnings about the catastrophic, traumatic injuries forced and prolonged separation of families would produce. For example:

a.     In September 2016, more than a year before the family separation pilot program officially began in El Paso, the DHS Advisory Committee on Family Residential Centers issued a report concluding that "[t]he best interests of the child should be paramount in all custody decisions regarding family members apprehended by DHS."[29] This report explicitly warned that "separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children."

---

[28] *Policy Options*, *supra* note 18; *see also*, Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASH. POST (June 19, 2018), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a- deterrent.

[29] U.S. IMMIGRATION & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., REPORT OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS (2016) at 2, *available at* https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf [hereinafter ICE FAMILY DETENTION REPORT].

b.      Commander Jonathan White, former Deputy Director of ORR for the

Unaccompanied Alien Children's Program, testified before Congress that, as

early as February 2017, he repeatedly cautioned Administration officials that

a policy of separating children from their parents had "significant potential

for traumatic psychological injury to the child."[30] Administration officials

ignored Commander White's warnings for over a year and up through the

day he left ORR on March 15, 2018, mere weeks before the policy was

launched across the entire southern border, and continued to disregard his

warnings thereafter.

c.      In March 2017, several DHS officials told the press that the

department was considering a policy of separating mothers and children who

cross the border illegally in order to deter families from migrating to the

United States. The very next day, the American Academy of Pediatrics

responded with a statement opposing DHS's proposed family separation

program, warning that:

> Federal authorities must exercise caution to ensure that the
> emotional and physical stress children experience as they seek
> refuge in the United States is not exacerbated by the additional

---

[30] *Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White), *available at* https://youtu.be/OPPncPb50QE?t=73. *See also* Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE (July 31, 2018), https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be- horrific-for-children.html.

trauma of being separated from their siblings, parents or other relatives and caregivers. Proposals to separate children from their families as a tool of law enforcement to deter immigration are harsh and counterproductive. We urge policymakers to always be mindful that these are vulnerable, scared children."[31]

40.     The Trump Administration, including DHS officials, not only disregarded warnings from several of their own Administration members, they also ignored a plethora of scientific and medical evidence demonstrating that separating children from their parents likely causes extraordinary trauma and long-lasting effects on children's development. The Administration acted intentionally and/or recklessly and unreasonably by implementing these policies, which have been proven to cause permanent emotional and behavioral problems and brain damage in children.

41.     In the weeks following implementation of the family separation policy, in May 2018, widespread media coverage sparked public outrage and condemnation across the nation. In response to the public outrage, Administration officials denied all claims that they implemented the "Zero Tolerance" policy to

---

[31] Press Release, Fernando Stein & Karen Remley, Am. Acad. Of Pediatrics, *AAP Statement Opposing Separation of Mothers and Children at the Border,* (Mar. 4, 2017), available at, https://www.psychiatry.org/newsroom/news-releases/apa-statement-opposing-separation-of-children-from-parents-at-the-border.

deter immigration.[32] Remarkably, the Administration also publicly denied the existence of any policy of family separation as they were brutally meting it out.[33]

42.     These statements, however, were contradicted by the admissions of numerous high-level officials, including Secretary Nielsen, Attorney General Sessions, and then-White House Chief of Staff John Kelly, all of whom made statements confirming that family separation was the express policy and that its intended purpose was to terrorize and deter parents from seeking asylum through the use of forced family separation. The admissions reached the highest levels.

43.     Despite widespread condemnation and a federal court injunction requiring the government to reunite separated families and stop further separations, President Trump continued to defend the policy as a deterrent to migration from Central America, such as when he tweeted, "[I]f you don't separate, FAR more people will come."[34]

---

[32] *See* Christina Wilkie, *White House Denies Separating Families Is "Policy," but Insists It Is Needed "to Protect Children*," CNBC (Jun. 18, 2018), https://www.cnbc.com/2018/06/18/white-house-denies-separating-families-is-policy.html; *The Way Forward on Border Security: Hearing Before the H. Comm. on Homeland Sec.*, 116th Cong. 46-47, 48 (2019) (statement of Sec. Kristjen Nielsen, Dep. of Homeland Sec.).
[33] Wilkie, *supra* note 32.
[34] Donald Trump (@realdonaldtrump), TWITTER (Dec. 16, 2018, 11:25 AM), https://twitter.com/realDonaldTrump/status/1074339834351759363 (emphasis in original); *see also* Kimberly Kindy, Nick Miroff & Maria Sacchetti, *Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings*, WASH. POST, Apr. 28, 2019, https://washingtonpost.com/politics/trump- says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border- crossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5story.html.

44.     Accordingly, from 2017 through the time period at issue in this Complaint, government officials intentionally caused parents and children pain and suffering in order to deter them from seeking asylum, which is a universal human right dating to the 1951 United Nations Refugee Convention enacted to prevent a repeat of the horrors visited upon refugees who could not find sanctuary from persecution and slaughter during World War II.

### 2. The Implementation of the Separation Policy and the Failure and Refusal to Reunify

45.     During this period, CBP officers separated parents and children, including Plaintiffs, under the family separation policy at several immigration detention sites near the U.S.-Mexico border.

46.     Immigration officials frequently detained arriving parents and children, including Plaintiffs, in inhumane conditions. Immigration officials used cells which are commonly and infamously known as *hieleras* or "ice-boxes" due to the cold temperature inside, in short-term detention centers to house parents and children.

47.     Shortly after arrival, immigration officials would inform parents that immigration officials would take their children. Having received limited information and not knowing when immigration officials would come for their children, many parents waited in terror.

48.     Often, parents' terror and anxiety compounded as they were effectively forced to watch immigration officials take other parents' children away.

49.     If the parents did not willingly hand their children over to immigration officials, or when children clung to their parents, the officials often forcibly ripped the children out of their parents' arms.

50.     Immigration officials separated children as young as four months old and as old as 17 years old from their parents, without regard for the children's, health, age or language ability.

51.     After forcibly separating family units, CBP transferred many parents, including Plaintiff Fathers, into ICE custody.[35] Parents, including Plaintiff Fathers, begged immigration officials not to take their children, but immigration officials did so, often with callous disregard for the parents' and children's all too evident distress.

52.     Parents often endured immigration officials physically seizing their terrified children from their side and forcibly carrying them out of the cells and out of their sight.

---

[35] OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HOMELAND SEC., OIG-18-84, SPECIAL REVIEW - INITIAL OBSERVATIONS REGARDING FAMILY SEPARATION ISSUES UNDER THE ZERO TOLERANCE POLICY (Sept. 27, 2018) at 2-3, 13, 15, *available at* https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf [hereinafter DHS OIG REPORT].

53.     Immigration officials flew children, including Plaintiff C.D.A., thousands of miles away from their parents under the pretense that the separation was the necessary result of the criminal prosecution of the parents. In an effort to create maximum chaos and harm, the government took the children regardless of whether their parents were taken into criminal custody, remained in criminal custody for any length of time, or were even prosecuted at all.

54.     Following family separation, the government then classified the children as "unaccompanied," even though they were accompanied by their parents when they arrived in the United States and remained accompanied until the government forcibly and unlawfully separated them from their parents and transferred the children to ORR custody. ORR is responsible for the long-term custodial care and placement of "unaccompanied [noncitizen] children." *See* 6 U.S.C. § 279(a).

55.     As predicted by then-White House Chief of Staff John Kelly, ORR staff then placed the children in "foster care or whatever."[36] The "whatever" included placement of many children in ORR facilities throughout the United States. At times, these facilities range from for- profit and non-profit warehouses with cages and prison-like beds, to temporary tent cities in the Texas desert, to

---

[36] *Transcript: White House Chief of Staff John Kelly's Interview with NPR* (May 11, 2018) (transcript available at https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr).

repurposed Wal-Marts, to foster care services run by religious organizations, to "tender-age" centers for babies and toddlers.[37]

56.     Various news agencies described these facilities as "unspeakable environments, characterized by a complete loss of human dignity."[38] For instance, many "facilities lacked basic hygiene products like toothbrushes and soap in many cases, and are often covered in lice."[39] In a Texas facility, visiting lawyers reported seeing "kids taking care of kids."[40] On one occasion, girls as young as 10 were trying to take care of "[a] 2-year-old boy [who] want[ed] to be held all the time."[41] Lawyers reported that there were some children who had wet their pants, but had no diapers and were wearing soiled clothing unable to bathe or change for weeks.

57.     The parents and children were not provided information as to each other's whereabouts or dates when they would be able to see or speak to each

---

[37] Silva, *supra* note 16.

[38] Nila & Rizer, *supra* note 21.

[39] *Id.*; *see also* Clara Long and Nicole Austin-Hillery, *We went to a border detention center for children. What we saw was awful*, CNN OPINION (Jun. 25, 2019), https://www.cnn.com/2019/06/24/opinions/children-migrant-centers-at-border-long-austin-hillery/index.html; Gaby Del Valle, *Lice, and Open Toilets: What Attorneys Saw at Migrant Processing Centers*, VICE NEWS (Jun. 22, 2019), https://www.vice.com/en_us/article/43jpjp/flu-lice-and-open-toilets-what-attorneys-saw-at-migrant-child-processing-centers.

[40] *Hundreds of migrant children held in unsafe conditions at Texas facility, lawyers warn*, GUARDIAN (Jun. 21 2019), https://www.theguardian.com/us-news/2019/jun/21/child-migrant-facilities-shocking-conditions-revealed.

[41] Cedar Attanasio, Garance Burke & Martha Mendoza, *Attorneys: Texas Border Facility Is Neglecting Migrant Kids*, ASSOCIATED PRESS (Jun. 21, 2019), https://apnews.com/46da2dbe04f54adbb875cfbc06bbc615.

other again. Many parents, including Plaintiff Fathers, had to wait months before

speaking to their children. In some cases, when parents finally obtained contact

information for their children, they were told they had to pay to make phone calls,

a significant obstacle for detained parents who had no resources.

58.     Parents including Plaintiff Fathers, already traumatized by the threat

of harm or death that motivated their arduous journey, which was compounded by

an exhausting and perilous journey to the U.S., thereafter suffered physically,

mentally, and/or emotionally during the separation from their children.

59.     Likewise, children separated from their parents, including Plaintiff

Sons, suffered physically, mentally, and/or emotionally. Their trauma was

aggravated by the fact that, often times, many of them did not understand or were

too young to understand why they had been separated.[42] Some believed their

parents had abandoned them. Others could no longer even remember their

parents, compounding the stress, confusion, and trauma upon reunification.

60.     The government further exacerbated the children's and parents'

trauma by failing to take even the simplest and most reasonable steps to record

---

[42] OFFICE OF THE INSPECTOR GEN., U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-09-18- 00431, CARE PROVIDER FACILITIES DESCRIBED CHALLENGES ADDRESSING MENTAL HEALTH NEEDS OF CHILDREN IN HHS CUSTODY 10 (Sept. 18, 2019), *available at* https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf) [hereinafter "HHS OIG REPORT II"] ("Children who did not understand why they were separated from their parents suffered elevated levels of mental distress. For example, program directors and mental health clinicians reported that children who believed their parents had abandoned them were angry and confused.").

which children belonged to which parents, further demonstrating the Administration's sheer and utter disregard for the well-being of the families or their duty of care to human beings in its custody.

61.     The government's failure to ensure appropriate record-keeping manifested itself in many ways. For example, ICE's computer system "did not display data from CBP's systems that would have indicated whether a detainee had been separated from a child."[43] As a result, when ICE processed detained parents for removal, "no additional effort [was made] to identify and reunite families prior to removal."

62.     In 2018, immigration agencies identified 471 parents "who were removed from the United States without their children, and without being given the opportunity to elect or waive reunification in accordance with a court order. [June 26, 2018 preliminary injunction granted in favor of the *Ms. L* class.]."[44]

63.     The government's failures prolonged delays in parents' ability to locate and communicate with their children, and ultimately to be reunited, causing

---

[43] DHS OIG REPORT, *supra* note 35, at 9-10.
[44] Order Granting In Part And Denying In Part Plaintiffs' Motion To Allow Parents Deported Without Their Children To Travel To The United States at *2**,** *Ms. L. v. U.S. Immigration and Customs Enforcement et al*., No. 18cv00428 DMS (MDD) (S.D. Cal. July 27, 2018), ECF No. 456 (*citing* ECF No. 382 at 7) ("But during the chaotic and unprecedented practice of separating these migrant families, 471 of the parents were deported without their children.").

even more distress for separated families. These failures "also contributed to children's anxiety and fear for their parents' well-being."[45]

64.     When the DHS Office of Inspector General ("OIG") pressed ICE for information that should have been available to ICE (e.g., information on the current location of separated children), ICE could not provide the information, and had to request it from HHS. DHS later "acknowledged to the OIG that there is no 'direct electronic interface' between the DHS and HHS tracking systems."[46] It became frighteningly clear that the U.S. Government had no plan, process or intention to systematically reunite children separated from their parents during family separation.

65.     As emphasized by United States District Court Judge Dana M. Sabraw of the Southern District of California in a ruling addressing the constitutionality of the family separation policy in *Ms. L. v. U.S. Immigration and Customs Enforcement*, the agencies' failure to coordinate tracking of separated families was a "startling reality" given that:

> The government readily keeps track of personal property of detainees in criminal and immigration proceedings. Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainee's release, at all levels— state and federal, citizen and [noncitizen]. Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce [noncitizen] children. The unfortunate

---

[45] HHS OIG REPORT II, *supra* note 42, at 10-11.
[46] DHS OIG REPORT, *supra* note 35, at 11.

reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*. Certainly, that cannot satisfy the requirements of due process.[47]

66.     The government compounded the harm it caused by failing to provide

parents and children, including Plaintiffs, with any information regarding each

other's whereabouts or well-being for weeks and, in many cases, months, and by

failing to facilitate adequate communication between parents and children.[48] The

torture of not knowing where their family members were, whether they were

healthy and safe, and when or whether they would see each other again further

exacerbated the trauma parents and children suffered as a result of being torn

apart.[49]

---

[47] *Ms. L.*, 310 F. Supp. 3d at 1144 (emphasis in original).

[48] *See, e.g.*, *id.* at 1136-37 ("[T]here is no genuine dispute that the Government was not prepared to accommodate the mass influx of separated children. Measures were not in place to provide for communication between governmental agencies responsible for detaining parents and those responsible for housing children, or to provide for ready communication between separated parents and children."); Kevin Sieff, *The Chaotic Effort to Reunite Immigrant Parents with Their Separated Kids*, WASH. POST (June 21, 2018), https://www.washingtonpost.com/world/the_americas/the-chaotic-effort-to-reunite-immigrant-parents-with-their-separated-kids/2018/06/21/325cceb2-7563-11e8-bda1-18e53a448a14_story.html (reporting that "government authorities have often been unwilling to arrange phone calls between [separated parents and children], or provide details about where the child is held").

[49] *See, e.g.*, HHS OIG REPORT II, *supra* note 42, at 11 ("Adding to the challenge of addressing mental health needs of separated children was the uncertainty that came with a hectic reunification process for children covered by the *Ms. L v. ICE* lawsuit. Changing guidance resulted in uncertainty around how or when reunification would happen. For example, case managers in facilities were not always able to let children know when, or even if, they would be reunified with their parents, or whether that reunification would happen in the United States. This type of uncertainty added to the distress and mental health needs of separated children. [F]acilities reported that logistical issues introduced further uncertainty that could lead to emotional distress. Facilities reported that some reunifications were scheduled with little advance

67.     Although President Trump signed an executive order ("EO")
purporting to end the policy of family separation on June 20, 2018 after provoking
widespread national and international condemnation, families continued to be torn
apart.[50]

68.     The EO stated that it is the "policy of this Administration to maintain
family unity, including by detaining alien families together where appropriate and
consistent with law and available resources."

69.     The EO, however, did not explain whether or how the federal
government would reunify children whom the government had forcibly separated
from their parents. In fact, on June 22, 2018, the government admitted that it had
no reunification procedure in place.[51]

---

notice, or suddenly canceled or delayed, which increased the levels of uncertainty and anxiety in
separated children.").

[50] *Affording Congress an Opportunity to Address Family Separation*, Exec. Order No. 13841, 83
Fed. Reg. 29435 (June 25, 2018).

[51] *See Ms. L.*, 310 F. Supp. 3d at 1140–41 (citing Transcript of Status Conference at *29-30, *Ms.
L.*, No. 18cv00428 DMS (MDD) (S.D. Cal. June 22, 2018), ECF No. 77); *see also,* GAO
REPORT, *supra* note 10, at 21 ("HHS officials told [the GAO] that there were no specific
procedures to reunite children with parents from whom they were separated at the border prior to
the June 2018 court order."). The only procedure in place capable of reuniting children with their
parents was the procedure developed to place unaccompanied children with sponsors in
compliance with the Trafficking Victims Protection Reauthorization Act. *Id.* Under this
procedure, however, a parent could only be reunited with his or her child if the government
deemed them eligible to be a sponsor. *Id.* Judge Sabraw noted that this procedure was inadequate
because it was created to address "a different situation, namely what to do with [noncitizen]
children who were apprehended *without their parents* at the border or otherwise," and further,
that the procedure was not developed to address situations such as this one where family units
were separated by government officials after they crossed the border together. *Id.* at 27 (quoting
Order Following Status Conference at *2, *Ms. L.*, No. 18cv00428 DMS (MDD) (S.D. Cal. July
10, 2018), ECF No. 101).

70.     On June 26, 2018, in *Ms. L.*, Judge Sabraw ordered the government to reunify families. The class-wide preliminary injunction, among other things, prohibited the government from separating parents from their minor children in the future, absent a determination that the parent is unfit or presents a danger to the child; prohibited the deportation of any detained parent before reunification with his or her separated children; and ordered the government to reunify parents separated from children under the age of five within fourteen days, and with children aged five and older within thirty days.[52]

71.     Only after Judge Sabraw issued the injunction did the government begin taking steps to reunify families who were members of the *Ms. L.* class. These efforts were marred by chaos and hampered the Administration's animus toward asylum-seeking families.

72.     The government claimed that DHS and HHS had created a centralized database containing all relevant information regarding parents separated from their children. But there was "no evidence that such a database exists."[53] Any data the government collected was incomplete, contradictory, and unreliable.

73.     Accordingly, the agencies resorted to a variety of inefficient and ineffective methods to determine which children were subject to Judge Sabraw's

---

[52] *Ms. L.*, 310 F. Supp. 3d at 1149-50.
[53] DHS OIG REPORT, *supra* note 35, at 10.

injunction,[54] including hand-sifting through agency data looking for any indication that a child in HHS custody had been separated from his or her parent, and calling in the officer of the Assistant Secretary for Preparedness and Response, an HHS agency whose normal prerogative involves responding to hurricanes and other public health disasters, to review data provided by HHS, DHS, and ORR.

74.    The method for determining which families required reunification changed frequently, sometimes more than once a day, with staff at one ORR shelter reporting that "there were times when [they] would be following one process in the morning but a different one in the afternoon."[55]

75.    Judge Sabraw criticized the agencies for their callous treatment of families: "[W]hat was lost in the process was the family. The parents didn't know where the children were, and the children didn't know where the parents were. And the government didn't know, either."[56]

76.    Consistent with Judge Sabraw's rulings, the government's policy of separating children from their parents absent a determination that the parents were unfit or presented a danger to their children and its failure to track the children and

---

[54] GAO REPORT, *supra* note 10, at 23-25.

[55] *Id*. at 27.

[56] Transcript of Status Conference at *58, *Ms. L.*, No. 18cv0428 DMS (MDD) (S.D. Cal. July 27, 2018), ECF No. 164.

promptly reunite the families once they were separated violated the constitutional right to family integrity of the persons subject to the policy.[57]

77.     As evidenced by Administration officials' statements that the policy's purpose was to deter asylum seekers, the government's refusal to provide parents and children any information about each other's whereabouts and well-being, and its failure to track separated families and address reunification in any meaningful way until a federal judge ordered it to do so, Defendant intentionally instituted and implemented this policy for the purpose of inflicting emotional, physical and mental distress on the parents and children whom it separated.

78.     The U.S. government succeeded in its goal to punish asylum-seeking families. It succeeded, with devastating consequences for Plaintiff Fathers and Sons.

---

[57] *See W.S.R. v. Sessions,* 318 F. Supp. 3d at 1125 (finding separation of Plaintiffs C.D.A. and Mr. A. along with another father-son pair shortly after crossing the U.S.-Mexico border constituted a violation of "the fundamental right to reunify with a fit parent in immigration custody"); *see also Ms. L. v. U.S. Immigration and Customs Enf't*, 302 F. Supp. 3d 1149, 1161-67 (S.D. Cal. 2018) (finding that plaintiffs had stated a legally cognizable claim for violations of their substantive due process rights under the Fifth Amendment to the United States Constitution based on their allegations that the government had separated them from their minor children, and kept them separated from their minor children, while they were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children); *Ms. L.*, 310 F. Supp. 3d at 1142-46 (finding that plaintiffs were likely to succeed on the merits of their substantive due process claim); *see also Smith v. Org. of Foster Families for Equal. & Reform,* 431 U.S. 816, 845 (1977) (liberty interest in family relationships has its source in "intrinsic human rights").

B. **The Well-Known Physical and Mental Health Trauma Associated Resulting from Family Separation**

79.     Separating a young child from a parent – particularly when the child has no information about the parent's whereabouts or the possibility of reunification – is a traumatic event in the child's life. "Decades of research have concluded that children," like the minor Plaintiffs, who have been forcibly and "traumatically separated from their parents have a high likelihood of developing emotional problems, cognitive delays and long-term trauma."[58]

80.     Recent studies indicate that "separation can impair memory and normal production of cortisol, a hormone produced in response to stress."[59] The American Academy of Pediatrics has explained the real life harm suffered when a child is ripped away from his parent: "[f]ear and stress, particularly prolonged exposure to serious stress without the buffering protection afforded by stable, responsible relationship . . . can harm the developing brain and harm short-and long-term health."[60]

---

[58] Miriam Jordan, *A Migrant Boy Rejoins His Mother, But He's Not the Same*, N.Y. Times (July 31, 2018), https://www.nytimes.com/2018/07/31/us/migrant-children-separation-anxiety.html.
[59] *Id.*
[60] Letter from Colleen A. Kraft, MD, FAAP, President of the American Academy of Pediatrics, to DHS Secretary Nielsen (Mar. 1, 2018),
https://downloads.aap.org/DOFA/AAP%20Letter%20to%20DHS%20Secretary%2003-01-18.pdf.

81.     "[H]ighly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short-and long-term health. This type of prolonged exposure to serious stress – known as toxic stress – can carry lifelong consequences for children."[61]

82.     It is clear that the trauma caused by the government's inhumane actions will likely have a devastating and lasting impact on the Plaintiffs' physical and mental well-being, their familial relationship, and their mental health, likely, for the remainder of their lives.

**C. The Seven-Week Forced Separation of Mr. A. and C.D.A**

    **1. Mr. A. and his son fled Brazil to seek asylum in the United States.**

83.     In Brazil, Mr. A. and his son C.D.A. faced persecution from several sources. First, both C.D.A. Mr. A., have suffered a history of verbal and physical abuse at the hands of C.D.A.'s grandfather (Mr. A's father). Because of Mr. A.'s economic hardship, they were obliged to live with C.D.A.'s grandfather and their family feared continued and worsening abuse. Moreover, as is often the case for Brazilian families in economic distress, the family owes an $8,000 debt, with interest, to loan sharks operating as a transnational criminal

---

[61] Colleen A. Kraft, *AAP Statement Opposing Separation of Children and Parents at the Border, Am. Acad. of Pediatrics* (May 5, 2018), https://docs.house.gov/meetings/IF/IF14/20180719/108572/HHRG-115-IF14-20180719-SD004.pdf.

organization involved in drug and human trafficking. He fears the result of failing to comply with his debtors and the reality that such persons may conscript his son to satisfy the debt.

84.     Fleeing the above persecution, on May 23, 2018, Mr. A. and C.D.A. sought asylum in the United States. They tried to present themselves at a port of entry but were told it was "closed." They then entered the U.S. without inspection to request help and were apprehended and detained by CBP.

**2. After Mr. A. and C.D.A. crossed the U.S.-Mexico border to seek asylum, immigration officials apprehended, detained, and forcibly separated the family.**

85.     Mr. A. and C.D.A. were detained for two days near the border. The conditions of the place where they were detained were very poor. The children slept on the floor with their fathers. It was very cold, and the lights were on all the time.[62] There were children of both sexes mixed together. There were girls as old as 14 that had no bathroom privacy. The guards only spoke Spanish, and they would use Google Translate on their phone to communicate with Mr. A. and C.D.A., who speak only Portuguese. The Brazilians frequently did not understand the guards' attempts at communication.

---

[62] Ryan Devereaux, *'Dad, I'm Never Going to See You Again' - Two Brazilian boys describe living through family separation* (THE INTERCEPT), July 3, 2018, https://theintercept.com/2018/07/03/family-separation-ice-brazilian-boys-fathers-lawsuit/ ("'It was very cold, and there were no beds.' He and his father slept on the floor. 'The lights were on all the time,' C.D.A. said.").

86.     On May 25, 2018, a guard named Victor Sandoval told C.D.A. and his father that they would be separated for a "process" that would last three to five days but that they would be reunited afterward. The guard did not tell Mr. A. where he was taking his nine-year-old son.

87.     C.D.A. was clinging to his father and was distraught when the guard physically separated them.

### 3.  Following the separation from his father, C.D.A. was forcibly sent to ORR custody in Chicago away from his father.

88.     The Government placed C.D.A. at an ORR facility called Heartland, in Chicago, Illinois. Mr. A. was not told where his son was taken, and he was not permitted to speak with C.D.A. for over three weeks.

89.     C.D.A. experienced severe psychological trauma from the separation. On July 2, 2018, Dr. Michelle Cutler, a clinical psychologist, interviewed and evaluated C.D.A. She also reviewed Heartland's records, including daily monitoring logs, counseling notes, incident reports, and psychiatric records.

90.     Dr. Cutler found that C.D.A. suffered from severe anxiety and depression due to the separation. **His deteriorating mental health manifested itself in thoughts of self-harm and harm to others.**

91.     C.D.A. was separated from his father for 47 days.

**4. After being separated from his son, Mr. A. remained in various federal custody locations.**

92.    After being separated from his son, Mr. A. was detained in federal custody in New Mexico and charged with misdemeanor illegal entry pursuant to 8 U.S.C. § 1325 and Defendant's policy. At the hearing, Mr. A. and the other immigrant parents were given a choice: accept deportation and see their children or fight the charge and receive up to six months' detention. The lawyers present did not talk to Mr. A. individually and he felt like he and the other parents were being induced to leave the United States.

93.    Mr. A. chose to go back to ICE custody where, he thought, he would have a chance of seeing his son again. He pled guilty, received time served, and was returned to ICE detention in New Mexico. He did not know where his son was and had not spoken to him. Mr. A. was transferred to various facilities in New Mexico; however, he was not transferred to a place where he could reunite with his son. Mr. A. was even transferred to a holding facility where he was forced to sleep on the floor and it was very cold. The guards refused to raise the temperature when Mr. A. asked.

94.    There, he was able to speak to other Brazilians in ICE custody and was told that some of them had been there already for up to 18 days without seeing their children or knowing where they were. Mr. A. called the 1-800 number that his

attorney provided for him to talk to his son, but he was told he would have to wait another week.

95.     The next week, Mr. A. was allowed to speak with his son who told him many disturbing things. C.D.A., a 9-year-old child, told his father, "God help me, I don't want anyone to go through what I'm going through."

96.     By the end of June, C.D.A. had spoken with his father twice in total. He was allowed two 10-minute calls with his mother each week. "I want to talk to my mother so much that I made a calendar of the days that I can talk to her," he told his attorney. "I want to talk to my dad when I am sad," he added. "I want to be back with my dad. I don't know where my dad is right now."[63]

**5.  After C.D.A. filed a lawsuit in federal court, he and his father were reunited and sent to ICE family detention in Pennsylvania.**

97.     Meanwhile, on June 20, 2018, C.D.A., along with another child separated from his father, filed a lawsuit in the United States District Court for the Northern District of Illinois against the Government officials responsible for separating them from their fathers, alleging that the separation violated substantive due process and that their placement in the Heartland facility in Chicago violated the *Flores* Settlement Agreement, which governs the detention, release, and

---

[63] *Id.*

treatment of minors in the custody of immigration authorities.[64] After filing suit, C.D.A. moved for a temporary restraining order, seeking immediate reunification with his father and related relief. The Court enjoined the Government from removing Mr. A. from the United States without his son and ordered C.D.A. to be reunited with his father. *W.S.R. and C.D.A. v. Sessions et al.*, 318 F.Supp.3d 1116, 1126 (N.D. Ill. 2018).

98.     On July 12, 2018, before reuniting Mr. A. with his son, officials at the Chicago, Illinois ICE office conditioned that reunification on Mr. A.'s forfeiture of his and his son's rights to seek asylum or related relief, namely withholding under the Convention Against Torture and U.S. immigration laws.[65] ICE presented Mr. A. with a "Separated Parent's Removal Form," which offered him two choices: (1) reunification with C.D.A. "for the purpose of repatriation to" Mr. A's country of citizenship, or (2) repatriation without reunification.[66]

---

[64] *Flores v. Sessions*, 862 F.3d 863, 869, 874 (9th Cir. 2017).

[65] The practice of coercing asylum applicants to sign waivers has been well-documented. *See* B. Shaw Drake et al., *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers*, Human Rights First, 16 (2017), https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf. *See also* Compl., ¶¶19, 20 21, *Al Otro Lado v. Duke*, No. 2:17-cv-05111 (C.D. Cal. July 12, 2017), ECF. No. 1 (documenting well-plead instances where asylum seekers were coerced to sign waivers of their right to asylum, often based on a threat of family separation); *see also* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss at *5-6, *Al Otro Lado v. Nielsen*, No. 3:17--cv-2366 (S.D. Cal. Aug. 20, 2018), ECF. No. 166 (describing well-pled allegations of coerced asylum withdrawals).

[66] *See* Compl., *N.T.C. et al. v. ICE et al.*, No. 1:18-cv-06428 (S.D.N.Y., July 16, 2018), ECF No. 1 (hereinafter N.T.C. COMPLAINT), Ex. B. *See also* Jeremy Stahl, *ICE Deportation Form: Trump Is Making Parents Choose Between Losing Their Children and Deportation*, Slate (July 3, 2018), https://slate.com/news-and-politics/2018/07/ice-deportation-form-trump-is-making-parents-choose-between-their-children-and-deportation.html.

99.    The ICE Officials that presented this "choice" were fully aware that they were under court order to reunify Mr. A and C.D.A., and that Mr. A. was not, in fact, required to choose either option in order to reunify.

100.    Under the first option, Mr. A.'s consent to repatriation of himself and C.D.A. would effectuate a waiver of C.D.A.'s independent asylum and other statutory immigration protection rights, because repatriated children are not able to pursue asylum and other statutory immigration protection claims. Because the only opportunity for family reunification presented by the Separated Parent's Removal Form required consent to repatriation and the resulting abandonment of asylum and other child immigrant rights, the government's use of the form coerced Mr. A. into waiving his child's rights as well as his own.

101.    On June 24, 2018, a DHS official tweeted that parents separated from their children "were quickly given the option to sign paperwork leading to their deportation. Many chose to do so."[67] That same day, a senior administrative official, speaking on the condition of anonymity, confirmed that Defendant did not plan to reunite families until after a parent had lost his or her deportation case, effectively punishing parents who might otherwise pursue an asylum claim or other

---

[67] *See* @jacobsoboroff Twitter (June 24, 2018, 5:29 AM),
http://twitter.com/jacobsoboroff/status/1010862394103328771.

relief and creating tremendous pressure to abandon such claims so that a parent might be reunited with their children.[68]

102.   Numerous parents were told by CBP and ICE agents that they would see their children again sooner if the parent withdrew his or her asylum application and accepted earlier deportation.[69]

103.   Mr. A. was given the form outside of the presence of counsel, or indeed with any notice to his counsel. He signed the form, thinking he had to in order to reunite with his son.

104.   The Convention Against Torture, upon which the U.S. statutory definition of torture is based, *see* 18 U.S.C. § 2340, defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes" as "intimidating or coercing him or a third person."[70]

105.   On July 12, 2018, officials of the United States government subjected Mr. A. and his young son to intense mental and physical anguish and refused to

---

[68] *See* Maria Sacchetti *et al., Sen. Warren visits detention center, says no children being returned to parents there,* Wash. Post (June 24, 2018), https://www.washingtonpost.com/local/immigration/desperate-to-get-children-back-migrants-are-willing-to-give-up-asylum-claims-lawyers-say/2018/06/24/c7fab87c-77e2-11e8-80be-6d32e182a3bc_story.html.

[69] *See* N.T.C. COMPLAINT *supra* n. 66, fn 11, 12.

[70] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85.

relieve them of such anguish unless Mr. A. effectively confessed that he would not exercise his rights under U.S. and international law. This is torture.

106.   The same day Mr. A. signed the form, C.D.A. and his father were reunited in ICE detention in Chicago, Illinois, and transferred to family detention at the Berks County Residential Center in Leesport, Pennsylvania.

107.   ICE's own Advisory Committee on Family Residential Centers stated that families should not be detained.[71] However, Defendant was not amenable to reunifying Mr. A. and C.D.A. and releasing them from custody for asylum proceedings, as they did for the other family in *W.S.R.* They were still intent on the family's deportation - regardless of the extreme impropriety of Defendant's treatment of Mr. A. and C.D.A.

108.   The Berks County Residential Center is a secure, unlicensed[72] detention center for families. The facility does not permit parents and children to leave and restricts free movement through prison-like schedules and procedures.

---

[71] *See* ICE FAMILY DETENTION REPORT, *supra* note 29 at 1 ("[D]etention is generally neither appropriate nor necessary for families – and … detention or the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children.").

[72] The Pennsylvania Department of Human Services revoked the Berks County Residential Center's license on January 27, 2016, because the license for a child residential center was inconsistent with the center's operation as a federal immigration detention facility for families. The revocation is currently being appealed by the County, and the Pennsylvania Department of Health has permitted Berks to continue operation pending the decision on the appeal.

109.   During the night, children at Berks and their parents, including C.D.A. and Mr. A., are subjected to total sleep deprivation in the form of periodic "bed checks." These bed checks are conducted once every *fifteen minutes* from 8:30 p.m. until 6:30 a.m. Over a single night, families are subject to 40 bed checks.

110.   These bed checks are performed every night, seven days a week.

111.   To conduct a check, Berks staff enter families' rooms while they attempt to sleep, and shine a flashlight onto the bodies and faces of each occupant, including the children. Frequently, the staff shine the flashlight directly into the eyes of the occupants.

112.   The staff also often create loud noises when they enter and exit the rooms. Some staff members slam the metal door upon entering and exiting.

113.   In addition, staff members will often leave the room door ajar after completing an inspection. As a result, light and noise from the hallway—the other staff's laughter, conversation, and nearby television sounds on full volume—spill into the room.

114.   No applicable Pennsylvania code provision authorizes this practice.

115.   These ICE practices re-traumatized Plaintiffs C.D.A. and Mr. A., trauma survivors. Such conduct has a re-traumatizing effect including abrupt and

intrusive disruptions of sleep and making them feel as if they were under constant surveillance.

116.   The 15-minute bed checks caused immense physical and psychological harm to C.D.A. and Mr. A, who were held at Berks from July 12, 2018 to August 9, 2018.

117.   Sleep deprivation "causes significant cognitive impairments including deficits in memory, learning, logical reasoning, complex verbal processing, and decision-making."[73] It is also associated with an increase in suicidal risk.[74] As noted above, C.D.A. was already having suicidal ideation during his separation from his father *before* being brought to Berks.

118.   Furthermore, sleep deprivation that results in just four hours of sleep per night for *less than a week* can cause physical harms, including hypertension, cardiovascular disease, altered glucose tolerance, insulin resistance, impaired immune functions, and chronic pain syndromes.[75]

---

[73] Human Rights First, *Leave No Marks: Enhanced Interrogation Techniques and the Risk of Criminality*, 22 (2007), https://www.humanrightsfirst.org/wp-content/uploads/pdf/07801-etn-leave-no-marks.pdf [hereinafter "Human Rights First, *Enhanced Interrogation Techniques*"].
[74] *Id.* at 23.
[75] *See, e.g.*, G. G. Alvarez & N. T. Ayas, *The Impact of Daily Sleep Duration on Health: A Review of the Literature*, 19 Progress in Cardiovascular Nursing 56 (2004); M. A. Carskadon, *Sleep Deprivation: Health Consequences and Societal Impact*, 88 Med. Clinics N. Am. 767 (2004); M. Haack & J. M. Mullington, *Sustained Sleep Restriction Reduces Emotional and Physical Well-Being*, 119 Pain 56, (2005).

119.    Children, like C.D.A., possess a "peculiar vulnerability" not seen in adults and consequently require stability and nurturing to promote their cognitive, emotional, and physical development.[76] It is well established in medical and mental health research that detention–even for just a few weeks–has severe negative effects upon children.

120.    The physical and psychological harm of sleep deprivation is a widely recognized form of abuse, well-established as a technique used to break down interrogation subjects.[77] Aleksandr Solzhenitsyn described sleep deprivation as one of the basic practices of the Soviet police in the 1930s.[78] Chilean dictator Augusto Pinochet also used sleep deprivation to target political opponents in the 1970s.[79] Additionally, in the early 2000s as part of the "Global War on Terror," the United States employed sleep deprivation in Afghanistan, Iraq, and Guantanamo Bay. For enemy combatants held in various Afghan sites, a "'common technique' for keeping detainees awake was to keep bright lights on at all times or to *wake detainees every fifteen minutes*."[80]

---

[76] *See Bellotti v. Baird*, 443 U.S. 622, 634 (1979).
[77] *See* Human Rights First, *Enhanced Interrogation Techniques*, *supra* note 73, at 22.
[78] *Id.*
[79] *Id.*
[80] *See* Human Rights First, *Break Them Down: Systematic Use of Psychological Torture by US Forces*, 4 (2005), https://s3.amazonaws.com/PHR_Reports/break-them-down.pdf.

121.    Sleep deprivation has widely been recognized as torture. In *Ashcraft v. State of Tenn.*, 322 U.S. 143, 150 n. 6 (1944), the Supreme Court wrote, "It has been known since 1500 at least that deprivation of sleep is the most effective torture and certain to produce any confession desired."

122.    More recently, sleep deprivation has internationally been recognized as an act of torture that violates the dignity of persons. The Israeli Supreme Court, for example, declared that intentional sleep deprivation violated constitutional rights of dignity.[81] In the twenty-first century, sleep deprivation is understood to be part of a suite of "enhanced interrogation techniques" that constitute torture.[82]

123.    For 27 straight nights, C.D.A. and his father were subjected to being woken 40 times a night.

124.    Without intervention from counsel, Mr. A. and C.D.A. would have been deported from Berks based on the coerced waiver of their asylum rights in

---

[81] *See* HJC 5111/94 *Public Committee Against Torture in Israel v. The State of Israel* [1999] IsrSC 53(4); *see also* Addendum: Consideration of Reports Submitted by States Parties under Article 19 of the Convention: Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment: 3rd Periodic Reports Due in 2000, Israel, U.N. Comm. Against Torture, ¶¶ 4–20, UN Doc CAT/C/54/Add.1 (2001).

[82] *See, e.g.*, Oliver Laughland, *How the CIA Tortured its Detainees*, Guardian (May 20, 2015, 11:38 P.M.), https://www.theguardian.com/us-news/2014/dec/09/cia-torture-methods-waterboarding-sleep-deprivation; Matt Apuzzo, Sheri Fink & James Risen, *How U.S. Torture Left a Legacy of Damaged Minds*, N.Y. Times (Oct. 9, 2016), https://www.nytimes.com/2016/10/09/world/cia-torture-guantanamo-bay.html.

order to reunify. Mr. A. and C.D.A.'s attorneys requested intervention by the U.S.

Asylum Office on behalf of the family.

125.   Upon interviewing C.D.A., the asylum office determined that the

family established a significant likelihood that they could establish eligibility for

Asylum in an Immigration Court. On August 9, 2018, they were released from

Berks after C.D.A. received a positive finding of credible fear in an interview with

an asylum officer.

### 6.   Mr. A. and C.D.A.'s Harms and Losses

126.   Both Mr. A. and C.D.A. suffered stress, depression, and anxiety

during and after their separation. As Judge Chang wrote in his opinion:

> The government forcibly separated W.S.R. and C.D.A. from their
> respective fathers and is now maintaining the boys in a facility almost
> 1,000 miles away from the fathers. ... [T]he government embarked on
> a zero-tolerance policy, bringing misdemeanor charges and
> separating thousands of children from their parents, without a plan
> for reunification after the short time-served sentences. On these facts,
> **there is no doubt that the scales of justice weigh entirely in
> Plaintiffs' favor. ... [T]he irreparable harm inflicted on the boys
> reinforces why the separation shocks the conscience.**

*W.S.R. and C.D.A. v. Sessions et al.*, 318 F.Supp.3d 1116, 1126 (N.D. Ill. 2018).

127.   C.D.A. and his father experienced re-traumatization, anxiety, and

hopelessness in their detention, both when separated and while detained together at

Berks. As noted *supra*, a psychologist found that C.D.A. suffered from severe

anxiety and depression due to the separation, finding that his deteriorating mental health manifested itself in thoughts of self-harm and harm to others.

128.   The significant cognitive impairments produced by the Berks sleep deprivation were particularly detrimental to C.D.A., who is still in the process of cognitive growth and development.

129.   As for Mr. A., a licensed psychologist who evaluated him while at Berks found that the separation causing his inability to adequately care for and protect his son, as well as his prolonged detention, had triggered his relapse into a Major Depressive Episode.

130.   Both C.D.A. and his father remain traumatized and suffer from intrusive flashbacks to their time in detention both apart and together. C.D.A. continues to suffer from behavioral problems both at school and at home, and has been recommended to undergo individual psychotherapy for his conditions.

### D.  The Five-Week Forced Separation of Mr. Q. and E.A.Q.A. and Related Trauma

#### 1.  Mr. Q. and his son fled Honduras to seek asylum in the United States.

131.   Mr. Q. and his 10-year-old son E.A.Q.A. fled Honduras because they were in danger after a gang targeted the mechanic shop owned by Mr. Q. He made several police reports and attempted to help with an investigation, but the police

refused to investigate. The gang had told him, "If you call the police, I'm going to kill you and find your family."

132.   Mr. Q., by filing reports with the police and by assisting an investigation against the gangs, placed himself and his son in imminent risk of death or torture in Honduras.

133.   Fleeing threats from the gang, on or about June 7, 2018, Mr. Q. and E.A.Q.A. sought asylum in the United States.

> **2.   After Mr. Q. and E.A.Q.A. crossed the U.S.-Mexico border, immigration officials apprehended, detained, and forcibly separated them.**

134.   Mr. Q. and E.A.Q.A. were detained for two days near the border. The conditions of the place where they were detained were very poor, and the room was very cold. These border detention centers are notoriously known as "iceboxes" due to their unwaveringly freezing temperatures. Sometimes the lights are left on all night in the iceboxes, a known form of torture.[83]

135.   On the third day, June 9, 2018, father and son were separated. At around 7 pm, a female guard took E.A.Q.A. away. Mr. Q. begged her to give his son back but she told him, "You have a federal conviction and you have to

---

[83] Serena Marshall, Lana Zak & Jennifer Metz, *Doctor compares conditions for children at immigrant holding centers to 'torture facilities,'* ABC News (*last updated* June 24, 2019), https://www.abcactionnews.com/news/national/doctor-compares-conditions-for-children-at-immigrant-holding-centers-to-torture-facilities.

complete your sentence." He cried for the next twelve hours. He could not eat, or sleep, he just cried. He became ill.

136.   Mr. Q. asked everyone with whom he came into contact how to get reunited with his son, but nobody would give him information. They said, "Your son is fine," but wouldn't give him any information about where they took E.A.Q.A. He states, "I asked the judge, the deportation officers, they said 'I don't know anything, I don't know anything.'" The phone number they gave him didn't work.

137.   Finally Mr. Q.'s common-law wife, E.A.Q.A.'s mother, was able to get information from someone about the facility where E.A.Q.A. was being held.

### 3.  Following the separation from his father, E.A.Q.A. was forcibly sent to ORR custody.

138.   The Government placed E.A.Q.A. at La Esperanza Home for Boys in Brownsville, Texas, an ORR facility. Mr. Q. was not told where his son was taken, and he was not permitted to speak with E.A.Q.A. for over a month.

139.   At 10 years old, E.A.Q.A. was the youngest child in the facility, which predominantly held older boys. He experienced severe psychological trauma from the separation and isolation.

### 4.  After being separated from his son, Mr. Q. remained in various federal custody locations.

140.   After being separated from his son, Mr. Q. was detained in federal custody in Texas and charged with illegal reentry (8 U.S.C. § 1326). He was there for approximately 15 days. He was not thereafter reunified. He was imprisoned with people who had committed serious crimes and states that it was very hard for him. Mr. Q. was thereafter transferred to ICE detention, and not reunified with his son. In total, Mr. Q. was held in five prisons or detention centers.

141.   It was more than a month before Mr. Q. was able to finally speak with his son. Although Mr. Q. requested a phone call with his son, days and weeks passed without being afforded a phone call.

142.   When they finally did speak, it was the only time Mr. Q. would be permitted to speak to his son. E.A.Q.A. was crying and said "I miss you *papi*, why am I here in this place? Why can't you come get me?"

143.   It would be another month before Mr. Q. would see his son again.

144.   The Convention Against Torture, upon which the U.S. statutory definition of torture is based, *see* 18 U.S.C. § 2340, defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally

inflicted on a person for such purposes" as "intimidating or coercing him or a third person."[84]

145.   In 2018, officials of the United States government subjected Mr. Q. and his young son to intense mental and physical anguish and refused to relieve them of such anguish unless Mr. Q. effectively confessed that he would not exercise his U.S. and international law rights. Though Defendant repeatedly attempted to coerce Mr. Q. to sign forms waiving his and his son's rights, he refused to sign.

### 5.  Mr. Q. and E.A.Q.A.'s Reunification

146.   Mr. Q. and his son E.A.Q.A. were reunified by the government on or around July 15, 2018. Mr. Q. stated, "When we saw each other again, he just cried. I said, 'You're not alone anymore, don't worry. This will never happen to you again.'"

147.   They were released together from custody on or around July 18, 2018.

### 6.    Mr. Q. and E.A.Q.A.'s Harms and Losses

148.   Mr. Q. and E.A.Q.A. continue to endure the emotional and psychological scars of their forced separation.

---

[84] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85.

149.   Both Mr. Q. and E.A.Q.A. suffered stress, depression, and anxiety during and after their separation. E.A.Q.A. and his father remain traumatized and suffer from intrusive flashbacks to their time in detention both apart and together.

150.   To this day, Mr. Q. reports that it is difficult or impossible for him and his son to talk about what happened to them. He says, "It brings up emotions that are too strong." In the process of preparing this complaint, Mr. Q. at times cried uncontrollably.

## COUNT I
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

151.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

152.   By engaging in the acts described in this Complaint, the federal officers and officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress. Namely, Plaintiff Fathers' forced separation from their sons was directed as part of a broader policy designed to inflict maximal punishment, stress and trauma on asylum seekers so as to deter future migrants from seeking asylum in the United States. In addition, U.S. officials specifically refused to alleviate the family's known and obvious emotional distress by making inconsistent and pretextual excuses to prevent reunification and

by conditioning reunification on a waiver of Plaintiff Fathers and Sons' legal rights to pursue the protection of the United States from persecution and torture in their home countries.

153.   As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.

154.   Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for damages for intentional infliction of emotional distress.

155.   The conduct of federal officers and officials was so outrageous and harmful, Plaintiffs are entitled to punitive damages.

## COUNT II
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

156.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

157.   The federal officers and officials referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs. The risks of harm from the government's conduct was known to federal officers and officials or should have been known.

158.   By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

159.   As a direct and proximate result of the referenced conduct, Plaintiffs suffered severe emotional distress.

160.   Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for damages for negligence.

## COUNT III
## NEGLIGENCE

161.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

162.   The federal officers referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

163.   By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

164.   As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for damages for its negligence.

## COUNT IV
## LOSS OF CONSORTIUM

165.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

166.   Plaintiffs have suffered severe, permanent, and disabling injuries. They now must contend with the long-term health effects and emotional and psychological trauma caused by the federal officers referenced above.

167.   The wrongful conduct of the federal officers referenced above directly and proximately caused these injuries, which substantially interfere with Plaintiff parents and children's capacity to interact with one another in a normally gratifying way and has caused Plaintiffs to suffer damages as a result.

168.   Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for damages for loss of consortium.

## COUNT V
## TORTURE

169.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

170.   The acts committed by U.S. officers and officials against Plaintiffs constitute torture, which the court has jurisdiction to remediate via damages under the Alien Tort Statute, 28 U.S.C. §1350.

171.   "[T]orture means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. § 2340(1). This includes "act[s]

specifically intended to inflict severe physical or mental pain or suffering . . . for the purpose of . . . punishment, intimidation, coercion, or any reason based on discrimination of any kind." 18 U.S.C. § 2441(d)(1)(A) (War Crimes Act). "[S]evere mental pain or suffering" means "prolonged mental harm caused by or resulting from," among other things, "the intentional infliction or threatened infliction of severe physical pain or suffering," or "threatened" harm to the victims or third persons. 18 U.S.C. § 2340(2) (definitions applicable to 18 U.S.C. § 2340A (Anti-Torture Statute)); 18 U.S.C. § 2441(d)(2)(D) (incorporating definition from 18 U.S.C. § 2340(2)).[85]

172.   The norm prohibiting torture is well settled under U.S. and international law, including customary international law, and has reached *jus cogens* status. The norm presents a non-derogable duty that no sovereign can avoid.

173.   Federal officials intentionally inflicted severe physical or mental pain or suffering on Plaintiff Fathers and Sons and did so in order to coerce and intimidate them to forfeit their legal rights.

---

[85] *See also* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 1, ¶ 1, GA Res. 39/46, (Dec. 10 1984) (CAT), reprinted in 23 ILM 1027 (1984), as modified, 24 ILM 535 (1985) (defining torture as including causing "severe pain or suffering, whether physical or mental," without the requirement to show prolonged mental harm).

## COUNT VI
## CRIME AGAINST HUMANITY: PERSECUTION

174.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

175.   The acts committed by U.S. officials against Plaintiffs constitute under customary international law, the crime against humanity of persecution, which the court has jurisdiction to remediate via damages under the Alien Tort Statute, 28 U.S.C.§1350. Crimes against humanity are universally proscribed and clearly defined under international law. Crimes against humanity are the commission of certain prohibited acts as part of a widespread or systematic attack against a civilian population. "Attack" means a course of conduct involving the commission of acts against a civilian population, pursuant to or in furtherance of a State or organizational policy; it does not equate to a military attack nor require the existence of an armed conflict.

176.   Persecution, as a crime against humanity, is universally proscribed and clearly defined as the intentional and severe deprivation of fundamental rights contrary to international law, based on the identity of the group, including on the basis of national, ethnic or racial grounds.[86]

---

[86] *See, e.g.,* Rome Statute of the International Criminal Court art. 7(1)(h), 7(2)(g), July 17, 1998, 2187 U.N.T.S. 90.

177.   The crime against humanity of persecution, first codified in the Charter of the International Military Tribunal established at Nuremberg, has attained *jus cogens* status.

178.   The forcible separation of Plaintiff Fathers and Sons, the withholding of information about the status of their sons from Plaintiff Fathers, the emotional distress inflicted on Plaintiff Fathers by making inconsistent and pretextual excuses to prevent reunification and by conditioning reunification on a waiver of Plaintiff Fathers' fundamental rights, and the profound mental harm caused by the separation of father from son on the basis of national, ethnic or racial status constitutes persecution.

179.   The federal officials' acts and omissions were knowing, deliberate, and/or purposeful.

180.   The federal officials' acts and omissions were part of a widespread or systematic attack against migrants and asylum seekers at the Southwest border, the vast majority of whom came from Central America. This attack, and broader animus towards those nationalities, were knowingly effectuated through the Family Separation Policy.

181.   Through their acts and omissions, federal officials caused Plaintiff Fathers and Sons to suffer the severe deprivation of their fundamental rights to family unity; to be free from torture and cruel, inhuman and degrading treatment;

their right to a life with dignity; and to equality and non-discrimination in pursuing their right to asylum.

## COUNT VII
## CRIME AGAINST HUMANITY: INHUMANE ACTS

182.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

183.   The acts committed by U.S. officials against Plaintiffs also constitute, under international law inhumane acts, a category of crimes against humanity, which the court has jurisdiction to remediate via damages under the Alien Tort Statute, 28 U.S.C. §1350. Crimes against humanity are universally proscribed and clearly defined under international law. Crimes against humanity are the commission of certain prohibited acts as part of a widespread or systematic attack against a civilian population. "Attack" means a course of conduct involving the commission of acts against a civilian population, pursuant to or in furtherance of a State or organizational policy; it does not equate to a military attack nor require the existence of an armed conflict.

184.   Inhumane acts, as a category of crimes against humanity, are acts that cause "great suffering, or serious injury to body or to mental or physical health."[87] Inhumane acts are similar in nature and gravity to other crimes against humanity

---

[87] *See, e.g.*, Rome Statute of the International Criminal Court, A/CONF. 183/9 (July 17, 1998), art. 7(1)(k) and 7(2)(g).

such as torture, persecution, enforced disappearance, deportation or forcible

transfer of a population, rape and other forms of sexual and gender-based violence,

imprisonment in violation of fundamental rules of international law, murder,

enslavement, and extermination.

185.   The crime against humanity of inhumane acts was first codified in the

Charter of the International Military Tribunal established at Nuremberg, and has

attained *jus cogens* status.

186.   The forcible separation of Plaintiff Fathers and Sons, the withholding

of information about the status of Plaintiff Sons from their fathers, the emotional

distress by making inconsistent and pretextual excuses to prevent reunification and

by conditioning reunification on a waiver of Plaintiff Fathers' fundamental rights,

and the profound mental harm caused by the separation of father from son

constitute inhumane acts.

187.   The federal officials' acts and omissions were knowing, deliberate,

and/or purposeful.

188.   The federal officials' acts and omissions were part of a widespread or

systematic attack against migrants and asylum seekers at the Southwest border, the

vast majority of whom were Central American or other BIPOC, effectuated

through the "Zero Tolerance Policy," and broader animus towards those

nationalities, and were committed with knowledge of that attack.

189.   Through their acts and omissions, federal officials have intentionally caused Plaintiff Fathers and Sons great suffering, and serious injury to body and to their mental and physical health.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the following relief:

A. Compensatory and punitive damages;

B. Issuance of a declaration that the Plaintiffs' rights were deprived under color of law and the certification of a U Visa;

C. Attorneys' fees and costs pursuant to, among other provisions, 28 U.S.C. § 2412 and 28 U.S.C. § 2678; and

D. Such other and further relief as the Court deems just and appropriate.

Dated: February 1, 2021

*/s/ Karen L. Hoffmann*
Karen L. Hoffmann
SYRENA LAW
128 Chestnut Street, Suite 301A
Philadelphia, PA 19106
412-916-4509
karen@syrenalaw.com

Bridget Cambria
Amy Maldonado
ALDEA – THE PEOPLE'S JUSTICE CENTER
532 Walnut Street

Reading, PA 19601
484-877-8002
bridget@aldeapjc.org
amy@amaldonadolaw.com

*Attorneys for Plaintiffs*