IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| C.D.A., a minor child, and Mr. A., his father; and E.A.Q.A., a minor child, and Mr. Q., his father, | : : : : | Civil Action No. 5:21-cv-00469 |
| Plaintiffs, | : : | |
| v. | : : | |
| The United States of America, | : : | |
| Defendant. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS THE PLAINTIFFS' AMENDED COMPLAINT

At issue in this case is whether the federal government's enforcement of federal laws can be challenged under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671 et seq. (the "FTCA") and the Alien Tort Claims Act, 28 U.S.C. § 1350 (the "ATS"). It cannot. This case should not be viewed as a widespread challenge to immigration law. The amended complaint raises *tort* claims and must be viewed in this context.

These tort claims are subject to dismissal. There has been no waiver of the federal government's sovereign immunity for claims seeking money damages under the circumstances pled in the plaintiffs' amended complaint. Accordingly, the plaintiffs' FTCA and ATS claims should be dismissed, with prejudice, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

1

In the alternative, if any claims survive dismissal, they should be litigated in a different forum. The gravamen of the tort claims here was the separation of each father from his son. One set of plaintiffs were separated in Texas. The other set of plaintiffs were separated in New Mexico. If any claims survive dismissal, those claims should be severed and transferred pursuant to 28 U.S.C. § 1404(a). Any surviving claims alleged by the plaintiffs separated in Texas should be transferred to the United States District Court for the Western District of Texas. Any surviving claims alleged by the plaintiffs separated in New Mexico should be transferred to the United States District Court for the District of New Mexico.

## I.  OVERVIEW

In 2018, Plaintiffs Mr. A. and Mr. Q. each unlawfully entered the United States. At the time he entered, Mr. A. had his son, C.D.A., with him. At the time he entered, Mr. Q. had his son, E.A.Q.A., with him. Mr. A., Mr. Q., and their respective sons, were apprehended on separate days when they unlawfully crossed the border of the United States from Mexico. The two were each referred to a U.S. Attorney's Office for prosecution for violations of 8 U.S.C. § 1325 and § 1326, respectively. After Mr. A. and Mr. Q. were referred for prosecution, their sons were placed in the Department of Health and Human Services, Office of Refugee Resettlement's ("ORR") custody.

The plaintiffs entered the United States during a time in which the former administration enforced a "Zero Tolerance Policy" of referring for criminal enforcement any unlawful entrant found crossing the southern border at a location

other than an official port of entry. Although the United States has now denounced this policy and committed itself to family reunification,[1] this case is not the forum in which to broadly debate this policy. Rather, this is a tort case. Specifically, the plaintiffs seek monetary damages for alleged injuries caused by: (1) the defendant's implementation of a policy to refer for prosecution and to prosecute all individuals illegally entering the United States at the United States–Mexico border, including parents traveling with children; and (2) the conditions of confinement and treatment of the plaintiffs after they were separated.

## II.    LEGAL AND FACTUAL BACKGROUND

### A. Factual allegations in the plaintiffs' amended complaint

The plaintiffs in this case are two fathers and their respective sons who arrived at the southern border and crossed the U.S.-Mexico border without authorization into the United States between ports of entry. The only apparent connection between the two pairs is that they entered the United States without authorization and are represented by the same counsel in this case.[2] The two sets of

---

[1] *See* Executive Order on the Establishment of Interagency Task Force on the Reunification of Families, Feb. 2, 2021, available at https://www.whitehouse.gov/briefingroom/presidential-actions/2021/02/02/executive-order-on-the-establishment-ofinteragency-task-force-on-the-reunification-of-families/. The current Administration has committed the federal government to protect family unity and ensure that children entering the United States are not separated from their parents or legal guardians, except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law.

[2] Rule 20(a) permits the joinder of plaintiffs in a single action if: (1) the plaintiffs have a right to relief arising out of the same transaction, occurrence, or series of transactions or occurrences; and (2) there exists some question of law or fact common to the plaintiffs. Fed. R. Civ. Pro. 20(a). These elements are not met here. The two fathers and sons crossed the border weeks apart in different states, came from different countries of origin, were never detained in the same places or at the same time, were separately prosecuted for different violations, and were released in different locations. Most notably among the differences between each pair, Plaintiffs Mr. Q. and E.A.Q.A. were never

fathers and sons seek money damages based on their separations and conditions of confinement subsequent to their unauthorized entries, detention, and separation.

Plaintiff Mr. A. and his son, C.D.A., who are Brazilian and speak Portuguese, crossed the southern border into New Mexico between ports of entry on May 23, 2018. *See* Exhibit A_a, A_b, C.D.A. I-213, Mr. A. I-213. Border Protection apprehended Mr. A. and his son eight miles east of the Santa Teresa Port of Entry. *Id.* Mr. A. and C.D.A. were initially detained together in Santa Teresa, New Mexico. On or about May 25, 2018, the government charged Mr. A. with illegal entry under 8 U.S.C. § 1325. Exhibit A, Declaration of Joshua Pichardo ¶ 4.

As Mr. A., now referred for criminal prosecution, was no longer able to provide for the care and custody of his son. C.D.A. was designated as an unaccompanied minor and ORR accepted care and custody of C.D.A. as required by the Trafficking Victims Protection Reauthorization Act of 2008, ("TVPRA"). Exhibit B, ORR Facility Discharge Record. The separation of Mr. A. and C.D.A. occurred in New Mexico. Exhibit A_a, C.D.A. I-213 Report, p. 4. C.D.A. spent one day in Clinton, Texas before being transferred to into HHS custody in Chicago, Illinois. Exhibit B, ORR Facility Discharge Record, Exhibit A_a, p. 4.

Mr. A. was prosecuted and convicted of violating 8 U.S.C. § 1325 on June 6, 2018. Exhibit C – Criminal Docket Report, Entry #6. He was sentenced to 15 days of

---

detained in the BCRC facility, which is the site of the only activity to occur in this district. For this reason, severance of any claims that survive dismissal is appropriate. *See, e.g., Cooper v. Fitzgerald*, 266 F.R.D. 86 (E.D. Pa. 2010) (severing and dismissing claims).

incarceration or time served. *Id.* On June 7, 2018, Mr. A. was transferred into ICE custody and was detained pursuant to an expedited order of removal. Exhibit D – Declaration of William S. Shaw, ¶ 5.

On July 12, 2018, Mr. A. and C.D.A. were then both transferred to the Berks County Residential Center (the "BCRC") in Leesport, Pennsylvania where they were reunited. Exhibit E – BCRC Intake Log. They remained together at the BCRC until their release into the United States on August 9, 2018. Exhibit F – BCRC Release Log.

The other two plaintiffs, Plaintiff Mr. Q. and his son, E.A.Q.A., who are Honduran, crossed the southern border between ports of entry into Texas without authorization. They were apprehended by United States Border Patrol a little over a mile west of the Paso Del Norte Port of Entry on June 7, 2018. *See* Exhibits A_c, A_d, I-213 Reports of E.A.Q.A. and Mr. Q. Mr. Q. and E.A.Q.A. were initially detained together in El Paso, Texas. *Id.*

Mr. Q. was charged with violating 8 U.S.C. § 1326 because he had previously unlawfully entered the United States and been removed. Exhibit A, Declaration of Joshua Pichardo ¶ 6. On or about June 27, 2018, ICE took custody of Q. Exhibit L – Declaration of Alfonso Ramirez Jr., ¶ 4. He remained in ICE detention in Texas until his release in July 2018. Exhibit G – Declaration of Alfonso Ramirez Jr., ¶ 5.

As Mr. Q. was no longer able to provide for the care and custody of his son because he faced criminal charges, E.A.Q.A. was designated as an unaccompanied

minor and was transferred to the care and custody of ORR in Brownsville, Texas on June 11, 2018, as required by the TVPRA. Exhibit H, E.A.Q.A. ORR Placement.

On July 17, 2018, a little over a month later, the charges against Mr. Q. were dropped, and Mr. Q. and E.A.Q.A. were reunited in El Paso, Texas and then released together into the United States. Exhibit I, E.A.Q.A. EARM Notes.

After submitting administrative claims under the FTCA, on February 1, 2021, the plaintiffs filed their complaint initiating this civil action. (Doc. No. 1.) After the government moved to dismiss this complaint, the plaintiffs filed an amended complaint on January 28, 2022. (Doc. No. 31.)

Although the plaintiffs certainly characterize the events differently than the government, the parties agree that the plaintiffs were detained and that the fathers were detained separately from their sons before being reunited.[3] The legal issue, which can and should be resolved on this motion, is whether the facts as alleged by the plaintiffs allow them to sue in tort under the FTCA and the ATS.

The plaintiffs allege eight tort claims in the amended complaint: intentional infliction of emotional distress (Count I); negligent infliction of emotional distress (Count II); negligence (Count III); abuse of process (Count IV); loss of consortium (Count V); torture (Count VI); crimes against humanity (specifically persecution) (Count VII); and crimes against humanity (specifically inhumane acts) (Count VIII). Although the amended complaint does not precisely delineate which claims are

---

[3] The complaint is replete with immaterial allegations that would be subject to a Rule 12(f) motion to strike if the claims were not subject to dismissal for the reasons outlined herein.

asserted under the FTCA or ATS, it appears that the first five "common law" claims are brought under the FTCA and the remaining three "international law" claims are brought under the ATS.[4]

### B. Statutory Framework for Noncitizens Entering the United States Without Authorization

Noncitizens who arrive in the United States, including those who arrive between ports of entry, are considered "applicant[s] for admission" and are required to be "inspected by immigration officers" to determine their admissibility to the United States.  8 U.S.C. §§ 1225(a)(1), (a)(3), (b). When a noncitizen enters the United States between official ports of entry, he or she may be prosecuted for criminal immigration violations, including entering the United States "at any time or place other than as designated by immigration officers" and eluding "examination or inspection by immigration officers." 8 U.S.C. § 1325(a). Section 1325(a) sets out a misdemeanor that is punishable by a fine and 'imprison[ment] not more than 6 months" for a first infraction. *Id*. A subsequent violation may result in imprisonment of not more than two years. *Id*. Reentering the United States without authorization after having been previously removed is a felony. 8 U.S.C. § 1326. An individual who reenters the United States without authorization after having been removed "shall be fined under title 18, or imprisoned not more than 2 years, or both." *Id*. § 1326(a).

---

[4] The plaintiffs demand a jury trial on all claims where a jury is proper. There is no jury entitlement for the FTCA claims. 28 U.S.C. § 2402; *see also Fulton v. United States*, 198 Fed. Appx. 210, 214 (3d Cir. 2006). If any FTCA claims survive, any jury demand as to those claims should be stricken.

Individuals arriving in or present in the United States who are deemed inadmissible are subject to removal from the United States and, as appropriate, detention pending such removal. *See id.* §§ 1225(b); 1226; 1357. These provisions apply to both adults and their accompanying children. Detention of unauthorized noncitizens with final order of removal, including reinstated orders of removal, is governed by 8 U.S.C. § 1231(a). It authorizes detention in two circumstances. "During the removal period," the Attorney General "shall" detain the individual. *Id.* § 1231(a)(2). "[B]eyond the removal period," the Attorney General "may" continue to detain certain individuals specified in the statute or release them under an order of supervision. *Id.* § 1231(a)(3). The removal period specified in § 1231(a)(1)(A) lasts 90 days, and begins on the latest of the following: (1) the date the order of removal becomes administratively final; (2) if the removal order is judicially reviewed, and if a court orders a stay of the removal of the individual, the date of the court's final order; or (3) if the noncitizen is detained or confined (except under an immigration process), the date the individual is released from detention or confinement. *Id.* § 1231(a)(1)(B).

The federal government possesses statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." *Id.* § 1231(g)(1). In some cases, the Department of Homeland Security ("DHS") may exercise its discretion to release a noncitizen from custody pending a decision on removal. *See, e.g.*, 8 U.S.C. §§ 1182(d)(5), 1226(a)(2).

### C. Statutory Framework for Immigration Custody Relating to Unaccompanied Minors

Federal immigration law authorizes the United States to provide for the custody and care of unaccompanied minor children entering the United States without authorization. *See* 6 U.S.C. § 279 and 8 U.S.C. § 1232. Specifically, ORR is charged with "the care and placement of unaccompanied alien children who are in federal custody by reason of their immigration status." 6 U.S.C. § 279(a), (b)(1)(A), (b)(1)(C); *see also* 8 U.S.C. § 1232(b)(1). The term "unaccompanied alien child" or "UAC" is defined as a child who: (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) "with respect to whom . . . there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

Under the TVPRA, "[e]xcept in the case of exceptional circumstances, any department or agency . . . shall transfer the custody of such child to [ORR] not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3). ORR seeks to place UACs "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). However, ORR "shall not release such children upon their own recognizance." 6 U.S.C. § 279(2)(B). Rather, once in ORR custody, there are detailed statutory and regulatory provisions that must be followed before the child is released to an approved sponsor. *See* 8 U.S.C. § 1232(c)(3). Congress requires that "an unaccompanied alien child may not be placed with a person . . . unless the Secretary of Health and Human Services makes a

determination that the proposed custodian is capable of providing for the child's physical and mental well-being" and that "[s]uch determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id*. § 1232(c)(3)(A). In some instances, a home study is required. *Id*. § 1232(c)(3)(B).

### D. Flores Agreement requirements

In 1996, the federal government entered into a settlement agreement referred to as the "Flores Agreement."[5] The Flores Agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the [immigration authorities]." *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016) (citing Flores Agreement ¶ 9). The Flores Agreement "unambiguously" applies both to unaccompanied minors and to minors who are encountered together with their parents or legal guardians. *Id*. at 901. Under the Flores Agreement, the government must expeditiously transfer any minor who cannot be released from custody to a non-secure, licensed facility. *Id*. at 902-03 (quoting Flores Agreement ¶ 12)). The government must also "make and record the prompt and continuous efforts on its part toward . . . release of the minor." *Flores v. Rosen*, 984 F.3d 720, 738 (9th Cir. 2020) (quoting Flores Agreement ¶ 14).

Notably, the Flores Agreement applies only to minors. *Flores*, 828 F.3d at 901. It "does not address . . . the housing of family units and the scope of parental

---

[5] *See Flores v. Sessions*, No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015) (ECF 101).

rights for adults apprehended with their children[,]" and it "does not contemplate releasing a child to a parent who remains in custody, because that would not be a 'release.'" *Id.* at 906; *see also United States v. Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 U.S. Dist. LEXIS 2660, at *22 (W.D. Tex. Jan. 5, 2018) ("[Flores] does not provide that parents are entitled to care for their children if they were simultaneously arrested by immigration authorities[.]"). Nor does the Flores Agreement provide any rights to adult detainees, including any rights of release. *Flores*, 828 F.3d at 908; *see also Dominguez-Portillo*, 2018 U.S. Dist. LEXIS 2660, at *24; *Bunikyte v. Chertoff*, Nos. A-07-CA-164-SS, A-07-CA-165-SS, A-07-CA-166-SS, 2007 U.S. Dist. LEXIS 26166, at *49-52 (W.D. Tex. Apr. 9, 2007). Although the Flores Agreement prefers the release of minors to a parent, this preference "does not mean that the government must also make a parent available; it simply means that, if available, a parent is the first choice." *Flores*, 828 F.3d at 908.

### E. Prior Executive Branch Directives Regarding Immigration Enforcement

During the time period relevant to this action, the Executive Branch issued several directives regarding enforcement of federal immigration laws. In January, 2017, Executive Order No. 13767 ("EO 13767") was issued, stating that "[i]t is the policy of the executive branch to . . . detain individuals apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations[.]" 82 Fed. Reg. 8793, § 2(b) (Jan. 30, 2017). EO 13767 directed DHS to "ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or

their removal from the country to the extent permitted by law[,]" *id*. § 6, and to exercise its parole authority "only on a case-by-case basis in accordance with the plain language of the statute . . . and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." *Id*. § 11(d).

On April 11, 2017, the former Attorney General issued guidance to all federal prosecutors regarding a renewed commitment to criminal immigration enforcement and directed that federal law enforcement prioritize the prosecution of several immigration offenses, including illegal entry under 8 U.S.C. § 1325 and illegal reentry of individuals who had been removed previously under 8 U.S.C. § 1326.[6]

On April 6, 2018, the former Attorney General issued a "Memorandum for Federal Prosecutors along the Southwest Border." U.S. DOJ, News Release: Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (April 6, 2018), DOJ 18-417, 2018 WL 1666622 (hereinafter the "Zero Tolerance Memorandum"). The memorandum directed federal prosecutors along the Southwest border "the extent practicable, and in consultation with DHS, to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)." *Id*. In addition, on May 4, 2018, the DHS Secretary directed officers and agents to ensure that all adults deemed prosecutable for improper entry in violation of 8 U.S.C. § 1325(a) were referred to DOJ for criminal prosecution.

---

[6] *See* U.S. DOJ, Memorandum on Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), available at https://www.justice.gov/opa/press-release/file/956841/download.

This initiative applied to all amenable adults, including parents or legal guardians traveling with minor children. Consistent with EO 13767, and the April 2018 Zero Tolerance Memorandum, DHS referred for prosecution adult individuals, including those traveling with children, who unlawfully entered the United States on the Southwest border in violation of § 1325 or other statutory provisions authorizing criminal prosecution. Minor children of those adults were transferred to ORR custody as required by the TVPRA.

### F.  The BCRC

In 2001, Berks County, Pennsylvania converted a nursing home in Leesport, Pennsylvania into the first family residential center under a contract with DHS. The facility, known as the BCRC, operates as a congregate-care facility with communal sleeping quarters, bathrooms, dining rooms, and recreational areas. DHS signed an intergovernmental service agreement authorizing Berks County to operate the facility (the "IGSA").[7]

Pursuant to the IGSA, individuals in the "legal custody" of ICE, by law, are "released to the physical custody" of Berks County. The IGSA sets forth the services that Berks County will perform to receive payment from ICE at rates set forth in the (IGSA ¶ I.B.) Those covered services include providing bed space and "Basic Needs" for detainees. (*Id*. III.) With respect to Basic Needs, the IGSA tasks Berks County with providing "residents/detainees with safekeeping, housing subsistence,

---

[7] *See*  https://www.co.berks.pa.us/Dept/BCRC/Pages/AboutDepartment.aspx, attached as Exhibit J (without attachments).

medical services that are not provided for elsewhere and other services in accordance with this Agreement." (*Id*. ¶ III.B.)

The IGSA requires Berks County to house residents and perform services "in accordance with the most current edition of the ICE/DRO Residential Standards" and to otherwise abide by various federal standards and regulations. (*Id*. ¶ V.) But the IGSA delegates to Berks County day-to-day performance under the IGSA, including operating the Berks Facility and maintaining physical custody over residents, as it sees fit, so long as it does so consistently with the IGSA and applicable federal standards. The IGSA authorizes federal representatives to inspect and monitor Berks County's performance of the IGSA. (E.g., *id*. ¶ VIII.C.)

Under the IGSA, Berks County has promulgated various policies and procedures for the operation of the BCRC that are designed to comply with ICE/DRO requirements. *See* Family Residential Center: Resident Safety Checks Guidance, updated October 26, 2016, attached hereto as "Exhibit K," and ICE/DRO Residential Standard for Residential Census, dated December 21, 2007, attached hereto as "Exhibit L." Among other policies, Berks County has enacted policies to ensure the safety of its residents. This includes, but is not limited to, policies calling for nighttime hall sweeps and evening bedroom safety checks. During the nighttime hall sweeps, staff do not enter resident rooms or shine lights unless there is a need for investigation. During evening bed checks, staff do not make loud noises or shine lights at residents. Efforts are made not to disrupt sleeping residents unless there is

14

an emergency. Exhibit K - Residential Standard for Residential Census, p 2
"Evening Bedroom Safety checks.

## III.    STANDARD OF REVIEW

The United States moves for dismissal of the amended complaint or, in the
alternative for a transfer to a more appropriate forum. Different standards apply to
each.

### A.  Standard of Review for Dismissal

This Court lacks jurisdiction to hear each of the plaintiffs' claims. As to the
plaintiffs' FTCA claims, there is no waiver of sovereign immunity for the challenged
conduct so these claims should be dismissed under Rule 12(b)(1). As to both the
FTCA and ATS claims, the plaintiffs cannot state a claim under either statute, so
all claims are separately subject to dismissal under Rule 12(b)(6). Although liberal
amendment is generally permitted, it is not required where, as here, amendment
would be futile due to a lack of subject matter jurisdiction or inability to state a
claim. *See Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000).

### 1.  Standard of review for dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)

Pursuant to Rule 12(b)(1), a complaint must be dismissed where the court
lacks jurisdiction over the claims in that complaint. Fed. R. Civ. Pro. 12(b)(1); *See*
*Bracken v. Matgouranis*, 296 F.3d 160, 162 (3d Cir. 2002). The burden is on the
plaintiff, not the defendant, to prove jurisdiction. *Livera v. First Nat'l State Bank of*
*N.J.*, 879 F.2d 1186, 1195 (3d Cir. 1989).

Because a Rule 12(b)(1) motion addresses the trial court's jurisdiction, the trial court may weigh the evidence and satisfy itself as to the existence of its power to hear the case. *See Morris v. Gonzales,* No. 06-cv-4383, 2007 U.S. Dist. LEXIS 69520, at *6-7 (E.D. Pa. Sept. 19, 2007). As a result, the trial court "is not restricted to the face of the pleadings but may review any evidence to resolve factual disputes concerning the existence of jurisdiction." *Id.* (citing *Cestonaro v. United States*, 211 F.3d 749, 752 (3d Cir. 2000)).

### 2. Standard of review for dismissal for failure to state a claim under Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a complaint must be dismissed where it fails to state a plausible claim. Fed. R. Civ. Pro. 12(b)(6). This means any claim must be supported by both the law and the facts. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Conclusions and legal argument are insufficient. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

The burden to prove a failure to state a claim is on the defendant, not the plaintiff. *See CNA v. United States*, 535 F.3d 132, 140 (3d Cir. 2008) *as amended* (Sept. 29, 2008). In deciding the motion, the Court must accept as true all well-pled factual allegations of the non-moving party and must view all inferences in the light most favorable to that party. *Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989).

### B. Standard of review for transfer

When a party seeks transfer to a more convenient forum, the burden is on that moving party to establish that a balancing of proper interests weigh in favor of

transfer. *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970). Although the moving party bears the burden, it need not show truly compelling circumstances. *See In re United States*, 273 F.3d 380, 388 (3d Cir. 2001). Instead, the moving party need only show that, all relevant things considered, it would be better to transfer the case to another district. *Id.*

## IV.   ARGUMENT

The plaintiffs' claims in the amended complaint are subject to dismissal under Rule 12(b). Because amendment cannot cure the deficiencies, the United States seeks dismissal of the amended complaint, in its entirety, with prejudice. In the alternative, if the Court permits any claim to proceed, those surviving claims should be transferred to the districts where the respective separations occurred.

### A.  The plaintiffs' claims are barred under the FTCA and ATS.

The plaintiffs allege eight tort claims in the amended complaint. The first five are state tort claims under the FTCA. They are not viable and should be dismissed. The remaining three claims are "international law" claims presumably asserted under the ATS. They similarly are not viable and should be dismissed.

#### 1.  The plaintiffs' claims under the FTCA should be dismissed for lack of subject matter jurisdiction.

Congress enacted the FTCA as a limited waiver of the government's sovereign immunity, to provide remedies to certain individuals harmed by government negligence. There are numerous exceptions to the FTCA's limited waiver of sovereign immunity. *See* 28 U.S.C. § 2680; *see also United States v.*

17

*Mitchell*, 463 U.S. 206, 212 (1983). Any waiver is strictly construed in favor of the United States. *U.S. v. Bein*, 214 F.3d 408, 412 (3rd Cir. 2000). Where there is no waiver, the Court lacks subject matter jurisdiction to entertain a claim. *United States v. Sherwood*, 312 U.S. 584, 590-91 (1941).

The plaintiffs' FTCA claims are for intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, abuse of process, and loss of consortium. The alleged factual basis for most of these claims is the separation resulting from the decision to initiate criminal proceedings against the fathers. Plaintiffs also criticize some conditions of confinement. Here, there is no waiver of sovereign immunity for the tort claims brought under the FTCA for six independent reasons. This lack of waiver deprives the Court of jurisdiction to hear the claims. Moreover, even if there was jurisdiction, the plaintiffs fail to state a claim because the conduct they point to cannot sustain any of their claims. In light of this, any amendment would be futile.

### a. All FTCA claims are barred by the discretionary function exception.

The plaintiffs' FTCA claims are barred by the discretionary function exception. The United States, as a sovereign entity, is immune from suit except insofar as it has specifically and expressly consented to be sued. *Lehman v. Nakshian*, 453 U.S. 156, 160-61 (1981) (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)). "[T]he terms of [the government's] consent to be sued in any court define that court's jurisdiction to entertain the suit." *Lehman*, 453 U.S. at 160 (internal quotes and citations omitted). Absent a specific, express waiver, sovereign

immunity bars a suit against the government for lack of subject matter jurisdiction. *See FDIC v. Meyer*, 510 U.S. 471, 475-76 (1994).

The FTCA provides "a limited waiver of sovereign immunity." *Gonzalez v. United States*, 814 F.3d 1022, 1026 (9th Cir. 2016). The FTCA allows individuals to sue the United States when a federal employee's conduct, within the scope of his or her employment, causes "injury, loss of property, or personal injury or death." 28 U.S.C. § 1346(b)(1). However, the FTCA's waiver of sovereign immunity is subject to exceptions. *See* 28 U.S.C. § 2680.

When an exception applies, the United States retains its sovereign immunity, the court lacks jurisdiction, and the claim must be dismissed. One such exception— the "discretionary function exception" (the "DFE")—bars "[a]ny claim" that is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see also Gaubert v. United States*, 499 U.S. 315, 325 (1991); *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

The Supreme Court has set forth a two-part test to determine if the DFE applies. *Gaubert*, 499 U.S. at 328-32. Courts must first ask whether the challenged conduct was in fact "discretionary in nature"—that is, whether the conduct involved "'an element of judgment or choice.'" *Id*. at 322 (quoting *Berkovitz*, 486 U.S. at 536). The first prong is met unless "'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'" *Mitchell v. United States*,

225 F.3d 361, 363 (3d Cir. 2000) (quotation marks omitted); *see also S.R.P. v. United States*, 676 F.3d 329, 332-33 (3d Cir. 2012). The discretionary function exception applies whether or not the discretion involved was abused. *Baer v. United States*, 722 F.3d 168, 175 (3d Cir. 2013).

Second, if the conduct involves choice or discretion, courts must next determine whether the judgment of the government employee was "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23. Recognizing that tort actions challenging the government's discretionary policy judgments could "seriously handicap efficient government operations," Congress designed the DFE to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy" through a tort action. *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984). The focus of this inquiry is whether the "nature of the actions taken," pursuant to an exercise of discretion, "are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325.

If both prongs of the *Gaubert/Berkowitz* test are met, the DFE applies, the United States retains its sovereign immunity, the court lacks jurisdiction, and the claim must be dismissed. *See Baer*, 722 F.3d at 175. This result applies even where the government may have been negligent in the performance of such discretionary acts, as negligence is irrelevant to the discretionary function inquiry. *United States Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988); *Gen. Pub. Utils. Corp. v. United States*, 745 F.2d 239, 245 (3d Cir. 1984). As the legislative history of the FTCA explains, the FTCA's limited waiver of sovereign immunity was "not

intended to authorize suit for damages to test the validity of or provide a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion." H.R. Rep. No. 77-2245, 77th Cong., 2d Sess., at 10.

### i. The decisions to prosecute and detain plaintiffs were discretionary.

The plaintiffs' claims based on the decisions to prosecute and detain Mr. A. and Mr. Q., which resulted in the separation of C.D.A. and E.A.Q.A., are barred by the DFE because these decisions both involved an element of judgment or choice and also are susceptible to policy analysis. The plaintiffs do not allege that United States Border Patrol lacked the discretion to apprehend Mr. A. and Mr. Q. after they each crossed the border illegally. Nor do the plaintiffs allege that Mr. A. and Mr. Q. were improperly prosecuted in terms of whether the government had good cause to charge them for violations of 8 U.S.C. § 1325 and § 1326, respectively. Nor do the plaintiffs allege that the government lacked discretion to transfer C.D.A. and E.A.Q.A. to ORR custody once Mr. A. and Mr. Q. were subject to criminal prosecution.

These decisions, which together resulted in C.D.A. and E.A.Q.A.'s placement in the care and custody of ORR, are quintessentially discretionary. As the Supreme Court has recognized, "[t]he Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Indeed, "[t]he Supreme Court has long recognized that 'the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.'" *In re Sealed Case*, 829 F.2d 50, 63 (D.C. Cir. 1987)

(quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)); *Smith v. United States*, 375 F.2d 243, 247 (5th Cir. 1967) ("decisions concerning enforcement" are a matter of "discretion"). Therefore, the decision whether or not to prosecute a given individual is a discretionary function for which the United States is immune from liability under the FTCA. *See Bernitsky v. United States*, 620 F.2d 948, 952 (3d Cir. 1980).

As other courts have recognized, the Zero-Tolerance Policy—which was subsequently revoked—"amounts to exercise of the prosecutorial discretion that Congress and the Constitution confer on the Attorney General." *Mejia-Mejia v. ICE*, No 18-1445 (PLF), 2019 WL 4707150, at *5 (D.D.C. Sept. 26, 2019); *see also Peña Arita v. United States*, 470 F. Supp. 3d 663, 686-87 (S.D. Tex. 2020). The DFE bars the Court from "second-guessing" or inquiring into government actors' intent in exercising that prosecutorial discretion. *Berkovitz*, 486 U.S. at 536; *see also Bernitsky*, 620 F.2d at 952 (collecting cases).

In determining the applicability of the DFE, the Court looks only at whether the conduct or decision at issue is susceptible to policy analysis from an objective perspective. Here, however, the government's decisions were not merely "susceptible to" policy analysis, but there was a policy analysis. In fact, the government spelled out the policies it sought to further through its enforcement efforts in a series of Executive Branch directives.

The government's decisions concerning the prosecution and detention issues in this case were discretionary and susceptible to policy analysis. Concerns about

22

"subjecting the prosecutor's motives and decision making to outside inquiry" are magnified in the immigration context. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999). There, the federal government possesses the express statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). "Congress has placed the responsibility of determining where aliens are detained within the discretion of the [Secretary]." *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1440 (9th Cir. 1986) (emphasis added); *see also Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. Cir. 1999) (holding that the "Attorney General's discretionary power to transfer aliens from one locale to another, as she deems appropriate, arises from" statute); *Gandarillas-Zambrana v. BIA*, 44 F.3d 1251, 1256 (4th Cir. 1995) ("The INS necessarily has the authority to determine the location of detention of an alien in deportation proceedings . . . and therefore, to transfer aliens from one detention center to another."); *Sasso v. Milhollan*, 735 F. Supp. 1045, 1046 (S.D. Fla. 1990) (holding that the Attorney General has discretion over the location of detention).

Although the Third Circuit has not yet addressed directly whether detention in the immigration context is a discretionary function, all the other circuits to analyze this question have concluded it is. As the Ninth Circuit has explained, "[b]ecause the decision to detain an alien pending resolution of immigration proceedings is explicitly committed to the discretion of the Attorney General and implicates issues of foreign policy, it falls within this [FTCA] exception." *Mirmehdi*

*v. United States*, 662 F.3d 1073, 1081-82 (9th Cir. 2011); *see also Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018) (placement decisions are susceptible to policy analysis); *Santana-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003) ("assignment to particular institutions or units . . . must be viewed as falling within the discretionary function exception to the FTCA"); *Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998) (decisions where to place prisoners are policy-based decisions protected by DFE); *Bailor v. Salvation Army*, 51 F.3d 678, 685 (7th Cir. 1995) (decisions whether to detain or release are policy-based decisions protected by DFE).

This discretion necessarily entails decisions regarding with whom noncitizens are detained, including decisions regarding whether adults and minors can be detained in the same facility and whether to detain family members together. *See Peña Arita*, 470 F. Supp. 3d at 691-92 (decisions by DHS to separate family members are protected by the DFE). Although the Flores Agreement contains some requirements concerning the detention of minors, it does not specifically prescribe a course of action and, thus, does not remove the government's discretion. Moreover, the Flores Agreement does not require release of a parent or mandate that parents be housed with their children. *Flores*, 828 F.3d at 908; see also *Dominguez-Portillo*, 2018 WL 315759, at *14-15; *Bunikyte*, 2007 WL 1074070, at *16. Here, the challenged decisions vis-à-vis the detention and prosecution of Mr. A. and Mr. Q. resulted from the exercise of the government's discretion.

For similar reasons, the decision to separate and detain C.D.A. and E.A.Q.A. were also covered by the DFE. *See* 6 U.S.C. § 279(g)(2). Whether a parent is "available to provide care and physical custody" is a policy question vested in federal officials. *See D.B. v. Poston*, 119 F. Supp. 3d 472, 482-83 (E.D. Va. 2015) ("Federal agencies are afforded discretion under the statutory scheme when classifying juveniles as unaccompanied alien children."), *aff'd in part and vacated in part*, 826 F.3d 721 (4th Cir. 2016); *see also Baie v. Secretary of Def.*, 984 F.2d 1375, 1377 (9th Cir. 1986) ("[I]nterpretation of the statute is a plainly discretionary administrative act the 'nature and quality' of which Congress intended to shield from liability under the FTCA."); *Medina v. United States*, 259 F.3d 220, 227 (4th Cir. 2001) (determining whether conduct constituted "crime of moral turpitude" under applicable statute was "a quintessential exercise of [agency's] broad discretion"). Here, Mr. A. and Mr. Q. were prosecuted and detained pending that prosecution. In those circumstances, the DFE protects the officials' determination that C.D.A. and E.A.Q.A. should have been deemed unaccompanied and, thus, transferred to the custody of ORR in the minors' best interests. *See Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 287 (3d Cir. 1995) (holding that a decision was protected by the DFE when it "necessarily reflects the decisionmaker's judgment that it is more desirable to make a decision based on the currently available information than to wait for more complete data or more confirmation of the existing data").

In the end, the plaintiffs do not allege injury from any government action or decision that was not subject to discretion and susceptible to policy analysis. To the extent that the plaintiffs suggest that the government was required to release them into the interior, did not have the discretion to prosecute Mr. A. and Mr. Q. for criminal violations of immigration law, or did not have discretionary authority to determine that C.D.A. and E.A.Q.A. were unaccompanied, these arguments must be rejected for they delve into quintessential discretionary policy judgments subject to the DFE.

### ii. The plaintiffs' conditions-of-confinement claims also challenge discretionary conduct.

Although the government is committed to safe and humane treatment of every individual in detention, the plaintiffs' remaining conditions-of-confinement claims are nonetheless barred by the DFE. Courts have repeatedly held that the DFE applies to claims based on acts or omissions relating to "conditions of confinement" because the manner in which the government manages and operates its detention facilities involves discretionary decisions susceptible to policy considerations. *See, e.g., Bultema v. United States*, 359 F.3d 379, 384 (6th Cir. 2004) (decision not to provide bed rails susceptible to policy considerations); *Campos v. United States*, 888 F.3d 724, 733 (5th Cir. 2018) (deficiencies in computer database that failed to reveal immigration status protected by discretionary function exception); *Cosby v. Marshals Service*, 520 F. App'x 819, 821 (11th Cir. 2013) (detainee decisions involve "several policy considerations . . . including prison security, the allocation of finite resources, and the logistics of prisoner

transportation if transfer to an off-site facility is an option"); *Patel v. United States*, 398 F. App'x 22, 29 (5th Cir. 2010) (DFE applied to decision to transfer prisoner); *Antonelli v. Crow*, No. 08-261, 2012 WL 4215024, at *3 (E.D. Ky. Sept. 19, 2012) (collecting cases in which myriad conditions of confinement claims, including claims based on temperature and crowding, barred by DFE); *Lineberry v. United States*, No. 3:08-cv-0597, 2009 WL 763052, at *6 (N.D. Tex. Mar. 23, 2009) ("Plaintiff's allegation of negligent overcrowding falls within the discretionary function exception").

### iii.   The plaintiffs' constitutional allegations do not alter the analysis.

That the plaintiffs suggest that certain alleged conduct violated the Constitution does not alter the DFE analysis. Amended Compl. ¶8. Congress did not create the FTCA to address constitutional violations, but rather to address violations of state tort law committed by federal employees. *See Meyer*, 510 U.S. at 477 (recognizing that "§ 1346(b) does not provide a cause of action for" a "constitutional tort claim"). As noted, the Supreme Court has explained that when a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," there is no further discretion to exercise. *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536) (emphasis added). The Constitution is no different: in some cases, the Constitution may establish such a specific prescription that it removes an official's discretion, but the requirement of specificity applies with the same force whether the prescription is found in the Constitution or a statute.

27

The Supreme Court has long recognized that conduct may be discretionary even if it is later determined to have violated the Constitution. The common law doctrine of official immunity thus applies to the exercise of "discretionary functions" even when the conduct violated the Constitution, so long as the constitutional right was not defined with sufficient specificity that the official should have known the act was prohibited. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *see also, e.g., Wilson v. Layne*, 526 U.S. 603, 614-615 (1999) (applying the "discretionary function[]" formulation and holding that officers were entitled to qualified immunity because, although their conduct violated the Fourth Amendment, the law was not clearly established at the time). Thus, when the Supreme Court in *Berkovitz* held that a federal mandate must "specifically prescribe[]" conduct in order to overcome the DFE, it referred to official immunity precedent, underscoring that the two standards operate in tandem. 486 U.S. at 536 (citing *Westfall v. Erwin*, 484 U.S. 292, 296-297 (1988));*see, e.g., Bryan v. United States*, 913 F.3d 356, 364 (3d Cir. 2019) ("Because . . . the CBP officers did not violate clearly established constitutional rights, the FTCA claims also fail" under the discretionary function exception.).

Indeed, even before it specifically addressed the qualified immunity standards applicable to federal employees, the Supreme Court in *Butz v. Economou*,

explicitly recognized that the DFE would apply even if alleged conduct might later be held unconstitutional. 438 U.S. 478 (1978). The Court in that case held that officials sued for violations of constitutional rights were entitled to qualified, but not absolute immunity. The Court explained that were it otherwise, the recently recognized *Bivens* remedy would be illusory, and, as relevant here, it noted that "no compensation would be available from the Government, for the Tort Claims Act prohibits recovery for injuries stemming from discretionary acts, even when that discretion has been abused." *Id.* at 505. DFE

The Third Circuit has not stated the level of specificity with which a constitutional proscription must be articulated in order to remove the discretion of a federal actor. *See Sutton v. Rasheed*, 323 F.3d 236, 258 (3d Cir. 2003). For the reasons discussed, a court should require the same level of specificity that would be required in determining whether a statute left an employee with no discretion to abuse.

In any event, whatever the precise standard, it is not satisfied here. The plaintiffs have alleged actions of various kinds by various officials. Regardless of whether some or all of these acts reflected an abuse of discretion, the plaintiffs have identified nothing in the decisions of the Supreme Court or the Third Circuit that removed any official's discretion with respect to any of the categories of asserted actions by "specifically prescrib[ing] a course of action for an employee to follow." *Gaubert*, 499 U.S. at 322. Indeed, as the Fourth Circuit observed, "we . . . have been unable to find a substantive due process right to family unity in the context of

29

immigration detention pending removal." *Reyna as next friend of J.F.G. v. Hott*, 921

F.3d 204, 210-11 (4th Cir. 2019). And, although some decisions have concluded that

constitutional allegations made the exception inapplicable, none have analyzed the

relevant standards set out in the Supreme Court's FTCA decisions and in its

decisions involving official immunity. Those principles make clear that the DFE

bars precisely the sorts of claims at issue here.

> **b.  Plaintiffs' claims relating to the transfer of C.D.A. and E.A.Q.A. to ORR Custody are barred by the FTCA's exception for actions taken while reasonably executing the law.**

The plaintiffs' claims relating to the decision to transfer C.D.A. and E.A.Q.A.

to the custody of ORR are independently precluded because the FTCA prevents the

United States from being held liable for "[a]ny claim based upon an act or omission

of an employee of the Government, exercising due care, in the execution of a statute

or regulation, whether or not such statute or regulation be valid." 28 U.S.C. §

2680(a). Thus, "[w]here government employees act pursuant to and in furtherance

of regulations, resulting harm is not compensable under the act[.]" *Dupree v. United

States*, 247 F.2d 819, 824 (3d Cir. 1957); *see also Accardi v. United States*, 435 F.2d

1239, 1241 (3d Cir. 1970) (claim based on "enforcement of 'rules and regulations'"

barred by § 2680(a)).

This exception "bars tests by tort action of the legality of statutes and

regulations." *Dalehite v. United States*, 346 U.S. 15, 33 (1953); *see also* H.R. Rep.

No. 77-2245, 77th Cong., 2d Sess., at 10 (noting that it was not "desirable or

intended that the constitutionality of legislation, or the legality of a rule or regulation should be tested through the medium of a damage suit for tort"); *Powell v. United States*, 233 F.2d 851, 855 (10th Cir. 1956) (FTCA does not waive sovereign immunity for claims based on employees' acts "performed under and in furtherance of the regulation . . . even though the regulation may be irregular or ineffective"). Thus, where a government employee's actions are authorized by statute or regulation – even if that statute or regulation is later found unconstitutional or invalid — the claim must be dismissed for lack of subject matter jurisdiction. *See Borquez v. United States*, 773773 F.2d 1050, 1052-53 (9th9th Cir. 1985).

Here, the United States is required to "transfer the custody" of children who meet the definition of a UAC under the TVPRA to the care of ORR "not later than 72 hours after" determining that there is no parent available to provide care and physical custody, absent exceptional circumstances. 8 U.S.C. § 1232(b)(3).).), 1232(c)(2)(A), 8 U.S.C. § 279(g). In this case, the government made the determination that Mr. A. and Mr. Q. were unable to provide care and physical custody for C.D.A. and E.A.Q.A when the government made the discretionary decisions to refer Mr. A. and Mr. Q. for criminal prosecution and to detain them in a secure immigration detention facility separate from C.D.A. and E.A.Q.A. Once those protected discretionary determinations had been made, the TVPRA required that C.D.A. and E.A.Q.A. be transferred to ORR custody. The enforcement of that statutory command cannot form the basis of an FTCA claim. The plaintiffs' FTCA

claims are barred by the exception for actions taken while reasonably executing the law.

### c. The plaintiffs' FTCA claims are further barred because they have no private analog.

The plaintiffs' FTCA claims are further barred because their claims have no private analog, a requirement for FTCA liability. The FTCA's waiver of sovereign immunity is limited to "circumstances in which the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *Lomando v. United States*, 667 F.3d 363, 372 (3d Cir. 2011). The statute authorizes tort recovery against the United States only "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. In other words, for a claim to be cognizable against the United States under the FTCA, the Court must find a state law under which a private actor would be liable for the actions alleged. *See United States v. Olson*, 546 U.S. 43, 44 (2005); *see also CNA*, 535 F.3d at 132.

The FTCA does not waive sovereign immunity for claims against the United States based on governmental "action of the type that private persons could not engage in and hence could not be liable for under local law." *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988) (internal quotes omitted). The FTCA "requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing liability under the FTCA. *United States v. Olson*, 546 U.S. at 45-46. Though the private analogue need not be exact, a plaintiff must offer "a persuasive analogy" showing that the government actor sued would be subject to

liability under state law if it were a private person. *Westbay Steel, Inc. v. United States*, 970 F.2d 648, 650 (9th Cir. 1992).

Because only the federal government has the authority to enforce federal criminal and immigration laws and make detention determinations, there is no private-person analogue that would support a claim under the FTCA. The alleged harms here stem from the federal government's decision to enforce federal immigration laws, criminally prosecute certain individuals, and hold parents in custody pending immigration proceedings or prosecution, resulting in their children's placement in the care and custody of ORR. The United States has not waived its sovereign immunity for such decisions to enforce federal law, as they have no private-person counterpart. *Feres v. United States*, 340 U.S. 135, 146, (1950); *see also Maliek-Ali v. United States Dep't of State*, Civil Action No. 18-102 Erie, 2019 U.S. Dist. LEXIS 55105, at *3 (W.D. Pa. Apr. 1, 2019); *Muhammad v. United States*, 884 F. Supp. 2d 306 (E.D. Pa. 2012); *see, c.f. Avalos-Palma v. United States*, Civil Action No. 13-5481(FLW), 2014 U.S. Dist. LEXIS 96499 (D.N.J. July 16, 2014) (finding an FTCA claim could lie where the government deported a plaintiff contrary to immigration law). The plaintiffs' FTCA claims are, thus, barred because their claims have no private analog.

### d. The plaintiffs' FTCA clams are barred because they allege systemic claims rather than claims based on direct liability.

The plaintiffs' FTCA clams are barred because they allege systemic claims rather than claims based on direct liability. The FTCA's limited waiver of sovereign immunity allows a plaintiff to sue the United States for damages arising from

certain torts committed by federal employees acting within the scope of their employment. *Lichtman v. United States*, 316 F. App'x 116, 120 (3d Cir. 2008) (citing 28 U.S.C. § 1346(b)). The terms "person" and "employee of the government," as used in the FTCA, mean individuals and natural persons, not institutions or corporate entities. *Daniels v. United States*, No. 20-3893, 2021 U.S. Dist. LEXIS 108492, at *6 (E.D. Pa. June 1, 2021) (citing *Rayonier Inc. v. United States*, 352 U.S. 215 (1957)); *see also Adams v. United States*, 420 F.3d 1049, 1052-55 (9th Cir. 2005); *Ochran v. United States*, 117 F.3d 495, 506 (11th Cir. 1997). Hence, a plaintiff cannot assert "systemic" claims or seek to hold the United States directly liable under the FTCA but must instead allege tortious conduct by individual federal employees, acting within the scope of their employment, for whom the United States has assumed liability for under the FTCA. *See, e.g., Lee v. United States*, No. CV 19-08051-PCT-DLR (DMF), 2020 WL 6573258, at *6 (D. Ariz. Sept. 18, 2020) (applying *Adams* and dismissing claims of "generalized negligence" asserted against staff and employees of federal institutions "as a whole" for lack of jurisdiction).

Here, as in *Lee*, the plaintiffs seek to raise direct liability and institutional tort claims against the United States. Throughout the amended complaint, the plaintiffs attribute the alleged tortious conduct to the government as a whole, referring throughout to "the United States government," "the U.S. government," and "the government," rather than specific tortious conduct on the part of specific federal employees for whom the United States must assume liability. *See,* e.g., Amended Compl. ¶¶ 9, 10, 30, 55-56, 62-63, 65, 68, 73-74, 90, 130, 142, 151. The

FTCA's limited waiver of sovereign immunity does not encompass such "systemic," institutional tort claims or "generalized theories" of tortious conduct "asserted against the staff and employees of federal institutions as a whole." *Lee*, 2020 WL 6573258, at *6. The plaintiffs' FTCA clams are barred because they allege systemic claims rather than claims based on direct liability.

### e. All FTCA claims relating to detention at the BCRC are barred by the independent contractor exception.

Under the FTCA, the United States is liable for the acts of government employees acting within the scope of their employment. 28 U.S.C. § 1346(b). The United States is not liable for the acts of an independent contractor. 28 U.S.C. § 2671. The Supreme Court has held that the application of the independent contractor exception turns on whether the United States "controls the physical conduct of the contractor in performance of the contract." *Logue v. United States*, 412 U.S. 521, 527 (1973). In other words, "the question here is . . . whether [the contractor's] day-to-day operations are supervised by the Federal Government." *United States v. Orleans*, 425 U.S. 807, 815 (1976).

Here, Mr. A. and C.D.A. were detained in facilities run by contractors, not by the federal government. The day-to-day operation of the BCRC was managed by Berks County acting as a contractor. All allegations about the temperature, food, crowding, and night checks during detention criticize the actions of contractors. The plaintiffs have pled no federal government actor directing these actions, and indeed there is none. All FTCA claims relating to detention at the BCRC (and any other facilities run by contractors) are barred by the independent contractor exception.

**2. All FTCA claims are barred because they are unsupported by applicable state law and therefore the plaintiffs fail to state a claim.**

In analyzing FTCA claims, the Court must first determine what state law applies to those claims. *See, e.g., Gould Elecs., Inc. v. United States*, 220 F.3d 169 (3d Cir. 2000) (applying a choice of law analysis). Generally, the applicable law is the law of the place where the alleged tortious act or omission occurred. 28 U.S.C. § 1346 (b). The court uses the choice-of-law provisions from that state to determine what substantive law applies. *See Richards v. United States*, 369 U.S. 1, 8-10 (1962).

For Mr. Q. and E.A.Q.A., the analysis is straightforward. They were apprehended in Texas and initially detained together there. They were separated in Texas because Mr. Q. was charged with illegal reentry pursuant to 8 U.S.C. § 1326 and held in criminal custody in Texas for his criminal proceedings. E.A.Q.A. also was housed in ORR custody in Texas while his father was in criminal custody. Upon reunification, Mr. Q. and E.A.Q.A. were released together in Texas. They do not plead any allegedly tortious acts or omissions occurring outside of Texas. Therefore, Texas's choice of law rules apply—and, because Texas courts look to the state with the most significant relationship in their choice-of-law analysis, the tort law of Texas applies to each of Mr. Q. and E.A.Q.A.'s five FTCA claims. *See Quicksilver Res. Inc. v. Eagle Drilling, LLC*, 792 F. Supp. 2d 948, 951 (S.D. Tex. 2011) (citing *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979)).

Although less straightforward, the analysis lends a clear result for Mr. A. and C.D.A. as well. They were apprehended in New Mexico and initially detained

36

together there before being separated. The separation, which forms the gravamen of their claims, occurred in New Mexico after Mr. A. was charged with illegal entry under 8 U.S.C. § 1325. After being charged, Mr. A. was held in criminal custody in New Mexico. C.D.A. was sent to ORR custody and held in Texas and Illinois. Ultimately, Mr. A. and C.D.A. were reunited and detained in Pennsylvania before being released. For tort cases, New Mexico follows the doctrine of "lex loci delicti commissi—that is, the substantive rights of the parties are governed by the law of the place where the wrong occurred." *De Jesus Carrillo v. Cent. Trucking, Inc.*, No. 1:19-cv-00863-MV-LF, 2020 U.S. Dist. LEXIS 78432, at *6-7 (D.N.M. May 4, 2020) (citing *Terrazas v. Garland & Loman, Inc.*, 142 P.3d 374, 377 (N.M. 2006)). Under this doctrine, the place of the place of where the wrong occurred is the location of the last act necessary to complete the plaintiff's injury. *Id.* (citing *Terrazas*, 142 P.3d at 377).

As to Mr. Q. and E.A.Q.A.'s claims, these claims fail because, broadly, Texas law privileges the actions at issue here. But even if this were not true, all the claims fail under applicable state law because the facts are at odds with the elements of the claim alleged.

### a. All of Mr. Q. and E.A.Q.A.'s FTCA claims fail under Texas law because these claims challenge privileged conduct.

Mr. Q. and E.A.Q.A.'s FTCA claims are barred because these claims challenge privileged conduct. Under Texas law, conduct that may otherwise give rise to liability is not considered tortious if the conduct is privileged. *See Hinojosa v. City of Terrell, Tex.*, 834 F.2d 1223, 1231 (5th Cir. 1988) (citing Restatement

(Second) of Torts § 10, and W. Keeton, Prosser and Keeton on Torts 16 (5th ed. 1984)). This principle applies here because the challenged conduct—the separation of Mr. Q. from his son while Mr. Q. was subject to criminal prosecution—was privileged under Texas law and federal immigration statutes.

It is well established that in FTCA cases, the United States is entitled to invoke state law privileges. *See Villafranca v. United States*, 587 F.3d 257 (5th Cir. 2009) (Texas' civil privilege defense statute applied in FTCA action alleging assault by federal officer); *McElroy v. United States*, 861 F. Supp. 585 (W.D. Tex. 1994) ("the United States may invoke any defenses available to individual law enforcement officers under Texas law."); *Hernandez v. United States*, No. 1:17-CV-00087, 2018 WL 4103015, at *3-4 (S.D. Tex. July 2, 2018) ("the Government may look to state law privileges as a defense to FTCA claims").

A leading case on this point is *Caban v. United States*, where the INS detained the plaintiff when he arrived at JFK airport from the Dominican Republic because he was not able to satisfactorily show that he was an American citizen. 728 F.2d 68 (2d Cir. 1984). The INS ultimately determined that he was an American citizen, and he was released after being detained for six days. He sued under the FTCA for, *inter alia*, false imprisonment. New York's statutory definition of false imprisonment provided that false imprisonment does not occur if "the confinement was . . . otherwise privileged." *Caban*, 728 F.2d at 72. The Second Circuit held that the INS agents' conduct was "otherwise privileged" because a federal immigration statute provided that a person entering the United States who cannot clearly show

his right to entry "'shall be detained for further inquiry.'" *Id.* at 71 (quoting 8 U.S.C. 1225(b) (1976)).

Privileges apply to public officials performing their official functions with legal authority and courts have applied these privileges in FTCA cases. In a case affirmed by the Fifth Circuit, the district court in *Tovar v. United States*, considered the United States' liability under the FTCA for false imprisonment claims raised in an immigration context. No. 3:98-cv-1682, 2000 U.S. Dist. LEXIS 5044, at *23 (N.D. Tex. Apr. 18, 2000), *aff'd* 244 F.3d 135 (5th Cir. 2000). Citing *Caban*, the district court looked to federal law to determine whether the INS agents acted with legal authority. *Id.* at *18. The district court then held that the "INS acted under authority of law" because federal immigration statutes authorized the challenged government conduct. *Id.* at *22. Therefore, the privilege applied. *Id.*

Here, the challenged conduct—the separation of Mr. Q. from his son while he was criminally charged and prosecuted—was authorized by federal law. *See supra* Section IV.A.1.b of this brief. Accordingly, under *Tovar* and its progeny, the conduct was privileged under Texas law and the United States cannot now be held liable in tort for claims arising from the separation.

### b. The plaintiffs fail to state a claim under applicable state law.

The torts alleged here are defined by state law. Yet, for each tort claim alleged, the plaintiffs fail to plead all the necessary elements as defined by Texas and New Mexico law. For this reason, their FTCA claims fail.

> ### i. Texas and New Mexico law both bar the plaintiffs' claims for intentional infliction of emotional distress.

Applicable state law bars the plaintiffs' claims for intentional infliction of emotional distress. Both Texas and New Mexico adopt the Restatement (Second) of Torts definition of this tort which requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Johnson v. Merrell Dow Pharm., Inc.*, 965 F.2d 31, 33 (5th Cir. 1992); *Young v. U.S. W. Communs.*, No. 97-2287, 1998 U.S. App. LEXIS 31000, at *8-9 (10th Cir. Dec. 9, 1998) (unpublished opinion).

The separations here, which were caused by lawful criminal prosecution, do not meet this definition. Texas courts have long recognized a strong public policy in favor of protecting lawful prosecutions. *See Smith v. Sneed,* 938 S.W.2d 181, 184 (Tex. App. 1997) (collecting cases). In accordance with that public policy, Texas "prohibits a person convicted of a crime from suing another for damages caused by conviction," including for claims of intentional infliction of emotional distress. *Jones v. Hyman*, 107 S.W.3d 830, 831-32 (Tex. App. 2003).

Under Texas or New Mexico law, where, as here, a parent is separated from his child due to the parent's criminal detention and prosecution, the decision to separate is does not meet the level of extreme or outrageous conduct required to state a claim under state law for intentional infliction of emotional distress. This is especially true where, as here, the separation was required by federal law. The plaintiffs fail to state a claim for intentional infliction of emotional distress under

Texas or New Mexico law. These claims should be dismissed.

### ii. Texas and New Mexico law both bar the plaintiffs' claims for negligent infliction of emotional distress.

Applicable state law bars the plaintiffs' claims for negligent infliction of emotional distress. Texas does not generally recognize a claim for negligent infliction of emotional distress, regardless of the severity of the alleged emotional distress that a plaintiff suffers. *Garza v. United States*, 881 F. Supp. 1103, 1108 (S.D. Tex. 1995). Such a claim is viable only where there is a special duty imposed by law. *Boyles v. Kerr*, 855 S.W.2d 593, 594 (Tex. 1993). Texas courts do not recognize a special duty by immigration officials to prevent emotional distress by detainees. *See Villafuerte v. United States*, No. 7:16-CV-619, 2017 U.S. Dist. LEXIS 227976, at *30-37 (S.D. Tex. Oct. 11, 2017) (dismissing detainee's negligent infliction of emotional distress); *Walding v. United States*, No. SA-08-CA-124-XR, 2009 U.S. Dist. LEXIS 26552, at *52 (W.D. Tex. Mar. 31, 2009) (accepting voluntary dismissal of detainee's negligent infliction of emotional distress where such claim was unsupported by Texas law).

Here, as previously noted, the plaintiffs were separated lawfully by the application of federal law. Under Texas law, no special duty arose to shield Mr. Q. from any emotional consequences from detention, including separation from his son (which was required by federal statute). The facts, as pled, do not support a negligent infliction of emotional distress claim under Texas law.

New Mexico's tort of negligent infliction of emotional distress is even narrower. It applies only to a bystander who suffers "severe emotional shock as a

result of witnessing a sudden, traumatic event that causes serious injury or death to a family member." *Silva v. United States*, 859 F. App'x 285, 287 fn.2 (10th Cir. 2021) (unpublished) (citing *Fernandez v. Walgreen Hastings Co.*, 968 P.2d 774, 777 (N.M. 1998)).

Here, there is no allegation that Mr. A. or C.D.A. suffered serious injury or death. At most, the complaint alleges that each suffered emotional distress as a result of the government enforcing federal law. Even assuming either witnessed each other experiencing emotional distress, alone such allegations are insufficient to sustain a claim for negligent infliction of emotional distress under New Mexico law.

Both sets of plaintiffs therefore fail to state a claim for negligent infliction of emotional distress under applicable state law. These claims should be dismissed.

### iii. Texas and New Mexico law both bar the plaintiffs' claims for negligence.

Applicable state law bars the plaintiffs' claims for negligence. Negligence arises from a defendant's failure to take necessary care. To state a claim for negligence under Texas law, a plaintiff must plead "the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *Kristensen v. United States*, 993 F.3d 363, 368 (5th Cir. 2021); *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002).

Here, Mr. Q. and E.A.Q.A. have failed to identify a duty that was breached. Their negligence claim is grounded in their separation. But no state, including

Texas or New Mexico, requires that parents being criminally prosecuted be housed with their children. *Cf., Davis v. Carlson*, 837 F.2d 1318, 1319 (5th Cir. 1988) (denying mandamus and holding that the Bureau of Prisons has "no clear duty— nor, indeed, any duty" to transfer a prisoner to a facility near his wife).

Here, Mr. Q. was criminally prosecuted. That necessitated separation of him from E.A.Q.A. Separation due to criminal prosecution after entering the country without authorization is legal. The federal government has no duty to refrain from enforcing federal law, and there can be no breach by lawful enforcement thereof. There was no breach of any duty under Texas law.

The negligence claims suffer from an additional deficiency under both Texas and New Mexico law. The law in both states require that a plaintiff show some physical injury to succeed on an ordinary negligence claim. *Temple-Inland Forest Prods Corp. v. Carter*, 993 S.W.2d 88, 91 (Tex. 1999) (citations omitted); *Flores v. Baca*, 871 P.2d 962, 969 (N.M. 1994). And the laws distinguish between physical injuries and physical manifestations of emotional distress. *See Holler v. United States*, 724 F.2d 104, 105 (10th Cir. 1983); *Chapa v. Traciers & Assocs.*, 267 S.W.3d 386, 397 (Tex. App. 2008). In *Villafuerte* the district court held that the detainee's alleged pain from prolonged exposure to extremely low temperatures, sleep deprivation, hunger, stomach aches, headaches, weakness, dizziness, and symptoms of trauma, depression, and anxiety were not physical injuries. 2017 U.S. Dist. LEXIS 227976, at *9. Rather, the court held that these were mental and emotional harms insufficient to support a negligence claim. *Id.*

Here, the plaintiffs allege no physical injuries. Rather, they allege the same sorts of emotional distress rejected in *Villafuerte*. The mental anguish they allege in the amended complaint is insufficient to state a claim under both Texas and New Mexico law. The plaintiffs fail to state a negligence claim under applicable state law. These claims should be dismissed.

### iv.  Texas and New Mexico law both bar the plaintiffs' claims for abuse of process.

Applicable state law bars the plaintiffs' claims for abuse of process. In both states the tort is characterized by a misuse of the power of the judiciary by a litigant with a malicious motive that results in damages. *See Carolina Cas. Ins. Co. v. Nanodetex Corp.*, 733 F.3d 1018, 1023-24 (10th Cir. 2013) (applying New Mexico law); *Roe v. United States*, 839 F. App'x 836, 846-47 (5th Cir. 2020) (applying Texas law).

Missing here is any pleading of damages. The plaintiffs do not challenge their federal prosecutions. The plaintiffs allege that Mr. A. and Mr. Q. were pressured to relinquish their asylum rights in exchange for reunification with their sons. But the amended complaint does not allege that Mr. Q. did agree to relinquish his asylum claims or that either Mr. Q. or Mr. A.'s asylum proceedings have been detrimentally impacted in any way. Unless and until they are denied asylum for a reason traceable to the alleged abuse of process, they have suffered no damages. Nor is it even clear that an abuse of process claim could encompass administrative proceedings, like any future asylum proceedings. Their claim, as currently pled, is

entirely speculative and no damages are evident. This is fatal to their abuse of process claims, which should be dismissed.

### v. Texas and New Mexico law both bar the plaintiffs' claims for loss of consortium.

Applicable state law bars the plaintiffs' claims for loss of consortium. Texas and New Mexico law permit loss of consortium claims but only where there has been death or serious bodily injury. *Thompson v. City of Albuquerque*, 397 P.3d 1279, 1281 (N.M. 2017); *Reagan v. Vaughn*, 804 S.W.2d 463, 467 (Tex. 1990). Claims cannot be based on purely emotional harm. *Rodriguez v. H.E. Butt Grocery Co., L.P.*, No. 13-20-00467-CV, 2021 Tex. App. LEXIS 8190, at *8 (Tex. App. Oct. 7, 2021) (citations omitted).

Here, it is clear there has been no death. Nor does the amended complaint contain allegations of serious bodily injury. At most, the amended complaint pleads emotional distress, but that is insufficient to support a claim for loss of consortium. Just as this is fatal to the plaintiffs' negligent infliction of emotional distress and ordinary negligence claims, it is similarly fatal to their loss of consortium claims. These claims are barred under both Texas and New Mexico law. The claims should therefore be dismissed.

Taken in total, the plaintiffs' FTCA claims fail for six independent reasons. Any one of these grounds would be sufficient for dismissal. Amendment cannot cure these deficiencies. This Court should dismiss, with prejudice, Counts I through V of the amended complaint.

### 3. The plaintiffs state no viable ATS claim.

The Court should also dismiss Counts VI, VII, and VIII, which rely on the ATS. As the Supreme Court noted in *Sosa v. Alvarez-Machain*, the ATS is "jurisdictional," it creates "no new causes of action" for private plaintiffs like the plaintiffs here. *See* 542 U.S. 692, 724 (2004); *see also Jesner v. Arab Bank, PLC*, 138 S.Ct. 1386, 1397 (2018) ("The ATS is 'strictly jurisdictional' and does not by its own terms provide or delineate the definition of a cause of action for violations of international law"). Rather, where there has been a violation of the law of nations or a treaty of the United States, the ATS allows such a violation to be litigated in federal court. *See* 28 U.S.C. § 1350; *see, e.g., Karunamunige Chamila Krishanthi v. Rajakumara Rajaratnam*, No. 09-CV-05395 (DMC-JAD), 2010 U.S. Dist. LEXIS 88788, at *57 (D.N.J. Aug. 26, 2010) ("Federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted").

Thus, for the ATS to apply, the plaintiffs here would have to prove a violation of the law of nations or a treaty of the United States that gives rise to a tort. *See Bieregu v. Ashcroft*, 259 F. Supp. 2d 342, 350-51 (D.N.J. 2003). The Supreme Court has cautioned courts from liberally finding such a violation, noting that courts should only recognize private claims under federal common law for violations of any international law where such violations were well accepted among civilized nations when section 1350 was enacted. *Sosa*, 542 U.S. at 724-25; *see also Hereros v. Deutsche Afrika-Linien Gmblt & Co.*, 232 F. App'x 90, 93 (3d Cir. 2007) (noting that

there was a "very limited category" of violations recognized when the ATS was enacted). In other words, there must be a violation of a norm that is specific, universal, and obligatory. *Sosa*, 542 U.S. at 732-33; *Ben-Haim v. Neeman*, 543 F. App'x 152, 154 (3d Cir. 2013). Courts in this circuit finding an ATS claim do so where there is evidence that noncitizen detainees were tortured, beaten, harassed, and housed in sub-human conditions. *See, e.g.*, *Jama v. United States INS*, 343 F. Supp. 2d 338, 386 (D.N.J. 2004) (denying motion to dismiss).

The plaintiffs' complaint does not allege such a violation. The application of federal immigration law when plaintiffs crossed the Southern border and which thereafter dictated their handling under federal statutes, does not equate to torture or crimes against humanity. American courts have recognized that the right to be free from cruel, unhuman, or degrading treatment is a universally accepted customary human rights norm. *Abebe-Jira v. Negewo*, 72 F.3d 844, 847 (11th Cir. 1996), *cert. denied*, 117 S. Ct. 961 (1996) (two minor plaintiffs were stripped naked, bound, whipped severely, and threatened with death); *Paul v. Avril*, 901 F. Supp. 330, 331-35 (S.D. Fla 1994) (the plaintiffs were kidnapped, beaten with blunt objects and had their genitalia squeezed until they fainted from pain); *Xuncax v. Gramajo*, 886 F. Supp. 162, 184-85 (D. Mass. 1995) (the plaintiffs were beaten, mutilated, and forced to watch their family members being killed). The commonality between these cases is that they involved extreme forms of abuse. Here, the facts, as alleged, do not amount to extreme forms of abuse like those described in cases where ATS violations have been found. *See Filártiga v. Peña-Irala*, 630 F.2d 876,

882-85 (2d Cir. 1980). The conduct of which the plaintiffs complain did not violate *jus cogens* norms—the highest international law norm supported by widespread state practice of nations acting of out a sense of legal obligation. RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES, §102(2).

Even taken in the light most favorable to the plaintiffs, the allegations in the amended complaint do not rise to the level of a violation of international law.

The plaintiffs state no viable ATS claim. The facts as alleged do not provide jurisdiction to this Court under the ATS, and the facts do not amount to an ATS claim. Amendment cannot cure any of these deficiencies. This Court should dismiss, with prejudice, Counts IV through VII of the amended complaint.

**B. In the alternative, if any claims survive this threshold motion, they should be severed and transferred to the respective district where each separation occurred.**

If any claims survive this threshold motion to dismiss, they should not be litigated in this district. Rather, those claims should be transferred pursuant to 28 U.S.C. § 1404(a), which authorizes transfer to a more convenient forum in the interest of justice. This requires a two-step analysis. First, the Court must determine if there is another proper venue. If there is, then the Court moves on to the second step and determines whether the balance of interests weighs in favor of transfer. *See Atlantic Marine Constr. Co. v. U.S. District Court*, 571 U.S. 49, 62 n.6 (2013) (providing a non-exhaustive list of factors to balance the various interests).

**1. Another venue is proper.**

There is another proper venue here for the plaintiffs. Mr. Q. and E.A.Q.A. could have brought their case in the Western District of Texas. Mr. A. and C.D.A. could have brought their case in the District of New Mexico. The separation of the parents and children is the gravamen of the amended complaint and the express subject of a majority of the FTCA claims. Venue would be proper in the federal district where the separation occurred, pursuant to 28 U.S.C. § 1402(b). As such, transfer to those two districts there is authorized by 28 U.S.C. § 1404(a). *See, c.f., Barroca v. United States*, No. 19-cv-699, 2019 WL 5722383, *3 (N.D. Cal. Nov. 5, 2019) (granting motion to transfer in FTCA case where majority of allegations in plaintiff's complaint occurred in the transferee state); *Koval v. United States*, No. 2:13-cv-1630, 2013 WL 6385595, *4 (D. Ariz. Dec. 6, 2013) (granting motion to

transfer case to Eastern District of California where "[t]he only connection that this case has to Arizona is that plaintiff happened to move there sometime after the events upon which his claims are based occurred").

### 2.  The balance of relevant factors strongly favors transfer.

The balance of interests strongly weighs in favor of transfer. Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness. *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995); *Solomon v. Cont'l Am. Life Ins. Co.*, 472 F.2d 1043, 1046 (3d Cir. 1973) (citing *Norwood v. Kirkpatrick*, 349 U.S. 29 (1955)); *Wood v. Zapata Corp.*, 482 F.2d 350, 358 (3d Cir. 1973).

In exercising its discretion, the Court considers both private factors, which go to the convenience of the parties and witnesses, as well as public factors, which go to the interests of justice. *See Jumara*, 55 F.3d at 879. Private factors include: (1) the parties' respective forum preferences;[8] (2) the location where the claims arose; (3) convenience to the parties; (4) convenience to witnesses; and (5) the location of underlying evidence. *See id.*[9] Public factors include: (1) the enforceability of judgment; (2) any practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora

---

[8] Although the plaintiff's preference is certainly weighed, no one factor, including this one, is dispositive. *See e.g., Askerneese v. NiSource, Inc.*, No. 12-7167, 2013 U.S. Dist. LEXIS 48718, at *2 (E.D. Pa. April 4, 2013) (transferring over the plaintiff's objection).

[9] The convenience of counsel is not a factor to be considered. *Solomon v. Cont'l Am. Life Ins. Co.*, 472 F.2d 1043, 1047 (3d Cir. 1973).

resulting from court congestion; (4) the local interests in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases. *See id.* at 879-80.

Here the private factors support transfer. The claims arose out of alleged events that occurred in Texas and New Mexico. Although it appears the plaintiffs prefer to litigate in Pennsylvania, the undersigned is unaware of the plaintiffs' current locations. Witnesses are largely located in Texas and New Mexico, not Pennsylvania. Evidentiary materials are also largely located in Texas and New Mexico, not Pennsylvania. Critical, non-party rebuttal witnesses will also expectedly be located in Texas and New Mexico, beyond the subpoena power of this Court. Litigating in Pennsylvania will be expensive and burdensome, requiring that most potential witnesses travel for deposition and trial. Much of this expense and burden is obviated or reduced if the claims are severed and transferred to the appropriate districts.

The public interests also favor transfer. Save for the plaintiffs' own preference, there is no reason for the case to have ever been filed in Pennsylvania. The amended complaint does not clarify a connection between each of the four plaintiffs and Pennsylvania.[10] Mr. Q. and E.A.Q.A. entered the United States in Texas, were apprehended there, were separated there, and were detained there, and

---

[10] Even if all four plaintiffs now resided in Pennsylvania, it would not make this district the best forum for their claims. The undersigned is unaware where the plaintiffs reside or if they ever resided in this district. The amended complaint is completely devoid of any allegations about where the plaintiffs do reside or what their alleged connection is to this forum.

51

were released there. Their allegations have no connection to Pennsylvania. Only Texas law applies to their claims.

Although the other plaintiffs were housed in Pennsylvania for part of their detention, that detention is not the primary focus of their FTCA claims. Mr. A. and C.D.A. entered the United States in New Mexico, were separated in New Mexico, and were held in Texas and Illinois. By the time these two plaintiffs came to Pennsylvania, they had been reunited—so any claims relating to separation are unrelated to Pennsylvania. New Mexico law applies to their claims.

Courts in Texas and New Mexico are more familiar with the controlling tort laws in those states, and those courts have a greater local interest in the official misconduct that is alleged to have occurred there. These courts are familiar with the detention centers where the plaintiffs were detained. These courts heard the criminal cases against Mr. A. and Mr. Q. The plaintiffs' contacts with Texas and New Mexico are substantial. Plaintiffs' current residence bears no relationship to the allegations in their amended complaint. In contrast, alleged acts and omissions of government officials in Texas and New Mexico are central to the allegations in the amended complaint. For all these reasons, the claims of each sets of plaintiffs should be severed and transferred to the respective districts where the separations occurred.

The only factor that favors maintaining this action in Pennsylvania is the plaintiffs' choice of forum; but in the circumstances here, it should carry little weight. Deference to a plaintiff's chosen venue is substantially reduced where that

52

locale lacks any real connection to the activities alleged in the complaint. *See, e.g.,*
*Amazon.com v. Cendant Corp.*, 404 F. Supp. 2d 1256, 1260 (W.D. Wash. 2005); *IBM*
*Credit Corp. v. Definitive Computer Servs., Inc.*, No. 95-3927, 1996 U.S. Dist. LEXIS
2385, at * 6 (N.D. Cal. Feb. 27, 1996) ("ordinarily, where the forum lacks any
significant contact with the activities alleged in the complaint, plaintiff's choice of
forum is given considerably less weight, even if the plaintiff is a resident of the
forum"); *SEC v. Ernst & Young*, 775 F. Supp. 411, 416 (D.D.C. 1991) ("Texas is the
site of nearly all of the facts underlying the filings here. 'Despite the presumption in
favor of plaintiff's forum choice, that choice should not be allowed to stand where
the forum chosen bears virtually no relation to the occurrences giving rise to the
cause of action.'"). The Eastern District of Pennsylvania has limited connection to
any activity alleged in the amended complaint.

The actual increased burden on the plaintiffs prior to trial if the case is
transferred would likely be minimal. A majority of discovery will be conducted in
Texas and New Mexico whether the case is transferred or not. By contrast, the
inconvenience to the government of litigating this case across the country from
where the events occurred would be substantial.

The two sets of fathers and sons here have no apparent connection to each
other. They were from different countries of origin. They speak different languages.
They crossed the border at different times and in different places. Each father was
charged with a different criminal offense. They were detained in different facilities.
They were reunited with their sons at different times and in different places.

Different state law applies to their claims. The only apparent connection between these two set of plaintiffs is that they have the same counsel. There is no other apparent reason why they filed their claims together in this single lawsuit, rather than separately proceeding.

Under these circumstances, in light of the fact that other forums are more appropriate for any surviving claims, severance of the claims is warranted. Federal Rule of Civil Procedure 20 permits multiple plaintiffs to join in an action if each of their claims arise from the same transaction or occurrence, and if there is a common question of law or fact relating to all plaintiffs' claims. Fed. R. Civ. P. 20(a); see, c.f., Cooper v. Fitzgerald, 266 F.R.D. 86, 88 (E.D. Pa. 2010) (severing claims where the only commonality between the plaintiffs was that they each sought to compel action on immigration benefits). Courts have discretion to sever claims where they rest on different sets of facts. *Klimaski v. Parexel Int'l*, No. 05-298, 2005 U.S. Dist. LEXIS 6403, at *8 (E.D. Pa. Apr. 4, 2005). Here, if any claims survive dismissal, those claims should be severed and transferred to the United States District Courts for the Western District of Texas and the District of New Mexico.

## V.     CONCLUSION

For the aforementioned reasons, this Court should enter an order dismissing all claims in the plaintiffs' amended complaint, with prejudice. In the alternative, if any claims survive dismissal, those claims should be severed and transferred.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
United States Attorney


/s/ *Susan R. Becker* for GBD
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division



/s/ *Veronica J. Finkelstein*
VERONICA J. FINKELSTEIN
ANTHONY ST. JOSEPH
Assistant United States Attorneys

*Counsel for the United States of America*


Dated:  March 28, 2022