```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                              *
C.D.A, et al,                 * Docket # 21-cv-469
                              *
          Plaintiffs,         *
                              * United States Courthouse
       vs.                    * Easton Courtroom
                              * Easton, PA
United States of America,     * July 6, 2022
                              * 9:38 a.m.
          Defendant.          *
 * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

             TRANSCRIPT OF MOTION TO DISMISS HEARING
             BEFORE THE HONORABLE EDWARD G. SMITH
              UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For The Plaintiffs:        Adam Kirschbaum, Esquire
                           Anne E. Reddy, Esquire
                           Blake M. Bailus, Esquire
                           Daniel Friedman, Esquire
                           Nick A. Norden, Esquire
                           Richard A. Edlin, Esquire
                           Greenberg Traurig, PA
                           One Vanderbilt Avenue
                           New York, NY 10017

For The Defendants:        Anthony St. Joseph, Esquire
                           Veronica J. Finkelstein, Esquire
                           615 Chestnut Street, Suite 1250
                           Philadelphia, PA  19106

Audio Operator:            J. Fitzko

Transcribing Firm:         Principle Court Reporting
                           Services, Inc., 544 Grove Ave.,
                           Suite 1, Johnstown, PA  15902
                           Telephone: 814-269-4666


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

1                               I N D E X

2                                                                     PAGE

3    DISCUSSION AMONG PARTIES                                          3

4    ARGUMENT

5         By Mr. St. Joseph                                            4

6         By Ms. Finkelstein                                          36

7         By Edlin                                                    52

8         By Friedman                                                 72

9    DISCUSSION AMONG PARTIES                                         92

10   ARGUMENT

11        By Mr. Bailus                                               94

12        By Mr. Norden                                              112

13   DISCUSSION AMONG PARTIES                                        125

14   ARGUMENT

15        By Ms. Reddy                                               126

16   REBUTTAL ARGUMENT

17        By Mr. St. Joseph                                          157

18   DISCUSSION AMONG PARTIES                                        163

19        By Ms. Finkelstein                                         164

20        By Mr. Edlin                                               175

21        By Ms. Reddy                                               179

22   DISCUSSION AMONG PARTIES                                        180

23   CERTIFICATE                                                     182

24                           E X H I B I T S

25                          (NONE OFFERED)

1            THE CLERK:   All rise.  Court is now in session.  The

2  Honorable Edward G. Smith presiding.

3            THE COURT:  You may be seated.  Thank you.

4            MR. ST. JOSEPH:  Thank you, Your Honor.

5            MR. EDLIN:  Good morning, Your Honor.

6            THE COURT:  Good morning.

7            MR. ST. JOSEPH:  Morning.

8            THE COURT:  The court is called to order in the

9  matter of C.D.A., a minor child, Mr. A., his father, E.A.Q.A.,

10 a minor child, Mr. Q., his father, versus the United States of

11 America.  This is civil action number 21-469.  Present in the

12 courtroom?  I don't know which counsel will be actually

13 presenting, but it's Richard Edlin, Nick Norden, Daniel

14 Friedman, Blake Bailus, Anne Reddy and Adam Kirschbaum.

15            On behalf of the United States of America appears

16 Veronica Finkelstein and Anthony Joseph.  Good morning to all

17 of you.

18            MR. ST. JOSEPH:  Good morning, Your Honor.

19            THE COURT:  The court convenes today to hear argument

20 with respect to the motion to dismiss that has been filed by

21 the United States of America.  Primarily arguing that these

22 claims are not cognizable under the federal tort claims act and

23 that there is no waiver of sovereign immunity with respect to

24 the -- let me just get it right here.  With respect to the

25 crimes against humanity under the ATS persecution and inhumane

1  acts.

2          Also the United States has suggested that because

3  C.D.A. and Mr. A. were separated in the district of New Mexico

4  and I believe crim -- Mr. A. was criminally charged there and

5  E.A.Q.A. and Mr. Q. were separated in the western district of

6  Texas and I believe Mr. Q. was prosecuted there, but I'm sure I

7  will hear more of that.  That these case -- the proper venue

8  with respect to this case would be that the cases would be

9  separated and one would be the district of New Mexico and the

10 other the western district of Texas.

11         Attorney Finkelstein, are you prepared to argue on

12 behalf of the government, or Mr. Joseph?

13         MR. ST. JOSEPH:  Your Honor, I'd like to divide if we

14 may?

15         THE COURT:  Absolutely.

16         MR. ST. JOSEPH:  The argument.  So I was going to

17 handle the federal court claim portion and the Ms. Finkelstein

18 can handle the alien portion.

19         THE COURT:  That would be fine.  Thank you.

20         MR. ST. JOSEPH:  Perfect, Your Honor.  All right.

21 Thank you, Your Honor.  Good morning.  As stated, my name is

22 Anthony St. Joseph on behalf of the United States.  I'm here

23 with Veronica Finkelstein.  The United States moves to dismiss

24 the complaint under federal rules of civil procedure 12(b)(1)

25 and 12(b)(6) because as the court stated a moment ago, the

1   United States has not waive sovereign immunity for the claims

2   arising under the circumstances as alleged in the complaint.

3          And then the -- the complaint seeks to bring a tort

4   claims against the United States under both the federal tort

5   claims act and the alien torte statute.  So I'm going to

6   address why the federal tort claims act is not an appropriate

7   remedy for the plaintiffs.

8          Before moving any further into the case I want to

9   restate the government's positions that this is not a defense

10  of the policy that was in place back in 2018 by the prior

11  administration.  Our understanding is that that policy is not

12  what's at issue in this case.  It's not a policy challenge,

13  it's not a systemic challenge.  And so once you remove that

14  element then you're left with is this a torte claim that's

15  cognizable under the federal tortes claims act.  And that, the

16  federal tortes claim act provides a limited waiver of sovereign

17  immunity for the United States.  And there are several reasons

18  that this case should be dismissed.

19         THE COURT:  And would you agree that there are no

20  constitutional claims here?  We have no -- no com -- no

21  deliberate indifference.  We have no citing to a statute.  We

22  have no attempt to proceed under the 14th Amendment.  This is a

23  strictly state torte cause of action other than the -- the

24  alien torte statute?

25         MR. ST. JOSEPH:  Absolutely, Your Honor.

1          THE COURT:  And do you also agree that the choice of

2    law in this particular case, because these are state law claims

3    for Mr. A. would have to be the New Mexico law and for Mr. Q.

4    would have to be Texas law?  Or do you believe Pennsylvania law

5    applies in any respect?

6          MR. ST. JOSEPH:  No, Your Honor.  We believe that --

7    or I should say, yes, Your Honor.  We agree that for Mr. Q.

8    it's Texas and Mr. A. it's New Mexico.  The sliver of the case

9    that attaches to Pennsylvania would be the claim against the

10   Berks Residential Center.

11         THE COURT:  And that's using the flashlight in the

12   eyes and waking them up?

13         MR. ST. JOSEPH:  Correct, Your Honor.  That -- that's

14   the evening bed checks, which we believe are kind of cutting

15   right to the chase on that one.  We believe that case is easily

16   -- or that portion of the case is easily dismissed under -- if

17   it -- if it survives and alien torte claim, which is what we

18   think it falls under, then it's independent contractor

19   doctrine.  Because the acts that are alleged are conducted by

20   county employees, not federal employees.

21         THE COURT:  Right.  All right.  Excuse my

22   interruption.  You may continue.

23         MR. ST. JOSEPH:  No.  No, thank you, Your Honor.

24   It's very helpful because -- so briefly list the categories in

25   which the court may dismiss the case, first and the most

1  significant is the discretionary function exception which

2  applies to this case in -- in brief because it is subject to

3  policy now.  So there's a two-part test and both parts of the

4  test are satisfied.  Therefore, this case should be dismissed

5  on the discretionary function exception.

6       In the al -- in the alternative to the extent that the

7  plaintiffs are arguing that there was no discretion available,

8  the due care exception goes into effect.  The due care

9  exception says that when the government is compelled to act in

10 a certain way that that also falls as it not subject to a torte

11 claim.

12         The third would be the private analog.  All of the

13 events that give rise to this claim, that give rise to the

14 alleged torte, there is no private analog.  It is directly the

15 result of the enforcement of federal immigration law, which

16 only federal authorities can do.  State actors can't do it,

17 private actors cannot do it.  There is no private analog and

18 therefore there is no exception under the federal tort claims

19 act that allows this case to go forward.

20         I mentioned independent contractor doctrine and then

21 if any of those defenses -- if the court does not believe any

22 of those defenses would apply then the final bastion is under

23 the common law of the states of New Mexico and Texas.  And

24 under the common law of both of those the claims, the

25 individual claims must fail and we'll detail those shortly.

1   But the claims as presented are not cognizable under Texas law

2   or New Mexico.

3           THE COURT:  One question.  Analyzing this particular

4   lawsuit, normally when we have a suit against the United States

5   a -- the federal tort claims act is waived, meaning they can be

6   used a private individual even though we know, the United

7   States is never quite like a private individual.  Certain

8   procedural differences, no jury et cetera.  But not punitive

9   damages, no interest.  But normally it's a driver of a post

10  truck, drives negligently, hits someone, causes injury and the

11  United States stands liable for that.

12          So you can sue the United States for the injury you

13  suffered.  The United States was acting through the driver of

14  the truck.  Here where I had a little trouble with the analysis

15  and I would appreciate input from both sides, here it sounds

16  like the argument is that the United States' policy of

17  separating the people thereby implemented by those who actually

18  worked for the United States and did it caused the harm.  If

19  that's the case, then we're getting into an interesting issue

20  with discretionary function.  The person who is doing the

21  separating, do they have any discretion or have they been given

22  direct orders that they must do that?

23          But it's a two-edged sword for both sides because if

24  they have no discretion then you get into the issue that this

25  is strictly an attack on the policy, not on the action of a

1  government official that was negligent.  Because if I'm doing

2  my job as a federal employee and I'm doing my job as I'm told

3  to do my job and I'm not negligent in doing it, suddenly it

4  can't be my negligence that leads to liability it must be that

5  the policy is improper.  How do you make that distinction

6  between, the actions of the employee of the federal government

7  versus the policy of the United States government?

8                    MR. ST. JOSEPH:  Your Honor, from the point

9  of view of the United States, that's why the case fails in a

10 nutshell.  While I started off saying it's not a case about

11 policy, the complaint isn't about policy, when you actually

12 examine the case, when you examine the complaint and you

13 examine the response to the government's motion.  It's really

14 all about the policy.  It's essentially an argument that the

15 policy itself is a torte.  And that's what's not cognizable

16 under the federal tort claims act.

17          In fact, the federal torte -- the discretionary

18 function exception of the federal tortes claims act expressly

19 excludes things that are subject to a policy analysis.  Which

20 this case would be and so discretion comes in on multiple

21 levels in this case and then the thing is, if by looking at the

22 individual decisions there is discretion of the individual

23 officers to the extent that each officer has to decide in each

24 case whether or not the person coming across the border at the

25 time was subject to the policy.

1          That discretion does play in, but there's no
2    allegation that that was misapplied.  There's no allegation
3    that it was done in any way other than in compliance with a
4    policy that was -- that enunciated.
5          THE COURT:  So can the United States order one of its
6    employees to act negligently under state law and thereby be
7    liable for that employee's actions?  In other words, if the
8    policy -- if the policy of the United States is deemed, under
9    state law to lead to the employee engaging in negligent acts or
10   even nec -- intentional interfere -- or intentional acts here
11   too, but that can happen?  Or is that -- is that the United
12   States having a policy that is not subject to a cartable claim
13   under state law for -- for violating torte.
14         MR. ST. JOSEPH:  I don't think -- I think the answer
15   to that question is, is that the end.  It's not cognizable
16   under a torte.  So if the government has a policy that violates
17   rights that certainly can be brought to court and arguably,
18   apparently for C.D.A., they went to court in -- in Illinois,
19   federal court and were ordered reunited based on a
20   constitutional claim that something had been violated.
21         But even in that decision the court there tried to --
22   to tread a very careful line because the -- the right that
23   would be at issue in this case that would give rise and that,
24   in fact, is part of the response to argument was, that the acts
25   are unconstitutional therefore they're cognizable under torte.

1          In order -- under the Third Circuit, under the Brian

2    decision and -- and the Supreme Court, in order for there to be

3    a violation, of the constitution that would -- would be able to

4    trump the -- excuse me, the in -- the discretionary function

5    exception.  I want to keep my -- my thoughts straight,

6    discretionary function exception.  It's -- it would have to be

7    known to the agent, so to the officer it would have to be a

8    right that would be recognized and the officer would be aware

9    of.

10         Then when you look at the facts of this case, and the

11   complicated nature of this case, the act of separation would

12   have to be that act.  And the act of separation itself cannot

13   qualify as a torte.  It is pursuant to federal law.  It is

14   authorized by fed -- by statute.  There's a criminal statute

15   that allows a criminal prosecution.  There are discretionary

16   decisions as to who and when they should be criminally

17   prosecuted.  Those statutes have not been challenged.

18   Constitutionally they're valid.  And so when you dig down

19   further that's where you run into the tort claims act problem

20   of why this doesn't qualify as a torte.

21         There may be something else out there, maybe another

22   claim, there may have been something violated, but it doesn't

23   qualify as a torte.  And -- and I would submit I hadn't really

24   connected the -- so could an order of the Federal government,

25   constitute a torte under state law --.

1          THE COURT:  There's -- there's a principle under

2   federal -- under military law that you cannot obey an illegal

3   order.  If you obey an illegal order that you know that is

4   illegal you -- you don't have a defense saying I was ordered to

5   do this.  Here are these employees who engaged in these acts

6   that are alleged to be negligent.  Even though they are not

7   going to --- pointing to specific individuals and obviously the

8   United States is responsible for the actions of its employees.

9          If they were ordered to do something that while maybe

10  not illegal nevertheless, it caused harm to others, can the

11  United States then be found liable under the Federal Tort

12  Claims Act.  It's a -- just a -- I -- it's a very difficult

13  question because the unique nature of this action.  Where it

14  leans towards the attack on the policy.  Because he pleas, or

15  simply if you tell we'll go back to that --- the post office.

16  If the post office instructs the drivers to deliver mail in a

17  certain way, he's to deliver male in a certain way.  And if

18  he's negligent in doing it then the United States is liable.

19          Here if they tell him to do it in a negligent way,

20  but he does exactly as they tell him is that the United States

21  policy then is created the negligent fact -- negligent act.

22  And that's a little rhetorical than something that you can

23  really answer.

24          MR. ST. JOSEPH:  Well, I will try my best, Your

25  Honor.  Because that is -- that is the, I think you cut right

1   through the long outline.  Excuse me, the heart of -- of the
2   question before the court and -- and the argument that the
3   government is making.  Again, not to overly stress it, but it's
4   important, we're not defending the policy itself.  So we're not
5   saying that the policy was justifiable or correct.

6           THE COURT:  Even when you say that, are you
7   nevertheless saying that there is a separation of powers?  And
8   we do recognize the -- the responsibilities of the executive,
9   the responsibilities of the legislative branch and the
10  responsibilities of the court.  And we have to always be
11  cognizant of the extent to which the courts can step over that
12  line in trying to address what the executive branch is doing
13  when it's exercising its functions.

14          MR. ST. JOSEPH:  I am, Your Honor.  To the extent
15  that we're talking about a torte claim, so if there were some
16  other claims I might have different orders, we might approach
17  it differently from the government, but because this is a torte
18  claim for money damages that says a specific act by federal
19  agents and officers on the ground committed a torte against
20  specific individual plaintiffs, that's where -- that's where
21  the case falls down.

22          THE COURT:  Because I think I may hear from the
23  plaintiff that yes, there's policy and yes that gets addressed
24  through the pol -- political process and it has.  But that
25  doesn't undo the harm that individuals might have suffered

1   under the previous policy.  So the question then becomes even

2   though the executive branch, through the political process, has

3   altered the policy, does that automatically eliminate any

4   individual claims that people might have who suffered as a

5   result of that prior policy?

6         MR. ST. JOSEPH:  The answer to that question, Your

7   Honor, is that in this case it does.  Because in this case

8   we're not talking about a recognized right that was violated by

9   the individual officers so to use the military analogy, it

10  wasn't clearly unlawful order at the time.  Border agents are

11  charged with arresting people who are undocumented.  So the

12  undocumented folks that come over, sometimes that results in

13  separation.

14        THE COURT:  That was a great analogy.

15        MR. ST. JOSEPH:  Thank you, Your Honor.  Okay, I -- I

16  won't continue.  If Your Honor thinks it's necessary, I'll go

17  through the legal framework.  But based on the -- the teeing up

18  of the case that was done ---

19        THE COURT:  Well, first I want to make sure I

20  understood and maybe this comes best from the plaintiffs,

21  exactly what the claim is because as you read the complaint

22  which is very thorough, or the amended complaint, it's very

23  thorough, but -- and this is part of the problem, the reason

24  for these questions.  It just doesn't fall within what we

25  normally expect from a federal Tort Claims Act case.

1          We've got the United States being treated as a

2  private individual subject to the laws of the state, the torte

3  laws of the state.  Here this really is not anything to do with

4  the torte laws of the state other than trying to find a vehicle

5  to get damages.  There's nothing about this seems in -- what

6  you would expect a private individual ever to be sued as, like

7  a -- a private individual would never be sued for what the

8  United States is alleged to have done in this action.

9          The driver of the post truck, he's just like the

10  driver of a vehicle.  You can make the analogy, it makes

11  perfect sense, it's exactly what Congress intended.  Here is it

12  at all possible that Congress in passing the federal tort

13  claims act intended that an undocumented migrant coming across

14  the border who is separated from their child could then bring a

15  suit under state torte law, and using the federal tort claims

16  act as its vehicle, is that -- is that even plausible, that

17  Congress intended that outcome?

18          MR. ST. JOSEPH:  To answer the question, Your Honor,

19  in some circumstances, yes.  So if the station where an

20  undocumented migrant is taken was not maintained properly, and

21  there's a slip and fall, that's a case where I think tort

22  claims act does apply.  And -- and the individual plaintiff

23  doesn't -- doesn't really make a difference, it would still

24  apply.  If -- if to use the analogy, if the DHS driver is

25  driving from one location to the other and drives negligently

1   and causes an accident that causes a physical injury that would

2   be likely compensable.  I probably couldn't concede that

3   because I haven't checked that one.  But I think that would

4   likely come under federal Tort Claims Act as well.  The -- I

5   want to get into the whole issues of are you present, are you

6   not present?  Would that qualify?  My immigration brain is

7   going off there, so I don't want to overstep my bounds.

8           But I think and generally speaking those are the

9   types of things where -- where a torte claim is cognizable.

10  But in this case, we're not in any of those worlds.  We're in a

11  very, very different world where a policy that has been

12  renounced by the current administration that was frankly, was

13  renounced by the past administration, be -- you know, which

14  they were still in office.  It went into effect and taking

15  individual components that are clearly legal and in fact,

16  necessary.  A child cannot accompany a parent into criminal

17  custody.  That doesn't happen.  It doesn't happen to citizens;

18  it doesn't happen to non-citizens.

19          That's really what the torte claims about.  Those

20  acts when they took place and the only way that a -- this claim

21  goes forward is if you then gloss on the policy and look at it,

22  well, this -- this all happened because of a policy.  So at the

23  micro level this case falls apart.

24          THE COURT:  Now, this is another question best

25  addressed by the plaintiffs, but this is not a condition of

1  confinement claim under the 14th or 5th Amendment.  This is not

2  a constitutional claim addressing conditions of confinement.

3  It's a federal Tort Claims Act case.  At what point -- for what

4  reason is that distinction made?  Is this -- was the -- were

5  the detainees in custody?  Was the United States responsible

6  for their care, custody and control?  Did an exercise in that

7  care, custody and control they do -- did something that caused

8  harm even if it's not a constitutional violation, but a torte

9  violation and is that even possible?

10        I know the examples you just gave, but I guess I'm

11  backing it up.  At the time of the separation did we have care,

12  custody and control responsibilities with respect to the

13  detainees?

14        MR. ST. JOSEPH:  They were definitely in custody.  I

15  think -- think the government has recognized that there is at

16  least some recognition of care and control.  What's important

17  is that in this case none of that is what's being challenged or

18  -- or attacked.

19        THE COURT:  I'm -- I'm com -- coming up with a trick

20  question for you here.  So suppose there was a policy that

21  required return to Mexico to await your asylum here in --?

22        MR. ST. JOSEPH:  I'm familiar with that.

23        THE COURT:  And you -- and we have now care, custody

24  and control of a detainee and we remove them from the United

25  States and remove them to an area that is dangerous and they

1  are assaulted or otherwise harmed.  Can the United States be

2  sued under federal Tort Claims Act for having done that?

3        MR. ST. JOSEPH:  No, Your Honor.

4        THE COURT:  And the reason?

5        MR. ST. JOSEPH:  And the reason for that is that also

6  falls under discretionary function and exception.  Because

7  that's a policy issue of -- of --

8        THE COURT:  Wouldn't we be using the federal Torte

9  Claims Act to try to affect the United States immigration

10 policy?

11       MR. ST. JOSEPH:  That -- that would be the end

12 result, yes, would be dictating, if I heard you correctly,

13 you're dictating policy by allowing individual lawsuits for

14 people to challenge each individual immigration --

15       THE COURT:  But don't we all often times use the

16 torte system to try to remedy societal problems.  We -- we

17 allow car manufacturers to be sued because the car has a

18 defect, thus hoping to reduce defects in cars.  We, you know,

19 safety issues, et cetera.  Can the federal Torte Claims Act be

20 used by individual immigrants?  Can it be used by individual

21 immigrants even though it does affect policy, but it's also to

22 pursue the individual interests?

23       MR. ST. JOSEPH:  Our argument would be not if there

24 isn't an all -- already an avenue to to do so.  So in this case

25 you'd be creating a -- a new avenue that undercuts the ability

1  to -- of the -- of the executive, as the court had stated
2  earlier to establish a policy.  To answer the question in a
3  slightly different manner, the -- this case and -- and I would
4  submit a number of the decisions that have come out of the
5  Ninth Circuit Courts in Arizona essentially put, you know, put
6  it on its head.  Put the analysis of federal torte claims act
7  on its head.  They say that because of the conclusion that the
8  policy was a bad policy, therefore the government can't escape
9  liability under the Torte Claims Act.
10         Instead of looking at it as we argue the Third
11  Circuit in Bryant said that you need to, when you're analyzing
12  under the discretionary function, which is, was there a clearly
13  established right that the -- that was known and that the
14  officers would have been aware of at the time of the actions
15  that are alleged to be the torte.  And in this case the actions
16  are alleged to be a torte of the separation.  And so there is
17  no -- there frankly is no basis to think that an officer
18  separating parent and child for the purpose of criminal
19  prosecution was violating a constitutional right.
20         Now, the court will acknowledge, the court -- certain
21  the court in Illinois found that as applied to the plaintiffs
22  in this case it resulted in a violation of --- interestingly or
23  found the integrity, but the court also acknowledges that found
24  the integrity can't be waived as adsorbed initially to prevent
25  to prosecution under immigration law, or criminal law.  And

1   hence we're back to the very thorny nature of this particular

2   case.

3          THE COURT:  Say it, what you just said about the

4   family integrity?

5          MR. ST. JOSEPH:  Okay.  I'm going to make sure I say

6   it the same way.  So -- so the court in Illinois found that in

7   C.D.A.'s case they needed to be reunited because the policy as

8   applied violated the right to family integrity.  The court also

9   in that same decision recognized and stated that it did not

10  guarantee the father's release, Mr. A.'s release and that

11  family integrity can't be used as a sword essentially to block

12  or to -- or to challenge the application of criminal law and

13  immigration law.

14         THE COURT:  And where did -- where did the court find

15  the right to family integrity arises from?

16         MR. ST. JOSEPH:  It recognized in other decisions

17  which are escaping me at the moment.  But it was -- it was a

18  court, it's judicial doctrine that was found and been accepted

19  by various circuit courts, that there is --

20         THE COURT:  And we all agree in family integrity, but

21  we also all recognize that it's far from absolute.  I mean when

22  we send our military, if we deploy them, they are separated

23  from the children.  Every time I sentence somebody to jail, I'm

24  separating them from their children.  Mandatory education, you

25  know, now that is on a temporary basis, deployments on a longer

1   basis.  Certain jobs require parents to be away from their

2   children for lengths of time.  Everybody agrees that to the

3   extent we can keep families together we want to keep families

4   together.

5          MR. ST. JOSEPH:  Absolutely, Your Honor.

6          THE COURT:  And it shouldn't be a punishment.  It

7   certainly shouldn't be a punishment.  We're deliberately trying

8   to punish you to discourage from crossing the boarder by

9   separating you from your children.  At the same time there may

10  legitimate governmental interests that require that separation.

11  I don't know, that's a policy and it may become a legal issue.

12         MR. ST. JOSEPH:  Right.  Your Honor, and -- and --

13  and you once again walked me to one of the thornier issues,

14  which is, you know, there are I mean, child trafficking

15  happens.  Family trafficking happens and one of the cases, in

16  fact, one of the other cases that's in California, I think it's

17  a California case that the issue, there is an issue because the

18  parent or the adult is not blood related to the child.

19         Now ultimately, they were reunited.  I think the AG

20  just looked at it and decided.  But that's the kind of issue

21  that -- that confronted at the border and needs to be

22  addressed. That's just one.  Another, you know, if -- that --

23  that the court has recognized that the current administration's

24  policy seeks to hold is that separations only occur, or I

25  shouldn't say only occur, but will occur when someone comes

1  back and they have a criminal history that -- that's triggered.

2  So even if you're with your family and you have a criminal

3  history we're going --- we're going to --

4        THE COURT:  Now, does that come into play here?

5  First of all, I'm limited with my factual record.  That's the

6  problems with the motion to dismiss, I'm limited with my

7  factual record.  I'm limited to what -- essentially what's been

8  plead here.  But is this a situation where both Mr. A. and Mr.

9  Q. were charged criminally?  And were those crimes immigration

10 crimes or other types of crimes?

11       MR. ST. JOSEPH:  They were immigration crimes, Your

12 Honor.

13       THE COURT:  Okay.  And what was the -- the result of

14 the litigation?

15       MR. ST. JOSEPH:  Mr. A. was convicted, plead and

16 sentenced to the time served, 15 days' time served.  Mr. Q. was

17 originally charged and the US Attorney's office dismissed the

18 charges.

19       THE COURT:  Okay.  And ultimately, they were then

20 reunited, one after five weeks of separation and one reunited

21 after seven weeks of separation?

22       MR. ST. JOSEPH:  Yes, Your Honor.  Mr. Q. was roughly

23 five weeks.  They stayed in Texas the whole time.  Mr. Q. and

24 E.A.Q.A. and C.D.A. and Mr. A. they were separated for slightly

25 longer, closer to seven weeks.  And they were reunited and then

 1  -- and then were housed in the Berks facility for a few weeks.

 2          THE COURT:  You said a past tense.  Are they still

 3  there?

 4          MR. ST. JOSEPH:  No.  No, Your Honor.  No one is.

 5          THE COURT:  Is anyone in Pennsylvania?  Does anyone

 6  reside in Pennsylvania?

 7          MR. ST. JOSEPH:  Oh, do they reside in Pennsylvania?

 8          THE COURT:  Yeah.

 9          MR. ST. JOSEPH:  My understanding from the claim is

10  they do; they both reside there.

11          MR. EDLIN:  They -- they all do.

12          THE COURT:  Why were they -- thank you.  Why were

13  they not deported?

14          MR. ST. JOSEPH:  Well, now I believe they both have

15  asylum claims that are being pursued.

16          THE COURT:  Okay.

17          MR. ST. JOSEPH:  So -- so once -- not to -- this

18  isn't an immigration case, this is a federal Torte Claims Act

19  case.  I'll stick to that.  But for the immigration portion,

20  which I'm very familiar with, typically that's what will happen

21  is once the -- the interview takes place and there is a

22  credible fear of determination then you're put into a long

23  queue for an asylum.

24          THE COURT:  So both -- it sounds like both the

25  plaintiff and the defense is going to agree that Mr. A., Mr.

1   Q., and their children reside here in the Eastern District of

2   Pennsylvania?

3            MR. ST. JOSEPH:  We have no reason to dispute that,

4   Your Honor.

5            THE COURT:  Okay.  I know.  Have I disrupted you

6   enough to make it almost impossible to get back onto your

7   argument?

8            MR. ST. JOSEPH:  Well, that may -- in a good way,

9   Your Honor.  It actually helped cut to the chase.  So I will

10  quickly summarize then, the discretionary function argument

11  which we've already discussed --

12           THE COURT:  Well, let me stop you there again.

13           MR. ST. JOSEPH:  Okay.

14           THE COURT:  I'm going to interrupt you again, I'm

15  sorry.

16           MR. ST. JOSEPH:  I will not --

17           THE COURT:  So when we analyze this discretionary

18  function to what extent do I have to analyze whether there's a

19  constitutional violation even though none is brought?  And

20  you're -- you're standing like, I don't know what you're

21  talking about Judge, you don't have to consider constitutional

22  violation at all.  Do I?  Do I have to consider the due process

23  clause at all in trying to determine whether there's a

24  discretionary function -- whether the discretionary function

25  exception applies?

1          MR. ST. JOSEPH:  Only to the extent that I stated a
2   few minutes ago, that if the court found that the family
3   integrity was of such a -- was of such a right that the
4   officers on the southern border should have been aware of it,
5   otherwise there is no constitutional analysis.  It's not a
6   constitutional claim, it's a torte claim.  And so whether or
7   not there was a const viol -- constitutional violation, that's
8   a -- that's a different case that would have to be brought
9   under different provisions.  It would not come under the
10  federal Torte Claims Act.

11         You don't -- the federal Tortes Claims Act is not
12  designed -- and the waiver of sovereign immunity is not
13  intended to address constitutional violations.  It's intended
14  to address slip and falls, medical malpractice, you know, like
15  the VA or at public clinics.  You know, failure to maintain the
16  sidewalk next to Independence Hall, negligent FBI agents who
17  were not paying attention when they're following people.  Those
18  -- those types of cases.

19         THE COURT:  If I were to find that these acts fell --
20  that that the federal government had waived sovereign immunity
21  I would have to find that they expressly waived it and I would
22  have to find that -- I would have to interpret it narrowly,
23  correctly before we can get into the discretionary function
24  exception I would have to find that I was interpreting this
25  waiver narrowly.  How do I do that?  How do I find -- narrowly

1  interpret sovereign immunity and the exception of immunity nar

2  -- not narrowly interpret sovereign immunity, broadly interpret

3  sovereign immunity.

4         MR. ST. JOSEPH:  We -- we'd prefer that.

5         THE COURT:  Narrowly interpret the exceptions to it.

6  Are we not expanding beyond any -- any example in the past, are

7  we not expanding the exception to sovereign immunity beyond

8  what it's ever been ex -- expanded before?

9         MR. ST. JOSEPH:  I want to make sure I understand.

10 So would deciding in the government's favor expand sovereign

11 immunity?

12        THE COURT:  No.  No.  That would be -- what I'm

13 saying is, we know that sovereign immunity is a very broad

14 principle.

15        MR. ST. JOSEPH:  Yes, Your Honor.

16        THE COURT:  Powerful.  You can's sue the king unless

17 the king agrees to being sued and obviously the federal

18 government is very reluctant to give very broad exceptions to

19 its immunity.  However, you could argue the federal tort claims

20 act is pretty broad, but interpreted narrowly, not interpreted

21 broadly because exceptions to sovereign immunity must be

22 interpreted narrowly.  So when we interpret the federal Torte

23 Claims Act, we don't try to increase the waiver of the

24 sovereign immunity, we interpret it narrowly to maintain the

25 sovereign immunity, unless it's very express and clear that the

1   federal government intended to waive its sovereign immunity.

2          In this particular case, can you think of any way
3   this is not greatly expanding the exception, the waiver of
4   sovereign immunity?  Can you think of any example where a case
5   such as this has been able to proceed under the federal Tort
6   Claims Act?

7          MR. ST. JOSEPH:  Other than the identical cases that
8   are filed in other districts, Your Honor, no.  No.  And in
9   fact, that's -- that's the government's argument.  There is the
10  one case from Texas that found in favor of the government
11  essentially stating exactly what Your Honor just said that it's
12  a limited waiver, this is clearly under discretionary function
13  because it's a policy attack and then -- and then dismiss that
14  portion.  And then it gets --

15         THE COURT:  And recognize that all the courts have --
16  it's -- it's at the motion to dismiss stage.  So it does make
17  it difficult.  All judges want to rule on a full factual record
18  if they can.

19         MR. ST. JOSEPH:  Thank you.

20         THE COURT:  It's more -- it's more fair to the
21  plaintiffs.  It makes a more clear decision because you've got
22  actual facts, et cetera.  So everybody -- judges do not like
23  ruling on motions to dismiss, as being dispositive because you
24  don't like get the opportunity to develop that full factual
25  record.

1          MR. ST. JOSEPH:  And that's absolutely understood,

2    Your Honor, and agreed.  And it's not -- it's not likely that

3    the government files this motion to dismiss or cites

4    discretionary function exception, in fact, in this case it, you

5    know, it's a particularly difficult, I think, I'll acknowledge

6    difficult for -- for -- for the current administration, the

7    current stance of the Justice Department.  Because we are

8    taking a legal stance and drawing a legal line exactly where

9    the court is pushing us which is the problem with this case, as

10   a Torte Act is it -- it broadly -- or it very greatly expands

11   arguably what any certainly, undocumented person could bring a

12   lawsuit against the United States for.  But then it's not

13   limited to just undocumented aliens -- or I'm not supposed to

14   say -- undocumented people.  It's -- it, you know, it's

15   obviously applicable in any context and if you have a context

16   in which the -- the central torte, the central act that caused

17   the alleged harm is a policy, is a policy that's enunciated

18   from Washington, DC and then enacted, and I keep going back to

19   the individual steps.

20          Part of what makes this case break down is when you

21   look at the individual steps of the separation and of charging

22   someone and of a child going into HHS custody.  Those are all

23   well-established, well laid out and not really challengeable on

24   -- on their own.  It's only when the policy is laid on top of

25   that and, you know, that -- and statements from certain

1  government officials are -- are put into focus for each

2  individual or applied to each individual that then suddenly it

3  becomes gray.  You know, it's -- it's really not gray when

4  looked as a torte claim and -- and what was the act?  What was

5  the alleged torte?  And -- and discretionary function in

6  particular, you know, was there an element of judgement of

7  choice and when to enforce -- I shouldn't say enforce, how to

8  enforce immigration law at the border is the ultimate element

9  of choice.

10         Every administration -- I've been in my office a long

11  time now, and every administration wrestles with where do you

12  draw the line on who to charge and who not to charge.  And --

13  and that's both in the civil context of removal and then

14  decisions of detention and then who gets charged criminally?

15  And -- and should they be charged criminally?  And the issues

16  that come into play as to how close someone is at the border

17  when they are detained.  And that's just -- we're just talking

18  about the southern border.  There's no reason it's limited to

19  the southern border.

20         It could be -- again, unless you -- unless you were

21  focused entirely on the policy.  If you're not focused entirely

22  on the policy and you're looking at the act of detention and

23  the act of separation, that can happen at the Philadelphia

24  Airport if someone tries to come in with a child.  You know, it

25  could happen anywhere along the northern border.  And so at

1    Miami I'm sure it happens frequently, you have people coming in
2    on boats.  You also have people coming in on -- on planes.  Who
3    -- who are not necessarily don't have authorization.  And --
4    and when it's judged in that context, first is the element of
5    choice by the government and then the second is whether, you
6    know, it was -- it -- it -- it -- it was -- this is the kind of
7    judgement that -- that it was designed to shield and whether or
8    not -- the way to determine that I whether or not it is
9    susceptible citing Golbeirt to the policy analysis.  And I
10   think our discussion over the last half hour or so has made it
11   plain that it's also affected policy analysis, that this case
12   stems entirely from a policy determination that was made.
13         THE COURT:  And wouldn't that mean also that there's
14   really not much of a factual issue in this case, because if you
15   had to anticipate what discovery would entail, it's not that
16   the facts are really disputed, it's that the policy is being
17   challenged or the harm caused by the policy.  And determining
18   what that is and whether it's cognizable under the -- under the
19   law because I assume as you read the facts, that's not your big
20   concern.  You're not concerned about what happened.  What
21   happened, happened.  So discovery wouldn't be that difficult,
22   perhaps on damages.  But even there I think most of that's just
23   emotional distress and that type of damages.  So it's not a
24   factual issue.  Discovery would be -- I don't think discovery
25   would turn up anything other than creative.  It can also be

1  stipulated to facts without the need for depositions, et

2  cetera.

3          MR. ST. JOSEPH:  Your Honor, I don't know that

4  plaintiffs' counsel agrees with that.

5          THE COURT:  All right.  Anything else on the federal

6  Torte Claims Act claims, which as I understand we've got

7  intention infliction of emotional distress, negligent

8  infliction of emotional distress, negligence, abuse of process

9  and loss of consortium are the five counts under the federal

10 Torte Claims Act.  And those would be based on the laws of New

11 Mexico and Texas.

12         MR. ST. JOSEPH:  Yes, Your Honor.  So I want --

13         THE COURT:  Because I do have another question I

14 thought was kind of interesting, comparative negligence.  Now,

15 of course, I'm not an expert on the comparative negligence

16 statutes of Texas or New Mexico, but here in Pennsylvania, if

17 the plaintiff is more than 50 percent liable, they can't

18 recover at all.  Is there comparative negligence issue here

19 when you're trying to bring this under the federal Torte Claims

20 Act where, obviously, Pennsylvania law, if we're in

21 Pennsylvania we'd have our comparative negligence statute come

22 into play.  And would there be -- and then we don't get a jury,

23 but let's assume there was a jury, would the fact finder have

24 to determine the negligence of the immigrant and is it

25 negligent to cross a border illegally without any real --

1  without knowing that you're likely to come in to contact with

2  border control and that you might end up being separated from

3  your children or other harm may befall you just by doing that,

4  bringing your child across the border almost perhaps blindly. I

5  don't know, maybe they had people waiting for them, et cetera.

6            Does comparative negligence come into play?

7            MR. ST. JOSEPH:  I will decline to answer that

8  question for a moment, Your Honor, until we have to at a later

9  date.  Because we definitely want --

10           THE COURT:  That was a rhetorical one too.

11           MR. ST. JOSEPH:  I'm going to step aside.  So I

12  appreciate that.  I will quickly, and I'll sum up my portion

13  and then turn it over to Ms. Finkelstein.  Because I will go

14  then to the -- to the individual claims under state law.  So if

15  -- if the case, you know, just in summary again, there's no

16  private analog that, I think, doesn't take much argument.  You

17  know, as we discussed it's just not something -- credible

18  criminal statutes and federal immigration statutes are only

19  enforced by federal authorities and the alleged torte here was

20  exactly that, was the enforcement of -- it was statutes we --

21  we discussed discretionary function at great length.

22  Independent contractor doctrine would preclude the claims

23  against the Berks County Residential Center.  So that's one

24  portion.  And then just going through quickly, the intentional

25  infliction of emotional distress.  So if the court were to

1  decide it did have jurisdiction on all of those bases or

2  despite those bases, then the government submits that the case

3  should still be dismissed under the torte law of both New

4  Mexico and Texas.

5           And just reviewing those quickly, and it's all in the

6  briefing so I will do it very quickly, both Texas and New

7  Mexico have adopted the restatement of tortes, the second

8  edition.  And that requires conduct that's so outrageous or so

9  extreme -- extreme excuse me, to go beyond all boundaries of

10  decency and utterly intolerable for intentional infliction.

11           Texas courts in particular -- and we would argue that

12  -- that the -- that the act of separation because it's

13  authorized by federal law would not meet that definition.

14  Texas courts, in particular have recognized a strong pol --

15  public policy in favor of protecting prosecution and

16  prosecutors and where someone is eligible to be prosecuted

17  allowing that discretion to go forward.  So that would not fall

18  under intentional infliction of emotional distress.  And that

19  applies to Mr. Q., who ultimately has the prosecution

20  dismissed, but that almost -- point -- proves the point, which

21  is he was referred for prosecution appropriately under federal

22  immigration law.  It was taken by the US Attorney's Office and

23  the Western District of Texas.  The Western District of Texas

24  then decided to dismiss the case.

25           Second -- and so that whole process is protected

1    under Texas torte law. Negligent infliction of emotional
2    distress, Texas generally doesn't even recognize the claim for
3    intentional infliction of emotional distress under <u>Garza</u>.   It
4    was recognized in <u>Garza</u> the Southern District of Texas, I95
5    case.

6            They don't -- Texas further don't recognize that
7    immigration officers have any special duty to de -- to
8    detainees under Texas law.  So the negligent infliction of
9    emotional distress claim of Mr. Q. should fail if it's survives
10   the other threshold arguments.

11           New Mexico's torte of negligent infliction of
12   emotional distress, is very narrow.  It applies only to
13   bystanders who suffer emotional shock as resulting of a sudden
14   traumatic event that -- and this is the key part, so even if
15   you argue that a separation is a traumatic event it needs to
16   cause such -- injury or death to a family member.  And there's
17   no allegation that either occurred in this case at the moment
18   of -- of separation.

19           THE COURT:  Or the nurse drops the newborn baby right
20   in front of the mother?

21           MR. ST. JOSEPH:  In front of the mom.  Exactly, Your
22   Honor.  That -- that would be -- that would be a negligent
23   infliction of emotional distress.  As to the general claims of
24   negligence the federal go -- government generally doesn't have
25   a duty to not enforce federal law.  And therefore, there's no

1  breach simply by an -- by enforcing both the immigration and
2  the criminal statutes.  There's also an additional deficiency
3  under Texas and Mex -- New Mexico law.  Both states require
4  that the plaintiff needs to show a physical injury to manif --
5  physical manifestation under and ordinary negligence claim.
6  And there's no allegation here that there was a physical
7  manifestation of the injury -- of the alleged torte.
8          The abuse of process claim, that's characterized by
9  misuse of power as -- with a malicious motive that results in
10 damages.  In this case that -- the -- the alleged damages would
11 be the -- that the government was alleged to have pressured
12 both plaintiffs into relinquishing their asylum rights.  And
13 that -- well, putting aside the question -- assuming that that
14 -- that did happen just for the purpose of this motion, they
15 did not relinquish their asylum rights and there's no
16 allegation, no evidence, no indication that that their asylum
17 claim was in any way impacted by that alleged -- by that
18 alleged effort by the government and -- and therefore an abuse
19 of process claim does not -- does not survive.
20         And finally, the loss consortium claim, again, this
21 only arises under both jurisdictions New Mexico and Texas, they
22 have a pretty high standard for that.  That also requires
23 either death or serious bodily injury for those claims to go
24 forward and neither has been alleged in this claim.
25         So are there any other questions about the federal

1  Tortes Claims Act?

2          THE COURT:  I think I've --

3          MR. ST. JOSEPH:  Thank you.

4          THE COURT:  -- asked everything I wanted to ask.

5          MR. ST. JOSEPH:  Thank you.

6          THE COURT:  Thank you, sir.  Attorney Finkelstein?

7          MS. FINKELSTEIN:  Your Honor, I'll try to keep it

8  more simple, if I can and address the --

9          THE COURT:  Well, Attorney Joseph wanted to keep it

10 simple.  I'm the one that made it complex.

11         MS. FINKELSTEIN:  His best laid plans, Your Honor.  So

12 I'll begin by addressing the Alien Torte Claim Statute and then

13 I will move on to the severance and transfer.

14         THE COURT:  Let me ask you one quick question.  Has

15 the United States of America ever waived sovereign immunity

16 with respect to the Alien Torte Statute?

17         MS. FINKELSTEIN:  I was not able to find a case in

18 which the United States permitted a claim like this to go

19 forward.  And every circuit court to address it that I was able

20 to locate has sound that there's not waiver of sovereign

21 immunity.

22         The Alien Torte Claim Statute does not create new

23 law, as Your Honor's aware.  It doesn't create a common law

24 claim.  It is not separately a waiver of sovereign immunity.

25 It is a vehicle, if a claim exists by which certain claims may

1    be heard --

2         THE COURT:  If they were going to waive sovereign

3    immunity, Congress would have put it right in the alien torte

4    statute; correct?

5         MS. FINKELSTEIN:  Absolutely, Your Honor.  And I

6    think Your Honor made a very prescient point when it came to

7    the federal Torte Claims Act, that it's a very specific waiver

8    of sovereign immunity under specific circumstances with a whole

9    series of caveats.  It's only for the United States standing in

10   the shoes of an individual federal employee or deemed employee

11   for the things that that employee or deemed employee does, not

12   a corporate negligence, not a broad level claim.  There's all

13   kinds of limitations.  There's no intentional tortes unless you

14   fall under the intentional torte exception for law enforcement

15   officers.  All kinds of nuances.

16        You can't have a claim for loss of mail.  All kinds

17   of very specific thoughts by Congress about when the United

18   States as a sovereign, as the government should be hailed into

19   court.  And there is no indication in the federal Torte Claims

20   Act that these sorts of international law claims should give

21   rise to a torte claim against the United States and that Alien

22   Torte Claim Statute itself doesn't count as such a waiver.

23        So unless the plaintiffs' can point to a specific

24   waiver of sovereign immunity that is particularized to the

25   types of claims that they're bringing here that would allow

1   them to proceed under the Alien Torte Claim Statute then the

2   analysis is quite simple on the Alien Torte Claim Statute.

3   There's simply no waiver.  But even if Your Honor was to look

4   at the substance of the claim, and without minimizing the fact

5   that individuals who are victims of torte and other violations

6   clearly suffer, the Alien Torte Claim Statute -- ordinary torte

7   or ordinary constitutional claims or all sorts of different

8   claims.

9           It's a vehicle for very particular type of claim.

10  Violations of treaties that the United States has obligated

11  itself to follow.  And violations of the law of nations.  And

12  when I say violations of the law of nations, that is not just

13  any -- any old violation that you claim constitutes a crime

14  against humanity or that you label a particular set of actions

15  as torture.  We're talking about specific international norms

16  that have widespread state practice and opiniourus, a sense of

17  obligation.  Countries are doing it because they feel it is a

18  moral obligation.

19          And the specific acts that we're talking about here

20  do not rise to the level of either of these two.  What happened

21  in this case is that two pairs of fathers and sons were

22  apprehended.  The fathers and sons were separated for criminal

23  prosecution, under immigration law.  That necessitated a

24  separation of the fathers and sons for a period of time, after

25  which they were reunited for a period, one of the pairs of

1   fathers and sons was housed in detention together and then all

2   four of them were released into the United States.

3        That set of facts, those specific facts do not

4   violate any treaty that the plaintiffs can point to.  Those

5   specific facts -- those specific chain of events that have pled

6   in the complaint, in the amended complaint in which the

7   plaintiffs must rely upon for their claims do not violate the

8   law of nations.  And simply characterizing them as torture or

9   characterizing them as a crime against humanity is not

10  sufficient.  That's not the test.  The question is this fact

11  pattern -- is this fact pattern a violation of a treaty or a

12  law of nations and it's simply not.

13        And if there's any question in Your Honor's mind as

14  to what kind of claims we're talking about that rise to that

15  level, not just any violation of international law, not just a

16  violation of international corporate law between companies, but

17  the highest form of international law, just look at the cases

18  where the alien torte claim statute has been applied.  We're

19  talking about brutal, intentional murders.  People being

20  physically harmed in front of their family members.  We're

21  talking about beatings.  We're talking about political

22  persecution on a very extreme degree.  None of those cases

23  comes anywhere near the level of an enforcement of federal law

24  that resulted in a separation for a period of time of some

25  parents from their children.

1        And that's not to minimize what happened.  It's to
2   point out to Your Honor that the alien torte claim statute is a
3   very high bar.  And that the facts as pled in the amended
4   complaint do not meet it an additional amendment would be
5   futile.  It would not resolve the last of waiver of sovereign
6   immunity and it would not -- no amount of additional pleading,
7   no more pages of a second amended complaint, no additional
8   detail about whether it was cold in some of the detention
9   facilities or whether lights were shined during bed checks, no
10  additional pleading would re -- raise this to the level of an
11  alien torte claim statute violation.
12        And so the government believes that that's a very
13  easy claim or easy set of claims for the court to resolve.  I'm
14  happy to answer any questions that you have.
15        THE COURT:  Well, I appreciate you using the term not
16  to minimize it.  It is serious, whenever that -- a child is
17  taken from a parent against that parent's will.  That -- that
18  is very serious.   But I think of what's going on in Ukraine
19  right now and the -- the issues, when we talk about torture and
20  there are times that children are separated from the parents
21  and sometimes by the government, by force.  That was not what
22  the -- this set of facts, I have to agree with you, was not
23  what the alien torte statute was intended to address, but then
24  the question becomes if you just read the language, if you just
25  read the language and not try to make law because we don't make

1    law here.  Does it -- does this arguably fall within the
2    language of the statute?  That -- because that's the cite at
3    first you got to get around, is the waiver of sovereign
4    immunity.  If the federal government has not agreed to being
5    sued under the alien torte statute the -- it's over, you can't
6    sue the federal government unless it's agreed, the United
7    States of America, unless it's agreed to be sued.

8             And I don't know where I find that waiver.  that's
9    why I can't wait to hear from the plaintiffs, where do I find
10   that waiver of sovereign immunity?  Then even if you get passed
11   that, then it becomes starting more of an interpretation of the
12   statute the language in the statute.  Can it possibly -- these
13   facts possibly fall under that?  I think everyone here who has
14   children would say if someone is trying to forcibly remove my
15   child from me there's not much more that would get me to
16   commit, you know, a heinous act against them than something
17   like that.  At the same time it does happen all the time.

18            It's -- it's just a reality for so many of us who
19   have to travel, who have to, you know, do -- do certain jobs as
20   you're separated from your children for periods of time or
21   periods of a day or whatever it might be.  All right.  Anything
22   else?

23            MS. FINKELSTEIN:  That's --

24            THE COURT:  Now, were you going to just -- was
25   anybody going to address the venue issue?

1          MS. FINKELSTEIN:  I -- I was if Your Honor was --
2          THE COURT:  Absolutely.
3          MS. FINKELSTEIN:  -- was done with the alien torte
4    claim statute.  If you have no further questions on the alien
5    tort claims statute, Your Honor.
6          THE COURT:  Well, before -- no, but before you
7    address venue it almost sounds like you don't want me to be
8    your judge.  And you never want to suggest that.  But --
9          MS. FINKELSTEIN:  Your Honor, I would never suggest
10   that.  That being said, we do think that there are proven
11   reasons why severance is appropriate in this case and why once
12   severance occurs, transfer of the cases is appropriate with, of
13   course, deference to Your Honor and -- and the wisdom of the --
14         THE COURT:  Thank you.
15         MS. FINKELSTEIN:  And the excellent jurist in general
16   on the Eastern District of Pennsylvania.
17         THE COURT:  Well, thank you.
18         MS. FINKELSTEIN:  That being said sometimes the
19   appropriate thing is severance and transfer and that's what the
20   government thinks is appropriate here.  So I want to start by
21   addressing severance.  The first issue that the court should
22   recognize is that there is essentially no commonality factually
23   between the two sets of plaintiffs.  They're from different
24   countries, they entered at different ports of entry.  They did
25   not apparently, at least from the amended complaint there's no

1    allegation that they ever interacted once with the same person

2    who represented the federal government at any time during any

3    of the events that are alleged to give rise to the torte.  And

4    not only is there no commonality between the two of them, but

5    one set of father and son, nothing in the amended complaint has

6    anything to do with this district when it comes to those two

7    plaintiffs.  They only entered this district after every event

8    that can be pointed to and alleged to be a torte was already

9    done.  And we're, you know, of course, crediting the

10   allegations in the amended complaint that they reside in this

11   district.  And if that's true, Mr. Q. and E.A.Q.A., his son

12   have no factual connection in terms of the alleged tortes when

13   it comes to Pennsylvania.  They were not housed in Berks.  They

14   were never detained in Pennsylvania.  They never came here as

15   part of the immigration process, visa via the allegations in

16   the complaint.

17          The Eastern District of Pennsylvania has nothing to

18   do with that except that they alleged that they now reside

19   here.  And remember, Your Honor, this is an FTCA claim.  That's

20   how the plaintiffs chose to plead it.  So allowing that set of

21   plaintiffs to litigate here would essentially, and especially

22   allowing them to litigate together with another set of

23   plaintiffs that have no factual commonality would essentially

24   be sanctioning somebody who slips and falls in Texas and

25   somebody who slips and falls in New Mexico, coming here

1  together, joining their claims --

2          THE COURT:  It makes it look like it's an attack on

3  the policy.

4          MS. FINKELSTEIN:  I can't disagree, Your Honor.  And

5  this is -- and the federal torte claims act claim is not the

6  avenue for a broad challenging against the federal policy.  And

7  that's the real problem that the United States has with the way

8  that this case has been teed up.  It's styled as an FTCA claim,

9  but it's brought like it's a broad challenge to policy.  And

10 the fact that you have two sets of fathers and sons who have no

11 factual commonality, no similarity in terms of what they're

12 alleging happened to them and yet they're suing together in

13 this district because they now reside here sure does make it

14 feel like this is not an FTCA claim, but rather it is a broad

15 attack on the policy.

16         So there's -- there's simply no commonality and I

17 would also point out to Your Honor that the only factual hook

18 for this district is the fact that the other set of plaintiffs,

19 Mr. A. and C.D.A. were for a period of time housed together in

20 the Berks residential facility.  Mr. St. Joseph has already

21 addressed the FTCA arguments.  I think -- I personally think

22 that one of the government's strongest arguments is the

23 independent contractor exception to the FTCA and that would

24 apply to all of the actions that happened at the Berks

25 residential facility.  And if Your Honor were to agree and if

1   Your Honor were to, you know, dismiss claims relating to Berks

2   now there's no hook for either plaintiff when it comes to the

3   Eastern District of Pennsylvania.

4           So as it stands you have two sets of plaintiffs

5   together in one case.  One set has no connection to the

6   district.  The other has a very tenuous connection.  Really

7   what the challenge here arises from is the separation.  And

8   there's no dispute that that separation did not occur in the

9   Eastern District of Pennsylvania.  That happened elsewhere in

10  other states that also have federal courts that have an

11  interest in litigating these cases.

12          So we believe the argument for severance is very

13  clear.  And that there is no legitimate reason why these two

14  sets of plaintiffs need to continue to litigate together or

15  need to continue to litigate here.  And once they're separated,

16  the cases become much more straightforward.  Probably the best

17  example I could point to of why severance and transfer is -- is

18  appropriate here is the many pages of pleading between the

19  government and counsel for the plaintiffs just trying to

20  understand and argue what choice of law applies.

21          It appears that we're both in agreement that

22  different choice of law is going to apply to the different sets

23  of plaintiffs even though the government and plaintiff's

24  counsel disagree about some of what choice of law would apply,

25  but we're all in agreement that Mr. Q. and E.A.Q.A., they're

1   subject to Texas law and Mr. A. and C.D.A. are subject to other

2   law.  The parties disagree about what law applies to Mr. A. and

3   C.D.A., but it's not Texas law.

4            THE COURT:  I was going to ask if the separation took

5   place in New Mexico, but the problems at the facility took

6   place in -- in Pennsylvania.

7            MS. FINKELSTEIN:  There are some allegations in the

8   complaint about the night check policy at Berks.  I would say

9   that a majority of the allegations in the complaint even about

10  Mr. A. and C.D.A. have to do with actions that occurred outside

11  of the district.  The only real challenge that has to do with

12  the Eastern District is that very limited period of time when

13  they are housed together in Berks.

14           THE COURT:  Which you believe the independent

15  contractor exception?

16           MS. FINKELSTEIN:  Yes.

17           THE COURT:  Address?

18           MS. FINKELSTEIN:  Yes, Your Honor.  But you know, the

19  government's point of view and the government's argument is

20  that the choice of law analysis makes clear that there's no

21  reason for these claims to be together.  There's really no

22  commonality.  The only apparent commonality is that they both

23  are sets of individuals who crossed the border during the

24  former presidency.  They both were subject to the policy and

25  they are unhappy with the application of the policy to them and

1    they have the same counsel.  If that was sufficient to get
2    jurisdiction for multiple plaintiffs in the Eastern District of
3    Pennsylvania, Your Honor, then frankly everybody, all across
4    the country who wanted to challenge anything under the federal
5    torte claims act, any car accidents, any slip and fall, any med
6    mal would just hire the same counsel and find themselves before
7    Your Honor.
8         And -- and so there are important reasons why it
9    makes sense to sever and transfer.  The Jumara factors, both
10   parties agree are the analysis.  I don't think there's any
11   disagreement between the counsel from both sides that then you
12   would be proper in the Western District of Texas and in the
13   District of New Mexico.  So there's no dispute that there is
14   another court where venue would be proper.  The only real
15   dispute between the government and counsel for the plaintiffs
16   is whether or not the cases should be severed and transferred.
17   And Your Honor, the government respectfully argues that the
18   Jumara factors are quite clear and they weigh in favor or
19   severance and transfer.
20        The only really Jumara factor that the plaintiffs can
21   point to is their preference.  But the plaintiffs' preference
22   of forum, while it's given some weight, it's not dispositive
23   and it's given less weight when the plaintiff can't articulate
24   a specific link between the forum it prefers and it's
25   preference.  And here the only link that's really been

1  articulated is a link that applies to only one set of

2  plaintiffs for only the narrowest subset of their claim.

3  Remember, Your Honor, this is a federal torte claims act case.

4  We've got multiple claims here.  And most of the claims when

5  you try to parse out what's in the amended complaint and you

6  try to figure out what facts are actually alleging negligence,

7  what facts are actually alleging intentional infliction of

8  emotional distress, when you actually sift through what's pled

9  an overwhelming majority of what's being challenged here is the

10 separation and the event that happened in and around

11 separation.

12         THE COURT:  Okay.  What about -- my understanding of

13 the argument that I'm going to hear from the plaintiffs is not

14 only do I give deference to the choice of forum but it would be

15 a great burden on the plaintiffs, they are not wealthy by any

16 means.  They do not have the means to travel to Texas, to

17 travel to New Mexico and to litigate.  And that if you change

18 venue, you would essentially hamper their ability to -- to

19 indicate their rights.

20         MS. FINKELSTEIN:  Your Honor, my understanding is

21 that plaintiffs are well represented by counsel.  I -- I --

22 they are certainly welcome to articulate that they would find

23 it to be a hardship to have to litigate in a different

24 district.  But they made the choice to move to this district

25 and then to challenge in court under the federal torte claims

1    act, acts that occurred in New Mexico and in Texas.  That was

2    their choice.  And if the court deems that those are the more

3    appropriate lo -- locals so that a Texas judge can interpret

4    Texas law, which is quite different than Pennsylvania law.  Or

5    a New Mexico judge can answer the question about contributory

6    negligence and how that pans out under New Mexico law.  The

7    mere fact that they now live in Pennsylvania and that they've

8    chosen to initial their proceedings here shouldn't be

9    dispositive.

10          Moreover, my second response to that argument is that

11   I -- I -- the government doesn't frankly believe that it is

12   going to be an imposition to have to litigate in a different

13   venue.  Regardless of where the case remains, if there are

14   depositions that are going to be taken about the separation, if

15   they're federal government employees, they likely are still

16   where the separation occurred.  So those depositions are likely

17   to occur in Texas and New Mexico, whether the case is venued

18   here or whether the case is transferred there.

19          Documents that are going to have to be produced are

20   going to have to be produced the same way regardless of where

21   they're located.  And so the only real factor that the

22   plaintiffs can articulate that suggests that they should be

23   allowed to remain in this venue is their preference and that

24   shouldn't outweigh all of the other factors.  The two that I

25   really want to highlight, although the government believes all

1  of the other factors also would suggest severance and transfer.

2          But the two that I really want to highlight are the

3  local interest in litigating matters of law specific to that

4  locale.  This is a federal torte claims act.  Your Honor,

5  articulated it perfectly in minute one when my co-counsel was

6  arguing, you essentially said, isn't the federal torte claims

7  act a way that you get into federal court, I'm paraphrasing you

8  a bit.  And you bring a state law claim?  And the answer is

9  yes.  So to the extent that any of the FTCA claims survived

10  we're talking about interpretation of Texas law, New Mexico

11  law, primarily and they're going to be novel.

12          If -- if this case is not dismissed you hit the nail

13  on the head, that other than the other similar challenges

14  brought by similarly situated plaintiffs contemporaneous to

15  this case that we don't have a whole body of case law about

16  characterizing separation for immigration proceedings as

17  negligent infliction of emotional distress.  So we're talking

18  about courts making law, applying Texas and New Mexico law for

19  the first time and there is a definite interest in that

20  happening and being enforced by judges who are located in those

21  areas and have an interest in the enforcement of their law,

22  especially when it comes to Texas, which has really strong

23  public policies that weigh onto the questions in this case.

24          The second factor that I want to highlight is judge

25  familiarity.  Because while Your Honor, of course, can get up

1  to speed on any of the nuances of -- of different laws, trying

2  to litigate, imagine the trial in this case.  If this case goes

3  forward it's an FTCA trial, bench trial, you're the judge.

4  We've got to try this case.  You have to make all of these

5  individual decisions about whether Texas or New Mexico law

6  applies, or Illinois law applies and what the differences are

7  between the two of them and apply it differently to the

8  different sets of -- of plaintiffs and it's the government's

9  position that although, of course, Your Honor, would be capable

10 of doing it, judges that are already familiar with Texas law,

11 judges that every day in their FTCA cases are applying New

12 Mexico law are much more readily situated to make these kinds

13 of really nuance decisions about whether or not to expand some

14 of their tortes or apply their tortes in a different context or

15 apply certain defenses.

16         And so while we would argue that all of the Jumara

17 factors aside from the plaintiff's preference would weigh in

18 the government's favor.  We think those are two really strong

19 ones and we certainly feel that severance would be appropriate

20 even if Your Honor does not ultimately dismiss all the claims

21 and decide to transfer both sets of plaintiffs.  But there's

22 really no articulable reason why a set of plaintiffs who are

23 suing in torte, whose claims are not going to be decided under

24 Pennsylvania law who were never in Pennsylvania at the time the

25 alleged tortes occurred should be allowed to continue to

1  litigate in litigation with another set of plaintiffs that has

2  a very different set of factual circumstances.

3          And for those reasons we would ask that Your Honor

4  dismiss all of the claims in the complaint.  But if Your Honor

5  does not dismiss all of the claims in the complaint we would

6  ask for severance and transfer appropriately to the courts in

7  New Mexico and Texas.  Thank you.

8          THE COURT:  Okay.  Thank you very much, counsel.

9  Well, the plaintiffs' counsel has been sitting so patiently.

10  Who would like to proceed?

11          MR. EDLIN:  Thank you, Your Honor.

12          THE COURT:  Good morning, sir.

13          MR. EDLIN:  I'm Richard Edlin.  I'm a partner at

14  Greenberg Traurig and we are very pleased to represent the

15  plaintiffs in this case, who are in the courtroom with us.

16          THE COURT:  Oh great.

17          MR. EDLIN:  Today.  With Your Honor's indulgence

18  several of my younger colleagues will take pieces of the

19  argument.  At this stage, I guess, all my colleagues wind up

20  being younger, as a point.

21          THE COURT:  So they have the advantage of hearing all

22  the questions that the plaintiffs have been peppered with, so

23  --

24          MR. EDLIN:  Yes.  Well, I -- I hope they've been

25  writing down your questions.

 1            THE COURT:  Or the defense, I mean.

 2            MR. EDLIN:  And then I'm sure that they'll have

 3   answers for you, Your Honor.  But I -- I suppose if I was -- my

 4   introductory remarks will go to the overall nature of the case,

 5   Your Honor.  I suppose if I was the government, I'd argue it

 6   the same way.  I would try to break it down into pieces and I'd

 7   try to pretend that the horror that occurred at the border was

 8   just an ordinary piece of business.

 9            THE COURT:  And when you hear the word horror, don't

10   you start to think about constitutional violation?  And we know

11   that in the Third Circuit, a immigration detainee is -- has the

12   same rights as a pretrial detainee, citizen, non-citizen, it

13   makes no difference.  Why is this not a constitutional claim

14   that is brought based on the care, custody, control and the

15   treatment of the detainees?

16            MR. EDLIN:  Your Honor, my -- my colleague Mr.

17   Friedman, I don't want to steal his thunder on his argument.

18   He will address those issues.  We have brought alleged

19   constitutional violations.  The claims are claims under the

20   FTCA.  But the constitutional violations are pled in the

21   complaint.  And Your Honor, you were in the military I

22   understand an aviator before a lawyer in the military.

23            When we send American servicemen into harms way we do

24   that to protect something.  And it's the American way of life

25   that we are there to protect.  Your Honor, we are there to

1  protect people's rights to live freely within their own

2  borders.  Surely, Your Honor, what occurs within our own

3  borders in the United States deserves no less protection for

4  anyone who is within our borders.

5       Your Honor, no one wants a lawless border, but people

6  have the right to come to the United States and seek asylum.

7  People have the right to come to the United States to

8  immigrate.  People certainly have the right to come to the

9  United States and seek asylum as our pla -- as our clients did.

10  They also have the right when so seeking to not be tortured for

11  doing it.  And it is -- it is not an overstatement.  It's not

12  purple prose.  It's nothing of the kind to say that when they

13  came and crossed the border pursuant to federal government

14  policy they were tortured.  Your Honor, I don't know if you've

15  every had the experience of losing track of a child or a

16  grandchild in a mall for 10 seconds.

17       THE COURT:  It was at the farm show out in

18  Harrisburg.

19       MR. EDLIN:  Well, I -- I can only imagine how

20  terrified you were for those few seconds or a minute or God

21  forbid, could you imagine a half an hour?  This is between one

22  and two months that we are talking about here.  This is no

23  minor exercise of -- of government policy.  There has never

24  been legitimate government law or statute.  There has never

25  been any international law that has allowed a government to

1  torture people seeking asylum within this country.  It's why

2  this policy was condemned roundly across the globe.

3          Now, madame clerk, may I ask you to kindly put the

4  power on?

5          THE COURT:  Now, as you focus on policy, you're

6  reinforcing the argument that the United States has made that

7  this is all about an attack on policy, which starts to sound

8  like it's an executive political issue, not a judicial issue.

9          MR. EDLIN:  Your Honor, there are -- we -- we are

10 living through times when our legal and political issues have

11 become intertwined in ways that have driven the emotions of the

12 country into very polarized positions.  And -- and I'm not

13 making any comment about the rightness or wrongness of other

14 cases.  What I am saying is there can be no legitimate

15 difference of opinion about whether or not it is all right to

16 torture a parent and a child coming to the border and seeking

17 asylum.

18          Your Honor, the pictures that we see, you'll see a

19 couple of them, if we saw them from other countries we would

20 say thank God we live in America.  Now, there is redress in the

21 manner of our pleading for the violations of our clients'

22 rights.  And we will walk through that with you and I'm sure --

23 I know Your Honor has questions, and we will do our best to

24 answer those questions.  What I am saying to the court, what

25 I'm saying as clearly as I can say is that when we torture

1  people like this when they step over our border, these people
2  are no threat to anybody.  There has never been any suggestion
3  that either of these fathers was an unfit parent for the child
4  that they came to the country with.  There is no suggestion
5  that these two sets of parent and child could not have been
6  held in the same facility.  No suggestion at all of that.

7          Now, federal law, Your Honor, requires the safe and
8  timely placement of children in the least restrictive setting
9  that is in the best interest of the child.  That's contained in
10 our -- in our -- in our laws.  What happened was, and you can
11 see from the very top of the government, it's then Attorney
12 General Sessions, we need to take away children.  You can see
13 from Mr. Miller, then the National Security Council
14 representative and a senior White House advisor, my mantra has
15 persistently been presenting aliens with multiple unsolvable
16 dilemmas to impact their calculus for choosing to make the
17 arduous journey to begin with.

18         Your Honor, this was deterrence, but it was
19 deterrence through terror and through torture.  And Your Honor
20 can see the -- the what will be obvious, I believe to the court
21 a naked just awful, lack of integrity in terms of how the law
22 is applied here.  This is 2017 memo and it's drafted by senior
23 officials in the Department of Homeland Security, it's in our
24 amended complaint in several places, paragraphs 31, 32 and
25 footnote 18.  What is says here is that the government intends

1   to announce that DHS is considering separating family units so

2   a family unit that comes across the border, separating them,

3   placing the adults in detention and through that act change the

4   status of the minor child and now all of a sudden deem that

5   child to be unaccompanied.  And now the government can do what

6   it wants to that child.

7           Your Honor, this is a manipulation of the law that is

8   appalling and it was roundly criticized inside and outside of

9   the United States.  Now, when these children were separated,

10  and I don't want to mince words here.  I'm not suggesting

11  anything other than the truth, taking a child away from a

12  parent, however that is done is a violent act against that

13  family unit.  It's violence, Your Honor.  There is no nice way

14  to tell a parent that they are taking their child away and

15  sending them thousands of miles away without telling them where

16  they are going or when they would see them again.

17          And under this policy in addition to our clients,

18  4,000 children as young as 4 months old were taken away from

19  their -- from their parents.  And Your Honor, for no good

20  reason.  That was n -- that is not the law of the United

21  States.  This is an abhorrent, unlawful, terrible policy.  And

22  you can even see the way this was spoken about in the

23  government.  US Attorneys saying, per the AG's policy we should

24  not -- this is an incredible statement, we should not be

25  categorically declining immigration prosecutions of adults in

1  family units because of the age of a child, translation, we

2  don't care how young these kids are.  We will take them away

3  anyway because this is going to deter other people from coming

4  to the United States and lawfully seeking asylum.

5          This has nothing to do, Your Honor, with the merit of

6  the asylum case.  This has nothing to do with whether or not

7  the government should or should not have granted asylum.  With

8  respect to our clients one case, one misdemeanor case as many

9  were was dismissed with time served and one case was dropped.

10 But in any event, regardless of that, the issue here is whether

11 or not children can be ripped away from their parents as a

12 matter of deterrence and as a matter of torture, Judge.

13         Now, the defendant knew full well that it had failed

14 to track these children.  I -- I remember reading and it was an

15 awful thing to read that when these children were taken away

16 the government was not sure how to get them back together again

17 with their parents.  The El Paso program, the pilot program

18 from 2017, 281 families had their children separated

19 whereabouts unknown.  The government itself reported in 2019

20 that it, the government, may have separated thousands more

21 children and they face challenges identifying where they were.

22         The government liked that so well that they expanded

23 it times 20 or more under the zero-tolerance policy.  Now, the

24 government says, well the zero-tolerance policy is not under

25 attack.  True.  But the consequences of it are at issue in your

1  court, Your Honor.  The consequences of it, the harm that was

2  done, the torte as you will hear the law of the three states

3  are not so very different.  You'll hear that Pennsylvania's

4  choice of law rules cares about whether the laws are terribly

5  different, and if they're not terribly different Pennsylvania

6  law will apply to persons located within Pennsylvania.  The

7  government's argument on -- on convenience, you'll hear from

8  another one of my colleagues.  The government is present

9  everywhere.

10         The government cannot be inconvenienced by litigating

11 in any of the judicial districts.  Again, this happened without

12 any showing that any parent was unfit.  Now, these cases have

13 made it to the courts.  This is the Ms. L case; this is from

14 the Southern District of California in 2018.  We are not, as

15 the government has suggested here today talking about a minor

16 incident where, you know, a child might have gone missing for a

17 little bit.

18         In the words of the district court in California, I

19 won't read all of this, Your Honor, but I've highlighted the

20 things that I think make this quite a different case than the

21 one the government has suggested.  The use of children as tools

22 -- the use of children as tools in the parents' criminal and

23 immigration proceedings shows that a finding of likelihood of

24 success is assured.  They talk about this policy and the way it

25 was implemented as so egregious, so outrageous that it might

1  fairly be said to shock the contemporary conscience.  And it

2  interferes within -- and with the rights implicit in concepts

3  of ordered liberty.

4           It was brutal and it was offensive.  Your Honor, we

5  are not talking about minor incidents that occurred.  And we

6  are not talking about minor consequences of those incidents.

7           THE COURT:  No, but here's what -- we're talking

8  about substantive due process there.  We're talking about

9  egregious, outrageous conduct, shocks the conscience.  And yet

10 you're bringing these actions under the federal torte claims

11 act so they are simple, ordinary torte claims.  These are not

12 ordinary torte claims in any -- even the government would agree

13 with that, these are not ordinary torte claims in any sense.

14          So is your argument about how terrible the policy was

15 and outrageous, doesn't that work against the argument that

16 this is what Congress intended by the federal torte claims acts

17 in its waiver of sovereignty?

18          MR. EDLIN:  Your Honor, you've asked a couple of

19 questions again, I -- I don't want to --

20          THE COURT:  I know you're going to defer to an

21 associate.

22          MR. EDLIN:  Well, I don't want to steal their

23 thunder, but I do want to address Your Honor's questions.

24          THE COURT:  Yes, sir.

25          MR. EDLIN:  With the understanding that there will be

1  some smarter elaboration on it.  Your Honor --

2           THE COURT:  Just younger elaboration, not smarter.

3           MR. EDLIN:  Your Honor, Ms. Reddy will explain the

4  sovereign immunity waiver here.  Now, it features, centrally in

5  the government's argument today.  It was not raised at all

6  until the reply brief.  So impermissible as that is supposed to

7  be we're -- we will deal with it as well as we can.

8           If Your Honor determines to rule on sovereign

9  immunity against the plaintiffs before doing so we would like

10 an opportunity to brief what Ms. Reddy will discuss at length.

11          THE COURT:  Certainly.  Which raises another question

12 I should ask now, if I should determine that these claims are

13 deficient in any respect, in part or in all, do you want an

14 opportunity to replead?

15          MR. EDLIN:  Yes.  Certainly.

16          THE COURT:  Just wanted to get that out of the way.

17          MR. EDLIN:  Yes, certainly.  There again, Ms. Reddy

18 will discuss this, but the United States proposed in the

19 Nuremberg trials that there is a level of civilized, human

20 conduct that no state can avoid submitting to.  You cannot, nor

21 does any country have the right to waive Jus cogens as it

22 applies to it.  And the waiver issue as it relates to this,

23 again, Ms. Reddy will describe this in more detail, the waiver

24 issue here, Your Honor, should not trouble the court because

25 the government cannot waive these kinds of claims.

1          The reason that I am showing how egregious these

2     claims are, the reason that every civilized country in the

3     world condemned what the United States was doing, and the

4     reason that the prior administration was even forced to

5     withdraw the policy, and the reason that the courts that looked

6     at it used these kinds of words was because what we did

7     violates every norm of civilized conduct.  It is not what

8     America stands for.

9          THE COURT:  And I need to interrupt you a moment.  I

10    apologize, sir.  But you said cannot waive.  I think what you

11    were saying, I want to make sure is you were actually saying

12    the government cannot immunize itself, that there's no existing

13    automatic immunization.

14          MR. EDLIN:  Yes, Your Honor.

15          THE COURT:  And in fact, they cannot immunize

16    themselves from liability.

17          MR. EDLIN:  For certain things.

18          THE COURT:  Okay.

19          MR. EDLIN:  And when those things rise to the level

20    of -- of the kind of conduct, Your Honor, mentioned the king

21    can't be sued unless the king agrees.  Well, that's true almost

22    all the time.  Unless the king engages in conduct that is so

23    against the norms of civilized society and the international

24    community that the international community can condemn it.  And

25    that is the whole point of what was gotten at in Nuremberg led

1  by the United States.  That principle exists.

2          Your Honor, I then would move on.  What the

3  government -- what we did, what the United States government

4  did was to offer those -- to offer my clients and to offer

5  those like our clients with a horrible, shocking, brutal

6  choice.  This is a federal form and it's probably large enough

7  on the screen, if Your Honor can -- can read that.  But what

8  the government offered people was a choice between leave with

9  your child and leave without your child, but you had to leave

10  one way or the other.  That was a federal form that was throwed

11  in front of these people during the course of their unlawful --

12  the unlawful separation that was going on with them and what

13  they hoped.  But that people would say, well, let me just take

14  my child then and get out of here.  So we'll torture you and

15  then we will give you this brutal choice.

16          Now, when it shows up in the movies, we've seen it

17  before.  We've seen this movie before.  This kind of a choice

18  should never be imposed on a parent.  It should never be

19  imposed by the United States on people lawfully seeking asylum.

20  Your Honor, I'm sure you're aware of the timelines, but the

21  simple fact of the matter here between our two clients, and we

22  can -- it's in our pleading and, of course, we can submit this

23  short presentation so it might be a little easier to -- to see.

24          But both of our clients were detained at the border.

25  Both of our clients were subjected to the same policy.  Both of

1  our clients were separated for between one and two months.

2  None of that was appropriate.  Both of our clients were

3  subjected to all of the terrible consequences and the tortes

4  that under the law of all of these states, all of these states

5  are not so different.  The differences are minor differences.

6  None in either Pennsylvania nor Texas nor New Mexico counten --

7  countenances the consequences of this type of brutality.

8              THE COURT:  Now, these children were removed from

9  their fathers?

10             MR. EDLIN:  Yes.

11             THE COURT:  Who removed them from their mothers?  And

12  where are their mothers and do their mothers have any say in

13  this matter?

14             MR. EDLIN:  The mothers, I believe are -- are not in

15  the United States and the mothers are not protesting any of --

16             THE COURT:  So as far as you know, they gave

17  permission for the father to take the child?

18             MR. EDLIN:  That's our understanding, Your Honor.

19             THE COURT:  And when they were reunited did the

20  mothers ever get reunited with their children?

21             MR. EDLIN:  I do not --.

22             MS. REDDY:  Yes.

23             MR. EDLIN:  Yes.

24             THE COURT:  You're going to address that.  Okay.

25             MR. EDLIN:  In both cases?

1          MS. REDDY:  I believe in both cases, yes.

2          MR. EDLIN:  Yes.  In both cases, Your Honor.  So --

3  so the point, Your Honor, and maybe we can think of it this way

4  for many crimes there is also an analog under the civil law.

5  So it is not one or the other.  I can be both and that is what

6  we are dealing with here today.  Your Honor asked about the

7  intent behind the statute.  I just want to touch that briefly

8  again, understanding my remarks will be a little bit limited.

9          It would be hard to imagine Congress passing a law

10 that says, that what if we go ahead and torture people?  What

11 we need to do is apply the law as is written to these facts and

12 when we do so, as we have done in our complaint we've satisfied

13 all of our pleading requirements under the words and language

14 of the statutes.  It would be -- it is -- it is often the case

15 that as situations change we apply the laws without ever

16 necessarily knowing that Congress would have thought of or

17 intended a particular issues, but we apply the laws as they're

18 written.

19         THE COURT:  Would you have expected Congress to put a

20 private right of action in the immigration laws for

21 mistreatment or the like?  If they intended that to fall under

22 the federal torte claims act, would it not have been more

23 express and clearer if they actually put in the immigration

24 laws a private cause of action for immigrants?

25         MR. EDLIN:  Your Honor, sometimes they do and

1  sometimes we've found private rights of action under the laws
2  that have not been put in, but we've read it and we've read the
3  statutes and sometimes -- sometimes it works and sometimes it
4  doesn't.  I believe here, I believe we have appropriately pled
5  under the A -- ATS and the federal tort claims act, pursuant to
6  the language of those statutes and pursuant to the underlying
7  laws in the states that we've been looking at, Pennsylvania,
8  Texas and New Mexico.

9          THE COURT:  And a think, not to paraphrase you, but I
10 think what you're saying when you talked about not being able
11 to immunize yourself for such outrageous behavior, that's more
12 under the ATS, the two ATS?

13         MR. EDLIN:  That's the ATS, yes.  Yes, Your Honor.
14 Now, we're not talking about a situation in which the courts
15 have only looked at the situation in total, but -- but in the
16 Northern District of Illinois, Your Honor, our client here
17 C.D.A.'s specific circumstances were evaluated there.  And
18 again, in very, very similar language used in California, what
19 the court there said was that the irreparable harm inflicted on
20 the boys, because there was another boy involved WSR in that
21 case, reinforces why the separation shocks the conscience.

22         Your Honor, we're here at the pleading stage.  We
23 have more than sufficiently pled the tortes that we have
24 alleged and the government will have an opportunity and we will
25 have an opportunity to explore all of this in discovery.  But

1  to shut the door, the justice of this court at this stage where

2  a pleading which I believe satisfies all of the pleading

3  requirements incumbent upon us, Your Honor, frankly, I think

4  would just be the wrong decision.

5          Now, this -- this policy as we have said, this was

6  not -- this is not a close question, and this touches on Ms.

7  Reddy's argument on whether you can immunize yourself, but

8  there was an international uniform outcry among the civilized

9  nation against this policy.  This policy was not something that

10 didn't rise to that level.  It does rise to that level.

11         The harm that is encountered by that is recognized in

12 numerous places by the government itself.  Now, on the left are

13 two columns that are from Office of the Inspector General

14 documents themselves.  So this is not us putting this together,

15 this is from the OIG, the two left columns, and they both talk

16 about the harms, the physical harms and the emotional harms,

17 all of the harm that is suffered when young children are

18 separated from their parents, physical symptoms, Your Honor.

19         On the right I want to hasten to say, the quote on

20 the right, this case is not in our briefing, but when you

21 search out cases, case after case on the right side, JP vs.

22 Sessions again, Central District of California.  It also

23 acknowledges the kind of trauma that the acts that the

24 government engaged in here, the kind of trauma that occurs.

25 There is no dispute about this.  There is no legitimate dispute

1  about this.

2           Now, the top of the government, my -- my colleagues,

3  counsel over here work for the US Attorney in this district.

4  The US Attorney in this district serves at the pleasure of the

5  President of the United States.  The president has said, if in

6  fact, because of the outrageous behavior, that word comes up a

7  lot.  Because of the outrageous behavior of the last

8  administration, you coming across the border, my clients,

9  coming across the border, whether it was legally or illegally,

10 and you've lost your child, your child is lost, it's gone, you

11 deserve some kind of compensation, no matter what the

12 circumstances.  We agree with that.  That's the top of the

13 government, in effect, their boss saying this.

14          Your Honor, we are simply here seeking exactly what

15 the President of the United States has said we are entitled to.

16 This is not a -- a crazy, outrageous claim.

17          THE COURT:  Well, shouldn't Congress pass a law

18 providing for compensation and the president should sign it and

19 then it be implemented and compensation paid?

20          MR. EDLIN:  Your Honor, that could happen.  We

21 believe the laws that are already in place more than adequately

22 protect our clients' rights and, of course, you have a tabletop

23 briefing on all of this.

24          Sometimes a picture speaks a thousand words.  If you

25 said that this was coming yesterday from Ukraine, I would

1  believe you.  And if you said that 25 years ago this was coming

2  from Bosnia, I'd have believed that too.  What I would never

3  have believed is that this is a picture of what we did to

4  children in the United States.

5           THE COURT:  Are you sure we're not doing that today?

6           MR. EDLIN:  I'm sorry?

7           THE COURT:  If you took pictures down at the southern

8  border today are you sure you would not see similar images?

9           MR. EDLIN:  I'm not sure what I would see at the

10 southern border today.  I know that this happened in the

11 current period of time that the complaint speaks to as a

12 function of what the government policy and actions incurred and

13 what I'm saying to the court is, I don't care when this picture

14 was taken, I would never have expected this to be a picture

15 taken in the United States.

16          THE COURT:  And I think the point you're trying to

17 make isn't so much that those blankets are strange, but they're

18 supposed to be very effective, I don't know.  But is children

19 separated from the parents is what I'm supposed to take from

20 that picture.

21          MR. EDLIN:  Yes.

22          THE COURT:  Not so much that the beds aren't very

23 good because they're not.  The blankets aren't very good,

24 because they're not.  But I think the image is more to stress

25 the point that all these children are here without their

1   parents.

2          MR. EDLIN:  All without their parents and is it any

3   surprise --

4          THE COURT:  Because this isn't about the care

5   conditions of the facility where the children were held, it has

6   to do with the separation.

7          MR. EDLIN:  It does, Your Honor.  And is it any

8   wonder that children treated like this are suffering from the

9   tortes inflicted upon them.  Now, I've probably taken up more

10  than my time.  You'll have many questions for my colleagues.  I

11  believe Mr. Friedman is going to speak next and he's going to

12  deal with the discretionary function and related defenses.

13         THE COURT:  Thank you, very much, sir.

14         MR. EDLIN:  Your Honor, thank you very much for your

15  time.

16         MS. FINKELSTEIN:  Your Honor, our screen blinked off

17  sometime right around Meryl Streep.  I don't know --

18         THE COURT:  Oh, your screen is not working?

19         MS. FINKELSTEIN:  No, and that one's not either.

20         THE COURT:  This is my -- Deputy Fitzko is the

21  expert.

22         MR. ST. JOSEPH:  Now, we don't have --

23         MS. FINKELSTEIN:  So well, that one keeps

24  periodically -- what it does.  Like it will come and ago.  I

25  don't know if there's going to be -- I'm not sure if there's

1  going to be additional presentations.

2          THE COURT:  Do you have a further Power Point

3  presentation?

4          MS. FINKELSTEIN:  Or whether there's law on it or

5  just images.

6          THE COURT:  Do you have a further Power Point

7  presentation.

8          MS. REDDY:  We do have one, Your Honor.

9          THE COURT:  Okay.  Let's see, can -- if it's not this

10 one we can -- well, why don't we -- why don't we take a ten-

11 minute recess and see if we can get the system --

12         MR. EDLIN:  Thank you, Your Honor.

13         THE COURT:  -- and working.

14         MR. EDLIN:  Thank you, Your Honor.

15         THE COURT:  We'll stand in recess for ten minutes.

16         MR. ST. JOSEPH:  Thank you, Your Honor.

17         THE CLERK:  All rise.

18 BRIEF RECESS

19         THE CLERK:  All rise.

20         THE COURT:  You may be seated.  Thank you.

21         MR. EDLIN:  Thank you, Your Honor.

22         MR. ST. JOSEPH:  Thank you, Your Honor.

23         THE COURT:  The court is called to order all parties

24 previously present are once again present.  I believe was it

25 Attorney Reddy who was coming in next?  Or --

1          MS. REDDY:  It was Mr. Friedman.

2          THE COURT:  Mr. Friedman.

3          MR. FRIEDMAN:  Good morning, Your Honor.

4          THE COURT:  Good morning, sir.

5          MR. FRIEDMAN:  My name is Daniel Friedman.  On behalf

6  of the plaintiffs, I'm going to be addressing a portion of Mr.

7  St. Joseph's argument.  I'm going to be addressing the

8  exceptions of FTCA liability and my colleague Mr. Bailus will

9  be addressing the questions of Texas, New Mexico and

10 Pennsylvania law.

11         THE COURT:  Very well.

12         MR. FRIEDMAN:  So I'm going to start with the five

13 claimed exceptions that the government raises to FTCA

14 liability.  But two points before I get into the specific

15 exceptions, first, points of agreement, plaintiffs' claims are

16 not constitutional claims.  Plaintiffs' claims are state law

17 torte claims.  They are common law tortes for which any private

18 person would be liable.  And just because these are common law

19 torte claims doesn't mean the government's conduct is any less

20 egregious or horrifying.  It just means these claims can be

21 brought under state law.

22         THE COURT:  It is often time, often times difficult

23 to look at the United States as being a -- a private person,

24 because a private person couldn't have done this.  Right?  This

25 could only have been done pursuant to a governmental policy.

1   So the United States shall be liable respecting the provisions

2   of this title relating to torte claims in the same manner and

3   to the same extent as a private individual under like

4   circumstances.  Can you imagine a private individual being

5   under like circumstances where they could remove you from your

6   child?

7             MR. FRIEDMAN:  Yes, Your Honor.  And we do cite

8   Pennsylvania cases in which an attempt to separate a parent and

9   a child was cognizable under Pennsylvania law as intentional

10  infliction of emotional distress.  But we're probably jumping

11  straight to the no private analog exception to liability.

12            Cases interpreting that exception have found that

13  FTCA claims can be brought in the context of immigration and

14  criminal law.  The government in their moving brief at least,

15  this is at page 33 of their moving brief argues any FTCA claim

16  related to the enforcement of criminal or immigration law

17  cannot be brought because private citizens cannot carry out

18  criminal led immigration laws.  And we cite a litany of cases

19  where the FTCA and its waiver of sovereign immunity was found

20  to apply in the immigration and in the criminal context.

21            One of the cases that the government cites in its

22  brief of Olos Palma v. The United States.  It was a District of

23  New Jersey case.  There and FTCA claim was allowed to proceed

24  against the government for wrongful deportation.  There the

25  government was carrying out immigration laws, the District of

1  New Jersey said because this conduct is analogous to what a

2  private individual can do and be liable for under torte law, we

3  allow this claim to proceed.

4         So this no private analog exception really looks to

5  broader categories of conduct to say this is not what a private

6  individual does.  The cases that the government cites applying

7  this exception to say you can't bring an FTCA claim are, one,

8  Ferris v. United States, which is the military context.  And

9  there the government says the military is its own thing.

10  Private citizens don't have the military they don't have the

11  kind of command structure that a military has.

12         THE COURT:  If it doesn't visit --- doesn't present -

13  - prevent a military person from bringing the very same lawsuit

14  that now an undocumented migrant can bring?

15         MR. FRIEDMAN:  Yes.  And that is because the

16  uniqueness of the military, which I won't pretend to understand

17  the same as Your Honor has, but -- does, but that was the whole

18  thing is Ferris, was that the military -- you can't bring an

19  FTCA, you can't bring a state law torte claim in the military

20  context.  Similarly, the only other case applying this doctrine

21  that the government cites is where some aspect of the

22  government refused to issue a passport and the holding there

23  was that -- I'm just going to get the name of the case for Your

24  Honor.

25         THE COURT:  Sure.

1              MR. FRIEDMAN:  Well, it's in the government's brief.

2    That issuing a passport is not something that a private citizen

3    can do because that is uniquely governmental, no FTCA claim can

4    lie.  But there is no broad exception for criminal or

5    immigration laws.  In fact, many FTCA cases, and we list them

6    in our opposition brief are brought in the context of criminal

7    and immigration legal enforcement.

8              THE COURT:  And I think the government all but

9    conceded if they were driving someone who was in an immigration

10   context or the slip and fall at a detention facility that would

11   -- I think the government conceded would fall under the federal

12   tort claims act.

13             MR. FRIEDMAN:  Yes, I believe so.  Just because it's

14   in immigration or in the criminal context doesn't mean it's

15   immune from the act, or separate from the act.

16             The second point of agreement between the parties in

17   this action is that the plaintiffs are not challenging the

18   zero-tolerance policy or the family separation policy.  I

19   believe Mr. St. Joseph said in his argument that this is not a

20   systemic challenge.  And we agree with that.  We are not

21   challenging the policies.  There's no need to challenge the

22   policies for two primary reasons.  One, because the prior

23   administration and the current administration have disavowed

24   the policies and two because when the policies were challenged

25   they were found to be unconstitutional even as applied to our

1  clients, C.D.A. -- well, C.D.A. was the plaintiff in that

2  action.  It was found to violate due process rights.  And I

3  believe it was going to violate substantive and procedural

4  rights.  So the Northern District of Illinois already found

5  this policy as unconstitutional.

6          THE COURT:  That again raises that issue I've asked

7  multiple times, why is this not brought as a deliberate

8  indifference care, custody, control pretrial, pretrial detainee

9  type of case under -- under the 14th Amendment, the 5th

10  Amendment.  Why is it brought under the FTCA and a negligence

11  standard, et cetera?

12          MR. FRIEDMAN:  So the FTCA and -- well, first you

13  can't bring constitutional claims under the FTCA.  You

14  necessarily must bring --

15          THE COURT:  Right.

16          MR. FRIEDMAN:  -- a state law torte claim.  You

17  cannot bring a constitutional claim against the government.

18          THE COURT:  Right.

19          MR. FRIEDMAN:  So the FTCA and the Bivens doctrine

20  are meant to be complimentary.  That --

21          THE COURT:  If always narrowly construed.

22          MR. FRIEDMAN:  I'm sorry?

23          THE COURT:  And they are also always narrowly

24  construed.  In other words, we're not expanding out the rights

25  to sue under a constitutional theory against the United States.

1  Those are also very narrowly construed.  Bivens is very

2  narrowly construed.  Rivera reluctant to expand it out.  Is

3  that the reason why this was not brought as a constitutional

4  claim against the individuals who actually violated the rights

5  of these people.  Rather it's brought against the United States

6  itself under the FTC act.  Is that -- is that the reason?

7          MR. FRIEDMAN:  Because we believe we can get full

8  redress by bringing these claims against the United States.

9          THE COURT:  Okay.

10         MR. FRIEDMAN:  Now, --

11         THE COURT:  Although, whether the FTCA there's no fee

12  shifting; correct?  There's no punitive damages.  You'd be in -

13  - even if you get over the immunity from suit you've got to get

14  over the different limitations on liability and what you're

15  allowed to recover, but that's for another -- sorry for the

16  interruption.

17         MR. FRIEDMAN:  Now, Your Honor has mentioned a couple

18  of times that the FTCA is to be interpreted narrowly the way it

19  waives sovereign immunity contained within it is to be

20  interpreted narrowly.  But the government does not actually

21  contest the waiver of sovereign immunity under the FTCA, what

22  the government is arguing is that there are exceptions to that

23  waiver.

24         THE COURT:  Right.

25         MR. FRIEDMAN:  The government bares the burden of

1 proving those exceptions and the exceptions themselves also
2 must be interpreted narrowly.  So because we are in the land of
3 exceptions to the waiver.

4          THE COURT:  The burden has somehow shifted over to
5 them.

6          MR. FRIEDMAN:  Starting with the discretionary
7 function exception.  This is the first of the five e -- excuse
8 me, that the government raises.  Under the discretionary
9 function exception, the government has the burden of showing
10 that the federal actors had an element of judgement or choice,
11 and secondly that the discretion was subject to a policy
12 analysis.

13          And we believe the discretionary function exception
14 doesn't apply for three different reasons.  First, as Your
15 Honor, mentioned because the people that came in contact with
16 plaintiffs had no discretion under the policy.  It was called
17 the zero-tolerance policy.  It was not a policy of discretion.
18 And therefore, the discretionary function exception does not
19 apply to all of those government actors.  Second, even if you
20 want to look at the government itself --

21          THE COURT:  Now, I got to stop you again.  So okay,
22 so this is where it gets so interesting.  So the actors, the
23 federal employees who have caused the harm, if they didn't have
24 discretion that means the policy that they are following.  The
25 policy itself is causing negligent conduct.  How do you --

1  because under the federal torte claims acts, we have to prove
2  negligence.  Negligence by the United States acting through its
3  employees.  So when you say they had no discretion, what you're
4  saying is they were implementing the policy of the United
5  States.  So under the federal tortes -- tort claims act you
6  have to find that -- let me ask you, as a question.  Do you
7  have to find that the people who are implementing the policy,
8  the federal actors are negligent or can you prove a claim by
9  saying the policy itself is negligence?  That when you -- when
10 you implement the policy even if you do it exactly the way it's
11 written it will result in negligent conduct, or if the
12 intentional inflection were allowed, intentional conduct?

13         Like who -- whose -- where's the negligence?  Is it
14 the people that made the policy?  And if it's the people that
15 made the policy they're clearly policy makers, that's clearly
16 discretionary.  So if it's the people who made the policy who
17 are negligent, you can't go.  So it's got to be the people who
18 drove the post truck, the person who caused the torte, you
19 know, caused the injury.  So it's the federal actor.  Well, the
20 federal actor is doing exactly what the policy says they are
21 supposed to do.  Zero tolerance, this is what you will do and
22 they do it exactly the way they're supposed to, then you have
23 to be arguing that the policy called for federal -- federal
24 employees to act negligently; is that right?
25         MR. FRIEDMAN:  Well, Your Honor, I think every

1  element is acting neglig -- negligently and I would also point

2  out that we have intentional claims as well as Mr. Edlin

3  pointed out in detail these were intentional actions being

4  carried out by the government.

5           THE COURT:  Well, all I'm -- I'm focusing mainly on

6  just the FTCA.  There is an intentional infliction of distress.

7           MR. FRIEDMAN:  Yes.

8           THE COURT:  And abuse of process you could argue, but

9  for the most part --

10          MR. FRIEDMAN:  The five elements of intent.

11          THE COURT:  -- their negligence state claims that

12  fall under negligence and so would you agree, and I know this

13  is more rhetorical, that if the policy maker is the one that's

14  negligent by creating a policy that resulted in harm then

15  that's discretionary function, I believe.  There's no more

16  discretionary function than the creation of policy.  That's

17  what our -- our policy makers do.  If the actual person that

18  removed the father from the child, that person were they

19  negligent and if they were negligent is it because they

20  violated something under state law or is it because they

21  followed a policy that by its very nature required them to act

22  negligently or intentionally in violation of your clients'

23  rights?

24          MR. FRIEDMAN:  Well, Your Honor, it doesn't have to

25  be an either/or choice.  They can be following the policy and

1  violating state law.  And I would analogize this to the due

2  care exception which I was going to turn to next.

3          THE COURT:  Right.

4          MR. FRIEDMAN:  That the due care exception says that

5  if you are taking an action specifically prescribed by a

6  statute you are immune from liability under the FTCA and

7  exercising due care and we'll come to that.  That doesn't apply

8  to a policy.  A policy is as you were saying it's -- it's not a

9  statute, it's not a regulation, it's not the constitution.  So

10 these are actors choosing to act in a torturous way.

11         But moving on, you can -- as you know --

12         THE COURT:  And the actor being the person that's the

13 immigration officer on the ground that's separating them.

14         MR. FRIEDMAN:  Yes.

15         THE COURT:  Okay.

16         MR. FRIEDMAN:  Well, the -- so the immigration --

17         THE COURT:  That's implementing the policy.

18         MR. FRIEDMAN:  The immigration officer on the ground

19 is acting without discretion and therefore the discretionary

20 function exception does not apply to that person's conduct.

21         THE COURT:  Okay.

22         MR. FRIEDMAN:  At the higher levels of government,

23 and this is the second reason the discretionary function

24 exception doesn't apply.  Because the government doesn't have

25 the discretion to violate the constitution and as Your Honor

1  noted in asking questions of the government every court that

2  has looked at this question under a constitutional analysis has

3  found that there is a constitutional violation.

4          THE COURT:  Right, but this is not brought as a

5  constitutional violation it's brought on the FTCA.  I'm still

6  having trouble getting the relationship, the dynamic between

7  the constitutional violation and FTCA, because normally we see

8  constitutional violations brought as a civil rights action.  We

9  don't see it brought under the FTCA.  We see the slip and

10 falls, we see the -- the car accidents, et cetera.  We don't

11 see a medical malpractice from a civilian who's married to a

12 military person in a military hospital.

13         Well we don't normally see what look on their faces

14 constitutional violations under the due process clause coming

15 under the FTCA.  That's -- that's the problem, so when you

16 reference the consti -- and we have a different standard for

17 constitutional violations et cetera.  It was rhetorical, but

18 you can see why the tug and pull there, between a

19 constitutional violation versus an FTCA violation.

20         MR. FRIEDMAN:  Well, Your Honor, if you look at the

21 structure of the argument and plaintiff -- defendant's motion

22 to dismiss, the government's motion to dismiss.  It becomes

23 clear why the constitutional violation is only looked at later

24 on.  We bring state law torte claims under the FTCA.  Now, the

25 government argues the discretionary function exception applies.

1   And it's only at that point that the constitutional violation
2   becomes relevant because in order for the government to argue
3   the discretionary function exception applies they need to show
4   there was no constitutional violation.  So that's why -- it
5   doesn't have to be in our complaint.  Is it in our complaint.
6   We do allege violations of due process under the 5th Amendment,
7   but it's only at this point once the government --
8          THE COURT:  It's only to address the discretionary
9   function aspect.
10         MR. FRIEDMAN:  Correct.  Moving on.  So every court
11  that has analyzed the question of the family separation policy
12  and the zero-tolerance policy constituted a constitutional
13  violation has found that it does.
14         THE COURT:  In that violation is the family integrity
15  violation, that's the right that's being violated?
16         MR. FRIEDMAN:  Yes, it's found to be a liberty
17  interest under the 5th Amendment.  And it's both a substantive
18  and a procedural right.  I -- I think Your Honor mentioned
19  earlier that we were talking about substantive due process.
20  That's true but there's also a procedural element before
21  separating the parent and the child.  Both parent and child are
22  entitled to process.  So the government tries to extend the
23  Bivens doctrine of qualified immunity into the context of the
24  FTCA.
25         But there are very good reasons why qualified

1  immunity applies to individual government actors, but not to

2  the United States.

3          THE COURT:  Right.

4          MR. FRIEDMAN:  I'm reading from Lumia v. United

5  States, a DC Circuit case that qualify -- and this is quoting a

6  Supreme Court case, qualified immunity is directly tied to the

7  risk that fear of personal monetary liability and harassing

8  litigation will unduly inhibit officials in the discharge of

9  their duties.  This is not a consideration that applies to the

10 United States.

11         THE COURT:  Right.

12         MR. FRIEDMAN:  The United States doesn't have concern

13 about --

14         THE COURT:  But it's got sovereign immunity.  But

15 you're right, qualified immunity is to protect the individual

16 from being individually liable.

17         MR. FRIEDMAN:  And I would add in the recent Southern

18 District decision from June D.J.C.D. v. United States.  I

19 believe that was the first court to consider this sovereign, or

20 qualified immunity argument in the context of the family

21 separation policy.  This case was not in our papers because it

22 came out after our papers.  It clarified that the FTCA looks at

23 the United States as if it was a private individual.  That is

24 the language of the statute that we've put the United States in

25 the shoes of a private individual.

1          A private individual does not have qualified
2    immunity.
3          THE COURT:  No.  But you know what's interesting,
4    under the FTCA it does provide that with respect to any claim
5    under this chapter the United States shall be entitled to
6    assert any defense based upon judicial or legislative immunity
7    which would otherwise have been available to the employees.
8    But that goes towards just that, absolute judicial immunity and
9    legislative immunity for legislators, et cetera.  It doesn't
10   go, I don't believe that qualified immunity in any way is
11   implicated by that permission of the FTCA.  I think qualified
12   immunity is simply a doctrine to protect individuals,
13   government employees from being sued in their individual
14   capacity while they're -- if they are sued in their official
15   capacity then it's the United States that is sued.
16         MR. FRIEDMAN:  Yes, Your Honor.  The third reason
17   that the discretionary function exception is inapplicable to
18   our claims is because the government tries to carve discrete
19   elements of our claims and says this was a discretionary
20   function, this was a discretionary function.  In it's moving
21   brief, the government highlighted the decision to prosecute the
22   fathers and the conditions of confinement.  In their reply
23   brief they add a third term, statements made during the
24   reunification process.  I believe that was referring to that
25   family reunification form.

1          Now, in order for the discretionary function
2    exception to apply, each and every alleged act must fall within
3    the exception.  That's a quote from Prescott v. United States,
4    a Ninth Circuit case from 1992.  The government by carving out
5    these discrete elements of plaintiff, of plaintiffs' claims
6    ignores the entire period of family separation after the
7    criminal prosecutions were over, in Mr. A.'s case with time
8    served and Mr. Q.'s case with a dismissal and the
9    reunification.  They do not even argue that the decision to
10   keep parents and children separated -- separate at that point
11   is subject to the discretionary function exception.
12          Moving on to the due care exception, this is the
13   second basis that the government argues.  The due care
14   exception like the discretionary function exception is the
15   government's burden to show.  Two elements to it that the
16   conduct was specifically prescribed by statute and the
17   government exercised due care in carrying out that statute.
18   First the government doesn't point to any statute that required
19   family separations, instead it was the policies, the zero-
20   tolerance policy, the family separation policy and as soon as
21   those policies were revoked by the prior administration
22   families were reunified.
23          So because this was subject to a policy it is not
24   subject to the due care exception.  But I would point out the
25   government doesn't even argue that the government actors had

1  due care in separating parent and child, particularly in

2  regards to the plaintiffs in this case because there was no due

3  care.  There's no even -- there's not even an allegation of due

4  care, the due care exception doesn't apply.

5      THE COURT:  Now, if there had been a specific statute

6  of regulation that provided for if you came across the border

7  illegally, let's say there was a legitimate reason, when

8  detention facilities could only accommodate children or adults

9  and we didn't want to mix children with adults, et cetera and

10 there was no other choice, would due care then be to make sure

11 that was accomplished in an appropriate manner to protect the

12 safety health and welfare of both the adult and the child.

13 Would that be the due care if, in fact, it was not simply a

14 policy, and that's an issue.  Where you get statute regulation

15 and then policy of implementation.  Would that be due care, if

16 they didn't handle them properly in the way they went about the

17 separation?

18     MR. FRIEDMAN:  I -- I believe so, Your Honor.  We

19 cite cases in our opposition brief describing what the standard

20 of due care means in the context of the FTCA.  But as Mr. Edlin

21 pointed out, this was a situation where the government couldn't

22 even track where the children were in relation to their

23 parents.  It took them an unreasonably long time to reunite

24 families.  And the Ms. L opinion notes that the government was

25 better at tracking the property of people coming across the

1  border than they were tracking their children.  So I don't

2  think there's any claim and the government doesn't make any

3  that they acted with due care in this situation.

4        We've addressed the no private analog exception, but

5  just briefly, the government makes the argument that there

6  cannot be FTCA claims when the government is acting in the

7  context of criminal and immigration law.  We cite a number of

8  cases in which FTCA claims were allowed to proceed in the

9  criminal and immigration context.  We also cite a number of

10 state law claims showing that there is -- that the tortes that

11 we bring are analogous to the conduct of the government here.

12       Now, analogous doesn't mean exactly the same.  The

13 government can never be acting exactly as a private citizen

14 does, but under the FTCA the court looks for the most

15 reasonable analogy.  We cite a number of cases in which similar

16 conduct that is a reasonable analogy to the government's

17 conduct here was found to be actionable under the FTCA.  And I

18 would point out that we raise a number of cases from Texas and

19 New Mexico in which private analogs were found that the

20 government does not even rebut in their reply brief.

21       The government argued a fourth basis in its motion to

22 dismiss.  I'm not sure they're still pursuing this one, but

23 they say that we're challenging -- we're bringing systemic

24 claims.  As discussed earlier, we're not bringing systemic

25 claims to challenge the policy, there is no need to challenge

1   the policy.  And I believe the government has abandoned this

2   argument here today.  Just because there are many victims of a

3   policy does not mean that each of those victims are not

4   entitled to bring a torte claim against the government.  It

5   would be odd if you could be immune from torte liability simply

6   because your torte has many victims.

7           The one case that the gov --

8           THE COURT:  I'm just thinking a non-citizen does not

9   have more rights than a citizen.  So if a citizen wants to

10  bring a claim for intentional inflic -- well that's not a good

11  one because those are hard to prove just because of the

12  requirements of an intentional inflectional of emotional

13  distress.  But let's say negligent emotional could be made out.

14  So suppose it really upset me that the government taxed me.  So

15  the government makes me pay taxes.  I'm upset by that.  I think

16  they were negligent in the way they went around giving me a

17  notice that my taxes were overdue when they weren't overdue.

18  You know, they were made in mistake so I sue them for negligent

19  infliction of emotional distress under the FTCA after going

20  through the proper process.  Why can't I do that?

21          MR. FRIEDMAN:  Well, I think there's a standing issue

22  if you're saying you were not treated differently than any

23  other person?

24          THE COURT:  No, this one had to do with me.  Let's

25  say, this would never happen, but let's say I got a notice that

1    my taxes were overdue and they weren't.  I paid them.  That

2    came specifically to me, I paid my notice and I got very upset

3    about it.  I spent a lot of money with the accountant to prove

4    that I had paid the taxes, et cetera, but I can't sue the

5    United States government over that.  I'm trying to think just

6    as I sit here because I just thought of it, what prevents me

7    from suing the United States under state law theory of

8    negligent infliction of emotional distress because they -- that

9    agent was wrong.  Whoever sent me that notice was wrong and

10   they sent me a notice.  Is there anything that prevents me from

11   bringing a state law torte claim under the federal torte claims

12   act for negligent infliction of emotional distress?

13          MR. FRIEDMAN:  Your Honor, I'd say if you have a

14   state law torte claim and there's no exception under the FTCA

15   and it's not like this systemic claims exception exists in the

16   statute, then you are allowed to proceed under the FTCA, even

17   if many other people have the same claim.  Just because many

18   other people have the same claim doesn't mean it's not a claim

19   you can bring.

20          THE COURT:  That's a great answer because that was a

21   stupid question.  So -- good answer to the question.

22          MR. FRIEDMAN:  Thank you, Your Honor.  And finally,

23   the government raises the independent contractor exception.

24          THE COURT:  Well, that's only for that small portion.

25   I had the independent contractor exception come up before with

1  respect to this particular facility and I don't -- so I was
2  pretty familiar with the contract between the government and --
3  and INS and I think in that case I found that the contractor
4  exception did apply, but I don't know and I obviously, would be
5  reanalyzed onto this case.  But that particular issue is only
6  for kind of the less important issue here, isn't it?  It's just
7  about what happened at the Reading facility with a very small
8  part of this case, the bed checks or whatever.  Is that
9  correct, or am I missing that?
10         MR. FRIEDMAN:  I wouldn't refer to it as less
11 important.  I would say that --
12         THE COURT:  Well, it's less important only because
13 the separation was what we're really focused on here; right?
14 We're not really focused on the -- how they were treated when
15 they were detained, et cetera, whether they got adequate food,
16 whether they had adequate bed, whether they should have been
17 woken up.  I mean, that's not the big issue.  The big issue is
18 that they were separated from -- the father was separated from
19 his son; correct?
20         MR. FRIEDMAN:  Yes, Your Honor.  And -- and that's my
21 point that each of our claims, would still proceed even if that
22 part was taken out of the case.
23         THE COURT:  Right.  That would only apply to the --
24 what happened at the Reading facility.
25         MR. FRIEDMAN:  Right.

1           THE COURT:  The contractor exception.

2           MR. FRIEDMAN:  Correct, Your Honor.  And as Your

3  Honor mentioned you had a case regarding this facility a few

4  years ago and there's a lot of jurisdiction discovery to

5  proceed.  If Your Honor is inclined to consider this

6  independent contractor exception we think jurisdictional

7  discovery again would be appropriate because that case was a

8  few years ago under a different administration and with

9  different immigration enforcement policies.

10          But I don't think we need to get there because even

11 if that exception applies it wouldn't result in the dismissal

12 of any of plaintiffs' claims, none of plaintiffs' claims are

13 dependent on the conde -- on the conduct that happened at that

14 facility.  It's definitely horrible conduct and makes the

15 claims worse, but without it none of the claims are dismissed.

16          And I'm going to turn over, unless there are any

17 other questions?

18          THE COURT:  No.  Thank you, very much, sir.

19          MR. FRIEDMAN:  Mr. Bailus is going to address Texas

20 and New Mexico and Pennsylvania law on the individual claims.

21 Thank you.

22          THE COURT:  Thank you.

23          MR. EDLIN:  Your Honor, would -- would you permit me

24 a short comment?

25          THE COURT:  Absolutely, sir.

1          MR. EDLIN:  Thank you.  Thank you, Dan, excellent
2     job.  I just want to make sure that Mr. Friedman's point on the
3     very first point got through.  Your Honor, had a very
4     typsilagism (phonetic) that I think without the answer coming
5     across would be bad for us.  So the if individual actors don't
6     have discretion the policy makers have all of the discretion,
7     aren't you out of luck?  And I think what Mr. Friedman said
8     was, well, in that circumstance individual actors at the top,
9     if they don't have discretion to violate the constitution.
10          So the answer to your question is why is the
11    complaint pled this way?  We're feeding the torte claims under
12    the FTCA.  But the government has a burden to prove the
13    discretionary function.  And we are entitled to defend that by
14    arguing that they do not have a right to violate the
15    constitution.  So that defense you might imagine in another
16    type of circumstance in a commercial case for example,
17    extortion is a defense to bribery in Pennsylvania.
18          You can imagine certain claims being posed, a counter
19    claim for bribery and a defense of extortion without the
20    requirement that there be an affirmative claim for extortion.
21    I think this is analogous to that.
22          THE COURT:  Okay.
23          MR. EDLIN:  Thank you, Your Honor.
24          THE COURT:  Thank you, very much, sir.  Counsel, you
25    may proceed.

 1              MR. BAILUS:  Morning, Your Honor.

 2              THE COURT:  Good morning.

 3              MR. BAILUS:  I have a Power Point presentation that

 4  I'm going to use, as an option as a exhibits.

 5              THE COURT:  And I understand we're pretty much going

 6  to have to depend on the big screens; correct?  We weren't able

 7  to --

 8              MR. BAILUS:  We can help you.

 9              THE COURT: We can tilt these so everybody can see

10  them.

11              THE COURT:  I can see this one fine.

12              MS. FINKELSTEIN:  I can see -- I can see this is

13  okay.

14              MR. BAILUS:  All right.

15              THE COURT:  I don't know if the gallery wants to see

16  them.  We might even be able to -- I can see mine fine.

17              MR. EDLIN:  It seems to be working.

18              MR. BAILUS:  Well, I'm going to address the slides

19  later on so I'll just get -- I'm Blake Bailus, of the law firm

20  Greenberg Traurig and I'm here to argue on behalf of the

21  plaintiffs.  First, I'd like to thank Your Honor for giving us

22  an opportunity to address the issues raised in the defendant's

23  motion to dismiss.

24               I want to focus specifically on whether the

25  plaintiffs, under applicable state law have pled all five of

1   their FTCA claims.  The parties agree that with regards to Mr.

2   Q. and E.A.Q.A. that Texas law should apply to all five of

3   those claims.  The parties also agree that with regards to Mr.

4   A.'s and C.D.A.'s loss consortium in a Visa process claims that

5   New Mexico law should apply.  There is disagreement, however,

6   as to whether New Mexico or Pennsylvania law should apply to

7   those claims of Mr. A. and C.D.A. that occurred in both of

8   those states.

9           Under Simon vs. United States, the choice of law

10  rules applicable to these multi-state tortes depends on the

11  jurisdiction containing the last significant negligent act or

12  omission relevant to the FTCA.  That last significant negligent

13  act occurred at the Berks County Residential Center in

14  Pennsylvania.  Thus, Pennsylvania choice of law rules should

15  apply to those three claims.

16          As I'm sure you're aware, Pennsylvania choice of law

17  rules first inquire into whether there's an actual conflict

18  between the foreign law, Pennsylvania law and any competing

19  states' laws.  There's an actual conflict where there are

20  relevant differences between the laws.  Meaning, a plaintiff's

21  recovery would be limited or barred in one state, but not the

22  other.

23          And that can't be said for those three claims in Mr.

24  A. and C.D.A..  They should be allowed to fully proceed under

25  either New Mexico or Pennsylvania law.  And thus, Pennsylvania

1  substantive law should apply to those three claims.  I want to
2  --
3           THE COURT:  And why is that important to you?  Is it
4  important to you?  In other words are there any -- a variance
5  between the two?  Is it to emphasize why the case should stay
6  here?  What are the different factors that make that important,
7  other than we want to get it right?
8           MR. BAILUS:  I would say that's the primary concern,
9  is I want to make sure the correct law is applied to those
10 claims.  But I don't want to say it's irrelevant but they
11 should be able to fully recover under Pennsylvania or New
12 Mexico law.  So it's really just about getting the right law
13 applied to those three claims.
14          THE COURT:  Okay.
15          MR. BAILUS:  And I want to briefly address an
16 argument that the government makes only in its moving papers.
17 I don't think they address it here, at argument today, that
18 their conduct is privileged with regards to only Mr. Q. and
19 E.A.Q.A.
20          The defendant has failed to explain how Texas law or
21 AUC 1325, 1326 or 1232(b) provides them the permission that
22 they seek for conduct that includes violating the US
23 constitution.  It violated it.  And the federal courts found
24 this, that it violated the plaintiffs' substantive due process
25 rights.  Their -- their liberty interest, their fundamental

1  right to family integrity.

2         This is the comment that my colleague, Mr. Edlin,

3  already noted constitutes torture.  The US government

4  intentionally and nefariously sep -- separated young children

5  from their parents and they needlessly prolonged that

6  separation even in defiance of court ordered injunctions for

7  five to seven weeks.  And this inflicted severe psychological

8  trauma on each of the plaintiffs.

9         Under Texas law to successfully invoke some sort of

10 privilege, some statutory privilege there must be an

11 identification of a specific statute, usually in Texas' penal

12 code.  The defendant has failed to make any attempt at doing

13 that.  There is no blanket or general law enforcement privilege

14 that exists under Texas law.  And further, before a finding of

15 privilege is actually successful there's always some -- some

16 inquiry by the courts, and there's a reasonability of the

17 defendant's conduct.  As alleged the defendant's conduct here

18 is wholly unreasonable.

19        And I want to turn next to the discussion of the --

20 the elements for each of the five claims.  But before I discuss

21 individually those five claims I want to discuss an argument

22 that the government makes with regards to, I believe three of

23 those torts, although I have a physical injury requirement for

24 four of them up here.  Because one is under Pennsylvania law.

25        But what they argue is that there's some sort of a

1   physical injury requirement and we disagree on the extent of

2   that physical injury requirement.  But there's some physical

3   injury requirement for several of these torts under Texas, New

4   Mexico and Pennsylvania law.  And what they argue is that the

5   plaintiffs have insufficiently pled physical injury.  For

6   intentional infliction of emotional distress, the defendant's -

7   - the defendant's outrageous conduct must result in severe

8   emotional distress accompanied by physical injury a quote,

9   physical injury under Pennsylvania law.

10          For negligent infliction of emotional distress, I

11  want to make a point as to Texas law, the government correctly

12  notes that negligent infliction is not independent recognized

13  tort under Texas law.  However, Texas does allow for bystander

14  recovery.  And the exact same circumstances that you can --

15  that you can recover in New Mexico and Pennsylvania.  And when

16  recovering under Texas law for bystander liability there is no

17  need to show any physical liability.  And you could see that in

18  one of the cases the defendant cites in its moving papers, City

19  of Tyler vs. Likes, an SCI funeral -- an SCI Texas Funeral

20  Services vs. Nelson and the Chapo decision which they reference

21  later in their notes of argument.

22          The only physical injury requirement for a negligent

23  infliction is for New Mexico law where the victim -- that

24  observation of a traumatic injury producing event, that event

25  was caused a quote, physical injury to the victim.  This is not

1   serious physical injury but a physical injury.  That is the
2   standard.
3        The defendant next argues that categorically there's
4   a physical injury requirement for Texas and New Mexico law to
5   recover on negligence.  However, the cases that they cite such
6   as the Temple and Lynne case specifically note it observes that
7   you can recover for neg -- and negligence what -- depending on
8   the quality of the proof offered and the nature of the duty
9   breached.  And under New Mexico law where the plaintiff has
10  pled severe distress there's no requirement to show physical
11  injury contrary to what the go -- what the government argues.
12       The loss of physical injury requirement is for loss
13  of consortium and that exists under New Mexico and Texas law.
14  And the Rodriguez case that they quote in their reply -- or
15  that they cite you in the reply, the only requirement of an
16  injury was a quote, physical injury although other cases in
17  Texas have noted that there needs to be a severe or disabling
18  injury, such as the Regan -- in the Regan vs. Law decision
19  which the government cites in its motion to dismiss.
20       And under New Mexico law there only needs to be a
21  showing that the victims suffered from a wrongful, or a
22  physical injury.  So for many of those torts that standard is a
23  quote, physical injury.  What the government -- not serious
24  physical injury as the government asserts.
25       The government next argues that the plaintiffs here

1   have insufficiently pled physical injury.  And in fact, for one

2   of these torts they have even required that we submit

3   corroborating medical evidence.  This is not a hearing on a

4   summary judgement motion.  This is a motion to -- this is a

5   facial attack on subject matter jurisdiction a 12(b)(6) motion

6   to dismiss.  Assuming the allegations are true and affording

7   the plaintiffs every reasonable inference, there must be just

8   enough factual matter to plausibly plead a claim.  And that's

9   the Tauble and Ikval standards.

10          And I've included here just a list of all the

11  instances.  It's not on the Power Point, but all the instances

12  in which the plaintiffs have plead physical injury, physical

13  trauma, physical distress.  For instance, paragraphs 60 and 61

14  of the amended complaint allege that plaintiff fathers of

15  plaintiff sons suffered physically as a result of that

16  forceable separation.  I could go through the list but I think

17  there's 14 instances where that phrase physical -- something

18  like physical injury is alleged.

19          That should suffice under this pleading standard.

20  Further we cite to numerous medical organizations in -- that

21  appear in scientific publications that document the exact sort

22  of physiological changes that will result in somebody who

23  endures this forceable family separation.

24          THE COURT:  I was going to ask you, just what is the

25  physical injury?  It's one thing to say -- to say they suffered

1  physical injury.

2          MR. BAILUS:  Sure.

3          THE COURT:  But what is the physical injury that they

4  suffered?

5          MR. BAILUS:  Well, I have two points to that.  And

6  the first, I want to discuss the direct physiological injury,

7  the physical injury that people like the plaintiffs, who endure

8  this family separation will suffer.  And it's well documented

9  by -- by scientific journals, cited in the -- the amended

10 complaint.  This includes a dysregulation of hormones in the

11 body, and that's from the American Academy of Pediatrics.  It

12 includes detectful physiological changes to the brain

13 architecture.

14         It -- it's -- it's a change in the body that pure --

15 that someone suffering from a pure emotional distress where you

16 can't detect in somebody's suffering just pure emotional

17 distress.  These are direct changes, adverse changes in the

18 body.  And I have another point to make with regards to this

19 showing of physical injury, authority in Texas, New Mexico and

20 Pennsylvania have all held in a variety of circumstances that

21 physical manifestations of -- of emotional distress qualify as

22 a physical or bodily injury.

23         And even this court, the Eastern District of

24 Pennsylvania has held, and I just want to read the language,

25 and this is in <u>Edmonton vs The Buckstop Incorporated</u>.  It held

1  -- this court held that physical injury includes physical

2  manifestations of emotional distress.  And courts in New Mexico

3  have come to that exact same conclusion as well.  And regarding

4  Texas I want to read another case.  It's a landmark Texas

5  Supreme Court decision that's often quoted in these common law

6  tort cases.  And this is from Hill vs Kimble where the Texas

7  Supreme Court stated a physical personal injury may be reduced

8  through a strong emotion of a line, there can be no doubt.

9          And that's exactly what we can see with the

10 plaintiffs here that this is severe psychological trauma

11 transgressed into a physical -- physical injury.  So I would

12 argue as to there's some showing more than just pleading of

13 physical trauma that was needed.  I would say we make two

14 points as to that.  That -- the scientific publications that we

15 cite you show a document, the physiological changes that

16 resulted in the forceable separation.

17         And further, there's this line of authority in all

18 three states that have explicitly stated that physical

19 manifestations qualify as a physical injury.

20         Now, I want to move on to the -- to the next slide,

21 which is on intentional infliction of emotional distress.  And

22 I'll -- the left-hand side those are the elements for that

23 claim.  A defendant's conduct must be extreme and outrageous

24 that the defendant was to have acted intentionally or at least

25 recklessly.  And as a result defense called it, that act must

1   have caused severe emotional distress.

2           What the defendant argues here is that they've merely
3   carried out federal immigration law.  They call this lawful
4   action, despite the fact that there's been court rulings that
5   this has been patently unlawful.  They -- they -- they claim
6   that what has happened here does not rise to extreme and
7   outrageous behavior.  And that it is rather ordinary.  All
8   they've done is carried out the law.  However, the courts in
9   the Ms. L litigation and W.S.R. vs. Sessions, have both noted,
10  both observed that this family separation policy shocks the
11  contemporary conscience.

12          As seen on the Power Point slides by my colleague Mr.
13  Edlin, even -- even the president remarked that this family
14  separation policy is outrageous.  It's been held in -- in the
15  Ms. L litigation which included as a class the plaintiffs here
16  and in W.S.R. vs. Sessions which included C.D.A., that those
17  plaintiffs have suffered irreparable injury as -- as a result
18  of the family separation policy.  In fact, Judge Shenk of the
19  Northern District of Illinois in the W.S.R. vs. Sessions case
20  noted that this has caused extreme irreparable injury to W.S.R.
21  and C.D.A.

22          What the government has done here constitutes
23  torture.  They've ripped apart families and they kept those
24  families separated, hoping all in the effort that this would
25  cause the plaintiffs to forfeit, to relinquish the rightful

1  asylum claims.  This is extreme and outrageous be -- behavior

2  that should not be tolerated in a civilized society.

3          I want to move on next to the -- the third slide and

4  that's on negligent infliction of emotional distress.  So

5  ignore my misspelling in that -- that first point.  What was --

6  the elements on a negligent infliction claim are that the

7  plaintiff was near the scene of an accident or a negligent act

8  or event that shock or distress resulted from that direct

9  emotional impact caused by the observance of the event, as

10  opposed to learning of it after the fact.

11          And finally, the plaintiffs closely related to the

12  injured victim.  This tort can be summarized as the observance

13  of some traumatic injury producing event resulting in a direct

14  emotional impact, and that is exactly what the plaintiffs have

15  alleged here.  As a result of experiencing -- actually, first

16  hand experiencing that physical -- physical and forceable

17  separation where they were ripped apart from one another and

18  the observance of that event, each of the plaintiffs has

19  suffered severe psychological trauma that they continue to

20  suffer from to this -- to this current day.

21          And this may not be a -- like many afflictions claims

22  where you mentioned somebody's hit by -- by a truck, but it

23  still fits within each of those elements.  And that claim

24  should be allowed to proceed.  And as I already noted when I

25  discussed physical injury, contrary to what the defendant

1   argues, Texas does recognize bystander recovery in the exact

2   same scenarios that New Mexico and Pennsylvania law does as

3   well.

4          And I want to move on next to the third slide on

5   negligence.  So the -- the elements of negligence are the

6   existence of a legal duty here at a minimum, the duty to act

7   with reasonable care owed to the plaintiffs that there be some

8   breach of that duty.  And that as a result of the breach --

9   that breach causes the plaintiffs' injury and the plaintiffs'

10  damages.

11         What the government has argued here and it's similar

12  to what they argued for intentional infliction is that merely

13  pleading that you've been detained or merely pleading that you

14  been prosecuted cannot amount to a breach of that duty of

15  ordinary care or of the plaintiffs' allegations center on how

16  they were prosecuted and how they were detained.  And I want to

17  make a -- a technical point with regards to Tex -- Texas law.

18  The plain -- setting aside the fact that we have alleged

19  physical injury under Texas law a plaintiff can recover mental

20  anguish damages and negligence where -- well, there's at least

21  two circumstances.  Where there's a special relationship

22  between the plaintiff and the defendant or where the defendant

23  has acted with intent or malice.

24         I've already gone through the defendant's nefarious

25  intent here, that this was the cautious objective of the family

1  separation policy to cause exactly this sort of harm that the

2  plaintiffs have suffered from.  And the plaintiff -- the

3  plaintiffs here and the defendant, the US government said to

4  have at least two special relationships recognized under Texas

5  law.  In <u>Salazar vs. Collins</u> the Texas court of appeals found

6  that there was a jailor/inmate relationship that imposed on the

7  jailor a special duty, a heightened duty to take reasonable

8  steps to prevent harm to those inmates.

9       And that in another case <u>Applebaum vs. Neman</u> the

10  Texas court of appeals also recognized another special duty

11  which -- which can be summarized as a sort of transfer of duty

12  from a responsible parent to some sort of child care facility

13  when that facility takes on custody of that child.  And that

14  duty is similar to the duty of reasonable care.  It must take

15  care of that child that it's entrusted with.  The defendant was

16  not taking care of plaintiff children here.  In fact, they've

17  intentionally caused harm to both of those children.

18       I want to move on next to the fourth claim and that's

19  abuse of process.  Abuse of process as the government's already

20  noted is some misuse of a judiciary by a litigant with some

21  malicious, improper, perverse motive and I want to go through

22  the two elements that I've bo -- that I've laid on the left-

23  hand side here.  The defendant -- as I've already stated the

24  defendant made an illegal, improper or perverted use of the

25  process motivated by malicious motive and that damages must

1  result to the plaintiff as a result of that abuse of process.

2          The government's argument here really only focus --

3  focuses on that -- that last element of damages traceable

4  through the abuse of process.  But I want to take a step back

5  and -- and note as to this first element that what the

6  government has done here is they've abused their charging

7  power, their power to prosecute to artificially designate

8  E.A.Q.A. and C.D.A. unaccompanied minors, despite the fact that

9  they both came to the border with -- with their fathers.  And

10  that this -- this designation gave them that pretext that

11  opportunity to separate the plaintiff children from their

12  fathers, which you know, caused all the harm that the

13  plaintiffs have suffered from.

14          And that really goes to that second element that the

15  damages be traceable to that abuse of process.  And they argue

16  that because the plaintiffs as having claims have yet to be

17  conclusively denied.  There are no damages traceable to that

18  abuse of process. However, all the damages that the plaintiffs

19  have suffered are traceable to that initial indictment, to that

20  prosecution of plaintiff fathers under AUSC 1325 and 1326.

21  That's -- that's in a motion, a chain of events that allowed

22  plaintiff fathers and plaintiff sons to be separated where they

23  were -- where the government prolonged that separation knowing

24  that with each day the trauma would compound and worsen.  These

25  are the damages traceable to the abuse of process.

1           And I want to move on now to the --

2           THE COURT:  And you're not alleging abuse of process

3 with respect to the individual that was convicted?

4           MR. BAILUS:  Sorry, can you repeat that question?

5           THE COURT:  You -- you are not alleging abuse of

6 process with respect to the victim -- with the plaintiff that

7 was convicted?

8           MR. BAILUS:  I -- I am because that abuse of process

9 did not result from the conviction.  It resulted from that

10 initial indictment which gave the government the opportunity to

11 separate plaintiff fathers and plaintiff sons.  It's not the

12 convic -- the conviction here, or any resulting conviction that

13 would happen isn't what resulted in the harm to the plaintiffs.

14 It was this policy by the government to charge everybody who

15 crossed that southern border with some sort of -- with some

16 sort of federal immigration statute which gave them that

17 pretext, that opportunity to separate families.

18           THE COURT:  Does it matter if they were guilty or

19 not?

20           MR. BAILUS:  It shouldn't matter because what -- what

21 matters here is the motive behind that -- that use of the

22 prosecutor -- prosecutorial power.  The fact that they are

23 convicted isn't what resulted in their separation.  That was --

24           THE COURT:  And what if the purpose of the statute is

25 to deter illegal immigration?  Is that abuse of process if they

1  would prosecute everybody that comes across the border if their

2  goal was not to avoid these asylum applications, but was

3  instead intended to deter, in general a deterrence of others

4  from violating the law?

5         MR. BAILUS:  I think the government can implement

6  federal immigration law to deter migration.  However, they

7  can't do those -- do that with regards to people who are

8  fleeing countries in terror and have colorable or rightful

9  asylum claims.  What the government alleges here is that they

10  are doing this to protect national security.  But it's really -

11  - they're -- they're motivated out of this hostility to

12  persons, towards the plaintiffs.

13         What abuse of process gets to is the motive behind

14  the abuse of that power.  So I think there are circumstances in

15  which the government could use AUSC 1325 and 1326 to deter

16  future migration, but the manner in which they did it here is

17  malicious.  It was with no proper motive.  And because of that

18  the plaintiffs should be able to recover for abuse of process.

19         THE COURT:  Okay.

20         MR. BAILUS:  And I want to move on to the -- the

21  final thing loss of consortium.  As I noted there's different

22  physical injury requires for Texas and New Mexico, but that --

23  that sort of claim can be summarized as where the defendants

24  caused the wrongful or physical, or under Texas, disabling

25  injury or death of someone who was in a close relationship to

1   the plaintiff resulting in harm to that relationship.  And here
2   the plaintiffs have suffered as alleged severe, permanent and
3   disabling injuries.  And because of that they must not contend
4   with the long-term health effects and emotional trauma caused
5   by federal officers implementing the family separation policy.
6        This -- this -- this family separation policy has
7   resulted in such severe psychological trauma that it has led to
8   a loss of that companionship, that benefit of a familial
9   relationship.  That is something that the plaintiff --
10        THE COURT:  And this -- the argument is it goes both
11  ways that the child lost the consortium of the father and the
12  father lost the consortium of the child or does it just go one
13  way?
14        MR. BAILUS:  I would argue that it goes both ways.
15  They both suffered.  It's been alleged that they both have
16  suffered severe psychological trauma that interferes with their
17  ability, that -- their capacity to care for one another, to
18  offer that companionship.  This is severe psychological trauma
19  that the plaintiffs are dealing with and continue to deal with.
20        Some of the -- the diagnoses that have been made for
21  the plaintiffs include severe anxiety, post-traumatic stress
22  disorder, depression and this has interfered substantially with
23  their ability to provide consortium, companionship.  The
24  government argues here under Texas law that there must be
25  actual recovery for the torts that resulted in that injury to

1  that close relative.  But as I've argued, the plaintiffs should
2  be able to proceed under all those other torts that resulted in
3  harm to that injured -- to that close relative.  That's
4  intentional and negligent infliction of emotional distress and
5  negligence.
6          So there is actual -- there should be actual recovery
7  here that would allow their claims to proceed under Texas law.
8  And finally, they argue that to recover under New Mexico law
9  that that injury to the close relative must sound in an
10  intentional act and not negligence.  And they quote, or they
11  cite to -- this is Rosebury vs. Starkovich decision for the New
12  Mexico Supreme Court in 1963.  Authority has since superseded
13  that -- that Rosebury decision.  And there have been several
14  claims, such as the case we cite in our opposition Breneman vs.
15  The Board of Regents of the University of New Mexico that have
16  allowed loss of consortium claims to proceed where that injury
17  to the close relative was a result of negligence.  And Your
18  Honor, that's -- that's all I have to say as to regards to what
19  the plaintiffs have pled each of their five FTCA claims.  Thank
20  you.
21          THE COURT:  Okay.  Thank you, very much, sir.  Notice
22  as it goes on I ask fewer and fewer questions, so the later you
23  go the luckier you are.  But I could make an exception.
24          MR. NORDEN:  Good afternoon, Your Honor.  My name is
25  --

1          THE COURT:  Good afternoon, sir.

2          MR. NORDEN:  -- Nicholas Norden.  I'm here today to

3    oppose the government's motion to transfer venue and sever.  If

4    it's okay with Your Honor, I'd like to start --

5          THE COURT:  That's because you like this court --

6          MR. NORDEN:  Yeah.

7          THE COURT:  -- sitting on this case.

8          MR. EDLIN:  Your Honor, we're prepared to stipulate

9    that this court can adjudicate any and all claims equally with

10   the Texas colleagues.

11         THE COURT:  Thank you very much, sir.

12         MR. NORDEN:  If it's okay with Your Honor, I'd like

13   to actually start off with the transfer because I think that

14   once the transfer 1404(a) question is decided the ruling on

15   severance really becomes academic and when I get to severance,

16   I'll explain that.  But I'd just like to start off with

17   pointing out what the government is asking for.  They're asking

18   for a 1404(a)-transfer due to convenience.  They are not

19   alleging that venue is improper in this district.  Ms.

20   Finkelstein, during her presentation admitted that they are not

21   contesting residency and under the FTCA the venue is proper

22   when plaintiffs reside -- under the FTCA venue statute, venue

23   is proper when the plaintiffs reside in a district.

24         THE COURT:  Right because the United States resides

25   everywhere.

1             MR. NORDEN:  Well, that's my point.  That's what I'm

2    getting to, so how can the US government credibly argue that

3    it's being inconvenienced by litigating in this district?  Now,

4    I don't think it can.  I think that what's really going on here

5    is my colleagues have laid out this substantive abuse and

6    mistreatment that my clients have received at the hand of the

7    government and I feel this is a kind of procedural mistreatment

8    because effectively, if the government gets the relief, it's

9    seeking here and gets a venue transfer our clients are going to

10   be deprived of their day in court.

11            And I wanted to -- so I think this question of

12   convenience could really settle the issue.

13            THE COURT:  Well, wouldn't it be direct -- if you're

14   going to depose -- I don't know what the discovery schedule

15   might look like.

16            MR. NORDEN:  Right.

17            THE COURT:  Or the discovery plan.  But I assume you

18   want to depose the people that -- that did the wrongful acts.

19   They're all down in Texas and New Mexico, with the exception of

20   that very small part of the case with respect to, I think,

21   C.D.A. that occurred in the residential facility.  But all the

22   other acts occurred down in the south western part of the

23   country.

24            MR. NORDEN:  Right.

25            THE COURT:  How do you possibly do discovery?

1  Everybody got to travel down there, constantly.

2       MR. NORDEN:  Well, I'm not disputing that the acts

3  occurred in New Mexico and Texas, but I will say that the

4  plaintiffs are here.  They're -- the treatment and consulting

5  they've received happened in this district, so I think there

6  are relevant districts here and I think if you go to the Jumara

7  factors, the government bears a burden on this motion.  And

8  they have not identified a single witness who would be

9  unavailable for trial, which is the standard.  So -- and they

10 have the burden.  So I -- I really think that -- I would like

11 to get into the Jumara factors next.

12      We agree with the government that these factors are

13 what's relevant.  We just disagree in whether or not they favor

14 transfer or not.  So the first factor is plaintiffs' choice of

15 forum.  This has been described as paramount.  It should not be

16 lightly disturbed.  And here it's obvious, this is plaintiffs'

17 choice of forum.  And both, I think, the Third Circuit and the

18 Supreme Court have ruled that the plaintiffs' choice of forum

19 is even heightened when the plaintiff resides there.  So this

20 factor, which is often described as the most important factor

21 weighs heavily against transfer.

22      The second factor is defendant's choice of forum.

23 Now, this factor is given little weight for a kind of logical

24 reason that there wouldn't be any dispute over the venue if the

25 defendant wanted to be here.  So courts will concede that the

1   government seeks the transfer for convenience but this factor

2   is not given much weight in the analysis.

3          The third factor is where the claims arose.  And

4   there's been much discussion about this.  And we will concede

5   that many claims have arisen in New Mexico and Texas.  But we

6   don't -- also do not think that the claims related to the Berks

7   are insignificant.  Events happened there and I also wanted to

8   draw the courts attention to a case Wilbur P.G. it was in the

9   Northern District of California.  And it was another border

10  separation case where a -- a motion to transfer was denied and

11  in this factor the courts considered the ongoing trauma and

12  pain to plaintiffs after they arrived in the district as part

13  of the analysis related to where the claims arose under this

14  factor.

15         So I think in light of the fact that claims did arise

16  in this district and this factor that the Wilbur P.G. point

17  courted out, this factor does not support a transfer either.

18         Now, the fourth factor is convenience of the parties.

19  And the government in their presentation said the only factor

20  that favored plaintiffs was the choice of home forum.  I just

21  cannot -- I don't know how they can credibly argue that the

22  convenience of the parties favors them here.  Look, the

23  plaintiffs are here.  They want to be here for this case and

24  see the case through.  And, you know, courts have ruled even --

25  the government can't show inconvenience, but even if they could

1  the courts have ruled that you don't transfer when you merely

2  shift the inconvenience from one party to the other.  So this

3  factor does not favor transfer either.

4          The next of these -- the -- the Jumara private

5  factors is the convenience of witnesses.  Now, again, under

6  Third Circuit precedent, this factor is only relevant if

7  witnesses are going to be unable for trial.  And the government

8  has not identified witnesses, let alone stated which ones are

9  going to be available for trial and which ones aren't.  You

10  know, in our briefing, we cited -- sorry, we cited a case

11  called Superior Pretext where the -- the entity seeking

12  transfer was Safeco and the court that this factor did not

13  favor transfer because while Safeco provided a list of

14  witnesses, they didn't identify how their testimony would be

15  material to the case.  So here we don't even have a list of

16  witnesses.  The government has not met its burden under this

17  factor.

18          Okay.  So the final of the private factors is the

19  location of books and records.  And I think that most courts

20  are now basically unanimous that this factor in this age of e-

21  discovery and el -- el -- electronicization of everything is

22  not really relevant.  In our -- in our briefing we cited the

23  Coppola case where it stated, from the Eastern District of

24  Pennsylvania, which stated as recognized by other decisions the

25  technocologal -- technological advances of recent years have

1   significantly reduced the weight of this factor in the balance

2   of convenience analysis.  So those are the private factors.  We

3   do not believe that really any of them support transfer.

4           Now, the public factors, I want to -- before just

5   getting into this part of it, there was a recent border

6   separation case decided after the briefing was completed in

7   this case.  It's E.L.A. vs. United States.  And the court

8   determined in its analysis that it would not be in the interest

9   of justice to transfer this case to a forum wherein plaintiffs

10  would be unable to litigate.  So I think that's a key public

11  interest analysis, because we want claimants who have been

12  wronged by this policy to come forward and liberally granting

13  transfer to far flung locations would not serve that goal.

14          Now, the other public interest factors that courts

15  look to do not support transfer.  There -- there tend to be

16  mostly neutral, I think, you know, to look to court congestion.

17  I looked at the docket stats of this district versus the

18  Western District of Texas and the District of New Mexico, I'm

19  not seeing significant difference.  I noted the Western

20  District of Texas has a judicial emergency while the other two

21  districts didn't.  The median time from filing from trial I did

22  not notice any significant difference.  So I do not believe

23  that factor supports transfer.

24          It does not -- I do not see any reason why a judgment

25  against the government would be more difficult to enforce in

1   one district over the other.  You know, the choice of law, the

2   Supreme Court has ruled that federal courts are capable of

3   applying the laws of other dis -- other states.

4               THE COURT:  Sure, but you can't jump over that one.

5               MR. NORDEN:  Yeah.

6               THE COURT:  Because these are novel issues of state

7   law.

8               MR. NORDEN:  Right.

9               THE COURT:  To ultimately, prob -- I would expect

10  determine by the Texas Supreme Court and the New Mexico Supreme

11  Court, they are not the run of the mill interpreting negligence

12  statutes, run of the mill interpreting the various elements of

13  the -- of the offenses.  They will involve, even though courts

14  have nothing to do with policy decisions they will involve

15  issues that very much reflect on the policy of the courts at

16  least as they have applied these -- these statutes.

17              I'm assuming that the Texas Supreme Court and the New

18  Mexico Supreme Court have not rendered any precedent that we

19  can rely on in trying to determine how they would answer these

20  novel issues.  So that puts me in the position of having to

21  answer novel issues of state law when I could transfer it and

22  have it determined by the -- the courts of that respective

23  state.  Why wouldn't I do it based on that public factor alone?

24              MR. NORDEN:  Well --

25              THE COURT:  I mean, obviously, doing all the

1  balancing, but why wouldn't that be a very powerful factor to
2  consider.
3        MR. NORDEN:  I think the issue is the -- well, the --
4  the application is novel.  I don't -- as my colleague laid out
5  in his presentation the -- the elements of these claims
6  throughout the jurisdictions are very similar and I don't think
7  the application  would differ significantly between the
8  respective districts.
9        THE COURT:  I wonder, what do you think about Texas?
10 I don't know too much about New Mexico, but I know Texas tends
11 to -- their law is -- the words look the same and yet the
12 outcome seems often times different.  And the question is how
13 is that possible?  Texas seems to have its own view of the law,
14 as do all of the states, but in this particular case if I
15 looked at how Pennsylvania looks to physical injury and loss of
16 consortium and when it applies and when it doesn't apply, you
17 don't think that the -- the law of Texas is unique?  And I
18 should say every law -- every state has unique aspects to its
19 law and yet at the same time in all fairness to litigants
20 throughout each of the individual states there's a lot of
21 uniformity.
22        MR. NORDEN:  Yeah.
23        THE COURT:  As we were addressing here today, there's
24 a lot of uniformity with respect to the elements required and
25 the interpretation of those elements.  But you -- you don't

1  think this is -- the issues are novel enough that there would

2  be a great benefit to both plaintiff -- plaintiffs and the

3  defendant to them being resolved through the courts of the

4  state of where they're all applicable?

5          MR. NORDEN:  Your Honor, I think that while the

6  issues involved may be novel, the application of the elements

7  is not -- is not novel and is not significantly different

8  between the states.  And I believe if there was a significant -

9  - if it was considered a significant issue a first impression

10 that certification to the state's supreme court would be

11 required in any event whether this was in a federal court in

12 Texas or in New Mexico.  But -- so but I -- I again, listening

13 to the elements that I believe that the application is straight

14 forward and it is the supreme court's view that federal courts

15 are capable of applying the laws of other states rather

16 routinely.

17         THE COURT:  And you believe I'm capable.

18         MR. NORDEN:  Oh, of course, Your Honor.  Okay.  So

19 that's the motion to transfer.  So we think the transfers have

20 -- the factors to apply indicate that transfer is not

21 warranted.  So now we have the government's motion to sever,

22 which they spent a lot of time on it and led with.  But I think

23 it's an academic question because the standard for severance

24 under FRCP 20 and 21 is nothing to do with transfer.

25         So the key decision of where these -- where these

1   cases are going to go is all tied up in the fourth -- in the

2   venue transfer analysis.  So leaving that aside, if you're --

3   if Your Honor is persuaded by the severance arguments you could

4   just have two cases here, but --

5          THE COURT:  Or one case here and one case --

6          MR. NORDEN:  Right.  If you -- if you -- if you found

7   transfer was more warranted for one of the two, but based on

8   the analysis of the transfer factors for both sets of

9   plaintiffs it's not warranted.  But we think that -- we don't

10  think in any event that severance is appropriate because courts

11  have found now the standard of same transaction or occurrence,

12  but courts have found that a systematic pattern between

13  torturer -- torturous events will satisfy the series of

14  transactions or occurrences problem.  And that's exactly what

15  we have here.

16         All of these border separation cases, while distinct

17  cases with their own distinct facts all occurred pursuant to a

18  systematic policy.  So that does not mean we are systematic

19  claims per say, but they all were rendered through the same

20  policy.  In -- in -- in its opening brief the government

21  actually supplied -- cited a case in support of its severance

22  argument and it's the Killmaski case.  It's on page 54 of their

23  opening brief.  In that case the government severed multiple

24  claims of workplace discrimination, but noted that joinder had

25  been held appropriate where a logical relationship has been

1  found to exist between the claims of multiple plaintiffs who

2  allege that they were discharged pursuant to a central company

3  wide policy of discrimination.  So I think that's what we have

4  here and I think why severance would not be appropriate, but I

5  do think that the most important question, if Your Honor, in

6  managing -- if this is all in your discretion, in Your Honor's

7  discretion, so if Your Honor found it appropriate, we think

8  that for now the cases should be consolidated, but if enough

9  distinct issues emerge at the time of trial where severance

10  might be more appropriate then I think that issue can be

11  discussed then.  But for now, for purposes of case -- case

12  efficiency we do not think that severance is warranted.

13        THE COURT:  Well, severance at time of trial would be

14  more if I felt there was going to be a spill over effect, but I

15  don't know that there's much of a spill over effect here that

16  would prejudice the defendant.  The -- the better issue is

17  there are similar issues of fact.  There are certainly similar

18  issues of law.  Although, then all of the sudden we're applying

19  two different states' laws.  Although, I also understand that

20  your argument is that Pennsylvania law may apply with respect

21  to the -- the one where there was some issues down in Reading.

22        So the -- it's -- it's really a contest pretty much,

23  we've got similar issues of law, similar issues of fact, it's

24  all addressed under these police of separating the parents and

25  children at the border.  And so the natural question becomes

1 how many more plaintiffs could you have joined to this?  Could

2 you have joined -- I had a case that went to trial with I think

3 12 dryer fires.

4            MR. NORDEN:  Yeah.

5            THE COURT:  And obviously they wanted them -- and I

6 tried them all together in front of one jury.  And there was

7 the issue of spill over, but the -- the evidence would have

8 come in anyway, the damages weren't that hard.

9            MR. NORDEN:  Right.

10            THE COURT:  Here's how much damages caused from this

11 fire -- but here there are so many potential difficulties at

12 trial that need to be addressed before trial.  I don't know

13 that just waiting until trial to sever would make sense and I

14 don't know whether they would even need to be severed for trial

15 or whether they could be tried together.  But it does seem

16 strange that I would take two cases dealing with two separate

17 parties unrelated to each other, dealing with two separate

18 types of law, two -- two different state laws and try them in

19 the same trial and have them proceed through discovery.

20            I mean, most of the discovery is even going to be

21 completely different because they were separated in different

22 states so they have to be different federal actors involved.

23 The paperwork has to be held in different places.  Everything

24 about discovery is going to be separate.  It's not like they

25 even came through the same processing location, et cetera.

1   There's nothing about these two cases that's related at all

2   except that the father and son were separated because of a

3   policy.  Doesn't that concern you?

4           MR. NORDEN:  Well, one I would just hope that the

5   severance analysis doesn't get subsumed in the transfer

6   analysis, but I made that point already.  And I -- I think that

7   -- that's why I call it kind of an academic point.  But I think

8   I'm looking at the Chrube, C-H-R-U-B-E, case that we cite where

9   the court found that the alleged misconduct of various

10  defendants in three different institutions, but all concerned

11  similar and related breaches of the housing and medical

12  protocols provided by the settlement agreement.  So that last

13  part that's different factual, but the idea was conduct across

14  three different institutions, but related to, you know, similar

15  breach of like a systemic policy.

16          THE COURT:  Right.

17          MR. NORDEN:  And the -- the court found that joinder

18  was helpful to it and so that's why --

19          THE COURT:  Oh on -- on the legal issues I actually -

20  - I absolutely agree with you.

21          MR. NORDEN:  Yeah, yeah.

22          THE COURT:  On the legal issues involving these two

23  cases joinder makes perfect sense to address them.

24          MR. NORDEN:  Right and the Russell court found

25  discussing this issue of should severance occur before trial

1  they found that the gov -- the defendant would not have any

2  prejudice unless severance wasn't granted prior to trial.  So

3  that's -- we think that that's important to this analysis too.

4  And that's all I have.

5           THE COURT:  Okay.  Thank you very much, sir.

6           MR. EDLIN:  Your Honor, just one brief comment if I

7  may?

8           THE COURT:  Certainly, sir.

9           MR. EDLIN:  It goes to your point about the novelty

10  of the laws.  I've had the opportunity to do quite a bit of

11  work down in Texas, Delaware and many other jurisdictions.  I

12  would absolutely agree that the procedures are quite different,

13  but the substance of the law here is quite similar and -- and

14  my experience has been that the laws of the states are much

15  more similar than they are not.

16           I think you see in the two cases that we've talked

17  about, the Southern District of California case, Northern

18  District of Illinois case, one might say a very liberal state,

19  one might say a much more conservative state on legal issues

20  and what happened.  Courts came out identically.  I think we

21  would see that here too.

22           THE COURT:  In the common law the restatement helps

23  with that as well.  And each individual state's adoption of the

24  restatement so --

25           MR. EDLIN:  Thank you, Your Honor.

1            THE COURT:  Thank you, sir.  Who's next up?

2            MS. REDDY:  Good afternoon, Your Honor.

3            THE COURT:  Good afternoon, Counselor.

4            MS. REDDY:  I will be using a Power Point as well if

5  -- if that is all right. Good afternoon again, may it please

6  the court, my name is Anne Reddy.  I am also a Greenberg

7  Traurig here today on behalf of plaintiffs who are all here

8  sitting behind you in the courtroom, on their summer break.

9            And I'm here to ar -- to ar -- to address the

10 sufficiency of the claims under the alien tort statute, which

11 is, as you know, 28 USC 1350.  Now, defendant argues two bases

12 for dismissal of plaintiffs ATS claims which plead violations

13 of Jus cogens norms, norms of international law.  First, they

14 argue that they're immune from such claims.  An argument as

15 noted that they raised for the first time in their reply brief.

16 And second, they argue that plaintiffs have now identified a

17 norm that defendant violated.  Or in other words, a claim --

18 they claim plaintiffs haven't pleaded conduct that's bad enough

19 to constitute torture or the other crimes that are recognized

20 under Jus cogens norms.

21            Now, I will turn, if you don't mind to the second

22 argument first and discuss the norms and the claims of the

23 elements of the torture claims.  So under the ATS jurisdiction

24 will vest upon the plaintiffs' plausible allegations of a

25 violation of an international norm, principle of Juice Cogen,

1   that is specific, universal and obligatory.  Now, Jus cogens
2   norms are mandatory or preemptory norms of international law
3   except as recognized by the international community, but very
4   importantly these are norms that are recognized as -- which no
5   derogation is -- is permitted in any circumstance.  So the
6   prohibition against torture is recognized as one of these
7   norms, the Supreme Court has held that the prohibition against
8   torture is sufficiently specific, universal and obligatory and
9   likewise, cruel, inhuman or degrading treatment and crimes
10  against humanity are so recognized under these Jus cogens
11  norms.

12          Now, the United States has recognized the right to be
13  free from torture and cruel and inhumane treatment in ratifying
14  the convention against torture, the CAT, or C-A-T, and it's
15  implements of legislation which it ratified in 1994 enacted it
16  as a note to the ATS.  And in ratifying the international civil
17  and political rights with regard to cruel and inhumane,
18  degrading treatment.  So under the CAT torture is defined as
19  any act by which severe pain or suffering, whether physical or
20  mental, is intentionally inflicted upon a person for such
21  purposes as intimidating or coercing him or her or a third
22  person, or for any reason based on discrimination at the
23  instigation or with the consent of a public official or other
24  person acting in an official capacity.

25          Now, here defendant concedes that plaintiffs meet

1  elements 2 through 4.  It does not dispute that the zero-
2  tolerance policy and the offshoot family separation policy and
3  its conduct in implementing those policies and in separating
4  young children from their parents at the border was
5  intentional.  It also does not dispute that the intent of such
6  separations was to deter migrants, including asylum seekers and
7  to coerce them into forfeiting their legal rights.

8          We have the Attorney General's statement we need to
9  take away the children, hopefully people will get the message,
10 as we have cited to in our -- in our complaint and in our
11 moving -- in our opposing papers.  We have Deputy General
12 Rosenstein's statement to the Office of the Inspector General
13 that these policies are intended to create a more effective
14 deterrent.  We have John Kelley's statement that this is a
15 technique.  Family separation is a technique to deter
16 migration, migration of asylum seekers, not -- not, you know,
17 generally speaking people who have claims for persecution for
18 seeking asylum in the US.  There are also internal memos.  We
19 saw part of one earlier in Mr. Edlin's presentation where the
20 intent to -- to deter is stated fairly and it's an interagency
21 memo.  It precedes the implementation of the policy.  This was
22 long the intent and that -- and that's conceded by the
23 government.

24         Nor does defendant dispute that these acts of
25 separation, the other abuses alleged were at the direction of

1 public officials.  So that leaves us with severe pain or
2 suffering, physical or mental.  Now, the amended complaint
3 alleges young children, 9 and 10 years old were forcibly
4 separated from their parents, the only people they knew in a
5 strange country where they didn't speak the language and they
6 had no idea what was being done to them.
7        It alleges the fathers had no idea where their
8 children were being taken, if they would be safe, if they would
9 be subjected to physical or sexual abuse, if they would ever
10 see their children again.  Plaintiffs were not given any
11 information, nothing.  They got perhaps a ten-minute warning
12 before the separation was -- was implemented.  They weren't
13 given so much as a piece of paper, a receipt you might get if
14 someone takes your keys for safekeeping.  They had no idea what
15 was happening to them on either side of the equation.
16        So I would say, put yourself in that situation and
17 many of us have been there in a tiny, tiny capacity at a
18 carnival, I've -- I've lost my child at a carnival for 10
19 minutes and there was all this sheer panic and sheer panic that
20 you're trying to control and you know it's all going to be
21 okay, you're in the United States and you have people there to
22 help you.  Okay?  None of that was the case for the -- for
23 these plaintiffs.  So that sheer panic creates, you know, a
24 feeling of sickness.
25        Now, wake up with that feeling of sickness for five

1    to seven weeks.  You -- you as a parent can't ensure the safety
2    of your child.
3              THE COURT:  But weren't they relying on the United
4    States to take care of them?  In other words, when you come
5    across the border illegally with -- with nothing aren't you
6    relying on the United States?  So you're asking the United
7    States to care for you because you can't take care of yourself,
8    not easily in any case.  And to take care of your son, because
9    you can't take care of your son. You have no money.  You have
10   no food.  You have no water.  You have no shelter.  You're
11   relying on the United States to take care of you.  So isn't the
12   United States doing exactly what you would ask them to do as
13   opposed to letting you be out in the desert in Texas or New
14   Mexico or wherever.  Like don't we have an obligation to take
15   care of them and isn't that what the father was asking the son
16   to do?  Or asking the government to do?
17             MS. REDDY:  The United States has obligation to -- to
18   put the child in the circumstances within its best interests.
19   Now, you have a four-year-old child, the only bond and the only
20   language they're speaking is say Portuguese.  You know, you
21   have a seven-year-old child, you have an eight- or nine-year-
22   old child and the only person in all reality that's looking out
23   for that child is going to be that parent because they have
24   that bond.  And they are going to be watching out for abuses,
25   sexual abuse, these kinds of things.  So yes, we -- I think

1  that the parents are, you know, requesting that the government

2  provide essential care, you know, instant formula.

3           THE COURT:  There's no argument there was sexual

4  abuse of these two boys.

5           MS. REDDY:  There is none, but I'm saying that in

6  terms of torture you're talking about mental.  You know, you

7  have a 14, 15-year-old kid, you have a 10- or 11-year-old

8  child, they're taken to Illinois and put with a body of a mixed

9  group of kids, most of whom are older than them, up to age 15,

10  I don't know how you would not envision that there's that

11  possibility.  That's part of the sheer terror.

12           THE COURT:  Can we -- how do we --

13           MS. REDDY:  That's created.

14           THE COURT:  -- separate out, and I don't know that

15  there's an answer to this, so this is more of a rhetorical

16  question.  It's got to be emotional distressful to leave your

17  home no matter how horrible it might be.  To go the distance to

18  get to the border to cross that border with all the unknowns,

19  the dangers.  When you talk about sexual abuse, you talk about

20  murder, aggravated assault, robberies all along the way being

21  with people you don't know, et cetera because you were

22  separated from your mother.  I don't know where the mothers

23  were, but they were separated from the mothers.

24           And now you're across the border and you've got the

25  United States border patrol and official with the United

1  States.  Wasn't that the first time they were ever safe was

2  when they were in the hands of the United States and under the

3  protection of the United States where shelter, food, I know the

4  beds look terrible, but they were beds.  You're out of the

5  desert, there's -- I don't know if there's air conditioning, I

6  hope so.  Isn't it now the first time you're finally safe?

7           MS. REDDY:  I don't believe that the record of any of

8  these cases reflects that feeling of safety.  I think that you

9  have a feeling of un --

10          THE COURT:  And that's just a rhetorical question,

11  because I have no idea.

12          MS. REDDY:  Right.  No, well, you're watching other

13  people have their children taken away to unknown places, you

14  don't speak the language, you don't really -- you didn't expect

15  them to be just taken away with no explanation.

16          THE COURT:  Right.

17          MS. REDDY:  That's no -- nothing that your -- plus

18  under the law of torture you look at the vulnerabilities of

19  each person when analyzing whether -- whether you, you know,

20  this is -- this caused severe physical or mental stress.  Those

21  vulnerabilities travel with that person, you know, along the

22  way and they come to the border and then you analyze what kind

23  of severe, you know, mental or physical dis -- you know, pain

24  or suffering you've caused; right?

25          But you have to take them as they come, their age,

1  their vulnerabilities, whether they've been persecuted all of

2  those things.  I mean, not that the United States government is

3  responsible for any of that conduct.  But that's how you look

4  at whether you've met this threshold that's showing of pain and

5  suffering, which I believe that we have easily met here.  It

6  doesn't -- it doesn't have to be comparable.  There are no --

7              THE COURT:  I think --

8              MS. REDDY:  Oh.

9              THE COURT:  Would you look at this differently, and I

10 -- this is another rhetorical question because I know your

11 answer.

12             MS. REDDY:  Right.

13             THE COURT:  If the -- if there was a legitimate

14 governmental reason to separate them that was for the health,

15 safety and welfare of the father and the -- the child and it

16 was done in the right way, where they know, they're told why

17 this is being done, why they are being put in this facility,

18 the protections that are going to be in place.  The food that's

19 going to be served, the translators that are going to be

20 available, what is going to be available et cetera, does the

21 whole equation change when the purpose of the separation is to

22 discourage the asylum application to cause -- the separation is

23 to cause pain as opposed to just the fact that the separation

24 occurred as part of this process?

25             MS. REDDY:  Absolutely, Your Honor.  I mean, it's a

1  factor.  It's a factor in the analysis.  The intentionality to

2  coerce someone else.  I mean, that's what torture is, you know,

3  a mental torture especially.  It's -- it's that intentionality

4  to -- and we don't have those facts here.  I don't know, maybe

5  there would be some situation where that would be okay, but we

6  don't have those facts here.  We have a complete lack of

7  information and a sinister plot, basically to say, okay, I'm

8  going to -- we're going to manipulate this statute and then

9  we're going to use this which hasn't been intended this way

10 previously, but we're going to use this -- this piece of the

11 statute to take away your children.

12          And then you're going to be in a position where

13 you're going to do almost anything to -- to get them back, even

14 if you have to go back to your country where you were

15 persecuted by gangs or, you know, subjected to death threats,

16 you know, in your own country that you're fleeing.  I mean,

17 you're going to do almost anything.  I mean, if you had to

18 weigh between, do I ever get to see my child and am I going to

19 go risk it, you know, with -- with the gang who is at my

20 mechanic shop, you might take that risk.  You know, because

21 it's your child.

22          THE COURT:  And I know we have subject matter experts

23 on immigration law and what's going on down at the southern

24 border.  Do they -- are there facilities today, are there

25 facilities that accommodate single males, single females,

1  families, unaccompanied children?  Like do they have separate

2  facilities and are they good?  Or are they bad?

3        MS. REDDY:  My understanding is that there are family

4  detention facilities just for this purpose to keep families

5  together because that was the policy and that's how it was done

6  previously.  And that there are those family detention

7  facilities.

8        THE COURT:  Okay.

9        MS. REDDY:  Absolutely and no reason to separate

10 them, except for a -- a cruel intention.

11        THE COURT:  Right.

12        MS. REDDY:  To coerce them.  You know, and to coerce

13 others, more importantly perhaps, they might hear of it through

14 the grapevine, don't come.  Whatever the circumstances in your

15 country America is not going to even give you -- they are going

16 to take your child before you even get a right to say I have a

17 credible fear; right?  So anyway, just this is a cumulative

18 analysis.  You have a five- or seven-week separation.  You have

19 parents waking up every morning not knowing if their child is

20 safe.  You have the children waking up not knowing that they've

21 been abandoned by their parents.

22        THE COURT:  And were there any like cell phones or

23 any way for the parent to communicate with the child?

24        MS. REDDY:  I mean, I think that there were a few

25 phone calls often by, you know, people trying to contact their

1  children from the country of origin, trying to track them down,

2  manage to get through.

3          THE COURT:  But we didn't provide cell phones?  The

4  United States didn't provide --

5          MS. REDDY:  I don't know.  I don't think there were

6  any cell phones.

7          THE COURT:  -- cell phones, or any other

8  communication?

9          MS. REDDY:  I never, as far as my understanding, Your

10 Honor.

11         THE COURT:  Or like liaisons that you could ask, well

12 that wouldn't be -- well, it would be better than nothing.  But

13 --

14         MS. REDDY:  My understanding was that the guards were

15 giving next to no information whatsoever, from our plaintiffs.

16 Now, I don't know if in other situations, but that's my

17 understanding.  I understand that there were a few phone calls

18 arranged with one of the plaintiff's sons' mothers calling from

19 Brazil, who managed to track, track them down at one point.

20         THE COURT:  And these facilities are they guarded or

21 do they just have -- I think they used the term correctional

22 care office -- down in Reading I know they had a unique term

23 they weren't guarded; people could walk out the facility, but

24 they stayed because they wanted to stay there.  That was a

25 place they had shelter, they had food and they were being

1 protected until the next step whatever the next step might be.

2        Do you know, these facilities where these children

3 were held and where the parents were, are they like guarded

4 facilities with barbed wire and you can't leave them?

5        MS. REDDY:  My understanding is that they were

6 detention centers where you could not leave.

7        THE COURT:  Okay.

8        MS. REDDY:  And at least in some of them there were

9 guards.  And in some of the -- the children's the places that

10 some of the chil -- that the plaintiff, C.D.A., was taken was

11 not a place that he could leave.

12        THE COURT:  Right.  And just, you know, this is just

13 for my own edification.

14        MS. REDDY:  Uh-huh.  Sure.

15        THE COURT:  I know this has nothing to do with the

16 motion because that's, my factual record there is nothing you

17 say now, it's based solely what's in the pleadings.

18        MS. REDDY:  Well, thank you, Your Honor.  So yeah, my

19 understanding just as far as my understanding is that they were

20 not permitted to leave.  It was -- it wasn't a facility where

21 you were free to come and go, not that there would have been

22 any place for them to go.

23        THE COURT:  Right.

24        MS. REDDY:  However, my understanding was that they

25 were not free to go and including at Berks as well.  So just

1  cumulatively you add that separation, you add the no

2  information given to either side, you add to that cumulatively

3  the threat of removal to the country of persecution, you don't

4  relinquish your rights, you add the intentional sleep

5  deprivation in the case of C.D.A. and Mr. A., you add the

6  icebox conditions and -- and -- and you cumulatively look at

7  all of those together and then you have to put this in the

8  context of family separation throughout history.

9         We saw a reference to World War II separations;

10 right?  There's also a historical context to slavery, to

11 separations that occurred in this very country between children

12 and -- and parents.  Now, you have to look in that historical

13 context that, you know, there's no reason for them to believe

14 that we're -- that the US is necessarily going to take good

15 care of their children.

16        THE COURT:  Yeah, but you -- you have to be careful

17 there because you don't want to minimize what happened in the

18 concentration camps with the Nazis or minimize --

19        MS. REDDY:  Of course not.

20        THE COURT:  -- slavery.

21        MS. REDDY:  No, I'm not --

22        THE COURT:  This -- this certainly does not rise to

23 that level --

24        MS. REDDY:  It -- it, yes.

25        THE COURT:  But if you just --

1          MS. REDDY:  Of course not.

2          THE COURT:  -- say severe --

3          MS. REDDY:  It's the panic.

4          THE COURT:  -- suffering, severe mental suffering,

5  well, yeah.  That sounds like severe mental suffering to me.

6          MS. REDDY:  It's -- it's the panic of not knowing.

7  I'm certainly not saying anything like that would ever happen.

8          THE COURT:  Right.

9          MS. REDDY:  It -- it's the panic of not knowing and

10 not understanding the culture as well.  You know?  So -- so

11 just two more points on that.  So the severity of this conduct

12 has also been considered by professionals, quite a few

13 professionals.  And they agree that the parent/child

14 separation, the forcible parent/child separation constitutes

15 torture.  They've looked at this very question.  We cite to you

16 in our brief Physicians for Human Rights every case that they

17 evaluated rises to the level of torture.  National Science

18 Council, separation creates toxic stress, it changes brain

19 architecture which is irreparable.  And especially in young

20 children.

21         Consensus within the field of pediatric healthcare

22 and American Academy of Pediatrics consensus, filed letters,

23 they are submitted, attached and footnotes in our brief.  And

24 then sleep deprivation is classic form of torture.  So this --

25 these are cumulative things.  Now, in addition with respect to

1  plaintiff C.D.A. the court in <u>W.S.R.</u> expressly found and I

2  quote, record evidence compiled in this case with regards to

3  C.D.A., demonstrate that suffering extreme irreparable harm to

4  their mental health, the fact of the matter is that <u>W.S.R.</u> the

5  other plaintiff and C.D.A. have proven that every day of

6  separation is causing dangerous harm to their mental health,

7  and that's at 1128 in the <u>W.S.R.</u> case.

8         THE COURT:  Now, curiously, do you -- and it's very

9  difficult to conceptualize, but do you -- do you focus more on

10 the severe mental suffering of the child being separated from

11 its parent, his parent, or the severe mental suffering of the

12 father whose child's being removed from him?

13        MS. REDDY:  I mean, I'm a parent, so --

14        THE COURT:  Right.

15        MS. REDDY:  I certainly -- I think they're different;

16 right?  And -- and from this -- from the material that I've

17 read of -- of people, professionals who've studied this, what

18 it creates in parents especially it's -- it's -- and in

19 children, the PTSD of not being able to care for their child

20 which creates, you know, feelings of inadequacy and, you know,

21 but also physical sickness, anxiety, just unable to cope,

22 unable to eat, unable to just sheer, you know, mental break

23 down of, you know, I'm not able to take care of my child.

24        That, you know, that kind of anguish.  And for

25 children, I mean you have all the cases that are kind of

1  heartbreaking with children being reunited not recognizing

2  their parent.  That's obviously an anguish for the parent as

3  well.  But I think for -- for young children, I mean, I also

4  have -- I have an eight-year-old and a nine-year-old.  I mean,

5  the idea of my eight-year-old being alone in a facility with a

6  bunch of 15-year-olds, she would be terrified.  So --

7            THE COURT:  And I wonder, does it make it even more

8  challenging if it's a female versus male children?

9            MS. REDDY:  Well, there is also the degrading element

10  of it because I know that even in the -- when brought up at the

11  border, and I don't know if it's carried on further, so I maybe

12  shouldn't speak to it, but you know, everyone has to use one

13  bathroom in a public area.  And that's -- that's degrading for,

14  especially for adolescent girls.  I mean, anyone really.

15            THE COURT:  Right.

16            MS. REDDY:  And I'm not -- I don't know what the

17  circumstances that's necessary or not, but it certainly seems

18  unnecessary to me.  So other than the -- the professional

19  studies W.S.R.'s finding, all I'd say is that, you know,

20  defendant in countering this claim, they say all they did was

21  apply federal law and they've handled plaintiffs under federal

22  statutes.  And they also claim that fathers were reunited with

23  their sons once the criminal case is concluded.  I just want to

24  touch on that last one because it's wrong.

25            Plaintiffs allege weeks of separation after the

1   criminal cases were concluded and after <u>Ms. L.</u> was handed down

2   and the fact, you know, C.D.A. had to go to the Northern

3   District of Illinois to get reunited with his father.  So that

4   was really simply not the case.  And you know, defendant

5   couldn't have simply followed federal law because there is no

6   law that required that they separate children as young as four

7   months from their parents for months without any finding of --

8   of best interests or risk to the child or criminal history or

9   any of these things which are not present in this case.

10          So you know, just to -- last point on this one is

11  that, you know, there are horrendous cases.  You know, torture

12  is horrendous, you're going to have horrendous facts.  You can

13  look through all those cases and they're horrendous.  I say

14  this is horrendous as well.  I would also say that the question

15  isn't whether it resembles a case, you know, out of Guantanamo

16  Bay or something like that.  The question is whether here we

17  plausibly alleged that defendants' acts caused severe mental

18  and physical pain and suffering and I -- and I would submit

19  that we clearly have met that -- that pleading burden.

20          THE COURT:  Right.

21          MS. REDDY:  With regards to torture.

22          THE COURT:  Now, we use the -- one of the aggravating

23  factors for the death penalty in Pennsylvania is torture.  So

24  if you've committed first degree murder and you tortured the

25  person before you -- you kill them, that idea of torture is

1    much different from this idea of torture.  It's almost like the

2    word, there should be two words to mean the same thing but one

3    being that idea of applying physical pressure, burning them

4    with a flame thrower, whatever, causing that torture that leads

5    to death versus this torture, while temporary is severe, more

6    of a mental than a physical ram -- manifestation from it.  But

7    it is -- that word torture is just hard because there's such an

8    array of what -- if you ask the layperson what is torture?

9              MS. REDDY:  Right.

10             THE COURT:  They can tell you what torture is.  They

11   wouldn't think remove a parent from a child.  But then if you

12   said if I removed your child from you would that be torture,

13   they would say yes.

14             MS. REDDY:  Correct.  Well, Your Honor, that was a

15   good lead in to my next crime.  So cruel, inhuman or degrading

16   treat -- treatment is also recognized as a Juice Cogen norm and

17   we've pleaded that as well.  Now, the crime has the same

18   elements of torture and you can see some of them here as

19   defined by the quality and human rights commission.  Under the

20   case law it -- it's been described as torture, yet falling

21   short of torture.  So it's as if defendant argues it doesn't

22   believe that plaintiffs suffered enough for it to constitute

23   what you might think of as the higher end of torture, which I

24   would submit is met by meeting the factors.

25             Here the question is whether defendant's conduct in

1  separating the children was universally condemned.  Now, we
2  have a case, a unique case in certain ways where we have
3  universal condemnation of -- of this conduct, public record
4  shows that it was a national/international uproar over this
5  conduct we have it was condemned by the UN as unconscionable.
6  So here I think it easily meets -- meets that criteria and even
7  after they were ordered to reunify the family the public
8  documents show -- and these are also sited in the complaint and
9  in the briefing, the defendant made every effort to slow walk
10 these reunifications.  To not comply with these orders.

11      To further coerce asylum seekers.  That piece of
12 paper you saw with the removal options, which were no options
13 at all and were not justified under any legal construct was
14 given to plaintiffs after Ms. L. was already handed down. So
15 the government made, it treads all over these decisions in
16 upholding families rights, which is this document.

17      Now, turning to crimes against humanity, again the
18 same general ideas make up the prohibited act.  What you also
19 need to have is a widespread attack against a civilian
20 population with knowledge.  And here we alleged, plaintiffs
21 alleged that the zero-tolerance policy and the family
22 separation policy was implemented only on the southern border.
23 And against asylum seekers, the vast majority, over 98 percent
24 according to the government's own studies and documents were
25 from Honduras, Guatemala, El Salvador, or Mexico.  Black

1  indigenous people of color and as is well known these countries

2  were disfavored under the former administration.

3        So I believe this is sufficient to allege crimes

4  against humanity at this stage of the ligation.

5        So to turn next to sovereign immunity.  Unless you

6  have any questions about --?

7        THE COURT:  Nope.

8        MS. REDDY:  Okay.

9        THE COURT:  You've explained it all.

10        MS. REDDY:  I know it's well after --

11        THE COURT:  Thank you.

12        MS. REDDY:  Noon.  So this argument was raised for

13  the first time on reply.  So our position would be the court

14  need not consider it and then if it would -- if Your Honor

15  would like a full briefing, we would ask that you not make any

16  determinations to dismiss a claim on this basis without a full

17  briefing.  However, I -- I -- I would -- I would like to talk

18  about --

19        THE COURT:  Has there ever been a situation in the

20  history of this country where we've been sued and recognizing

21  this statute is not that old, but we've been sued under and

22  international statute of any sort whether it's the Geneva

23  Convention, whether it's this statute, whether it is any -- any

24  type of international statute because you know, the United

25  States jealously guards its juris prudence and it is very

1  reluctant, often to a fault, from incorporating international

2  standards beyond what we individually determine to be the

3  appropriate international standard.  We jealously guard that

4  and in fact, there's great criticism whenever we turn outside

5  of American juris prudence to get guidance from foreign

6  countries, statutes the UN et cetera, their great criticism

7  when we do that.

8          When this issue of sovereign immunity comes up the

9  first question asked, well, has the United States ever been

10 sued under a similar statute where it withstood attack?  Would

11 this be the first time -- let's just focus on this time.  Would

12 this be the first time that a lawsuit based on this act would

13 apply?

14         MS. REDDY:  Let me just -- if -- if -- to answer your

15 question in a couple different ways.

16         THE COURT:  Not that I mind being a, you know, on the

17 front line of things.

18         MS. REDDY:  Absolutely, Your Honor.

19         THE COURT:  But --

20         MS. REDDY:  So Jus cogens violations, genocide,

21 murder, torture.

22         THE COURT:  Right.

23         MS. REDDY:  I mean, luckily you don't have cases very

24 often where the United States is -- is accused of -- of

25 genocide and torture.  Now, you do have Jus cogens is -- is a

1   subset of norms that hierarchically -- and we'll talk about

2   this in a minute is about -- rises above customer international

3   norms.  Anything created by the common law including immunity.

4   Those are created by the -- the federal common law.

5          THE COURT:  Right.

6          MS. REDDY:  Juice Cogen is here, down here is the

7   creation of those immunities.

8          THE COURT:  If you've all been surprised to learn

9   that sovereign immunity is not in our constitution at all.

10          MS. REDDY:  No.  No.  And there is actually a

11   petition which was originally against the Kang and you know, as

12   a way of getting -- but anyway, we won't talk about, we won't

13   talk about that full briefing I would be happy to go into that.

14   So what I would say for -- for their -- for Jus cogens norms,

15   we're not talking about general, you know, immunity from

16   anything other than this very specific and -- and

17   hierarchically supreme set of international norms.

18          And the question is whether there's domestic

19   sovereign immunity from that set of claims.  And we would say

20   that federal common law says from the beginning it's never

21   recognized any immunity there.  So you don't look for a waiver

22   where there's no immunity to begin with.  And with regard to

23   those claims, you look to federal -- federal common law to

24   determine the substance of the rights, the remedies, the

25   liability for a violation of the Jus cogens norms.  So I would

1  say there is a Shumari case in the Eastern District of Virginia
2  where Judge Brinkamen, I believe.  Brinkema, has held that the
3  US does not have sovereign immunity for Jus cogens violations.
4  So on that note I would also I'll cite that to you, it's 368
5  SF.3rd 935, the Eastern District of Virginia.
6         Now, in terms of precedent in the Third Circuit I --
7  I believe there is none.  There is no precedent directly on
8  point in the Third Circuit.  So there's nothing that would --
9  that would control Your Honor's decision in that regard.  And I
10  acknowledge that there are certainly cases out there regarding
11  express waiver.  I completely understand that body of law.  I'm
12  just saying it doesn't apply here, not in the Jus cogens
13  context.
14         So to develop that a little bit more, so as we talked
15  about Jus cogens it's a mandatory preemptory norm which
16  internationally -- and the international community recognizes
17  there's no derogation permitted bar none.  And you know, just a
18  concept that kind of goes through this analysis is what was
19  recognized in Nuremberg that there are some acts that as a
20  matter of morality and reason are fundamentally wrong such that
21  no state may authorized their commission, nor immunize those
22  involved in such acts from liability.  That's also in the
23  Shumari case that I had mentioned.
24         Now, the reason, first of all that you wouldn't look
25  to the ATS anyway for a waiver, not that there needs to be one,

1 and we'll talk about why there -- there would be no reason to
2 look for one.  You don't need to get that far.  Because the ATS
3 is a jurisdictional statute only.  Okay?  That has been held
4 numerous Supreme Court cases Sosa would be one of them.  But
5 even prior to that, jurisdictional only, it doesn't confer any
6 substantive rights or duties or the rule of law and you have to
7 look to the federal common law for that.

8        Now, Sosa will tell us that when you look to the
9 federal common law, the federal common law incorporates
10 international law and therefore the United States recognized
11 international law as part of federal common law.

12        Now, our position as you know by now is that federal
13 common law does not recognize sovereign immunity for Jus cogens
14 violations.  And there are three principles that, I think,
15 inform this analysis.  There's a lot of context and history
16 which we, you know, we can -- we will submit in our briefing.
17 But the three principles, I think, are specifically kind of
18 informed as to why this result must be in my mind.

19        So first Jus cogens violations are not acts of a
20 sovereign.  Okay?  It's a non-derogable right not justified
21 under any circumstances.  We have a -- a constitutional, we the
22 people, form of government.  We chose that.  We did not choose
23 a king, we chose to have a constitutional system of government
24 governed by the people, we -- we the people.  So under this
25 system of government power is delegated by the people, and the

1  people can't delegate murder, torture, genocide to the federal

2  government.  It's not a sovereign act it cannot be delegated to

3  the government.  The government cannot act as a sovereign in

4  doing those -- in -- in performing those acts.

5           Now, this principle has been acknowledged in numerous

6  cases, Jus cogens violations are acts that are not authorized

7  by the sovereign.  And here are a few of the cases that would

8  explain that.  International law doesn't recognize an act that

9  violates the Jus cogens as a sovereign act.  So right there

10 you're not acting as a sovereign, you shouldn't have sovereign

11 immunity.  So we don't -- we won't leave it there, but that's

12 one concept.

13          So the government can't immunize itself for conduct

14 that goes outside of it's delegated authority.  Any attempt of

15 its staff to bestow immunity on itself is an authorization of

16 torture, which is not a state act.  So put another way, as in

17 Jesner, states don't have the sovereign right to violate human

18 rights.

19          The second principle is the principle of hierarchy

20 that we discussed before.  Jus cogens trumps sovereign

21 immunity, just to put it simply.  Jus cogens norms are supreme.

22 They have supremacy over all rules of international law.  But

23 are in cases, is very constructive in that capacity.  It was

24 dealing with foreign sovereign immunity, it's a different

25 issue.  Jus cogens norms are above customary international law.

1  For customary international law everyone agrees this is the
2  law.  But the states get to consent or not consent.  And that's
3  very different than Jus cogens.  Jus cogens are fundamental to
4  the international community and they transcend consent.  You
5  can't say look, my state -- our interests differ so we're just
6  going to kind of bow out of this one.  It's -- it's -- that's
7  not the way Jus cogens norms work.  They are -- they transcend
8  consent.  Consent is not required.  There has to be a law that
9  everyone of the international members conforms to without
10 consent or there would be no international law of nations.
11         So you can see this in operation where Jus cogens
12 norms invalidate other rules of international law that conflict
13 with it, such as treaties.  Treaties conflict with Jus cogens
14 treaty falls.  So there can't be a non-viable, violable
15 international norm and at the same time a state's saying, yeah,
16 but we're immune.  We have no extensive immunity.
17         I agree it's a contradiction and that contradiction
18 has to give way to the supremacy of Jus cogens.  So countries
19 can't insulate themselves from Jus cogens, by a unilateral
20 decree.  And the third principle, and there is a lot of context
21 that goes into all of these.  I -- there -- I'm simplifying a
22 lot.  Is it a right, must have a remedy.  This is kind of core
23 to our very being.  Margay vs. Madison the right of every --
24 every individual to claim the protection of the laws whenever
25 he perceives an injury.

1            Now, the blanket application of sovereign immunity
2  leaves injured plaintiffs without a remedy.  Under the Westfall
3  Act a suit against the government, suits against the government
4  are the exclusive remedy for torts committed by government
5  officers in the course of government employment.  The victims
6  may not sue their American torturers directly.  The torture
7  victim protection act grants causative action only against
8  individual officials who commit torture under color of a
9  foreign state's law, unless answerable in a US court, federal
10 court these acts of torture committed at the border would be in
11 the unique position of being immunized everywhere in the world
12 by operation of foreign sovereign immunity and -- and -- and
13 compony.

14           So there would be no remedy.  Now, the Shumari case
15 holds that there is also an implied waiver.  Our position, as
16 you know, is that the waiver's not required.  You don't have to
17 get that far.  But if you were, to get that far, the United
18 States has implicitly waived any sovereign immunity that
19 presumably it may have had, with regard to Jus cogens norms in
20 at least these following ways.

21           Now, so recognition of Jus cogens norms are essential
22 to the existence of this international community must be a law
23 that binds the member nations.  The waiver comes by joining the
24 community of nations, accepting the laws of nations, holding
25 itself out as upholding the international legal order.  By

1  ratifying the CAT.  Under the CAT, or C-A-T, I'm not sure how
2  it's referred to, each state must ensure that victims are able
3  to obtain redress and they have unforcible rights to fair and
4  adequate compensation.  And the US reports to the CAT committee
5  that it is in compliance with this and that it's keeping with
6  that mandate.

7       And then full circle coming back to the Nuremberg
8  trials, so the US participated in and developed the norms in
9  the Nur -- in the Nuremberg trials.  It's actually, I think,
10 the principle author of -- of some of the principles that came
11 out Nuremberg at the end of World War II, which focused on
12 individual rights as well.  And a quote, and this is also I
13 think quoted in the Shumari case, it's from the international
14 military tribunal of Nuremberg there's a principle of
15 international law, which under certain circumstances protects
16 the representatives of a state can't be applied to acts which
17 are condemned as criminal by international law.

18      The authors of these acts can't shelter themselves
19 behind their official position.  So this -- these three areas
20 of -- they're also actually examples in the Shumari case of --
21 of different areas where the United States has implicitly
22 waived its immunity thereby applying equitable principles or
23 doing other things that kind of allow for it to be liable for
24 certain acts, which, you know, creates a kind of a grey area
25 that counteracts the notion that there has to be an express

1  waiver or -- that's the categorical.  That's what everyone
2  wants you to do is to say, here's the line and if there's no
3  express waiver, it's done.  But it's -- it's a lot more complex
4  than that and with regard to Jus Cogan if you were to review
5  and we would love to -- you know, brief this for you, the
6  history of the federal common law and how this develops over
7  the years and all of the acts that conform this understanding.
8  I don't think there's any other result, Your Honor.

9        And I -- I do -- I just with the cases that they've
10 cited they string cited cases in their brief on reply four of
11 those cases are not Jus Cogens claims, they have no relevance.
12 One was decided under the TV, the torture victim protection
13 act, it's not on point.  I believe it's relatively -- victim
14 with regard to this case, I think the Jama case was decided
15 under treaties which were -- it's kind of a difference analysis
16 because you might expect that the treaty itself would have the
17 substantive con --- they are not self-executing, it was found
18 to not me self-executing.

19       You have here all of the substantive content of the
20 ATS claims is self-executing.  That was found in Sepp's
21 (phonetic), so there doesn't need to be a statutory enactment
22 for a litigant to have a claim under the ATS.  And the Ferets
23 case, to the extent it -- it -- it rejects the application of -
24 - or it requires a -- a waiver for a Jus cogens claim.  It
25 relies on cases that are not Jus cogens at all to -- to -- it's

1  -- it's kind of black line rule.  And it also doesn't analyze

2  any of the federal common law that informs this analysis of Jus

3  cogens, which I believe is necessary to come to a result as to

4  where, you know, whether or not the -- the US government has

5  foreign immunity for this, or genocide, torture and -- and

6  crimes against humanity.

7           THE COURT:  And you believe that a private

8  individual, an individual standing alone, and I assume they can

9  be a citizen of the United States, a citizen of China, a

10  citizen of every -- any state, has a private cause of action

11  given jurisdiction by the -- the ATS to bring a lawsuit in

12  federal court seeking private damages, all relying on this Jus

13  cogens norms?  Isn't this normally country to country when you

14  talk about Nuremberg that's not the rights of the -- of an

15  individual.  Isn't this really country -- expectations of what

16  a country's laws will reflect as opposed to giving a private

17  right of action to an individual to sue a government?

18           MS. REDDY:  Okay.  I don't think that is such a far-

19  fetched idea to be honest because say Australia and New

20  Zealand, the United Kingdom, you know, they've -- they've --

21  they've all with regard to domestic acts by the US government

22  for which there is no other recompense, you're talking about a

23  very subset of norms that are highly selective.  This doesn't

24  happen all the time.

25           THE COURT:  Absolutely.

1          MS. REDDY:  And thank God.  You know, so I -- I don't
2    think that's -- I think that's the result of -- that -- that
3    really is -- is kind of directed by our -- our constitutional
4    form of government and by who we are as a -- as a nation that
5    we're not going to hold ourselves out of Nuremberg and create
6    all these standards we want every other country to comply with
7    and then say no, sorry, not us.

8          And -- and I -- I -- there are lots of limitations
9    that come through statutory, the foreign sovereign immunity's
10   act.  And the TVPA has it's own limitations and gives it's own
11   grant.  But for this particular circumstance which I don't
12   think is -- is opening a flood gate by any means, I -- I
13   believe that that we are properly here on an ATS claim and the
14   -- the government just can't claim sovereign immunity in this -
15   - in this circumstance, it's just -- it's not supported by --
16   by what was federal common law that informs the ATS claims.

17         THE COURT:  Okay.  Interesting.

18         MS. REDDY:  Thank you, Your Honor.

19         THE COURT:  Thank you very much, Counselor.

20         MR. EDLIN:  Your Honor.

21         THE COURT:  Yes, sir.

22         MR. EDLIN:  That concludes our arguments, thank you
23   very much for your indulgence, it's much appreciated and if you
24   have any questions, we will seek to answer any, any questions
25   that you might have yet to ask.

1        THE COURT:  No.  But I -- so far these arguments have

2    been outstanding so we'll turn back to the government.  Would

3    you like to respond?  Or do you think you're ready for lunch?

4        MR. ST. JOSEPH:  Okay.  All right.  Excuse me, thank

5    you, Your Honor.  The government, at least for the federal tort

6    claims portion I won't be very long.  I just have some -- a few

7    bullet points that I would like to hit if, the -- Your Honor's

8    agreeable.

9        THE COURT:  Certainly.

10       MR. ST. JOSEPH:  And -- and just the overriding theme

11   here is -- is what I want to hit and then just hit some -- some

12   specifics.  Over and over again, plaintiffs go back to motives

13   and policies.  And that's really the gravamen of the motion to

14   dismiss.  This case is not supposed to be a systemic change --

15   systemic challenge, excuse me, we all agree to that.  It's

16   whether individuals have a tort under the federal tort claims

17   act that can be pursued for com -- for compensation by the

18   individuals.

19       And it's clear based on the presentation and

20   arguments that there isn't an individualized claim.  That --

21   that what happened was a -- it falls under the discretionary

22   function exemption of the federal tort claims act that it is

23   actually the definition of discretion.  There was a policy, the

24   individual actors enacted that policy and -- and the key to

25   understanding that and recognizing that and again, let's take a

1  step back and say, we're not disagreeing that anything was

2  positive or good about that policy.  I want to make that clear

3  on behalf of the government as it stands today that the policy

4  that was enacted in 2018 was renounced and the current

5  administration strongly continues to renounce it.

6          Having said that at its core for the individuals

7  coming forward with their claims the claim is that an

8  individual officer following that policy by the act of

9  separating a parent from child for the prosecution of the

10  parent, under criminal law, which is a valid criminal statute

11  pursuant to valid immigration statutes.  It was cited earlier

12  1325, 1326.  We don't need to get into the specifics now, it's

13  all in the -- the briefing.  That act itself was the tort.

14  That that act itself was the thing that sets everything else in

15  motion.  And that simply cannot be.  There has to be something

16  more.  And plaintiffs agree the something more is the policy.

17  It is -- is the animus of the then Attorney General over that

18  administration.

19          And while that may give rise to something, it does

20  not give rise to a claim under the federal tort claims act.

21  That for the reasons enunciated earlier that -- that particular

22  avenue is foreclosed.  That there isn't a waiver -- that the --

23  that the exceptions apply and so therefore you can't -- you

24  can't proceed that.  Just a few --

25          THE COURT:  Go past that whole idea.  Is it the

1   policy that's negligent?  If the actor -- if the federal actor
2   is implementing the policy exactly as its intended to be
3   implemented and they, do it without any negligence, they're not
4   negligent, but the policy itself is causing harm, where does
5   the negligence come from?  Is the actor then imbued with the
6   negligence of the policy?  And can that -- can that lie in a
7   federal tort claims act?

8          MR. ST. JOSEPH:  And -- and the answer is no because
9   essentially what you have there is a corporate negligence
10  theory and that's barred under the federal tort claims act.
11  That is not available.  I believe that's the Rainer case that
12  made that clear.  So, there's no corporate negligence.  So once
13  you get to that level, and say that if the Attorney General who
14  lays out the policy is the one committing the negligent act,
15  then we don't have a claim under the federal tort claims act.

16         I don't mean to keep restating it, but there may be
17  something else out there, but it's not -- it's not this.

18         THE COURT:  How about the anti-torture act?

19         MR. ST. JOSEPH:  I wouldn't go that.  I suggest
20  that's also, you're right but I'll leave that to Attorney
21  Finkelstein.  You know, and -- and -- and part of the -- one of
22  the issues that was raised is the length of time between when
23  the prosecutions ended in each case, one with a conviction and
24  one with it being dropped and then the reunification.  There
25  was a matter of time -- I think there's a factual dispute as to

1 Mr. Q. as to exactly how much time.  But the -- but the

2 ultimate amount of time is not significant for the court's

3 current decision, because even that falls under discretionary

4 function.  Now, we're talking about the actual implementation

5 of -- of the reunification of where people are being housed.

6         There's a reason Mr. A. and Ms. -- and C.D.A., his

7 son went to -- went to -- went to Berks County because

8 initially they weren't simply released and I guess there was

9 some belief that they might be more ready to be removed.

10 Whatever the basis of that was that's the process that has to

11 take place so that they can be reunited and -- and housed and

12 that's all pursuant to statute and -- and pursuant to -- to

13 what the government's supposed to do.  That would arguably fall

14 under due care.  It's the implementation of the subsequent

15 statutes when it comes to detention pursuant to removal.

16         One of the underlying claims about the children and

17 how they were housed.  I -- I heard about, you know, we heard

18 about the ice box and different conditions of confinement,

19 which again, is not part of the case.  And to the extent that

20 plaintiffs argue that transfer to HHS, once the initial

21 decision is made to -- to -- to go ahead and prosecute under

22 criminal statute, that's statutorily provided for and it's

23 provided for because it is again, in practice, what W.S.R.

24 found.  The government doesn't dispute and didn't appeal that

25 -- that.

1          In practice it agrees it had a bad result.  But the

2   actual statute itself is not unconstitutional and the

3   individual officer following the -- the provisions of that

4   statute is protected under either discretionary function on the

5   one side or due care, once the HHS portions come into effect.

6   So that also just circles back to where, Your Honor, this case

7   is troubling.  We -- we acknowledge that.  There's a lot of

8   push/pull in the way things should be applied.

9          But ultimately discretionary function and for the

10  reasons that were -- that I laid out, I don't want to go over

11  them all again, the case should be dismissed.  Can we just see

12  if there's any -- I mentioned that.

13         Oh, I guess I'll wrap up with -- oh, I talked about

14  designation, once you're designated as a UAC, so the argument

15  is that that was a pretext rather than following from the

16  decision to prosecute.  That's -- again, this isn't an avenue

17  to challenge how the United States implemented those things and

18  the reason I say that is first, the decision has to be made to

19  prosecute.  Then the decision to designate as an unaccompanied

20  minor flow -- flows from that first decision.  And so we go

21  back to, you know, what was the actual tort because once the

22  parent is designated for criminal prosecution the child then

23  naturally gets put -- or I shouldn't say naturally, pursuant to

24  the effort to accommodate and give the best possible care, gets

25  put into the UAC status.

1      So I will wrap up my portion by going back to

2  President Biden and the quote -- we saw a lot of quotes, but I

3  think we saw a movie clip in there during the middle of the

4  presentation.  Putting that aside and just focusing on what the

5  current president has said, the court hit the nail on the head.

6  The president can say that someone may deserve compensation.

7  The appropriate means would be a congressional act, would be

8  going and assembling these cases and saying -- and

9  acknowledging as has happened with -- if we want to talk about

10  historical analogies, it happened 50 years later, but it

11  happened with --

12      THE COURT:  Japanese internment.

13      MR. ST. JOSEPH:  -- Japanese internment camps.  You

14  know, and 50 years later Congress passed an act and -- and

15  provided some compensation.  That would be the appropriate

16  means, not in a tort claim.  And he certainly did not say I

17  think everyone should then turn around and sue the court.  If

18  you remember, even the court itself says those who came

19  lawfully or unlawfully if X happened and even that it was an

20  awfully tough comment that a lar -- that basically encompassed

21  the whole recognition that he wanted to express on behalf of

22  the government as Ms. Finkelstein and I are doing today.  That

23  -- that we're not making any pretense that -- that the events

24  that took place were -- we're --- we're not attempting to

25  defend those or suggest that those should come back.

1          We are attempting to in summary just state and -- and

2    hopefully get in Your Honor's agreement that the federal tort

3    claims act is not an appropriate means to remedy whatever wrong

4    ultimately may have happened.  Thank you, Your Honor.

5          THE COURT:  Thank you very much, sir.  Attorney

6    Finkelstein?

7          MS. FINKELSTEIN:  So let me ask you a question.  How

8    interested are you in international law?  Because if you are

9    very interested I will go slide by slide through Ms. Reddy's

10   slide show giving you my counter position.  If you are not that

11   interested I will give you a more summary version of my

12   response to her.

13         THE COURT:  Well --

14         MS. FINKELSTEIN:  So I defer to the court as to what

15   you think is appropriate.

16         THE COURT:  You're asking that question at the wrong

17   time of day.  But I'm not that interested.  I find it

18   interesting, of course, but I am always concerned about the --

19   the -- I use that term jealously guard, the American juris

20   prudence is different.  And we are very reluctant to openly

21   admit that we're incorporating or adopting international

22   standards even though we have been the leaders in establishing

23   international standards, and establishing United Nations for

24   that matter, et cetera.

25         Obviously, we like to always do good.  We like to

1  always be known as the country that stands for right and that

2  stands for morality and -- and we always want to be known as

3  good.  And we go to great lengths to be known as good.  And

4  that's why it's that kind of an incongruous that we are so

5  reluctant to openly admit that we're incorporating any

6  international standards into our juris prudence and it always

7  leads to great criticism.  Because we like to be exceptional

8  and we like to stand out.  And we don't -- we don't accept that

9  even though we often are like I said, the leaders in creating

10 it.

11          So I don't think it's necessary to go through there.

12 I think that whole issue is probably the most interesting of

13 this case.  The federal tort claims act is more of a -- are we

14 trying to put a round peg in a square hole?  Does it fit and --

15 and plaintiffs have done a great job of trying to maneuver to

16 get it to fit.  Defendant's done a great job saying it just

17 doesn't quite fit and then its up to the court to determine one

18 way or the other, if it does fit or doesn't it fit, and is now

19 the right time to make that decision or should we allow more to

20 do all the factual record to work off of.

21          So while I appreciate the information, I'll decline -

22 -

23          MS. FINKELSTEIN:  I'll give you the short version.

24          THE COURT:  -- the invitation.

25          MS. FINKELSTEIN:  Okay.  Then I will give you the

1   short version.  If Your Honor doesn't mind, I'll begin with the

2   venue question.

3          THE COURT:  Certainly.

4          MS. FINKELSTEIN:  And then I'll move to the ATS

5   question, the alien tort claim statute.  So I think it was

6   really telling, the order in which plaintiff's counsel

7   addressed severance and transfer.  That first they began with

8   severance and then with transfer.  I think the reason why is

9   fairly obvious.  There is very little commonality between these

10  two sets of plaintiffs that would suggest they should be

11  together in the case and Your Honor illustrated beautifully why

12  that's going to be problematic in this case.  Not only

13  problematic at trial but problematic throughout the entire life

14  cycle of the case.

15         The official who separated Mr. A. from C.D.A. is in a

16  different state from the official who separated Mr. Q. from

17  E.A.Q.A.  And the same flows with everything related to

18  discovery.  All of the paperwork, all of the individuals, the

19  places where the depositions are going to happen.  And Your

20  Honor also pointed out a really astute and important point

21  which is it's a federal tort claims act statute.  So there's a

22  real slippery slope here.  If these two plaintiffs, these two

23  sets of plaintiffs belong together in this case alleging torts,

24  ordinary torts under the federal tort claims act, not a

25  constitutional violation, not a challenge to the policy at

1  large, ordinary tort then what stops everyone from being

2  gathered together in these weird combinations in federal tort

3  claims act cases where I've got kind of a not sympathetic slip

4  and fall at the Post Office, well let me get some other people

5  who have more sympathetic slip and falls in some other state,

6  we'll put them all together.  And that puts the government in a

7  really difficult position.

8          I have to fundamentally disagree with plaintiffs'

9  counsel's argument that the government is everywhere so it

10  doesn't make any difference.  The federal tort claims act is a

11  very specific, narrow waiver of sovereign immunity.  It gives

12  and it takes with the same hand.  The decision is if you're

13  going to be able to sue the government you have to follow those

14  rules.  Those rules include what types of claims you can bring.

15  Who can be part of those claims?  Who you can sue.  The fact

16  that you can't sue for corporate negligence or sort of global

17  mass tort.  You can't sue for products liability.  You can't

18  sue because you're complaining about back pains.  All kinds of

19  little nuances.

20          And to just sort of waive them away because two sets

21  of plaintiffs want to be together because they now live in

22  Pennsylvania.

23          THE COURT:  You just reminded me something that I

24  have to bring up, the idea in that diversity case, which we're

25  not dealing with here, but in a diversity, case joining

1  multiple different actions together to try to meet the amount

2  in controversial requirement, so you get ten different cases,

3  each one falling below the $75,000 joining together, over the

4  $75,000 and you have all those cases that arguably should not

5  be tried together but that's the only way they get jurisdiction

6  in federal court.

7          MS. FINKELSTEIN:  And I would argue that Your Honor

8  will end up with a bunch of cases that don't really belong

9  together under the federal tort claims act that -- where you

10 have similar situations like this because these two plaintiffs

11 are certainly not the only two people -- these two sets of

12 plaintiffs are not the only four people who came across the

13 border and were subject to the policy.  So if these two sets of

14 plaintiffs can be together in the Eastern District of

15 Pennsylvania because they live here now, who knows how many

16 other people could join together to this case or other cases.

17         It makes sense for them to be separate where there's

18 a true lack of commonality and here's there's a true lack of

19 commonality.

20         THE COURT:  But -- but there is commonality with

21 respect to the law and I'm wondering has there been any effort

22 to form an MDL or anything along those lines?

23         MS. FINKELSTEIN:  That was discussed.  At this point,

24 the government is not suggesting that the cases should be MDL.

25         THE COURT:  Because I think I heard 4,000 or

1  potentially 4,000 migrants that have been -- suffered through

2  this, which would seem that very likely there will be multiple

3  more, depending on how the law develops.

4          MS. FINKELSTEIN:  There aren't as many cases as I

5  would have thought there were cases, Your Honor.  When -- when

6  we first discussed our very first case --

7          THE COURT:  Right.

8          MS. FINKELSTEIN:  -- status conference I thought

9  there would be more than there were.  But certainly, there are

10  thousands of people who could find themselves similarly

11  situated and join this lawsuit or join together in other

12  combinations any where across the country.  And so there really

13  is no justification for them being together and I think that's

14  belied by the fact that plaintiffs counsel are now sort of

15  saying well, just punt it down the road, don't sever it now you

16  can sever it for trial.  But all these factual distinctions are

17  going to be problems in discovery as well, as Your Honor,

18  recognized.

19          And that brings me to this question of transfer.  So

20  once they're severed is there a reason for these cases to be

21  here?  And we can go back and forth all day on the factors, the

22  private factors that the plaintiffs want to be here.  I

23  recognize that.  I think I've made it plain, the government

24  doesn't think that this is the best venue.  We can go back and

25  forth all day long on those factors.  They're not going to get

1   us anywhere.

2            We can go back and forth all day long on how many

3   depositions and do I have to identify the names of people.  And

4   are some of them non-governmental employees anymore such that I

5   can no longer compel them to appear for a deposition in another

6   jurisdiction?  All of that is possible.  All of these factors

7   go back and forth.  But there's one factor that's very clear

8   and Your Honor touched upon it, and that's public policy.

9   Because say what you will, this is a very unique thing that the

10  court is being asked to weigh upon.  It is being asked to

11  interpret Texas, potentially Illinois, but at least at minimum

12  Texas, Pennsylvania and New Mexico law on a very novel set of

13  facts.

14           That would be, if -- if nothing else has convinced

15  Your Honor, the fact that we argued past lunch trying to

16  squeeze whether or not this fact pattern, this shifting of

17  sands in the plaintiffs' complaint, is it a challenge to the

18  policy?  Is it not a challenge to the policy?  Is it about

19  specific concrete tort?  Is it about this, like, broad reason

20  why the government had an animus, but then resulted in harm on

21  people?  We've got back and forth and to whether or not that

22  can squeeze into an intentional infliction of emotional

23  distress, loss of consortium.

24           We've gone back and forth on that for hours.  It's

25  novel.  And if a court is going to decide it, it should be a

1  court in Texas that can certify a question to the Texas Supreme

2  Court.  A court in New Mexico that is familiar with New Mexico

3  law and the nuances.  And the ways that their case law has

4  changed.  And while of course we have full confidence in Your

5  Honor, the reality is that there is virtually no hook in

6  Pennsylvania.

7       The smallest hook for one set of plaintiffs is that

8  they were housed for a short period of time at the Berks

9  facility.  Plaintiffs' counsel has -- has acknowledge just a

10  very small portion of the case.  We believe the government has

11  an extremely strong argument for dismissal of that portion of

12  the claims, if not for everything else, which would make that

13  small hook go away.  And now we have two sets of plaintiffs

14  that have no relationship to one another, never met each other.

15  Didn't come across the border in the same places at the same

16  time who want a court in Pennsylvania to decide on a very novel

17  set of facts that have wide reaching implications; right?

18  They're not the only ones who came through.

19       This -- that's precedent in -- under Texas law and

20  under New Mexico law and they're asking a Pennsylvania court to

21  determine that.  We think that it is more appropriate for the

22  venue to be where the plaintiffs came across the border, where

23  they were subject to the policy.  Where they were then

24  separated as a result of the criminal prosecution of the

25  parents and that everything else flows from there.

1           And so it's true that the venue is possible here, but
2   the government is requesting severance and transfer.  We think
3   it's more -- more appropriate.
4           Okay.  ATS.  Our ATS.  Let me take a step back here.
5   The plaintiffs are conflating the idea that there is a
6   violation of Jus cogens norms, with the question of whether or
7   not you can sue in federal court as an individual plaintiff for
8   an alleged tort that has happened to you under international
9   law.  They are not the same thing.  Jus cogens norms are a
10  certain body of norms that I do agree, in part, with plaintiff,
11  they are high level norms.  I don't think plaintiff is quite
12  right that they sort of have this hierarchical trumping over
13  (indiscern.).  But Jus cogens norms are universal preemptory
14  norms that -- those countries adhere to and they don't do it
15  just because they shook hands in a treaty.  But they do it out
16  of a sense of obligation.  That's -- that's Jus cogens.
17          It's widespread state practice and opiniourus, this
18  feeling of obligation.  The fact that there is a Jus cogens
19  norm does not mean that there is a tort claim for an
20  individual.  Jus -- a violation of Jus cogens norms as Your
21  Honor pointed out is litigated in the international court of
22  justice is a dispute between nations.  So if another country
23  feels that the United States' policy of separation at the
24  border violates a Jus cogens norm, or quite frankly if a treaty
25  member of the CAT feels that the United States has violated the

1   CAT they can bring those claims in an international tribunal.

2          The United States is a party to the international

3   court of justice and can be sued there and consents to -- to

4   litigate international law violations there.  So this question

5   of whether it's Jus cogens is just a question of whether it can

6   be a violation of international law.  It doesn't answer the

7   question of whether these plaintiffs, these individual people

8   can come into a federal court and sue the United States under

9   the alien tort claims statute.

10          And I remind Your Honor that the United States

11  government didn't interject the Alien Tort Claims Statute into

12  this case.  That's the law cited by the plaintiff in their

13  complaint.  That's the law that they say entitles them to sue

14  for crimes against humanity, torture and degrading and inhumane

15  treatment.  And so there needs to be -- in order for there to

16  be an ATS violation, an Alien Tort Claims Statute violation

17  there needs to be either a violation of a Jus cogens norm or a

18  violation of a treaty, which Your Honor sort of points out the

19  fact that you still have to comply with the ATS for a Jus

20  cogens norm considering that to sue under the ATS you have to

21  have one of two things, a Jus cogens violation or a violation

22  of a treaty and then you have to have a waiver of sovereign

23  immunity.

24          If you have that then you can come into any federal

25  court in the United States and you can sue under the alien tort

1    claims statute.  What they don't have here is either.  And
2    again, it's telling, the order in which these arguments were
3    made by the plaintiff.  First, they begin with a violation of
4    whether or not there's a substantive violation and only then do
5    they circle back around to this jurisdictional question without
6    answering the question.  The question is, can you sue in
7    federal court the United States government under the ATS?  The
8    answer is no.  Even if you have a jus cogens norm, you still
9    have to have a waiver of sovereign immunity.  And the fact that
10   we've participated in Nuremberg, not individual plaintiffs
11   bringing a tort claim, that was a violation of the law of
12   nations not states litigating with each other is not a waiver
13   of sovereign immunity.

14            The fact that we have other disputes between nations
15   does not mean that there's a waiver of sovereign immunity for
16   individual plaintiffs.  And the last thing I will leave you
17   with on the substance of the alien tort claims act is that it
18   is -- and Your Honor hit the nail on the head when you pointed
19   out that there -- one word, the word torture can mean different
20   things in different contexts.  It's not enough to simply say
21   there's torture, there's a violation of the convention against
22   torture.  There's a violation of the ITCPR, the international
23   covenant against civil political rights.

24            You have to prove that there's an actual violation
25   specific to what that treaty or what that Jus cogens norm

1  prohibits.  So you can't just come in under the alien tort

2  claims statute and say something bad happened to me and its

3  torture.  You have to actually prove that what happened here,

4  namely, a parent comes to the border without authorization,

5  crosses over the border, is apprehended with a child.  There's

6  a decision made to prosecute the father for a violation of the

7  law.  As a result of that prosecution the family is separated,

8  the parent is prosecuted and/or charges are dismissed.  And

9  then after a period of time there's a reunification.  You have

10 to find that that violates the CAT and that violates the ITCPR.

11 And that is a violation of jus cogens norm.

12         Not that torture at large is a violation or even that

13 you could sort of squeeze the effect of that action into the

14 CAT.  If that was the test then the separations that we do

15 every day in the criminal justice system would violate the CAT.

16 If that was the test, if the test was the effects, whether or

17 not the effect of something has a negative effect that could

18 arguably be squeezed into one of these definitions then that

19 again would create a dangerous slippery slope or essentially a

20 variety of lawful actions under federal law, would then be held

21 to give a private cause of action that anybody who'd been

22 criminally prosecuted or anybody whose separated from their

23 child as a result of a criminal prosecution could bring a

24 claim.

25         At the end of the day, Your Honor, it's not an

1  appropriate vehicle to litigate what happened here under the
2  alien tort claims act.  You heard Mr. St. Joseph say that and
3  you'll hear me say it again.  That the government is not
4  minimizing or attempting to minimize what happened and we are
5  not defending the prior policy.  But that isn't what this case
6  is about.  This case is about whether or not the complaint as
7  pled states the federal tort claims act claim, and it doesn't.
8  Because it's an attempt to challenge the policy, not truly an
9  attempt to pled state law claims and whether or not the
10 complaint states a violation of the alien torte claims statute.
11 And again, Your Honor, it doesn't.  It's an attempt to take a
12 negative outcome and construe that backwards as a violation of
13 international law and that simply is not what the alien tort
14 claims statute allows litigation over.  And for those reasons
15 we'd ask that this court dismiss the complaint in its entirety.
16 In the alternative, if any claims survive, we ask that they be
17 severed and transferred as the government has requested.  Thank
18 you.
19         THE COURT:  Thank you very much, Counsel.  Mr. Edlin?
20         MR. EDLIN:  Thank you, Your Honor.  I think I can
21 handle most of this, just so save a little bit of time.  And
22 I'd ask Ms. Reddy to address anything on the ATS.  Your Honor,
23 I'm not usually a big one for commenting on the other side's
24 order of arguments.  I don't think it reveals too much, but if
25 anything reveals anything the ATS, the sovereign immunity

1  claims was only raised by the government in its reply.  And if

2  the government acknowledges the ATS is present in the

3  complaint.  So they should have raised it right away.

4           Now, I'm not suggesting that that minimizes what the

5  court should do with the issue, it was only raised on reply.

6  We've spent a great deal of time talking about it.  It is a

7  complicated issue, far more complicated than the back of the

8  hand that counsel gives it.  And if Your Honor is going to act

9  on that in any way other than to allow the complaint to go

10 forward you can -- the appropriate thing to do is to allow both

11 sides a briefing.

12          So a couple of intermittent items.  With respect to

13 the Biden quote, which -- which counsel raised.  This is the

14 president.  The president is not saying, as by the way, the

15 government is saying with respect to the Roe v. Wade law, hey,

16 we better pass some new laws to deal with that.  That's not

17 what the president said.  The president didn't say, gee what

18 happened at the border was terrible we really should pass some

19 laws for you.  The president said you are entitled to recover

20 for what happened to you.

21          We have plenty of laws that protect our clients.

22 We've pled them.  The president does not say we don't have a

23 remedy for you.  The president was saying you're entitled to a

24 remedy.

25          THE COURT:  And I assume as patient as you are,

1  you're not patient enough to wait 50 years for Congress to pass

2  a law and the president to sign it?

3         MR. EDLIN:  Yes, Your Honor.  You know, I used to

4  represent Ross Perot when he ran for the presidency.  He said

5  something I thought that was very true.  He said, we take in

6  plenty of money in taxes, we just need to spend it better and

7  we have plenty of laws to cover all kinds of things, we just

8  need to apply them better.  With respect to the latter comment

9  I believe that's correct.  We have pled sufficiently here under

10 the laws as they exist.  And the president indirectly,

11 counsel's boss, has said that a remedy should be afforded to

12 our counterpart.  And we agree with the government's position

13 there.

14        With respect to transfer and severance, again,

15 counsel misstates the law and the factors here.  They said the

16 big issue is whether or not this court is going to be able to

17 decide a hard question of Texas law.  That is not the most

18 important factor.  The most important factor is the plaintiffs'

19 choice of forum and that is heightened when they reside in the

20 forum as they do here.  Now, if I were the government, I would

21 like to pick these two in -- Your Honor, I'm sure it's no

22 secret that we're doing this case pro bono.  They don't have

23 the funds to afford to fight the government here.  This is a

24 very aggressive government defense here.

25        They can say that they are not defending this policy,

1  but they want to do is deprive our clients from any right to

2  pursue a remedy as a result of that policy.  This is -- this is

3  a theoretical distinction.  They are trying to deprive our

4  clients a recompense for what happened at the border and -- and

5  having done that, which they say, gee that was terrible, but

6  don't blame us for it.  Now, they want to separate them and

7  send them back to New Mexico and back to Texas where they've

8  previously been traumatized.  And they want to send them back

9  there individually.  Now, we will go, we'll take depositions

10 all over the place, we don't care, it doesn't make any

11 difference to us.

12         That's not the point.  The point it these individuals

13 have to travel and go to those places themselves.  And they

14 don't have the funds for that.  And there's no reason to force

15 them to go back to these places when they have chosen

16 jurisdiction where they reside and where it is equally

17 convenient for the government to litigate.

18         Now, the factor that we've been discussing about this

19 court's ability to decide the law of Texas.  That is not a

20 prevailing factor.  That is not the number one factors; it is a

21 factor.  Your Honor, I have been in -- I have absolutely no

22 doubt that Your Honor's going to be able to parse issues of

23 Texas and New Mexico tort law if required.  But the

24 Pennsylvania choice of law provisions say that if the laws of

25 those states are similar to Pennsylvania the court will apply

1  Pennsylvania law.  And I'm very sure that the court can apply

2  Pennsylvania law.

3          But it doesn't matter, the court is capable of

4  applying any of these laws to this fact pattern as Your Honor

5  has said, many of these facts are not in dispute.  But that is

6  not a primary factor.  It is a factor.  The law identifies

7  primary factors and they are no basis to transfer this case.

8  Counsel also said with respect to the ATS claims, well, you

9  know, what we would have to do is prove all of these things and

10 there's a litany of things that -- that Counsel said.  I don't

11 know how much of the specifics of that I agree with.  But

12 generally speaking, we're not here to prove anything to them.

13 We are here to plead and our pleading doesn't require us to

14 prove a single thing.

15         We've established a right to proceed.  We will have

16 days that we need to prove things, that is not this day.  Anne,

17 anything on the ATS claim other than (indiscern.)?

18         MS. REDDY:  I just wanted to -- to add, Your Honor,

19 to as to private individuals, is the alien tort statute would

20 also limit that to aliens, so I don't think I mentioned that

21 before, but that would be a limitation.  And just to touch on

22 what -- what my -- Mr. Edlin had said, we went through the

23 elements.  The elements are set forth in the CAT.  There isn't

24 any kind of requirement that they have to be similar to other

25 cases where torture is completed.  We went through -- got to

1  meet each of these elements at the pleading stage in -- in

2  sufficient detail.  We haven't just -- it's not me up here

3  saying, hey this is torture because I say it's so.  We've gone

4  through why this meets the elements of torture and why it meets

5  the elements of these other crimes.  So, I would submit that

6  that's sufficient on the pleadings stage.  And that is fully

7  briefed in our papers.  Thank you, Your Honor.

8            THE COURT:  Thank you very much, Counselor.

9            MS. REDDY:  And we would like to brief the sovereign

10  immunity.  Thank you.

11            THE COURT:  Just -- certainly.

12            MR. EDLIN:  Having said that, Your Honor, I think

13  since we've all had our say I'd like to just thank you very

14  much for your time and your attention and your indulgence of

15  our extensive arguments here.  Thank you so much.

16            THE COURT:  Certainly.  I want to thank all of you.

17  I assume nobody has anything else.

18            MS. FINKELSTEIN:  We also want to thank Your Honor.

19            MR. ST. JOSEPH:  Thank you, Your Honor.

20            THE COURT:  I do want to thank, well, of course.  I

21  do want to thank all of you for the outstanding presentation

22  here.  Your written submissions were outstanding, but this

23  added a lot to those written submissions, so I very much

24  appreciate you putting the time and the effort into being here

25  today and presenting this.  I will take this under advisement.

1  I'll review it all again.  If you need any advice where you can

2  get some lunch, et cetera, just see my deputy here, Deputy

3  Fitzko.  But everyone have a great rest of the day and I thank

4  you very much.  Take care.

5           MR. EDLIN:  Thank you, Your Honor.

6           MR. ST. JOSEPH:  Thank you, Your Honor.

7           MS. FINKELSTEIN:  Thank you, Your Honor.

8           THE CLERK:  All rise.

9               (Court adjourned)

10

11              C E R T I F I C A T E

12

13     "I, Karen Wolfe, certify that the foregoing is a correct

14  transcript from the official electronic sound recording of the

15  proceedings in the above-entitled matter."

16

17

18  _Karen L. Wolfe_                    _7-20-22_

19      Signature                         Date

20

21

22

23

24

25