IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| C.D.A., minor child, and MR. A.,<br>his father; and E.A.Q.A., minor<br>child, and MR. Q., his father, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION NO. 21-469 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

**<u>MEMORANDUM OPINION</u>**

Smith, J.                                                                          March 28, 2023

This case involves four undocumented immigrants—two fathers and their respective minor sons—who have sued the federal government after being subjected to President Donald Trump's administration's zero-tolerance policy toward illegal border crossings.

According to the allegations in their amended complaint, the four plaintiffs journeyed in 2018 to the United States–Mexico border from their respective home countries—one father–son pair from Honduras and the other from Brazil—to seek asylum in the United States after being allegedly targeted by local gangs. The plaintiffs crossed the border in the late spring of 2018, at the peak of the Trump administration's zero-tolerance policy that mandated the prosecution of all illegal border crossings. The federal government detained the plaintiffs upon their arrival to the United States, charged the father plaintiffs for illegal entry, and subsequently separated the son plaintiffs from their fathers. During their weeks-long separations, the father plaintiffs were afforded minimal contact with their sons. All plaintiffs allege poor conditions throughout their detainments at multiple facilities, including freezing temperatures, lack of privacy, and sleep deprivation. Moreover, before reunification with their sons, the father plaintiffs claim that federal

employees attempted to coerce them into signing forms to relinquish their and their sons' rights to seek asylum as a condition of reunification. Following reunification, one pair of plaintiffs spent additional time at a family detention center in Pennsylvania at which they purportedly experienced poor conditions as well. All plaintiffs claim to have experienced severe emotional and psychological trauma—including physical manifestations of said trauma—during and following their time being detained and separated.

The plaintiffs brought this action against the federal government in February 2021, raising eight claims in total. Five of the claims—intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, abuse of process, and loss of consortium— are brought under the Federal Tort Claims Act ("FTCA"). The remaining three claims—torture, crime against humanity (persecution), and crime against humanity (inhumane acts)—are brought under the Alien Tort Statute ("ATS"). The federal government has now motioned for the court to dismiss the plaintiffs' claims, first raising the defense of federal sovereign immunity against all claims, and then asserting that, even if immunity does not exist here, the plaintiffs' factual allegations do not sufficiently support their claims. In the alternative, the federal government asks the court to sever the plaintiffs' claims and transfer them to more convenient fora. For the reasons laid out in this opinion, the court must properly dismiss the majority of the plaintiffs' claims. Nevertheless, the court finds no justification to grant the motions to sever and transfer.

Beginning with the motions to sever and transfer, the court finds that the plaintiffs have met the requirements for permissive joinder and that private and public interests weigh in favor of keeping the case within this forum. Turning to the motion to dismiss, the court finds federal sovereign immunity nonexistent in this case. For one, none of the FTCA exceptions raised by the federal government are applicable to the factual allegations here at this stage. Moreover, the

court finds an automatic determination of federal sovereign immunity from the plaintiffs' ATS claims inappropriate because the plaintiffs allege *jus cogens* violations. The court does, however, find that it must dismiss many of the plaintiffs' claims for lack of plausibility. Specifically, the court must dismiss all plaintiffs' claims of negligent infliction of emotional distress, negligence, loss of consortium, torture, and crimes against humanity, as the court finds that the plaintiffs cannot obtain relief for these claims under relevant state and international laws. The court must also dismiss Mr. Q. and E.A.Q.A.'s claims of abuse of process for the same reason.

The remainder of the federal government's motion to dismiss is denied. All plaintiffs can therefore proceed with their claims of intentional infliction of emotional distress, and Mr. A. and C.D.A. can also proceed with their claims of abuse of process.

## I.   PROCEDURAL HISTORY

The plaintiffs, C.D.A., Mr. A., E.A.Q.A., and Mr. Q., initiated this action by filing a complaint against the United States of America (hereinafter "Government") on February 1, 2021.[1] *See* Doc. No. 1. The complaint alleged that the plaintiffs—who are not United States citizens—suffered various traumas upon crossing the United States–Mexico border and entering the Government's custody. The complaint contained seven counts: (1) intentional infliction of emotional distress, (2) negligent infliction of emotional distress, (3) negligence, (4) loss of consortium, (5) torture, (6) crimes against humanity: persecution, and (7) crimes against humanity: inhumane acts. *See* Compl. at ¶¶ 151–89. The plaintiffs brought the first four counts under the Federal Tort Claims Act ("FTCA"),[2] and the latter three counts under the Alien Tort

---

[1] The court granted the plaintiffs permission to proceed in this matter under the pseudonyms "C.D.A.," "Mr. A.," "E.A.Q.A.," and "Mr. Q." *See* Doc. No. 12.

[2] Under the FTCA, plaintiffs have a right of action to bring forth

> claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances

Statute ("ATS").[3] *See id.* at ¶¶ 154, 160, 164, 168, 170, 175, 183. On April 26, 2021, the Government filed a motion to dismiss the complaint.[4] *See* Doc. No. 14.

On August 31, 2021, the parties jointly motioned for the court to hold the matter in abeyance for 60 days, *see* Doc No. 19, which the court granted. *See* Doc. No. 20. Three days later, the Government filed an unopposed motion to voluntarily withdraw its motion to dismiss, *see* Doc. No. 23, which the court granted. *See* Doc. No. 24. On October 29, 2021, the court approved a joint stipulated motion to extend the period of abeyance by an additional 60 days. *See* Doc. No. 26. Following the period of abeyance, the Government again filed a motion to dismiss the complaint. *See* Doc. No. 29.

Nevertheless, on January 28, 2022, the plaintiffs responded to the Government's motion to dismiss with an amended complaint, *see* Doc. No. 31, prompting the court to deny said motion as moot. *See* Doc. No. 32. The amended complaint—the operative complaint in this matter—contained the seven counts included in the original complaint, but also added an eighth count: abuse of process. *See* Am. Compl. at ¶¶ 170–74. On March 28, 2022, the Government filed its motion to dismiss the amended complaint, *see* Doc. No. 52, to which the plaintiffs filed a response in opposition on May 12, 2022.[5] Two weeks later, the Government filed a reply to the plaintiffs' response in opposition. *See* Doc. No. 56. On July 6, 2022, the court heard oral argument on the Government's motion to dismiss the amended complaint, which is now ripe for adjudication.

---

> where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Accordingly, federal courts can exercise jurisdiction over state law claims brought against the United States.

[3] Under the ATS, "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." *Id.* § 1350.

[4] The court had granted the Government a three-week extension on its deadline to respond to the original complaint. *See* Doc. No. 13.

[5] The court had granted extensions of time to the parties to file their respective briefs. *See* Doc. Nos. 35, 54.

## II.    FACTUAL ALLEGATIONS

The plaintiffs consist of two pairs of fathers and sons: Mr. A. is the father of C.D.A. and Mr. Q. is the father of E.A.Q.A. *See* Am. Compl. at ¶¶ 18, 20. Both C.D.A. and E.A.Q.A. were minors throughout the entirety of the facts alleged in the amended complaint. *See id.* at ¶¶ 19, 21. Mr. A. and C.D.A. are from Brazil whereas Mr. Q. and E.A.Q.A. are from Honduras. *See id.* at ¶¶ 18, 20. All plaintiffs entered the United States from the United States–Mexico border in late-spring 2018 to seek protection from persecution they faced in their respective home countries. *See id.* at ¶¶ 19–21. The plaintiffs' claims arise out of treatment they experienced upon arrival at the border, at which time they became subject to the "zero-tolerance" policy employed by President Donald Trump's administration between April 2018 and June 2018. *See id.* at ¶¶ 34, 69–73.

The Trump administration's zero-tolerance policy was a policy announced by then-Attorney General Jeff Sessions that mandated the detainment and prosecution of all individuals who illegally crossed into the United States. *See id.* at ¶ 34. The policy started as a pilot program in El Paso, Texas, but went into effect at all ports of entry beginning on April 6, 2018. *See id.* The policy often extended to individuals who were attempting to seek asylum in the United States and effectively resulted in the separation of thousands of children from their parents. *See id.* at ¶¶ 5, 34, 37. Detained parents would typically be transferred by United States Customs and Border Protection ("CBP") into United States Immigrant and Customs Enforcement ("ICE") custody. *See id.* at ¶ 53. The Government would then classify their children as "unaccompanied" and transfer them into the custody of the United States Department of Health and Human Services' Office of Refugee Resettlement ("ORR"), sometimes resulting in children being sent to

ORR facilities thousands of miles away from their detained parents.[6] *See id.* at ¶¶ 55–56. On June 20, 2018, President Trump signed an executive order ending the practice of family separation under his administration's zero-tolerance policy by directing the United States Department of Homeland Security—the department under which CBP operates—to "maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members." Exec. Order No. 13,841, sec. 3(a), 83 Fed. Reg. 29,435, 29,435 (June 25, 2018). On June 26, 2018, the United States District Court for the Southern District of California entered a mandatory preliminary injunction that ordered the Government to reunify families that were separated under the zero-tolerance policy. *See Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1149–50 (S.D. Cal. 2018).

While all plaintiffs were subject to the zero-tolerance policy, each went through different experiences during their respective times in detainment or federal custody. Accordingly, it is necessary to discuss separately the experiences of each father–son pair of plaintiffs, beginning first with Mr. A. and C.D.A. and then turning to Mr. Q. and E.A.Q.A.

## A.   Mr. A. and C.D.A.

Mr. A. and C.D.A. arrived at the United States–Mexico border on May 23, 2018, to seek asylum. *See* Am. Compl. at ¶ 86. Originating from Brazil, the two fled their home country out of fear that a particular criminal organization might punish them after Mr. A. failed to pay back an $8,000 loan to said organization. *See id.* at ¶ 85. Upon their arrival at the border, Mr. A. and C.D.A. were detained by CBP for two days. *See id.* at ¶¶ 86–87. They allege that the conditions

---

[6] Under federal law, "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3). Through this statutory provision, the Government decided to take custody of the children of individuals whom it detained under its zero-tolerance policy. *See* Mem. in Supp. of Mot. to Dismiss Pls.' Am. Compl. ("Def.'s Mem.") at 31, Doc. No. 52-1. Thus, the Trump administration's zero-tolerance policy became synonymously known as the "family separation" policy. *See* Am. Compl. at ¶ 1.

of their detainment during this time were very poor, with cold temperatures, little privacy, and lights on at all times. *See id.* at ¶ 87. On May 25, 2018, a guard named Victor Sandoval informed Mr. A. and C.D.A. that they would be separated for a "process" that would last no more than five days, but did not inform Mr. A. where CBP was taking C.D.A. *See id.* at ¶ 88. This separation was naturally distressing for both Mr. A. and C.D.A. *See id.* at ¶ 89.

Following separation, the Government charged Mr. A. with misdemeanor illegal entry pursuant to 8 U.S.C. § 1325 and kept him in ICE detention in New Mexico.[7] *See id.* at ¶ 94. At Mr. A.'s hearing, he allegedly received the choice of either accepting deportation to see C.D.A. again or receiving up to six months' detention. *See id.* Mr. A. decided to plead guilty to his misdemeanor, received time served, and returned to ICE detention, after which ICE transferred him to various facilities. *See id.* at ¶ 95. Mr. A. claims that the conditions in these facilities were poor, as he was forced to sleep on the floor and endure cold temperatures. *See id.*

During this time, the Government sent C.D.A. to an ORR facility in Chicago, Illinois. *See id.* at ¶ 90. C.D.A. could not speak to his father for over three weeks following their separation. *See id.* This separation allegedly caused C.D.A. to experience severe psychological trauma that manifested into thoughts of self-harm and harm to others. *See id.* at ¶¶ 91–92. Eventually, Mr. A. was permitted to speak over the phone with C.D.A., though they could only speak twice in total during their separation. *See id.* at ¶¶ 97–98.

---

[7] Section 1325's criminal sanctions provision reads as follows:

> Any alien who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) attempts to enter or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offense, be fined under Title 18 or imprisoned not more than 6 months, or both, and, for a subsequent commission of any such offense, be fined under Title 18, or imprisoned not more than 2 years, or both.

8 U.S.C. § 1325(a).

On June 20, 2018, C.D.A., along with another child, filed a lawsuit in the United States District Court for the Northern District of Illinois against federal government officials, alleging that his separation from Mr. A. violated substantive due process and that his placement in the ORR facility in Chicago violated the *Flores* Settlement Agreement.[8] *See id.* at ¶ 99. The district court ultimately ordered the reunification of Mr. A. and C.D.A. on July 9, 2018, given that Mr. A. was "no longer in criminal detention." *W.S.R. v. Sessions*, 318 F. Supp. 3d 1116, 1126 (N.D. Ill. 2018). Nevertheless, on July 12, 2018, employees at ICE's Chicago office allegedly conditioned Mr. A.'s reunification with his son on Mr. A. forfeiting C.D.A.'s right to seek asylum in the United States. *See id.* at ¶ 100. Specifically, ICE officers provided Mr. A. with a form titled "Separated Parent's Removal Form" that gave him the choice between repatriation to Brazil with C.D.A. or repatriation to Brazil without C.D.A. so that C.D.A. could remain in the United States to pursue asylum.[9] *See id.* The plaintiffs claim that the ICE employees who presented Mr. A. with this form were aware of the district court order requiring the reunification of Mr. A. and C.D.A. *See id.* at ¶ 101. Feeling coerced, Mr. A. signed the form and selected the option of reunification with C.D.A. and repatriation of both of them to Brazil, effectively signing away his and his son's abilities to seek asylum. *See id.* at ¶ 108.

---

[8] Dating back to 1997, the *Flores* Settlement Agreement "makes it an administrative responsibility to release children from detention without unnecessary delay to a parent or adult relative or licensed juvenile programs willing to accept custody." *The* Flores *Settlement*, IMMIGR. HIST., https://immigrationhistory.org/item/the-flores-settlement (last visited Mar. 24, 2023).

[9] The form used the following language to present this choice:

> *I am requesting to reunite with my child(ren) for the purpose of repatriation to my country of citizenship.*
> . . . .
> *I am affirmatively, knowingly, and voluntarily requesting to return to my country of citizenship without my minor child(ren) who I understand will remain in the United States to pursue available claims of relief.*

File:Separated Parent's Removal Form.pdf, WIKIMEDIA COMMONS, https://commons.wikimedia.org/wiki/File:Separated_Parent%27s_Removal_Form.pdf (last updated July 4, 2018). Detained parents had to choose between one of these two options. *See id.*

Following Mr. A.'s signing of the Separated Parent's Removal Form, Mr. A. and C.D.A. were reunited in ICE detention in Chicago—a full 47 days following their initial separation. *See id.* at ¶¶ 93, 109. The Government then transferred Mr. A. and C.D.A. to detention at the Berks County Residential Center ("BCRC")—a secure, unlicensed center for families—in Leesport, Pennsylvania. *See id.* at ¶¶ 109, 112. At BCRC, Mr. A. and C.D.A. were allegedly subjected to "prison-like schedules and procedures," as well as chronic sleep deprivation due to bed checks being conducted every 15 minutes at night. *See id.* at ¶¶ 112–13. These conditions purportedly caused Mr. A. and C.D.A. to experience physical and mental trauma. *See id.* at ¶ 120. The plaintiffs maintain that ICE dictated the conditions, staffed personnel, and kept an office at BCRC. *See id.* at ¶ 111.

While at BCRC, attorneys worked on behalf of Mr. A. and C.D.A. and requested a United States Citizenship and Immigration Services Asylum Office to intervene before Mr. A. and C.D.A. were repatriated to Brazil. *See id.* at ¶ 128. The Asylum Office eventually determined that Mr. A. and C.D.A. had a significant likelihood of establishing eligibility for asylum in an Immigration Court. *See id.* at ¶ 129. Accordingly, after spending 27 nights at BCRC, Mr. A. and C.D.A. were released from detention. *See id.* at ¶¶ 127, 129. Mr. A. and C.D.A. both remain traumatized from their experiences, and C.D.A. continues to suffer from behavioral problems that require psychotherapy. *See id.* at ¶ 134.

### B.  Mr. Q. and E.A.Q.A.

Mr. Q. and E.A.Q.A. arrived at the United States–Mexico border on June 7, 2018, to seek asylum. *See id.* at ¶ 137. Originating from Honduras, the two fled after Mr. Q. assisted a police investigation against local gangs, an act that placed him and his son at serious risk of death or other physical harm. *See id.* at ¶¶ 135–36. Upon their arrival at the border, Mr. Q. and E.A.Q.A.

were detained by CBP for two days. *See id.* at ¶ 138. Similar to Mr. A. and C.D.A., they allege that very poor conditions existed during their initial detainment, including freezing temperatures and lights being left on all night. *See id.* On June 9, 2018, an unnamed female guard took E.A.Q.A. away from Mr. Q., stating that Mr. Q. needed to complete a sentence for a federal conviction. *See id.* at ¶ 139. Mr. Q. received no information on where the Government intended to take E.A.Q.A. and became extremely distressed. *See id.* at ¶¶ 139–40.

After this separation, the Government detained Mr. Q. in federal custody in Texas and charged him with illegal reentry pursuant to 8 U.S.C. § 1326.[10] *See id.* at ¶ 144. Over the following weeks, the Government transferred Mr. Q. between multiple prisons and ICE detention centers. *See id.* During this same time, the Government moved E.A.Q.A. to an ORR facility in Brownsville, Texas. *See id.* at ¶ 143. E.A.Q.A. allegedly suffered severe psychological trauma while at the ORR facility due to his separation from Mr. Q. and feelings of isolation. *See id.* at ¶¶ 143, 149.

More than one month purportedly passed before Mr. Q. and E.A.Q.A. were permitted to speak over the phone.[11] *See id.* at ¶ 145. During this phone call, E.A.Q.A. expressed distress and

---

[10] Section 1326 provides in relevant part as follows:

[A]ny alien who—

(1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be fined under Title 18, or imprisoned not more than 2 years, or both.

8 U.S.C. § 1326(a).

[11] The plaintiffs allege that "[i]t was more than a month" following the June 9, 2018 separation "before Mr. Q. was able to finally speak with his son." Am. Compl. at ¶ 145. The plaintiffs then claim that "[i]t would be another month

asked why he could not be with Mr. Q. *See id.* at ¶ 146. Around this time, the Government allegedly attempted to coerce Mr. Q. into signing forms waiving the rights of E.A.Q.A. and himself, similar to Mr. A.'s experience with the Separated Parent's Removal Form. *See id.* at ¶¶ 100, 149. Nevertheless, Mr. Q. refused to sign any such forms. *See id.* at ¶ 149.

After 36 days of separation, the Government reunified Mr. Q. and E.A.Q.A. on July 15, 2018. *See id.* at ¶ 151. The Government released them from custody on July 18, 2018. *See id.* Both Mr. Q. and E.A.Q.A. supposedly suffered and continue to suffer from emotional and psychological trauma due to their separation, including stress, depression, anxiety, and intrusive flashbacks. *See id.* at ¶¶ 153–54.

### III.    DISCUSSION

The Government's motion to dismiss contains four arguments in favor of dismissing the plaintiffs' claims. Beginning with the plaintiffs' FTCA claims, the Government asserts that the court should dismiss such claims both for lack of subject-matter jurisdiction and because they are unsupported by applicable state law. *See* Def.'s Mem. at 17–45. Likewise, the Government argues that the court should dismiss the plaintiffs' ATS claims on account of its sovereign immunity and because they have not demonstrated that it violated the law of nations or a treaty of the United States that gives rise to a tort. *See id.* at 46–48; Reply in Supp. of Mot. to Dismiss Pls.' Am. Compl. ("Reply Br.") at 21, Doc. No. 56. In addition to its motion to dismiss, the Government also motions in the alternative for the court to sever the plaintiffs' claims and transfer them to more convenient fora. *See* Def.'s Mem. at 49–54. The court will analyze each of

---

before Mr. Q. would see his son again" following their phone call. *Id.* at ¶ 147. Nevertheless, the plaintiffs state that Mr. Q. and E.A.Q.A. were reunified on July 15, 2018. *See id.* at ¶ 151. Being that June 9th and July 15th are only 36 days apart, the plaintiffs' timeline regarding the amount of time between Mr. Q.'s and E.A.Q.A.'s separation and phone call and the amount of time between their phone call and reunification—both amounts the plaintiffs claim to be approximately one month—appears implausible. While these chronological inconsistencies bear little weight on the merits of the amended complaint, the court is obliged to make note of them.

these arguments, first addressing the motions to transfer and sever and then turning to the motion to dismiss the plaintiffs' FTCA and ATS claims.

## A.     Motion to Transfer

Plaintiffs bringing civil actions against the United States may do so in any judicial district in which "the plaintiff resides if no real property is involved in the action." 28 U.S.C. 1391(e)(1); *see also id.* § 1402(a)(1) ("Any civil action in a district court against the United States under [the FTCA] may be prosecuted only . . . in the judicial district where the plaintiff resides . . . ."). Venue is therefore proper in this case as the plaintiffs are residents of the Eastern District of Pennsylvania. *See* Am. Compl. at ¶ 17.[12] Nevertheless, the Government seeks to transfer venue under 28 U.S.C. § 1404 to a more convenient forum—namely to the Western District of Texas for Mr. Q. and E.A.Q.A.'s claims and the District of New Mexico for Mr. A. and C.D.A.'s claims. *See* Def.'s Mem. at 49. The Government argues that doing so would be "in the interest of justice." *See id.*; 28 U.S.C. § 1404(a).

When considering section 1404(a) motions for transfer to a more convenient forum, courts must consider both the parties' private interests and public interests. *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). The private interests include (1) "plaintiff's

---

[12] The Government questions whether the plaintiffs reside in Pennsylvania. *See* Def.'s Mem. at 51 ("The amended complaint does not clarify a connection between each of the four plaintiffs and Pennsylvania."); *id.* at 51 n.10 ("The undersigned is unaware where the plaintiffs reside or if they ever resided in this district. The amended complaint is completely devoid of any allegations about where the plaintiffs do reside or what their alleged connection is to this forum."). Although the court is concerned that the plaintiffs' allegation regarding their residence is conclusory, and notes that it is highly unusual to have plaintiffs, even when using identifiers for their names, not allege their residential addresses in a complaint (or amended complaint), the requirements of Rule 11 of the Federal Rules of Civil Procedure provide sufficient incentive for counsel to ensure that this representation is accurate. *See* Fed. R. Civ. P. 11(b) ("By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . **(3)** the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]"); Fed. R. Civ. P. 11(c) ("If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.").

forum preference as manifested in the original choice," (2) "the defendant's preference," (3) "whether the claim arose elsewhere," (4) "the convenience of the parties as indicated by their relative physical and financial condition," (5) "the convenience of the witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the fora," and (6) "the location of books and records." *Id.* The public interests include (1) "the enforceability of the judgment," (2) "practical considerations that could make the trial easy, expeditious, or inexpensive," (3) "the relative administrative difficulty in the two fora resulting from court congestion," (4) "the local interest in deciding local controversies at home," (5) "the public policies of the fora," and (6) "the familiarity of the trial judge with the applicable state law in diversity cases." *Id.* at 879–80.

Transfer "is not to be liberally granted" and should not occur "unless the balance of convenience of the parties is *strongly* in favor of defendant." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970) (emphasis added) (citations and internal quotation marks omitted). Accordingly, a defendant moving for a more convenient forum will not necessarily prevail even if a decent number of the *Jumara* factors weigh in their favor. Ultimately, upon applying each of the *Jumara* factors to the parties in this matter, the court finds that the factors weigh in the plaintiffs' favor. Accordingly, the court denies the Government's motion to transfer.

### 1.     Private Interests

#### a.     Plaintiffs' Forum Preference

To begin, the plaintiffs' forum preference clearly weighs in their favor. "It is black letter law that a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request." *Phila. Pro. Collections LLC v. Crawl Space Door Sys., Inc.*, No. 21-5476, 2022 WL 329563, at *1 (E.D. Pa. Feb. 3, 2022) (quoting *Jumara*, 55 F.3d at 879). This holds

especially true when "the plaintiff has chosen the home forum." *Doe v. Ritz Carlton Hotel Co.,*

*LLC*, 666 F. App'x 180, 182 (3d Cir. 2016) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235,

255 (1981)). Here, Mr. A., Mr. Q., and their respective sons have chosen their home forum—the

Eastern District of Pennsylvania—as their preferred forum. This decision "should not be lightly

disturbed." *Jumara*, 55 F.3d at 879 (citations and internal quotation marks omitted).

b.     Defendant's Forum Preference

The Government's preference to transfer to the Western District of Texas and District of

New Mexico is certainly a factor for the court to consider. *See Jumara*, 55 F.3d at 879.

Nevertheless, a defendant's choice of forum "is entitled to considerably less weight than" a

plaintiff's, "as the purpose of a venue transfer is not to shift inconvenience from one party to

another." *EVCO Tech. & Dev. Co. v. Precision Shooting Equip., Inc.*, 379 F. Supp. 2d 728, 730

(E.D. Pa. 2005). Overall, this second factor "generally does little more than frame the issue,

because there would be no motion to transfer *unless* the defendant prefers a different forum."

*Phila. Pro. Collections LLC*, 2022 WL 329563, at *2. Consequently, while this factor weighs in

the Government's favor, its weight is nowhere near that of the plaintiffs' forum preference.

c.     Where the Claim Arose

The locations of the plaintiffs' factual allegations, while geographically scattered

throughout the United States, are concentrated in Texas and New Mexico, thus weighing against

their forum choice. Specifically, Mr. A. and C.D.A. were separated in New Mexico and detained

in New Mexico, Illinois, and eventually Pennsylvania. *See* Am. Compl. at ¶¶ 85–129. Moreover,

Mr. Q. and E.A.Q.A. were separated in Texas and detained in Texas. *See id.* at ¶¶ 135–52.

Taking their factual allegations as true, then, only half of the plaintiffs—Mr. A. and C.D.A.—

experienced any potentially tortious conduct in Pennsylvania. Even then, such conduct represents

only a small portion of the total alleged misconduct that Mr. A. and C.D.A. collectively experienced across multiple states. This factor thus weighs in the Government's favor.

d.   Convenience of the Parties

While the Government may experience some inconveniences should the parties adjudicate the case in this district, this factor ultimately weighs in the plaintiffs' favor. Courts have found that "[u]nder . . . circumstances of significant disparity between the means of the parties, 'plaintiffs' choice of venue should be left undisturbed.'" *A.F.P. v. United States*, No. 21-cv-780, 2022 WL 2704570, at *6 (E.D. Cal. July 12, 2022) (alterations and internal quotation marks omitted) (quoting *Flores v. United States*, 142 F. Supp. 3d 279, 288 (E.D.N.Y. 2015)). Here, the Government contends that because most of the alleged conduct occurred in Texas and New Mexico, it would be difficult to engage in fact discovery, conduct depositions, and gather relevant witnesses all while managing the case in Pennsylvania. *See* Reply Br. at 29–30. There is, in all fairness, no doubt that transferring this case to the Government's desire fora would lessen these burdens.

At the same time, section 1404(a) does not exist to "merely shift the burden from the government to plaintiffs of limited means." *A.F.P.*, 2022 WL 2704570, at *6; *see also EVCO Tech. & Dev. Co.*, 379 F. Supp. 2d at 730 ("[T]he purpose of a venue transfer is not to shift inconvenience from one party to another."). The plaintiffs in this case are indigent, *see* Mem. in Opp'n to Mot. to Dismiss Pls.' Am. Compl. ("Opp'n Br.") at 36, Doc. No. 55, meaning they would endure significant financial hardship should this court transfer this case to districts thousands of miles away from their domiciles. Meanwhile, the Government undoubtedly has enough resources to handle this case in eastern Pennsylvania rather than the American Southwest. Overall, this factor weighs more in the plaintiffs' favor.

e.    Convenience of the Witnesses

Regarding the fifth factor, although both parties raise valid arguments as to the extent to which conducting this case in this district would inconvenience nonparty witnesses, ultimately, there is no clear victor. "[T]he convenience of witnesses" is "perhaps the most important factor" when considering section 1404(a) motions. *Headon v. Colo. Boys Ranch*, No. Civ.A. 204CV4847, 2005 WL 1126962, at *7 (E.D. Pa. May 5, 2005). That being said, the convenience of witnesses is only a factor insofar as "the witnesses may actually be unavailable for trial in one of the fora." *Jumara*, 55 F.3d at 879.

To support its argument for transfer, the Government notes that most of the nonparty witnesses will be in New Mexico and Texas, given the locations of the factual allegations. *See* Def.'s Mem. at 51. Thus, any depositions of these witnesses would need to be held in those states, and any witnesses testifying at trial would need to travel far to do so. The Government also claims that many of these witnesses would be contractors rather than federal employees. *See* Reply Br. at 30. Accordingly, even though the Government "is obligated to procure the attendance of its own employees for trial," *Coppola v. Ferrellgas, Inc.*, 250 F.R.D. 195, 199 (E.D. Pa. 2008), rendering the convenience of federal employee witnesses a nonfactor, many contractor witnesses could experience significant burdens in having to travel to Pennsylvania for trial. Finally, and relatedly, the Government highlights that said contractor witnesses would fall outside the subpoena power of this court. *See* Fed. R. Civ. P. 45(c)(1)(A) ("A subpoena may command a person to attend a trial, hearing, or deposition only as follows: . . . within 100 miles of where the person resides, is employed, or regularly transacts business in person . . . .").

In response, the plaintiffs underscore how the Government has failed to identify which witnesses are contractors and therefore outside the subpoena power of the court. *See* Opp'n Br. at

36. In such instances, courts have cautioned against weighing this factor in favor of the movant. *See, e.g.*, *Superior Precast, Inc. v. Safeco Ins. Co. of Am.*, 71 F. Supp. 2d 438, 447 (E.D. Pa. 1999) ("Nor has [the movant] met its burden of identifying which particular witnesses will benefit from transfer, which it can do by naming witnesses, showing the nature and the materiality of their testimony, and indicating the hardships they would suffer having to testify in this district."). Furthermore, they assert that at least *some* contractors would fall within this court's subpoena power, namely the contractors who worked at BCRC. *See* Am. Compl. at ¶¶ 109–17.

Both parties make significant arguments in their favor. Ultimately, it is true that contractor witnesses—aside from those working at BCRC[13]—would very likely not be subpoenable in this case. At the same time, many relevant witnesses are likely federal employees, whose capabilities of being subpoenaed and traveling to testify are not in question. Additionally, to the extent that other nonparty witnesses may worry about traveling to provide testimony, the parties "can utilize videotaped depositions in lieu of live testimony, or arrange for live testimony by video, lessening the burden on the witnesses." *Flores*, 142 F. Supp. 3d at 288 (citation omitted). Consequently, upon considering the merits of both parties' arguments, neither seem to prevail as the clear winner within this factor. As such, this factor is neutral.

f.   <u>Location of Books and Records</u>

This final private factor weighs in the Government's favor, though is largely irrelevant. "[I]n this current electronic age, it is difficult to imagine that . . . files cannot be produced in either forum." *Solve Together, LLC*, 2022 WL 5125087, at *6 (quoting *SalandStacy Corp. v.*

---

[13] The court notes that the Government closed down BCRC on January 31, 2023, well after the briefing and oral argument in this case. *See* Karen Shuey & David Mekeel, *Federal Government to Close Berks County Residential Center for Migrants*, Reading Eagle (Nov. 30, 2022), https://www.readingeagle.com/2022/11/30/federal-government-to-close-berks-county-residential-center. Should this closing bear any weight on the court's analysis today, the Government can raise such concerns at the summary judgment stage.

*Freeney*, No. 11-3439, 2012 WL 5451522, at *6 (D.N.J. Nov. 5, 2012)); *see also Phila. Pro. Collections LLC*, 2022 WL 329563, at *2 ("This factor has lost much of its significance in modern litigation, where few . . . entities retain physical archives of records."). Bearing this in mind, while the documents pertaining to the plaintiffs' detentions may be in New Mexico and Texas, *see* Reply Br. at 29, there is little reason to believe that the Government could not produce electronic versions of these documents for discovery purposes.

\*   \*   \*

On the whole, the private interest factors weigh slightly in the plaintiffs' favor. While the government prevails on three of the factors—defendant's forum preference, where the claim arose, and location of books and records—these factors are among the less important private ones. Meanwhile, one of the more important factors—convenience of the witnesses—is a wash from the court's perspective. Thus, the court's private interest analysis turns on the plaintiffs' forum preference and the convenience of the parties, both of which favor the plaintiffs and the former of which is "a paramount consideration" for the court. *Phila. Pro. Collections LLC*, 2022 WL 329563, at *1 (quoting *Jumara*, 55 F.3d at 879). Because the plaintiffs' forum preference is this district, and because they would be much more inconvenienced having to litigate this case in Texas and New Mexico than the Government would be in litigating this case in this district, the private interest factors ultimately lean against transfer. Next, the court examines the public interest factors.

### 2.    Public Interests

The public interest factors also weigh in the plaintiffs' favor. To begin, there is no reason to believe that this court's judgment in this matter would be any less enforceable than if it were transferred to the Government's desired venues. *See Jumara*, 55 F.3d at 879. Nor is there reason

to believe that this court is significantly more congested than the District of New Mexico and the Western District of Texas.[14] *See id.* Perhaps coordinating this matter would be easier and less expensive if moved to those districts; at the same time, transfer would certainly delay its expedient resolution, *see id.*, especially given that the plaintiffs commenced this action slightly more than two years ago. Accordingly, the first three public interest factors weigh against the Government.

Regarding local interests, the plaintiffs are alleging misconduct by the *federal* government in its application of *federal* immigration policy toward them. The plaintiffs "were apprehended by federal officers, held in federal detention centers, and allege mistreatment by federal officers." *A.F.P.*, 2022 WL 2704570, at *8. "Immigration, and the treatment of those who have entered the United States without inspection is a matter of national concern." *Alvarado v. United States*, No. 16-5028, 2017 WL 2303758, at *8 (D.N.J. May 25, 2017). Thus, while Texas and New Mexico may have respective interests in deciding cases regarding crossings at the United States–Mexico border, *see* Reply Br. at 30, these interests are not solely of a local nature. Furthermore, the Government claims neither in its motion to dismiss nor reply brief that Texas or New Mexico "ha[ve] any public policies relevant to this analysis." *Solve Together, LLC*, 2022 WL 5125087, at *8. The fourth and fifth public interest factors therefore weigh against the Government as well.

Finally, the sixth public interest factor—the familiarity of the trial judge with applicable state law—is not strong enough for the Government to overcome the five preceding factors. Both parties agree that Texas law should apply to the state law claims of Mr. Q. and E.A.Q.A. *See*

---

[14] In fact, as of June 30, 2022, the Western District of Texas had 841 pending cases per judgeship and the District of New Mexico had 462 pending cases per judgeship, whereas the Eastern District of Pennsylvania had 429 pending cases per judgeship. *See* UNITED STATES DISTRICT COURTS—NATIONAL JUDICIAL CASELOAD PROFILE (2022), https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0630.2022_0.pdf.

Opp'n Br. at 56; Reply Br. at 14. Consequently, the Western District of Texas is almost assuredly better equipped to handle those claims, simply by having heard more cases dealing with Texas law than this court. Nevertheless, the parties disagree over which state's laws should apply to the state law claims as pertaining to Mr. A. and C.D.A., with New Mexico, Illinois, and Pennsylvania each being a potential candidate. *See* Opp'n Br. at 56–70; Reply Br. at 15. Having yet to conduct a choice-of-law analysis, *see infra* at p. 42–43, it is impossible for this court to determine which forum would be more familiar with the applicable state law regarding Mr. A. and C.D.A. Even if the answer were New Mexico law, however, "[t]his court can certainly ascertain [New Mexico] law with the assistance of counsel." *A.F.P.*, 2022 WL 2704570, at *8; *see also Prudential Sec. Inc. v. Norcom Dev., Inc.*, No. 97 Civ. 6308, 1998 WL 397889, at *6 (S.D.N.Y. July 16, 1998) ("[F]ederal courts are deemed capable of applying the substantive law of other states."). The same goes for Texas law, too. Consequently, this court's potential unfamiliarity with the applicable state laws in this case is insufficient to favor the Government's motion for transfer.

In sum, both the private interest and public interest factors weigh in the plaintiffs' favor. The court must therefore deny the Government's motion to transfer to more convenient fora.

### B.   Motion to Sever

Under Rule 20(a) of the Federal Rules of Civil Procedure, persons may join in one action as plaintiffs if (1) "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences," and (2) "any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1). If joined plaintiffs do not meet these requirements, a court has

the power under Rule 21 to sever the plaintiffs. *See* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.").

Within the federal court system, "joinder is strongly encouraged." *Cooper v. Fitzgerald*, 266 F.R.D. 86, 88 (E.D. Pa. 2010) (citing *Hagan v. Rogers*, 570 F.3d 146, 152 (3d Cir. 2009)). Specifically, Rule 20(a) exists to "promote trial convenience and expedite the final determination of disputes, thereby preventing multiple law suits [sic]." *Id.* (quoting *Al Daraji v. Monica*, No. 07-1749, 2007 WL 2994608, at *10 (E.D. Pa. Oct. 21, 2007)). In other words, courts will typically favor joinder to promote judicial efficiency. Accordingly, "[u]nder the Rules, the impulse is toward entertaining the *broadest* possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *Russell v. Chesapeake Appalachia, L.L.C.*, 305 F.R.D. 78, 81 (M.D. Pa. 2015) (emphasis added) (quoting *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974)).

The Government moves to sever the plaintiffs' action into two separate matters, one with Mr. A. and C.D.A. and the other with Mr. Q. and E.A.Q.A. *See* Def.'s Mem. at 54. Nevertheless, the court finds that the plaintiffs have met both elements of Rule 20(a). Accordingly, severance of the plaintiffs' claims is not warranted here.

### 1.     Same Transaction

Beginning with the "same transaction" element of Rule 20(a), the plaintiffs need to demonstrate a "similarity in the factual background of the relevant claims." *Zuzel v. SEPTA*, No. 19-268, 2019 WL 1584598, at *2 (E.D. Pa. Apr. 11, 2019) (quoting *Cooper*, 266 F.D.R. at 88). Other judges within this district have interpreted "transaction" quite flexibly to mean "a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Id.* (quoting *Miller v. Hygrade Food Prods. Corp.*, 202 F.R.D. 142,

144 (E.D. Pa. 2001)). Indeed, so long as Mr. A., Mr. Q., and their respective sons establish a "systematic pattern" between the alleged tortious events that occurred as a result of their detentions and separations, they will satisfy the "series of transactions or occurrences" element. *Chruby v. Bearjar*, No. 17-cv-1631, 2018 WL 4051705, at *15 (M.D. Pa. Aug. 24, 2018) (quoting *Russell*, 305 F.R.D. at 81).

Here, the plaintiffs have satisfied this element, though it is admittedly a close call. According to the factual allegations, CBP seized all plaintiffs on the United States–Mexico border around mid-2018 after plaintiffs tried to seek asylum. *See* Am. Compl. at ¶¶ 86, 137–38. The Government then subjected all plaintiffs to the same zero-tolerance policy. *See* Opp'n Br. at 39. Following separation, C.D.A. and E.A.Q.A. were both kept in ORR facilities. *See* Am. Compl. at ¶¶ 90, 142. During these respective separations, the Government retained both Mr. A. and Mr. Q. in ICE detention. *See id.* at ¶¶ 94–95, 144. Moreover, federal agents attempted to have both Mr. A. and Mr. Q. sign away their and their sons' rights to seek asylum. *Id.* at ¶¶ 100, 149. These similarities in factual allegations are collectively significant enough to display a "systematic pattern" on behalf of the government. *See Chruby*, 2018 WL 4051705, at *15 (quoting *Russell*, 305 F.R.D. at 81).

To be sure, the Government points to many factual distinctions between the two sets of plaintiffs. For one, each set was detained and separated in different states—New Mexico and Texas—on different dates. *See* Reply Br. at 24. C.D.A. and E.A.Q.A. were also kept in ORR facilities in different states: Illinois and Texas. *Id.* Furthermore, the Government charged Mr. A. and Mr. Q. under different statutory provisions, the former for improper entry and the latter for improper reentry. *Id.* Finally, Mr. A. and C.D.A. resided in a detention facility post-reunification whereas Mr. Q. and E.A.Q.A. did not. *Id.*

These differences, however, are not substantial enough to undermine the like actions taken by the Government against all the plaintiffs. As already noted, the same federal agency detained both pairs of father–son plaintiffs while crossing the same international border, separated the plaintiffs under the same policy, kept the son plaintiffs in ORR facilities, and subjected the father plaintiffs to similar practices. The factual distinctions raised by the Government do not undo these crucial factual similarities that form the foundations of the alleged tortious conduct. By way of comparison, district courts and courts of appeal have routinely permitted the joinder of multiple plaintiffs suing for wrongful discharge under their employer's company-wide policies, despite the plaintiffs having held different positions and been discharged at different times. *See, e.g.*, *Klimaski v. Parexel Int'l*, No. Civ.A. 05-298, 2005 WL 857350, at *3 (E.D. Pa. Apr. 4, 2005); *Miller*, 202 F.R.D. at 144; *Mosley*, 497 F.2d at 1333–34. So long as the Government's conduct against each plaintiff stems from the same policies—e.g., zero tolerance—more specific factual distinctions will not disturb the "logical relationship . . . between the claims of multiple plaintiffs." *Klimaski*, 2005 WL 857350, at *3. Consequently, the plaintiffs in this case satisfy the first element of Rule 20(a).

### 2.    Common Question of Law or Fact

The second element also favors the plaintiffs here, and more clearly so. "Persons may join in one action as plaintiffs if . . . *any* question of law *or* fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1)(B) (emphases added). The Government contends that because different sets of state law will apply to the two pairs of father–son plaintiffs under their FTCA claims, there is no common question of law. *See* Reply Br. at 25. Nevertheless, while different state laws may apply to different plaintiffs in this case, many of the state tort claims raised in the complaint have essentially the same elements across all relevant states, such as

intentional infliction of emotional distress and negligence. *See infra* pp. 44–46, 48–50. Furthermore, the defendant completely ignores the plaintiffs' ATS claims, which are premised for both pairs of father–son plaintiffs upon "the law of nations or a treaty of the United States." 28 U.S.C. § 1350. In other words, regardless of the geographical distinctions between the detentions and separations of the plaintiffs, the questions of law for their ATS claims remain common in that they arise from the same body of international law and the elements of torture and crimes against humanity are the same regardless of whether someone is detained in Texas or New Mexico. Finally, even if there were no common questions of law, there are certainly common questions of fact present here: For example, all plaintiffs raise questions of their conditions and treatment in CBP and ICE detention. Thus, the second element of Rule 20(a) appears quite satisfied in this case.

*   *   *

Overall, with both elements of Rule 20(a) met here, the court denies the Government's motion to sever the claims of Mr. A. and C.D.A. from those of Mr. Q. and E.A.Q.A. While the Government raises fair arguments in its favor, the law requires courts to apply Rule 20(a) liberally and only rule against permissive joinder when the underlying legal claims and factual issues between multiple plaintiffs are so divergent that no logical relationship can be found. *See Klimaski*, 2005 WL 857350, at *3. Furthermore, the court must also consider judicial economy. *See Cooper*, 266 F.R.D. at 88 (noting that Rule 20(a) exists to "promote trial convenience and expedite the final determination of disputes"). Severing these claims would only further prolong a case that was filed over two years ago. The court must therefore deny the government's request to sever.

### C.    Motion to Dismiss

The Government moves to dismiss the plaintiffs' claims both on account of its federal sovereign immunity and because it asserts that their factual allegations do not support their claims under the FTCA and ATS. Accordingly, the court evaluates the Government's motion as both a Rule 12(b)(1) motion to dismiss for "lack of subject-matter jurisdiction" and a Rule 12(b)(6) motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(1), (6); *see also Ramsey v. U.S. Gov't, Veterans Affs. (LVAMC)*, No. 17-cv-631, 2018 WL 8581806, at *2 (M.D. Pa. July 11, 2018) (stating that existence of federal sovereign immunity results in lack of subject-matter jurisdiction). The court will first examine the Government's Rule 12(b)(1) arguments and then analyze its Rule 12(b)(6) arguments.

### 1.    Rule 12(b)(1)—Lack of Subject-Matter Jurisdiction

"[T]he United States enjoys sovereign immunity from suits and, accordingly, may be sued only if it has waived that immunity." *Beneficial Consumer Disc. Co. v. Poltonowicz*, 47 F.3d 91, 93–94 (3d Cir. 1995). "Waivers of federal sovereign immunity must be unequivocally expressed in the statutory text and any such waiver must be strictly construed in favor of the United States." *Id.* at 94 (alterations and internal quotation marks omitted). As of today, Congress has implemented three major statutory waivers of sovereign immunity: the FTCA, the Tucker Act, and the Administrative Procedure Act ("APA").[15] *See* Sarah L. Brinton, *Three-Dimensional Sovereign Immunity*, 54 Santa Clara L. Rev. 237, 249 (2014). Thus, a suit against

---

[15] The Tucker Act grants the United States Court of Federal Claims jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The APA grants federal courts jurisdiction over actions "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702.

the United States must usually fall within the parameters of these three statutory waivers for a federal court to have jurisdiction over it.[16]

Here, the Government asserts sovereign immunity against both the FTCA claims and ATS claims of the plaintiffs, though under different theories. Regarding the plaintiffs' FTCA claims, the Government recognizes the FTCA as a limited waiver of federal sovereign immunity, but argues that exceptions to said waiver apply in this case. *See* Def.'s Mem. at 17–18. On the other hand, when it comes to the plaintiffs' ATS claims, the Government maintains that there has been no statutory waiver of federal sovereign immunity that permits suits against the United States. *See* Reply Br. at 21. For the reasons stated below, the court finds neither argument convincing.

a.   <u>Standard of Review</u>

Federal Rule of Civil Procedure 12(b)(1) permits courts to dismiss claims for want of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). Rule 12(b)(1) serves as the proper means by which to challenge the propriety of federal jurisdiction by reason of federal sovereign immunity. *See Ramsey*, 2018 WL 8581806, at *2 (addressing federal agency's sovereign immunity argument in support of dismissal under Rule 12(b)(1)). A challenge to subject-matter jurisdiction under Rule 12(b)(1) may take two forms: a facial attack or a factual challenge. *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007) (citing *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000)). A Rule 12(b)(1) motion asserting federal sovereign immunity is properly treated as a facial challenge. *See, e.g., Charles v. Fed. Bureau of Prisons*, No. 20-cv-217, 2021 WL 3421273, at *1 (S.D. Ohio Aug. 4, 2021) (addressing Federal Bureau of Prisons' motion to dismiss under Rule 12(b)(1) based on

---

[16] There are, of course, other, lesser-used statutory waivers. *See, e.g.,* 28 U.S.C. § 1498(a) (granting jurisdiction to United States Court of Federal Claims over cases brought by patent owners against United States for unauthorized use of their patents).

sovereign immunity as facial challenge). When considering a facial challenge, the court "must consider the allegations of the complaint as true." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Moreover, the court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs.*, 220 F.3d at 176.

b.   FTCA Claims

The FTCA states that "[t]he United States shall be liable" for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Federal courts "have exclusive jurisdiction of civil actions" raising such claims. 28 U.S.C. § 1346(b)(1). The FTCA therefore acts as an express statutory waiver of sovereign immunity that is needed for an individual to sue the United States. *See Beneficial Consumer Disc. Co.*, 47 F.3d at 94. Nevertheless, the FTCA is not without its exceptions. *See, e.g.*, 28 U.S.C. § 2680 (listing statutory exceptions to FTCA). Should an exception apply, waiver of federal sovereign immunity would no longer exist, and a court would lose its subject-matter jurisdiction over the case before it. Here, the Government points to five FTCA exceptions that it believes invalidates the court's jurisdiction over the plaintiffs' claims: (1) the discretionary function exception, (2) the due care exception, (3) the private analog exception, (4) the systemic claims exception, and (5) the independent contractor exception. *See* Def.'s Mem. at 18–35. The court, however, finds none of these exceptions applicable to this case.

i.   *Discretionary Function Exception*

The first exception raised by the Government is the discretionary function exception. Under this exception, courts lack jurisdiction over any FTCA claim that is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on

the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). In other words, if a government employee had discretion over their actions that resulted in allegedly tortious conduct, a plaintiff may not bring a suit against the United States under the FTCA for said conduct.

The court conducts a two-step inquiry for determining whether to apply the discretionary function exception to an FTCA claim. First, the "court must determine whether the act giving rise to the alleged injury and thus the suit involve[d] an 'element of judgment or choice.'" *Merando v. United States*, 517 F.3d 160, 164 (3d Cir. 2008) (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). "If a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' the exception does not apply because 'the employee has no rightful option but to adhere to the directive.'" *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 333 (3d Cir. 2012) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). If, however, "a specific course of action is not prescribed, [the court] proceed[s] to the second step, which requires [the court] to determine whether the challenged action or inaction is of the kind that the discretionary function exception was designed to shield." *Id.* (citation and internal quotation marks omitted).

It is unnecessary here to go beyond the first step of this inquiry, as the Government's alleged conduct did not involve an element of judgment or choice. All actions taken against the plaintiffs as described in their amended complaint—their respective separations, prosecutions, detentions, presentations of right-waiving forms, and so on—stem from the Trump administration's zero-tolerance policy. Indeed, then-Attorney General Sessions "prescribe[d] a course of action for [federal] employee[s] to follow" when he issued an official memorandum on April 8, 2018 "direct[ing] each United States Attorney's Office along the Southwest Border . . .

to adopt immediately a zero-tolerance policy for all offenses referred for prosecution" pertaining to illegal entry into the United States. Memorandum from the U.S. Dep't of Just., Off. of the Att'y Gen., Memorandum for Federal Prosecutors Along the Southwest Border (Apr. 6, 2018), https://www.justice.gov/opa/press-release/file/1049751/download. The memorandum further directed that "[t]his zero-tolerance policy shall supersede any existing policies." *Id.* Given the nature of this policy, the court must agree with the conclusions reached by other district courts handling similar cases that "the front-line employees tasked with implementing the [zero-tolerance] policy did not reasonably have any element of choice." *Wilbur P.G. v. United States*, No. 21-cv-4457, 2022 WL 3024319, at *4 (N.D. Cal. May 10, 2022); *see also A.P.F. v. United States*, 492 F. Supp. 3d 989, 996–97 (D. Ariz. 2020) (rejecting Government's discretionary function exception because plaintiffs plausibly alleged constitutional violations); *D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 590–97 (S.D.N.Y. 2022) (same); *Nunez Euceda v. United States*, No. 20-cv-10793, 2021 WL 4895748, at *3 (C.D. Cal. Apr. 27, 2021) (same).

The Government's argument that prosecutorial discretion still existed under the zero-tolerance policy is unswaying. *See* Def.'s Mem. at 21–23. While prosecutors are typically afforded an abundance of choice in their decisions, the Attorney General had explicitly directed the United States Attorney's Offices at the United States–Mexico border to prosecute *all* instances of illegal entry. To be sure, the United States Attorneys could have ignored the policy, in the same way that any federal employee could technically ignore any regulations to which they are subject. That is called noncompliance though, not discretion. Applying the discretionary function exception to such scenarios would effectively render the FTCA meaningless. Equally unconvincing are the Government's arguments that discretion existed in the actions of detaining and separating the plaintiffs and subjecting them to subpar conditions in their respective

detention facilities. *See id.* at 23–27. Perhaps the discretionary function exception could provide coverage for each of these actions in a vacuum. These actions, nevertheless, all ultimately emanated from the Government's zero-tolerance policy and were therefore all part of the "course of action" prescribed by the policy. *S.R.P.*, 676 F.3d at 333 (quoting *Berkovitz*, 486 U.S. at 536); *see also A.P.F.*, 492 F. Supp. 3d at 996–97 ("Allegations related to conditions of confinement[,] . . . treatment of Plaintiff Children during and after the separations . . . , and the government's tracking system . . . are factual allegations primarily aimed at demonstrating the harm resulting from the separations.").

Based on these findings, the court need not move to step two of the discretionary function inquiry.[17] The discretionary function exception does not preclude this court from exercising subject-matter jurisdiction over the plaintiffs' FTCA claims.

### ii.    Due Care Exception

As an alternative to the discretionary function exception, the Government argues that the court cannot hear the plaintiffs' FTCA claims because of the due care exception. The due care exception applies in instances in which tort claims raised by a plaintiff are "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a). The Fourth Circuit Court of Appeals has developed the leading test for running a due care analysis, known as the *Welch* test. *See A.F.P.*, 2022 WL 2704570, at *14. First, the court must "determine whether the statute or regulation in question specifically pr[e]scribes a course of action for an officer to follow." *Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005). Second, "if a

---

[17] If the court were to have reached step two, it still would have likely found in favor of the plaintiffs. In performing a step-two analysis, courts must consider that the discretionary function exception "protects only governmental actions and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 323. Because many of the actions taken by Government employees against the plaintiffs were seemingly done so out of a sense of obligation to uphold and conform with immigration laws, it appears that public policy had not been much of a consideration.

specific action is mandated, [the court] inquire[s] as to whether the officer exercised due care in following the dictates of that statute or regulation. If due care was exercised, sovereign immunity has not been waived." *Id.*

Once again, the court's analysis need not go further than step one. Here, there was no "statute or regulation . . . pr[e]scrib[ing] a course of action" for the CBP and ICE employees described in the amended complaint regarding their actions taken that resulted in the alleged tortious conduct. *See id.* Rather, the employees were conforming with the Trump administration's zero-tolerance *policy*, which is neither a statute nor a regulation.[18] *See D.J.C.V.*, 605 F. Supp. 3d at 597–98 ("[T]he [due care exception] covers only actions taken pursuant to a 'statute or regulation.' . . . Accordingly, the suit is not barred by this exception." (quoting 28 U.S.C. § 2680(a))); *Wilbur P.G.*, 2022 WL 3024319, at *5 ("[T]he separations were conducted pursuant to executive policy, not pursuant to any statute or regulation; such actions are not shielded by the due care exception." (quoting *Nunez Euceda*, 2021 WL 4895748, at *4)). While some of the employees' actions in this case may have been taken pursuant to statutory authority, the court must assess these actions within their full context. For example, the Government is correct that federal agencies are statutorily obligated to transfer custody of unaccompanied alien children to the Secretary of Health and Human Services, i.e., an ORR facility. *See* 8 U.S.C. § 1232(b)(3). Nevertheless, in the present case, C.D.A. and E.A.Q.A. were unaccompanied only because of the Government's fulfillment of its zero-tolerance policy by detaining Mr. A. and Mr. Q. *See Wilbur P.G.*, 2022 WL 3024319, at *5 ("In this instance, the unavailability of the parents was due to them being detained for immigration proceedings or prosecution."). The Government

---

[18] While courts have long construed executive orders as regulations, *see, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 577 (D.D.C. 1952), the zero-tolerance policy was issued via memorandum from the Attorney General's office. *See* Memorandum for Federal Prosecutors Along the Southwest Border, *supra* p. 29. This memorandum does not rise to the level of a regulation.

asks the court to miss the forest for the trees. This cannot be done here. The court instead concludes that the due care exception does not apply to the plaintiffs' FTCA claims.[19]

### iii.   Private Analogs

The Government asserts that the court must dismiss the plaintiffs' FTCA claims because they have no private analog. The FTCA's waiver of sovereign immunity is limited to "circumstances in which the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *Lomando v. United States*, 667 F.3d 363, 372 (3d Cir. 2011). To satisfy the private analog requirement, a plaintiff does not need to demonstrate that the United States had been under the exact "same circumstances" of that of a private person in committing its allegedly tortious conduct—only that it had been under "like circumstances." *United States v. Olson*, 546 U.S. 43, 46 (2005) (emphases omitted) (quoting 28 U.S.C. § 2674). If the court finds no private analog to a particular FTCA claim, the court must dismiss that claim.

At the outset, the court is not persuaded by the Government's argument that "[b]ecause only the federal government has the authority to enforce federal criminal and immigration laws and make detention determinations, there is no private-person analog[] that would support a claim under the FTCA." Def.'s Mem. at 33. "To say that the challenged action is one that only the federal government does in fact perform does not necessarily mean that no private analog[] exists." *Liranzo v. United States*, 690 F.3d 78, 94 (2d Cir. 2012). To find otherwise would effectively immunize whole swaths of governmental functions from FTCA claims. Indeed, nothing in the FTCA's text suggests that private persons must be able to engage in the same

---

[19] Even if the court were to consider step two, it seems impossible to find one way or the other whether the Government employees discussed in the amended complaint "exercised due care" in the execution of any statute or regulation they purport to follow. *See Welch*, 409 F.3d at 652. The court would need a more-developed factual record to answer the question, meaning the Government's due care exception argument would likely fail on step two if the court were to reach it at this motion to dismiss stage.

activities of the Government for a plaintiff to bring a claim. Instead, the statutory language uses the word "if," 28 U.S.C. § 1346(b)(1), suggesting a more hypothetical nature to the private analog requirement: Yes, a private person cannot literally enforce federal immigration laws, but what *if* they could and behaved in a like manner to that of the Government in the case before the court? Could that person be held liable under a particular state law? That is the question for the court when conducting a private analog analysis.

Interestingly, the private analog requirement requires the court to engage in a somewhat circular analysis, in that the court cannot adequately ascertain whether there exists a state law under which a private person could be held liable for the Government's actions unless the court conducts an analysis of the plaintiffs' claims on the merits. *See, e.g.*, *D.J.C.V.*, 605 F. Supp. at 600–02 (discussing whether complaint properly alleged intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence under New York law to ascertain whether plaintiffs satisfied private analog requirement). Furthermore, the court must know which state law applies to the plaintiffs' claims before fully knowing whether a private analog exists. *See* 28 U.S.C. § 1346(b)(1) (requiring court reviewing FTCA claim to identify "the law of the place where the act or omission occurred"). This presents an issue because, as the court states later in this opinion, it is impossible to conduct a proper choice-of-law analysis at the moment without developing a more comprehensive factual record. *See infra* p. 42–43.

All this is to say that the court cannot perform a full private analog analysis at this stage. To the extent that the court does not believe that any private analog exists under any of the laws of the relevant states—Texas, New Mexico, Illinois, or Pennsylvania—for a particular FTCA claim raised by the plaintiffs, the court will address and dismiss those claims in the Rule 12(b)(6) analysis below. Nevertheless, for those claims that do survive the court's Rule 12(b)(6) analysis,

the court must hold off on concluding whether a private analog exists until the court renders a decision on choice of law after the factual record is developed.

iv.        *Systemic Claims*

According to the Government, the plaintiffs are seeking systemic claims against the federal government as a whole "rather than specific tortious conduct on the part of specific federal employees for whom the United States must assume liability." Def.'s Mem. at 34. "The FTCA limits suits against the Government to those based on the conduct of government employees." *E.S.M. v. United States*, No. CV-21-29, 2022 WL 11729644, at *2 (D. Ariz. Oct. 20, 2022). Thus, "plaintiffs may not assert 'systemic' claims against the Government writ large." *Id.* (citation omitted). Were the court to find that the plaintiffs' FTCA claims were not premised on the specific tortious conduct of specific employees of the Government, the court would have to dismiss said claims for lack of subject-matter jurisdiction.

The court, however, does not agree with the Government's assertions that the plaintiffs' FTCA claims are systemic. For one, the amended complaint makes numerous references to the actions of individual Government employees. *See, e.g.*, Am. Compl. at ¶¶ 88–89, 95, 100, 115–17, 139, 149. The amended complaint even references some officers by name. *See, e.g.*, *id.* at ¶ 88. Moreover, insofar as the amended complaint might fail to name certain Government employees, the plaintiffs can gather such details through discovery. *See Wilbur P.G.*, 2022 WL 3024319, at *6 ("The fact that [the plaintiffs] are unable to name the individual Border Patrol officers who forcibly separated them and detention center employees without the benefit of discovery, should not be fatal to their action."). Consequently, the court does not find the plaintiffs' FTCA claims systemic enough to invalidate the court's jurisdiction over them.

34

v.       *Independent Contractor Exception*

Finally, the Government asserts that, at the very least, the court should dismiss any FTCA claims relating to Mr. A. and C.D.A.'s detention at BCRC because the center was managed by independent contractors, not Government employees. *See* Def.'s Mem. at 35. The FTCA's reach typically does not extend to the actions of "any contractor with the United States." 28 U.S.C. § 2671. The Government may still be liable for an independent contractor's tortious conduct, however, if it "control[s] the physical conduct of the contractor in performance of the contract." *Logue v. United States*, 412 U.S. 521, 527 (1973). To ascertain this, the court must ask "whether [the contractor's] day-to-day operations [were] supervised by the Federal Government." *United States v. Orleans*, 425 U.S. 807, 815 (1976).

At this early stage, the court cannot conclude whether the independent contractor exception should apply to the experiences of Mr. A. and C.D.A. at BCRC. The parties present conflicting accounts of the precise level of control that the Government asserted over BCRC's operations. The plaintiffs allege that ICE dictated the conditions at BCRC, staffed its personnel, and kept an office at the center. *See* Am. Compl. at ¶ 111. Yet the Government maintains that BCRC's operations were largely managed by Berks County. *See* Def.'s Mem. at 35. Given this discrepancy, the courts finds that the parties should "engage in discovery" regarding BCRC's daily operations before "this [c]ourt mak[es] a ruling on whether the independent contractor exception to the FTCA is applicable in this case."[20] *Laoye v. United States*, No. 14-5195, 2023 WL 2263670, at *6 (D.N.J. Feb. 28, 2023).

---

[20] The court notes that none of the FTCA claims are tied exclusively to actions that took place at BCRC. *See* Am. Compl. at ¶¶ 156–78. Thus, the application of this exception is immaterial to this court's subject-matter jurisdiction over said claims. Nevertheless, the exception may play a role in which facts the court is permitted to consider at the summary judgment stage.

\*   \*   \*

Overall, the court finds each of the FTCA exceptions raised in the Government's motion to dismiss either inapplicable or presently lacking in factual support. As such, the court maintains its subject-matter jurisdiction over the plaintiffs' FTCA claims. The court next addresses whether federal sovereign immunity shields the Government from the plaintiffs' ATS claims.

c.     ATS Claims

The Government contends that the court should dismiss the plaintiffs' ATS claims because, "[a]s a threshold matter, the United States has not waived its sovereign immunity under the ATS."[21] Reply Br. at 21. Indeed, unlike statutes like the FTCA or Tucker Act, the ATS contains no express waiver of sovereign immunity. *See* 28 U.S.C. § 1350. This has led many courts to conclude that "the ATS 'does not waive sovereign immunity.'" *Quintero Perez v. United States*, 8 F.4th 1095, 1100–01 (9th Cir. 2021) (quoting *Koohi v. United States*, 976 F.2d 1328, 1332 n.4 (9th Cir. 1992)); *see also Goldstar (Panama) S.A. v. United States*, 967 F.3d 965, 968 (4th Cir. 1992) (finding that ATS does not act as waiver of sovereign immunity); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985) (same); *Rosner v. United States*, 231 F. Supp. 2d 1202, 1210 (S.D. Fla. 2002) (same). Accordingly, while the Third Circuit has yet to touch this question, the Government asserts that that the plaintiffs' ATS claims cannot stand against it.

The court, however, does not find the answer here so straightforward. To be sure, many types of suits brought against the United States under the ATS should be dismissible for lack of subject-matter jurisdiction via federal sovereign immunity. Nevertheless, the plaintiffs in this

---

[21] Because the Government raised this argument for the first time in its reply brief, not its motion to dismiss, this court has no obligation to address it. *See Lett v. Se. Pa. Transp. Auth.*, No. 19-3170, 2020 WL 12702548, at \*2 n.2 (E.D. Pa. June 11, 2020). Despite this, because "the court can raise *sua sponte* subject-matter jurisdiction concerns," *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 77 (3d Cir. 2003), the court will address the argument at this stage.

case are specifically pleading *jus cogens* violations,[22] namely torture and crimes against humanity. *See* Am. Compl. at ¶¶ 179–201. From a jurisdictional standpoint, this interplay of *jus cogens* and sovereign immunity is complicated. For instance, when it comes to common-law *foreign* sovereign immunity,[23] the Fourth Circuit has held that "officials from other countries are not entitled to . . . immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity." *Yousuf v. Samantar*, 699 F.3d 763, 777 (4th Cir. 2012). The circuit court reached this conclusion because "as a matter of international and domestic law, *jus cogens* violations are, by definition, acts that are not officially authorized by the Sovereign." *Id.* at 776; *see also Siderman de Blake v. Republic of Argentina*, 965 F.3d 699, 718 (9th Cir. 1992) ("International law does not recognize an act that violates *jus cogens* as a sovereign act.").[24] Accordingly, if a state official is not behaving as a sovereign when violating *jus cogens* norms,

---

[22] "*Jus cogens* describes peremptory norms of law which are nonderogable and form the highest level of international law." *Taveras-Lopez v. Reno*, 127 F. Supp. 2d 598, 608 n.10 (M.D. Pa. 2000) (quoting *Gisbert v. U.S. Att'y Gen.*, 988 F.2d 1437, 1448 n.22 (5th Cir. 1993)). In other words, *jus cogens* covers norms from which no state or state actor may permissibly deviate. While there exists no exhaustive, uniformly accepted list of *jus cogens*, it is generally agreed upon that *jus cogens* includes the prohibitions of aggression, genocide, crimes against humanity, racial discrimination, slavery, and torture. *See* Int'l Law Comm'n, Rep. on the Work of Its Seventy-First Session, U.N. Doc. A/74/10, at 146–47 (2019), http://legal.un.org/docs/?symbol=A/74/10.

[23] Under current federal law, foreign sovereign immunity for foreign states is governed by statute—the Foreign Sovereign Immunities Act ("FSIA"). *See* Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified at 28 U.S.C. §§ 1330, 1391(f), 1441(d), 1602–11). This is typically referred to as the "restrictive theory of sovereign immunity," as the FSIA contains numerous exceptions under which foreign states may be subject to suits in United States federal courts. *See* 28 U.S.C. §§ 1605(a)–(d), 1605A, 1605B, 1607 (containing FSIA exceptions); *Saudi Arabia v. Nelson*, 507 U.S. 349, 359 (1993) (explaining that, in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612 (1992), the Court "observed that the [FSIA] 'largely codifies the so-called "restrictive" theory of foreign sovereign immunity first endorsed by the State Department in 1952'"). However, common-law foreign sovereign immunity, which is much more absolute and dates back to *The Schooner Exchange* decision of 1812, still applies in instances of suits against foreign government officials. *See Samantar v. Yousuf*, 560 U.S. 305, 325–26 (2010) (holding that FSIA does not cover foreign government officials); *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute . . . . All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself.").

[24] The court acknowledges that the Second Circuit Court of Appeals did not agree to adopt the Fourth Circuit's reasoning when presented the opportunity in 2014. *See Rosenberg v. Pasha*, 577 F. App'x 22, 24 (2d Cir. 2014) (summary order). Nevertheless, the Second Circuit only declined to do so because it felt bound by its precedent that was established before the Supreme Court's *Samantar v. Yousef* opinion holding that foreign government officials are governed by common-law immunity, not the FSIA. *See id.*; *Samantar*, 560 U.S. at 325–26. Accordingly, the Second Circuit's decision should not be interpreted as a statement on the soundness of the Fourth Circuit's holding that common-law foreign sovereign immunity does not protect *jus cogens* violations.

they should not be granted immunity as a sovereign for allegations of such violations. Other judges in this district have found this reasoning persuasive, *see Aldossari ex rel. Aldossari v. Ripp*, 537 F. Supp. 3d 828, 850 (E.D. Pa. 2021), *rev'd on other grounds*, 49 F.4th 236 (3d Cir. 2022), as does this court today.[25]

At the same time, the effects of *jus cogens* on federal sovereign immunity is less settled. Many courts have found that federal sovereign immunity applies even in instances of claims of *jus cogens* violations, though often with little explanation beyond the fact that the ATS is not a waiver of immunity. *See, e.g.*, *Quintero Perez*, 8 F.4th at 1101; *D.J.C.V.*, 605 F. Supp. at 609; *Andrade v. United States*, No. 15-CV-103, 2017 WL 2985637, at *13–16 (S.D. Tex. July 12, 2017); *see also Hernandez v. United States*, 785 F.3d 117, 122 (5th Cir. 2015) (en banc) (Jones, J., concurring) (referring to notion that "the United States' sovereign immunity may be ineffective in American courts against [*jus cogens*] claims" as "troubling"), *vacated*, 137 S. Ct. 2003 (2017). On the other hand, one district court recently held that the federal government "has no sovereign power to immunize itself from liability for [*jus cogens*] violations," applying a logic similar to that of the Fourth Circuit in the context of foreign sovereign immunity:

> [T]he federal government may immunize itself from liability for *jus cogens* violations only if the acts of authorizing or engaging in such violations fall within the sphere of authority that has been legitimately delegated by the People. Under the principles of international law . . . , the People as sovereign are bound by the

---

[25] While other district courts have agreed with the Fourth Circuit's analysis, *see, e.g.*, *Mireskandari v. Mayne*, No. CV 12-3861, 2016 WL 1165896, at *17 (C.D. Cal. Mar. 23, 2016), at least one district court has raised concerns about this *jus cogens* exception, believing that it would place strain on the judiciary and merge the issue of immunity with the merits of underlying claims. *See Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 234–35 (D.D.C. 2018). This court does not share these concerns. For one, this court could find no signs of some significant onslaught of frivolous cases in federal courts tacking on *jus cogens* violation claims as a means of skirting past foreign sovereign immunity. Moreover, the assertion that courts should not look into the merits of claims to assess the applicability of immunity suggests that the doctrine of sovereign immunity precludes any analysis into whether a defendant is actually entitled to sovereign immunity. This seems incorrect. For instance, the court would certainly not grant a Rule 12(b)(1) motion to dismiss for a defendant claiming to be a foreign government official if the status of his position were in question. The same logic should apply to instances of alleged *jus cogens* violations: Courts should not simply grant a motion to dismiss by way of sovereign immunity if it is unclear whether the defendant even behaved as a sovereign during their alleged conduct.

> nonderogability of *jus cogens* norms, which means that the People may not
> legitimately delegate to the government the power to engage in *jus cogens*
> violations.

*Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935, 967–68 (E.D. Va. 2019). At least

one circuit court judge has also reached a similar conclusion. *See Hernandez*, 785 F.3d at 141

(Haynes, J., concurring) ("[I]t seems logical that cognizable *jus cogens* norms may preclude a

sovereign immunity defense."). Overall, courts disagree whether federal sovereign immunity

protects the Government from all claims of *jus cogens* violations.

The question thus becomes whether there is any sound rationale for treating federal

sovereign immunity differently from common-law foreign sovereign immunity in the context of

*jus cogens* norms. This court finds none. The two types of immunity are not, of course, perfectly

analogous. Federal sovereign immunity, for example, derives "from the laws and practices of our

English ancestors," namely that "the king never was suable of common right." *United States v.

Lee*, 106 U.S. 196, 205 (1882). While the United States has no king, sovereign immunity became

"adopted in our courts as a part of the general doctrine of publicists, that the supreme power in

every state, wherever it may reside, shall not be compelled, by process of courts of its own

creation, to defend itself from assaults in those courts."[26] *Id.* at 206. Meanwhile, common-law

foreign sovereign immunity arose in federal courts out of "grace and comity on the part of the

United States" toward foreign sovereigns and their officers. *Verlinden B.V. v. Cent. Bank of

Nigeria*, 461 U.S. 480, 486 (1983). As Chief Justice John Marshall explained over two centuries

ago:

> One sovereign being in no respect amenable to another; and being bound by
> obligations of the highest character not to degrade the dignity of his nation, by
> placing himself or its sovereign rights within the jurisdiction of another, can be

---

[26] Although the Court began applying federal sovereign immunity to suits against the United States well before *Lee*,
it provided little if any scrutiny of or basis for the doctrine's underpinnings in such cases. *See, e.g.*, *United States v.
McLemore*, 45 U.S. (4 How.) 286, 288 (1846); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 411–12 (1821) (dictum).

supposed to enter a foreign territory only under an express license, or in the confidence that the immunities belonging to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him.

*The Schooner Exchange*, 11 U.S. (7 Cranch) at 137.

Nevertheless, despite their divergent origins, both federal sovereign immunity and common-law foreign sovereign immunity rest upon the same crucial premise: The defendant's status as a sovereign is what immunizes them from civil suit. The underlying reasons for this premise may vary between these two types of sovereign immunity, but the same truth holds for either one that the defendant must be a sovereign (or representative thereof) for the respective immunity to apply. Given that the Government is subject to *jus cogens* norms just as much as any other sovereign state, *see Yousuf*, 699 F.3d at 777 (describing *jus cogens* as "a matter of international and domestic law"); *Estate of Hernandez-Rojas v. United States*, No. 11-cv-522, 2013 WL 5353822, at *4 (S.D. Cal. Sept. 24, 2013) ("[A] jus cogens norm of international law is binding on all states, including the state of California . . . ."); *Tachiona v. Mugabe*, 234 F. Supp. 2d 401, 417 n.57 (S.D.N.Y. 2002) (describing *jus cogens* as being "binding on all states and from which there can be no derogation"), it follows that the Government ceases to act in a sovereign capacity when it engages in *jus cogens* violations. *See Aldossari*, 537 F. Supp. at 850 ("By definition, *jus cogens* violations are those that are not 'officially authorized by the [s]overeign.'" (alteration in original) (quoting *Yousuf*, 699 F.3d at 776)). Consequently, this court finds that "when the United States government commits acts that violate *jus cogens* norms . . . it is not entitled to immunity for such acts." *Al Shimari*, 368 F. Supp. 3d at 967.

Here, the plaintiffs plead that the Government did indeed violate *jus cogens* norms. *See* Am. Compl. at ¶¶ 179–201. At this Rule 12(b)(1) stage, the court "must consider the allegations of the complaint as true." *Mortensen*, 549 F.2d at 891. The court therefore cannot dismiss the

plaintiffs' ATS claims for lack of subject-matter jurisdiction. The question still remains, however, whether these claims are actionable under the ATS. The court will answer this question in its Rule 12(b)(6) analysis.

### 2.     Rule 12(b)(6)—Failure to State a Claim

In the alternative to its Rule 12(b)(1) motion, the Government asks the court to dismiss the plaintiffs' FTCA and ATS claims for failure to state a claim. *See* Def.'s Mem. at 36–48. The court will individually address each of the plaintiffs' eight claims to determine their plausibility based on the factual allegations in the amended complaint.

### a.     Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of a complaint or a portion of a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests "the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted). As the moving party, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

In general, a complaint is legally sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "The touchstone of [this] pleading standard is plausibility." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Although Rule 8(a)(2) does "not require heightened fact pleading of specifics," it does require the recitation of "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In other words, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quotation omitted). "In ruling on a 12(b)(6) motion, courts can and should reject legal conclusions, unsupported conclusions, unwarranted references, unwarranted deductions, footless conclusions of law, and sweeping legal conclusions in the form of actual allegations." *Bright v. Westmoreland Cnty.*, 380 F.3d 729, 735 (3d Cir. 2004) (citation and internal quotation marks omitted). Ultimately, a complaint must contain facts sufficient to nudge any claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

b.    FTCA Claims

The Government asserts that the court should dismiss the plaintiffs' FTCA claims under Rule 12(b)(6). Before discussing these claims, the court must address two preliminary matters. First, the parties have raised choice-of-law issues that the court must eventually resolve. While the parties stipulate that Texas law applies to all FTCA claims as they pertain to Mr. Q. and E.A.Q.A., *see* Opp'n Br. at 56; Reply Br. at 14, the parties disagree over whether the laws of New Mexico, Illinois, or Pennsylvania should apply to the claims as they pertain to Mr. A. and C.D.A. *See* Def.'s Mem. at 36–37; Opp'n Br. at 56–57; Reply Br. at 14–16. "[W]hen confronted with a choice of law issue at the motion to dismiss stage, courts within the Third Circuit have generally concluded that it is more appropriate to address the issue at a later stage in the proceedings." *Graboff v. The Collern Firm*, No. 10-1710, 2010 WL 4456923, at *8 (E.D. Pa. Nov. 8, 2010). Thus, this court will defer on the choice-of-law questions at this stage and will

instead assess Mr. A. and C.D.A.'s FTCA claims under all three relevant states' laws. Should a claim be deemed sufficient within any one of these states, the claim will survive.[27] *See id.*

Second, regarding Mr. Q. and E.A.Q.A., the Government contends that their FTCA claims are barred under Texas law because the claims challenge privileged conduct. *See* Def.'s Mem. at 37. The court, however, finds the Government's argument misguided. While the Government is entitled to invoke state law privileges as a defense against FTCA claims, *see, e.g.*, *Villafranca v. United States*, 587 F.3d 257, 261–62 (5th Cir. 2009) (raising civil privilege defense under Texas law), the Government cites no privileges relevant to Mr. Q. and E.A.Q.A.'s claims. The Government points to two cases in which it successfully invoked privileges against

---

[27] Along with a factual record, the court will require more robust briefing on the choice-of-law question by the parties. The test for choosing the proper state laws in this case is complex and multi-parted. To begin, when assessing tort claims under the FTCA, a court must apply "the law of the place where the act or omission occurred." 28 U.S.C. 1346(b)(1). The Supreme Court has interpreted this language to mean that a court must apply the choice-of-law test of the state in which the act or omission occurred, rather than simply deferring to the state's own tort laws. *See Richards v. United States*, 369 U.S. 1, 8–11 (1962).

 The issue with this statutory language is that it presumes that a tortious act in question will have only occurred within one state. Nevertheless, in a case such as this one, the plaintiffs' claims can arise out of conduct that occurred across multiple states. Thus, the court must determine whether Illinois, New Mexico, or Pennsylvania's choice-of-law test should be employed for each of Mr. A. and C.D.A.'s claims. This requires the court to first ask whether the elements of the claims differ between these states and, if so, whether the choice-of-law tests also differ, so as to not waste time over a "false conflict." *Gould Elecs.*, 220 F.3d at 180. If the tests do differ, the analysis becomes complicated, as "[n]either the text of the FTCA nor *Richards* provides any guidance on how to choose between conflicting choice of law rules when the alleged acts or omissions occur in more than one state." *Id.* at 181.

 To help work through this legal ambiguity, the Third Circuit has identified five potential approaches to deciding between conflicting choice-of-law tests: (1) "appl[y] the choice of law rules on an act-by-act basis," (2) use the rules of "the place of the last act or omission having a causal effect," (3) use the rules of "the place of the act or omission having the most significant causal effect," (4) "select[] the choice of law rules of the state in which 'physical acts' could have prevented injury," or (5) "ma[k]e a choice of choice of law based on where the 'relevant' act or omission occurred." *Id.* at 181–83 (quoting *Bowen v. United States*, 570 F.2d 1311, 1318 (7th Cir. 1978); *Ducey v. United States*, 713 F.2d 504, 508 n.2 (9th Cir. 1983); *Hitchcock v. United States*, 665 F.2d 354, 359 (D.C. Cir. 1981)). While the Third Circuit has provided no guidance as to which approach a court should take, *see id.*, the method used by district courts seems to start by ruling out any approaches that are unworkable or inapplicable in the given case. *See, e.g.*, *Schalliol v. Fare*, 206 F. Supp. 2d 689, 698 (E.D. Pa. 2002). From there, the court should see which state would prevail under each of the remaining approaches; if one state prevails under all or most of the approaches, that state's choice-of-law test shall apply to a plaintiff's FTCA claims. *See id.*; *Gould Elecs.*, 220 F.3d at 183 ("Under these approaches, the last causal act, the most significant causal act, physical acts to prevent injury, and the relevant acts all occurred in New York. It follows, the District Court should have applied New York choice of law rules.").

 Once a choice-of-law test is selected, the court can determine which state's tort law should apply to a particular FTCA claim, which will allow the court to fully assess the merit of said claim. The parties should thus anticipate briefing the court on choice of law for the plaintiffs' surviving FTCA claims using the test outlined within this footnote should this case reach the summary judgment stage.

plaintiffs asserting FTCA claims against the United States Immigration and Naturalization Service. *See* Def.'s Mem. at 38–39. Nevertheless, these cases involved the claim of false imprisonment, which contains elements that, while slightly varied by state, generally privilege the conduct of immigration officers acting under the authority of law. *See Caban v. United States*, 728 F.2d 68, 71–72 (2d Cir. 1984); *Tovar v. United States*, No. 98-CV-1682, 2000 WL 425170, at *5–7 (N.D. Tex. Apr. 18, 2000). The plaintiffs here raise no false imprisonment claims. Moreover, the claims they *do* raise do not appear to contain elements that would grant comparable privileges to the Government employees whose conduct is in question in this case. The court therefore finds that Mr. A. and E.A.Q.A.'s claims do not fail under Texas law because of the existence of privileged conduct.

With all this said, the court must now assess whether the plaintiffs have plausibly pleaded their five FTCA claims. Because different state laws will apply for Mr. A. and C.D.A. versus Mr. Q. and E.A.Q.A., the court will evaluate each claim twice as applied to the two pairs. Overall, the court finds that all plaintiffs have plausibly pleaded intentional infliction of emotional distress. The court also finds that Mr. A. and C.D.A. have plausibly pleaded  abuse of process. On the other hand, the court finds that it is proper to dismiss the remaining claims under Rule 12(b)(6).

### i.    *Intentional Infliction of Emotional Distress*

The amended complaint alleges enough facts to support Mr. Q. and E.A.Q.A.'s intentional infliction of emotional distress ("IIED") claims. In Texas, a plaintiff must establish the following for an IIED claim: "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Hoffman-La Roche Inc.*

*v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004). The amended complaint clearly satisfies elements one, three, and four. To begin, the actions taken by the Government employees as described in the amended complaint read as intentional and deliberate—Mr. Q. and E.A.Q.A.'s separation and detention were not accidental. Moreover, the plaintiffs allege that Mr. Q. and E.A.Q.A. both "suffered stress, depression, and anxiety" and "remain traumatized and suffer from intrusive flashbacks" due to the Government's actions. Am. Compl. at ¶ 154.

When it comes to the "extreme and outrageous" conduct element, things are less straightforward. "Whether conduct is extreme and outrageous is generally a question of law. Only if reasonable minds may differ does the fact finder determine whether the conduct was sufficiently extreme and outrageous to result in liability." *Elliott v. Methodist Hosp.*, 54 S.W.3d 789, 796–97 (Tex. App. 2001) (internal citation omitted). The court must ask then whether a reasonable mind could find the Government's alleged conduct "so outrageous in character or extreme in degree as to go beyond the bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* at 796 (defining "extreme and outrageous" conduct). While this is a high bar, the court cannot currently rule that *no* reasonable mind could reach such a conclusion based on the factual allegations. Take, for example, the allegation that certain Government employees would not reunify Mr. Q. and E.A.Q.A. unless Mr. Q. signed forms waiving their rights to asylum. A reasonable mind could surely conclude that subjecting these plaintiffs to such a high-stakes, coercive situation falls within the territory of extreme and outrageous.[28] Thus, the plaintiffs should have the opportunity to develop this claim through

---

[28] This holds especially true when "[t]he extreme and outrageous character of the [Government's] conduct may arise from the [Government's] knowledge that the [plaintiff] is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. *Fields v. Teamsters Local Union No. 988*, 23 S.W.3d 517, 532 (Tex. App. 2000) (quoting Restatement (Second) of Torts § 46, cmt. e)). Considering Mr. Q. and E.A.Q.A. were separated for weeks after fleeing from a dangerous situation in Honduras, and E.A.Q.A. was a minor, a factfinder may determine that the Government knew that the two were "peculiarly susceptible to emotional distress." *Id.*

discovery and potentially have the factfinder decide this issue. If new information arises during discovery that erodes the strength of Mr. Q. and E.A.Q.A.'s IIED claims, the court can reassess the claims at the summary judgment stage.

For similar reasons, the court will not dismiss Mr. A. and C.D.A.'s IIED claims at this stage. The elements for IIED claims in New Mexico, Illinois, and Pennsylvania all mirror those of Texas: extreme and outrageous conduct by the defendant, caused by intentional or reckless actions, which resulted in severe emotional distress to the plaintiff. *See Trujillo v. N. Rio Arriba Elec. Co-op, Inc.*, 41 P.3d 333, 342 (N.M. 2001) (stating elements of IIED claim under New Mexico law); *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (stating elements of IIED claim under Illinois law); *Jordan v. Pa. State Univ.*, 276 A.3d 751, 775 (Pa. Super. 2022) (stating elements of IIED claim under Pennsylvania law). Furthermore, the question of whether a defendant's conduct was "extreme and outrageous" will only go to a jury in these states "[w]here reasonable persons may differ." *Lord v. Living Bridges*, No. CIV. A. 97-6355, 1999 WL 562713, at *4 (E.D. Pa. July 30, 1999) (quoting *Motheral v. Burkhart*, 583 A.2d 1180, 1188 (Pa. Super. 1990)). Thus, given the similarities of Mr. A. and C.D.A.'s factual allegations with those of Mr. Q. and E.A.Q.A., such as feeling coerced into signing a waiver form to be reunified,[29] the court finds that their IIED claims survives the Government's motion to dismiss.

*ii.*     *Negligent Infliction of Emotional Distress*

Conversely, the court finds that the amended complaint does not provide support for the plaintiffs' negligent infliction of emotional distress (NIED) claims. Beginning with Mr. Q. and E.A.Q.A., the court need only point out that "Texas does not recognize an independent cause of action for negligent infliction of emotional distress." *Garza v. United States*, 881 F. Supp. 1103,

---

[29] If anything, Mr. A. and C.D.A.'s factual allegations are even more likely to fall within the realm of extreme and outrageous because the ICE employees that supposedly presented Mr. A. with the form knew that there was a court order in place to reunify Mr. A. and C.D.A. *See* Am. Compl. at ¶ 101.

1108 (S.D. Tex. 1995) (citing *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993)). The court must therefore dismiss their NIED claims.

Turning to Mr. A. and C.D.A., while New Mexico, Illinois, and Pennsylvania do recognize a cause of action for NIED, the amended complaint does not meet any of the states' elements for a NIED claim. In New Mexico, the plaintiff must show "(1) a marital or intimate family relationship existed between the plaintiff and the victim, (2) the severe emotional trauma suffered by the plaintiff was a consequence of contemporaneous sensory perception of the accident, and (3) the victim suffered physical injury or death." *Thistlethwaite v. Elements Behav. Health, Inc.*, No. 14cv138, 2015 WL 11117305, at *6 (D.N.M. Mar. 23, 2015). In Illinois, the plaintiff must show that (1) they were "a bystander who [was] in a zone of physical danger," (2) they had "reasonable fear for [their] safety," and (3) their fear was caused by the defendant's negligence. *Rickey v. Chi. Transit Auth.*, 457 N.E.2d 1, 5 (Ill. 1983). Lastly, in Pennsylvania, the plaintiff must show one of the following: "(1) the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger and reasonably feared impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative." *Runner v. C.R. Bard*, 108 F. Supp. 3d 261, 272 (E.D. Pa. 2015).

While these tests vary, the running theme among all of them is that the plaintiff must have either experienced physical injury or been a bystander to some physical accident or injury incurred by a third person (with the exception of Pennsylvania's contractual or fiduciary duty scenario, which is irrelevant here). The amended complaint does not suggest that either Mr. A. or C.D.A. were in any such position. Neither were "subjected to a physical impact," neither were "in a zone of physical danger" or "near the scene of an accident," and neither witnessed "a

tortious injury to a close relative" or "physical injury or death." In each state, therefore, Mr. A. and C.D.A.'s factual allegations fail to satisfy at least one element of these respective NIED tests. Accordingly, as they have not stated NIED claims upon which relief can be granted in New Mexico, Illinois, or Pennsylvania, the court must dismiss their NIED claims.

*iii.*   *Negligence*

The court must also dismiss Mr. Q. and E.A.Q.A.'s negligence claims. In Texas, a plaintiff has the burden of demonstrating four elements for a negligence cause of action: (1) "the existence of a legal duty," (2) "a breach of that duty," (3) "damages," and (4) proximate causation. *Williams v. Parker*, 472 S.W.3d 467, 470 (Tex. App. 2015). The existence of a legal duty is a question of law, not fact, *see Dubose v. Worker's Med., P.A.*, 117 S.W.3d 916, 920 (Tex. App. 2003), and the Government contends that "Mr. Q. and E.A.Q.A. have failed to identify a duty that was breached." Def.'s Mem. at 42.

In response, the plaintiffs first note that they claim a duty owed to them in their amended complaint, which states that "[t]he federal officers referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to [them]." Am. Compl. at ¶ 167. It is not enough, however, to simply invoke the duty of ordinary care. Instead, the plaintiffs must establish that the Government legally owed a duty to Mr. Q. and E.A.Q.A. at the time of the factual allegations. *See Orchestratehr, Inc. v. Trombetta*, No. 13-CV-2110, 2016 WL 4563348, at *12 (N.D. Tex. Sept. 1, 2016). Because the Government argues in its motion to dismiss that it owed no legal duty to Mr. Q. and E.A.Q.A., the plaintiffs have a responsibility to cite caselaw supporting the existence of a duty. *See Loeffler Thomas P.C. v. Fishman*, No. 15-5194, 2016 WL 1457895, *11 (E.D. Pa. Apr. 12, 2016) (finding that plaintiff effectively abandons claim if they fail to respond to argument in motion to dismiss against said claim).

The plaintiffs only point out one potential legal duty in their response: a purported "special duty between an inmate and a jailor." Opp'n Br. at 65. The case to which the plaintiffs cite—*Salazar v. Collins*—is, nevertheless, inapplicable to the factual allegations here. Instead, *Salazar* discusses the duty of a prison to reasonably prevent third persons from physically harming inmates. *See* 255 S.W.3d 191, 200 (Tex. App. 2008) (citing Restatement (Second) of Torts § 320). The plaintiffs do not claim that any third persons physically harmed Mr. Q. or E.A.Q.A. while the Government detained them. Accordingly, the plaintiffs have failed to demonstrate the existence of a legal duty in furtherance of Mr. Q. and E.A.Q.A.'s negligence claims. The court must therefore dismiss said claims.

Likewise, the court will dismiss Mr. A. and C.D.A.'s negligence claims. In its motion to dismiss, the Government does not challenge Mr. A. and C.D.A.'s negligence claims for lack of the existence of a duty. Rather, the Government's only contention is that negligence claims in New Mexico supposedly require plaintiffs to show physical harm. *See* Def.'s Mem. at 43. The Government is correct here. To begin, the New Mexico caselaw to which the plaintiffs cite regarding recovery for severe emotional distress deals with claims of breach of contract and NIED, not pure negligence. *See Flores v. Baca*, 871 P.2d 962, 969 (N.M. 1994) (breach of contract); *Ramirez v. Armstrong*, 673 P.2d 822, 825 n.1 (1983) (NIED). Indeed, New Mexico courts have only permitted a plaintiff to recover for negligence resulting in emotional harm when they experience "contemporaneous sensory perception of [an] accident," in which case New Mexico courts allow plaintiffs to proceed under a NIED claim, not pure negligence. *See, e.g.*, *Gabaldon v. Jay-Vi Prop. Mgmt., Inc.*, 925 P.2d 510, 513–14 (N.M. 1996). Furthermore, Illinois and Pennsylvania courts have adopted the principle of section 436A of the Second Restatement of Torts, under which plaintiffs cannot recover for negligence solely resulting in emotional harm.

*See Rickey*, 457 N.E.2d at 4–5; *Banyas v. Lower Bucks Hosp.*, 437 A.2d 1236, 1239 (Pa. Super. 1981). In the event that a plaintiff's emotional harm leads to physical manifestations, they may be able to raise a claim of NIED; however, this court has already explained why the plaintiffs cannot succeed under such a claim. *See supra* pp. 46–48.

iv.     *Abuse of Process*

Under Texas law, the court is compelled to dismiss Mr. Q. and E.A.Q.A.'s abuse of process claims. In Texas, a plaintiff's abuse of process claim will only survive if "the original issuance of [the] legal process was justified, but the process itself [was] subsequently used for a purpose for which it was not intended." *Moore v. Bushman*, 559 S.W.3d 645, 653 (Tex. App. 2018).[30] Here, the plaintiffs state plainly in their amended complaint that the Government "*improperly* used . . . prosecution under 8 U.S.C. § 1326 against Mr. Q." to traumatize Mr. Q. and E.A.Q.A. and coerce them into abandoning their asylum claims. *See id.* at ¶ 172 (emphasis added). They premise their abuse of process claims upon these allegations. Accordingly, because the plaintiffs assert that the process in question—the prosecution of Mr. Q.—was done

---

[30] Texas's cause of action for abuse of process

is the malicious use or misapplication of process in order to accomplish an ulterior purpose. *Hunt v. Baldwin*, 68 S.W.3d 117, 129 (Tex. App.—Houston [14th Dist.] 2001, no pet.). The elements of abuse of process are: (1) the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process; and (3) damage resulted to the plaintiff as a result of such illegal act. *Id.*; *Bossin v. Towber*, 894 S.W.2d 25, 33 (Tex. App.—Houston [14th Dist.] 1994, writ denied). Implicit in the elements is the requirement that the process in question be improperly used *after* it was issued. *Hunt*, 68 S.W.3d at 130; *RRR Farms, Ltd. v. Am. Horse Prot. Ass'n*, 957 S.W.2d 121, 133 (Tex. App.—Houston [14th Dist.] 1997, pet. denied). In other words, the tort assumes that the original issuance of a legal process was justified, but the process itself is subsequently used for a purpose for which it was not intended. *Id.* at 130 (concluding that use of a false affidavit to support a writ of execution did not support a claim for abuse of process). When the process is used for the purpose for which it is intended, even though accomplished for an ulterior motive, no abuse of process has occurred. *Id.* "If wrongful intent or malice caused the process to be issued initially, the claim is instead one for malicious prosecution." *Bossin*, 894 S.W.2d at 33; *see also Hunt*, 68 S.W.3d at 130 (quoting *Bossin*).

*Moore*, 559 S.W.3d at 652–53.

improperly, and hence unjustified, Mr. Q. and E.A.Q.A. have no cognizable abuse of process claims under Texas law. *See Moore*, 559 S.W.3d at 653.

On the other hand, the court will not dismiss Mr. A. and C.D.A.'s abuse of process claims. Unlike Texas law, the laws of New Mexico, Illinois, and Pennsylvania seem less stringent when it comes to pleading abuse of process. For instance, in Illinois, a plaintiff need only establish "(1) the existence of an ulterior purpose or motive and (2) some act in the use of legal process not proper in the regular prosecution of the proceedings."[31] *Kumar v. Bornstein*, 820 N.E.2d 1167, 1173 (Ill. App. Ct. 2004). To satisfy the first element, a plaintiff can claim that a defendant initiated a process against them for an improper purpose, "such as extortion, intimidation, or embarrassment." *Id.* To satisfy the second element, "the plaintiff must show that the process was used to accomplish some result that is beyond the purview of the process." *Id.*

The amended complaint contains factual allegations that plausibly support Mr. A. and C.D.A.'s abuse of process claim under the aforementioned standard. For one, the plaintiffs allege that the Government prosecuted Mr. A. under 8 U.S.C. § 1325 with the ulterior motive of coercing not only him, but thousands of others, into abandoning their asylum claims. *See* Am. Compl. at ¶¶ 36–37, 171. Furthermore, the plaintiffs allege that the Government's actions went beyond the purview of Mr. A.'s prosecution by requiring him to sign the Separated Parent's Removal Form as a condition of reunification with C.D.A., despite supposedly knowing that a court had already ordered the Government to reunify them. *See id.* at ¶¶ 100–01. With these allegations in mind, the court will not dismiss Mr. A. and C.D.A.'s abuse of process claims.

---

[31] To demonstrate abuse of process in Pennsylvania, a plaintiff must show "that the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff." *Shiner v. Moriarty*, 706 A.2d 1228, 1236 (Pa. Super. 1998) (quoting *Rosen v. Am. Bank of Rolla*, 627 A.2d 190, 192 (Pa. Super. 1993)). In New Mexico, a plaintiff must show "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages." *Durham v. Guest*, 204 P.3d 19, 26 (N.M. 2009).

### *v.* *Loss of Consortium*

Finally, the court must dismiss the plaintiffs' loss of consortium claims. None of the relevant states' laws provide either Mr. Q. and E.A.Q.A. or Mr. A. and C.D.A. with a cause of action for loss of consortium here. To begin, while Texas recognizes loss of parental consortium, the parent's injury must be physical, "serious, permanent, and disabling."[32] *Reagan v. Vaughn*, 804 S.W.2d 463, 467 (Tex. 1990). Neither Mr. Q. nor Mr. A. have suffered from such types of injuries at the hand of the Government. In New Mexico, loss of consortium arises "from a physical injury upon another person." *Thompson v. City of Albuquerque*, 397 P.3d 1279, 1282 (N.M. 2017). Here, the plaintiffs at best plead physical manifestations of emotional and mental distress, which are not the same as physical injuries.[33] *Cf. Carey v. United Airlines*, 255 F.3d 1044, 1054 (9th Cir. 2001) ("[Plaintiff] suffered no physical injury from the 'accident' itself; his only allegations of physical injury are the physical manifestations of his emotional and mental distress, which presents an entirely different issue . . . ."). Illinois does not recognize loss of consortium between parents and children for nonfatal injuries. *See Vitro v. Mihelcic*, 806 N.E.2d 632, 640 (Ill. 2004) (declining to overturn *Dralle v. Ruder*, 529 N.E.2d 209 (Ill. 1988), which bars loss of consortium claims by parents if their child suffers nonfatal injuries). Lastly, Pennsylvania only recognizes loss of consortium between spouses. *See Dep't of Pub. Welfare v. Schultz*, 855 A.2d 753, 755 (Pa. 2004) ("Damages for loss of consortium are available only to spouses, and do not include a parent's loss of society and companionship of her child."). Overall,

---

[32] Texas does not recognize loss of consortium for parents whose children have been severely injured. *See Roberts v. Williamson*, 111 S.W.3d 113, 119 (Tex. 2003) ("We . . . decline to extend a claim for loss of consortium to parents of children who have been seriously injured.").

[33] While the plaintiffs allege some instances of physical discomfort during detention, such as cold temperatures and poor sleeping conditions, *see, e.g.*, Am. Compl. at ¶ 87, these were short-term discomforts that have had no direct impact on the quality of Mr. Q. and E.A.Q.A.'s relationship or Mr. A. and C.D.A.'s relationship.

the plaintiffs have zero means of plausibly pleading loss of consortium based on the factual allegations in the amended complaint.

*   *   *

In sum, the court will dismiss all plaintiffs' NIED, negligence, and loss of consortium claims. The court will also dismiss Mr. Q. and E.A.Q.A.'s abuse of process claims. At the same time, the court will deny the remainder of the Government's motion to dismiss the plaintiffs' FTCA claims under Rule 12(b)(6). The court will now turn to analyzing the sufficiency of the plaintiffs' ATS claims.

c.   <u>ATS Claims</u>

The plaintiffs plead three claims under the ATS—torture, persecution, and inhumane acts. *See* Am. Compl. at ¶¶ 179–201. The plaintiffs plead the latter two claims under the umbrella of crimes against humanity. *See id.* at ¶¶ 186–201. While the court has found that it can exercise subject-matter jurisdiction over the plaintiffs' ATS claims, this does not necessarily mean that the claims will survive a Rule 12(b)(6) analysis. Indeed, for this to happen, the plaintiffs must satisfy the standard established by the Supreme Court in *Sosa v. Alvarez-Machain*, which requires them to properly plead violations of international law norms that are "sufficiently definite" and were "accept[ed] among civilized nations" at the time Congress passed the ATS in 1789. *See* 542 U.S. 692, 731–33 (2004). "[N]ot all *jus cogens* norms may fall within the category of international common law torts that federal courts can recognize under *Sosa*." *Hernandez*, 785 F.3d at 141 (Haynes, J., concurring). Thus, just because the plaintiffs claim *jus cogens* violations does not automatically mean that they have a cause of action under the ATS. Ultimately, the court finds that none of the plaintiffs' ATS claims should continue past this motion to dismiss stage.

53

*i.      Torture*

Courts have found that torture can be actionable under the ATS if it is done "in violation of the law of nations." *Bowoto v. Chevron Corp.*, 557 F. Supp. 2d 1080, 1086 (N.D. Cal. 2008) (explaining that Eleventh Circuit Court of Appeals in *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005), "pointed out that torture under the ATS is only actionable if it is done 'in violation of the law of nations' . . . ."); *see also Garcia v. Chapman*, 911 F. Supp. 2d 1222, 1234 (S.D. Fla. 2012) ("State-sponsored torture, unlike torture by private actors, likely violates international law and is therefore actionable under the [ATS]." (alteration in original) (quoting *Aldana*, 416 F.3d at 1247)). The court must therefore turn to the international legal definition of torture to assess the plaintiffs' torture claims.[34]

This definition is found in the Convention Against Torture ("CAT")—to which the United States is party[35]—which codifies it as follows:

> [T]he term 'torture' means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 1(1), Dec. 10, 1984, 1465 U.N.T.S. 113 (hereinafter "CAT"). While the CAT is a non-self-executing treaty, *see Udenze v. Riley*, No. CIV.A. 03-2337, 2003 WL 22006805, at *3 (E.D. Pa.

---

[34] As the plaintiffs have pointed out, federal law contains many statutory definitions of torture. *See* Am. Compl. at ¶ 181. These definitions are irrelevant, however, in the context of the ATS. *See Bowoto*, 557 F. Supp. 2d at 1086 ("[T]he ATS is only actionable if it is done 'in violation of the law of nations' whereas torture under the TVPA is actionable if it fits the statutory definition.").

[35] *See Status of Ratification Interactive Dashboard*, U.N. Off. of the High Comm'r for Hum. Rts., https://indicators.ohchr.org (last visited Mar. 21, 2023).

Aug. 22, 2003), its definition has been incorporated into federal law by way of regulation. *See* 8 C.F.R. § 1208.18(a).

The plaintiffs argue that the Government's actions in this case meet the CAT's definition of torture. *See* Opp'n Br. at 73–78. Nevertheless, they fail to adequately address the crucial final sentence of the definition: that torture "does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions." CAT art. 1(1); *see also* 8 C.F.R. § 1208.18(a)(3) ("Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty . . . ."). Here, while there may be political disagreement over the appropriateness of the Government's zero-tolerance policy, the Government acted well within its legitimate powers by enforcing criminal provisions barring illegal entry and by prosecuting individuals who violated said provisions. *See, e.g.*, 8 U.S.C. §§ 1325(a), 1326(a). These acts were "lawful sanctions," and all other factual allegations within the amended complaint arose from said lawful sanctions.[36] *See* 8 C.F.R. § 1208.18(a)(3). Consequently, the plaintiffs cannot plausibly plead torture under the ATS.

### ii.    *Crimes Against Humanity*

Like torture, courts have found that claims that arise to the level of crimes against humanity under international law are actionable under the ATS. *See, e.g.*, *Jane W. v. Thomas*, 560 F. Supp. 3d 855, 886 (E.D. Pa. 2021) (finding persecution and extermination actionable if crimes against humanity); *Krishanthi v. Rajaratnam*, No. 09-CV-5395, 2010 WL 3429529, at *9

---

[36] While federal regulations state that this exception does not include "sanctions that defeat the object and purpose of the [CAT] to prohibit torture," 8 C.F.R. § 1208.18(a)(3), the court finds no authority supporting the notion that enforcing laws that prohibit illegal border crossings defeats the object and purpose of the CAT. In fact, many international organizations appear to support and encourage border security. *See, e.g.*, *Border Security and Arms Trafficking*, U.N. Sec. Council Counter-Terrorism Comm., https://www.un.org/securitycouncil/ctc/content/border-security-and-arms-trafficking (last visited Mar. 21, 2023).

(D.N.J. Aug. 26, 2010) ("[T]he limited guidance offered [by the Third Circuit] does not foreclose application of the ATS in the context of crimes against humanity."). Determining whether an act is a crime against humanity is a multi-part test. First, the plaintiff must identify the crime committed by the defendant. Courts have noted that such crimes can include murder, extermination, enslavement, deportation or forcible transfer, persecution, torture, rape, or "other inhumane acts." *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 257 (2d Cir. 2009); *Jane W.*, 560 F. Supp. 3d at 886; *Krishanthi*, 2010 WL 3429529, at *8. Second, the plaintiff must demonstrate that (1) such crimes were "part of a widespread or systematic attack against civilians, and (2) the defendant 'intended to further such an attack.'" *Jane W.*, 560 F. Supp. at 886 (quoting Rome Statute of the International Criminal Court art. 7(1), July 1, 2002, 2187 U.N.T.S. 90 (hereinafter "Rome Statute")).[37]

This second part is fatal to the plaintiffs' crimes against humanity claims, as it requires the presence of an "attack" within the factual allegations. While the Rome Statute provides no guidance on the meaning of the word "attack," *see* Nadia Alhadi, Note, *Increasing Case Traffic: Expanding the International Criminal Court's Focus on Human Trafficking Cases*, 41 Mich. J. Int'l L. 541, 565 (2020), international tribunals have interpreted an attack in the context of crimes against humanity to mean the commission "of a series of acts of violence."[38] Nahimana et al. v. Prosecutor, Case No. ICTR-99-52-A, Appeals Judgment, ¶¶ 915–18 (Int'l Crim. Trib. for Rwanda Nov. 28, 2007) (citing multiple international tribunal judgments reaching the same

---

[37] While the United States is not party to the Rome Statute, *see The States Parties to the Rome Statute*, Int'l Crim. Ct., https://asp.icc-cpi.int/states-parties (last visited Mar. 21, 2023), numerous courts have adopted its elements of crimes against humanity. *See, e.g., Jane W.*, 560 F. Supp. at 886; *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1353 (N.D. Ga. 2002); *Doe v. Drummond Co., Inc.*, No. 09-CV-1041, 2010 WL 9450019, at *9 (N.D. Ala. Apr. 30, 2010).

[38] While the court is certainly not bound by any decisions of international tribunals, courts can "consult authorities that provide an authoritative expression of the views of the international community even if, strictly speaking, the authority is not meant to reflect customary international law." *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1019–20 (9th Cir. 2014); *see also* Statute of the International Court of Justice art. 38(1)(d), Apr. 18, 1946, 33 U.N.T.S. 993 (stating that judicial decisions can provide "subsidiary means for the determination of rules of law").

conclusion). Here, the plaintiffs allege no facts that demonstrate a series of violent acts taken by the Government against them. Enforcing immigration laws is certainly not an act of violence. Even the more potentially disconcerting allegations, such as the Government's purported acts of coercion prior to the plaintiffs' respective reunifications, were not violent in nature. The most physical harms that plaintiffs experienced were discomfort during detention and physical manifestations of emotional trauma, but these too do not fall within the realm of violence.

Crimes against humanity might be one of the most difficult claims to properly raise in federal court. Indeed, the designation of "crime against humanity" is reserved only for those crimes that "exhibit especially wicked conduct that is carried out in an extensive, organized, and deliberate way, and that is plainly unjustified. It is th[e] kind of hateful conduct that might make someone a common enemy of all mankind." *Mamani v. Berzain*, 654 F.3d 1148, 1156 (11th Cir. 2011). In one case, plaintiffs had their claims of crimes against humanity dismissed by a court despite the defendants having supposedly killed nearly 70 individuals and injured approximately 400 over the course of two months. *See id.* The plaintiffs' factual allegations here do not arise even to that level. Accordingly, the court must properly dismiss the plaintiffs' crimes against humanity claims under Rule 12(b)(6).

## IV.    CONCLUSION

For the aforementioned reasons, the court will grant in part the Government's motion to dismiss. The court will dismiss the plaintiffs' negligent infliction of emotional distress claims under Count II, negligence claims under Count III, loss of consortium claims under Count V, torture claims under Count VI, and crimes against humanity claims under Counts VII and VIII. The court will also dismiss Mr. Q. and E.A.Q.A.'s abuse of process claims under Count IV. The court will deny the remainder of the Government's motion to dismiss.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.